LAW OFFICES OF
**MORGAN, LEWIS & BOCKIUS LLP**
101 PARK AVENUE
NEW YORK, NEW YORK 10178
(212) 309-6000
FAX: (212) 309-6273

ATTORNEYS FOR DEFENDANTS

# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| **PAULA KRITZMAN,** | : | |
| | : | |
| **Plaintiff,** | : | |
| | : | **06 CV 0233 (LAK)** |
| **v.** | : | |
| | : | |
| **AMERICAN EXPRESS RETIREMENT** | : | |
| **PLAN, AMERICAN EXPRESS** | : | |
| **COMPANY, AMERICAN EXPRESS** | : | |
| **COMPANY EMPLOYEE BENEFITS** | : | |
| **ADMINISTRATION COMMITTEE,** | : | *ELECTRONICALLY FILED* |
| **JOHN DOES 1-100** | : | |
| | : | |
| **Defendants.** | : | |
| | : | |

# MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS'
# MOTION TO DISMISS PLAINTIFF'S COMPLAINT

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ......................................................................................... iv

I.      INTRODUCTION ......................................................................................... 1

II.     BACKGROUND ........................................................................................... 2

    A.     Traditional Defined Benefit Plans.......................................................... 2

    B.     Cash Balance Plans ................................................................................. 3

III.    STATEMENT OF FACTS............................................................................. 4

    A.     The American Express Retirement Plan .................................................. 4

        1.    Contribution Credits.................................................................... 5

        2.    Interest ........................................................................................ 6

        3.    Account Balances ........................................................................ 7

IV.     ARGUMENT................................................................................................. 9

    A.     Count I Fails To State A Claim, Because The Amex Plan Is Not Age
        Discriminatory As A Matter Of Law....................................................... 9

        1.    The Amex Plan Does Not Reduce "The Rate Of An Employee's
            Benefit Accrual "Because Of The Attainment Of Any Age.". ................ 9

        2.    Plaintiff Errs In Suggesting That Age Discrimination Must Be
            Measured By Comparing Annual Benefit Amounts Payable At
            Different Times.......................................................................... 12

        3.    Plaintiff's Interpretation of ERISA Section 204(b)(1)(H) Is
            Inconsistent With The Legislative History And Leads To Absurd
            Results. ...................................................................................... 16

    B.     Counts II And III Fail To State A Claim Because The Opening Account
        Balances Were Not Age Discriminatory And Did Not Result In Any
        Impermissible Forfeitures. ...................................................................... 19

        1.    Count III Fails To State A Claim Because The Plan Does Not
            Cause Any Impermissible Forfeitures. ..................................... 19

        2.    Count II Fails To State A Claim Because The Setting Of Opening
            Account Balances Was Not Age Discriminatory. .................... 22

    C.     Count IV Fails To State A Claim Because The Amex Plan Does not
        Violate ERISA's 133 ⅓ Percent Rule. .............................................. 23

    D.     Count V Fails To State A Claim, Because The Amex Plan Complies With
        The Second Circuit's Decision In Esden v. Bank of Boston And IRS
        Notice 96-8............................................................................................. 25

        1.    The Governing Law ................................................................... 26

# TABLE OF CONTENTS
(continued)

**Page**

       2.     The Amex Plan Complies With Esden And Notice 96-8......................... 27

   E.     Count VI Fails Because Amex Provided A Summary Of Material Modification That Accurately Described The Terms Of The Cash Balance Plan And, In Any Event, This Claim Is Time-Barred. ...................................... 28

       1.     Amex Provided Participants Summaries Of Material Modifications And Summary Plan Descriptions That Accurately Described The Terms Of The Cash Balance Plan.......................................................... 28

       2.     Count VI Is Time-Barred Because Plaintiff Filed This Action More Than Six Years After Any Summary Of Material Modifications Was Required. ...................................................................................... 30

   F.     Count VII Fails Because Amex Provided The Requisite Notice And Because It Is Time-Barred. .................................................................. 31

   G.     Counts VIII Is Duplicative Of Other Claims In The Complaint And Fails To State A Claim. ................................................................................. 32

   H.     Count IX Is Duplicative Of Other Claims In The Complaint And Fails To State A Claim. ................................................................................. 33

V.     CONCLUSION.................................................................................................. 34

# TABLE OF AUTHORITIES

Page

## CASES

Alessi v. Raybestos-Manhattan, Inc., 451 U.S. 504, 101 S. Ct. 1895 (1981) ............20, 21

Barnhart v. Sigmon Coal Co., Inc., 534 U.S. 438, 122 S. Ct. 941 (2002) .................13, 15

Bonovich v. Knights of Columbus, 963 F. Supp. 143 (D. Conn. 1997)......................... 22

Chen v. U.S. Dept. of Justice, 434 F.3d 144 (2d Cir. 2006) ........................................... 17

Cooper v. IBM Personal Pension Plan, 274 F. Supp. 2d 1010 (S.D. Ill. 2003) ............... 10

Eaton v. Onan Corp., 117 F. Supp. 2d 812 (S.D. Ind. 2000) ....................................passim

Esden v. Bank of Boston, 229 F.3d 154 (2d Cir. 2000)..............................................passim

Flanigan v. Gen. Elec. Co., 242 F.3d 78 (2d Cir. 2001) ................................................ 13

Folker v. Johnson, 230 F.2d 906 (2d Cir. 1956)............................................................. 13

Helvering v. Morgan's Inc., 293 F. 121, 55 S. Ct. 60 (1934) ....................................... 13

Jones & Laughlin Steel Corp. v. Pfeifer, 462 U.S. 523, 103 S. Ct. 2541 (1983)............. 11

Levy v. Southbrook Int'l Invs., Ltd., 263 F.3d 10 (2d Cir. 2001)...................................... 4

Metz v. United Techs. Corp., 754 F.2d 63 (2d Cir. 1985) .............................................. 11

Miles v. New York State Teamsters Conf. Pension and Ret. Fund Employee
    Pension Benefit Plan, 698 F.2d 593 (2d Cir. 1983)............................................30, 31

Rothman v. Gregor, 220 F.3d 81 (2d Cir. 2000) ............................................................. 4

Siskind v. Sperry Ret. Program, 47 F.3d 498, 505 (2d Cir. 1995) ............................... 33

Sprint Spectrum L.P. v. Willoth, 176 F.3d 630 (2d Cir. 1999) ....................................... 15

Thornburg v. Gingles, 478 U.S. 30, 106 S. Ct. 2752 (1986)........................................... 17

Tootle v. ARINC, Inc., 222 F.R.D. 88 (D. Md. 2004)........................................10, 11, 14

## TABLE OF AUTHORITIES
(continued)

**Page**

U.S. v. Gaggi, 811 F.2d 47 (2d Cir. 1987).................................................................13, 15

U.S. v. Awadallah, 349 F.3d 42 (2d Cir. 2003).................................................................. 17

White v. Sundstrand Corp., 256 F.3d 580 (7th Cir. 2001).........................................20, 22

Williams v. Caterpillar, Inc., 944 F.2d 658 (9th Cir. 1991)..........................20, 21, 22, 23

## DOCKETED CASES

Engers v. AT&T Corp., No. 98-3660, 2001 U.S. Dist. LEXIS 25889
      (D.N.J. June 6, 2001)................................................................................................ 10

Lunn v. Montgomery Ward & Co., Inc. Ret. Sec. Plan, No. 97 C 3026,
      1998 WL 102751 (N.D. Ill. Feb. 26, 1998)............................................................. 22

Register v. PNC Fin. Servs., Group, No. 04-6097,
      2005 WL 3120268 (E.D. Pa. Nov. 21, 2005)......................................... 10, 11, 14, 26

Smith v. First Unum Life Ins. Co., No. 98-2415,
      1999 U.S. Dist. LEXIS 8381 (E.D.N.Y. June 2, 1999).......................................... 30

## STATUTES

26 C.F.R. § 1.411(d)-6T............................................................................................. 32

29 C.F.R. § 1.411 et seq.........................................................................................23, 24

29 U.S.C. § 1002(23).............................................................................................12, 14

29 U.S.C. § 1002(24) ................................................................................................. 8

29 U.S.C. § 1022....................................................................................................... 28

29 U.S.C. § 1022(a)................................................................................................... 28

29 U.S.C. § 1024(b)(1)............................................................................................... 30

29 U.S.C. § 1053....................................................................................................13, 20

29 U.S.C. § 1054.......................................................................................................13, 31

29 U.S.C. § 1054(c)(2)............................................................................................... 17

## TABLE OF AUTHORITIES
(continued)

**Page**

29 U.S.C. § 1054(c)(3) ................................................................. 14

29 U.S.C. § 1054(b)(1)(A)-(C) ...................................................... 23

29 U.S.C. § 1054(b)(1)(B) ........................................................ 15, 24

29 U.S.C. § 1054(b)(1)(B)(i) ...................................................... 24, 25

29 U.S.C. § 1054(b)(1)(H) ........................................................ 12, 15

29 U.S.C. § 1054(b)(1)(H)(i) ......................................................... 9

29 U.S.C. § 1054(c)(2) ................................................................. 17

29 U.S.C. § 1054(c)(3) ................................................................. 14

29 U.S.C. § 1054(g)(1) ................................................................. 25

29 U.S.C. § 1054(h) ................................................................. 31, 32

29 U.S.C. § 1055 ........................................................................ 13

Fed. R. Civ. P. 12(b)(6) ................................................................. 5

Pub. L. 107-16, § 659(b) .............................................................. 31

Rev. Rul. 81-12, 1981-1 C.B. 228 ................................................ 22

56 Fed. Reg. 47,524, 47,528 (Sept. 19, 1991) ............................. 18

## MISCELLANEOUS

Treasury Department I.R.S. Notice 96-8 ..............................26, 27, 28

H.R. Conf. Rep. 99-1012, 1986 U.S.C.C.A.N. 3868, 4026 ............ 16

Pension Benefit Guaranty Corp., Pension Insurance Data Book 2004, (2005), at
http://www.pbgc.gov/docs/2004databook.pdf (last visited February 2, 2006) ........... 4

**TABLE OF AUTHORITIES**
(continued)

**Page**

United States General Accounting Office, Report to Congressional Requesters,
    Private Pensions, Implications of Conversions to Cash Balance Plans,
    September, 2000 ................................................................................................. 19

## I.  **INTRODUCTION**

Plaintiff Paula Kritzman is a former employee of an affiliate of the American Express Company ("Amex") and a former participant in the American Express Retirement Plan ("the Amex Plan" or "the Plan").  The Plan is a form of pension plan commonly known as a "cash balance plan."  Plaintiff asserts nine separate claims under the Employee Retirement Income Security Act ("ERISA") in an attempt to obtain greater pension benefits than those to which she was entitled under the express terms of the Plan.  Plaintiff's allegations can be broken down into three categories:

- In Counts I-V, Plaintiff challenges the fundamental design of the Amex Plan as violating ERISA's age discrimination provision and violating ERISA's accrual and nonforfeitability rules.  Like the unsuccessful plaintiff in Eaton v. Onan Corp., 117 F. Supp. 2d 812 (S.D. Ind. 2000), Plaintiff in this case seeks a determination "that cash balance plans are essentially per se illegal."  Id. at 815.

- In Counts VI-VII, Plaintiff challenges the adequacy of communications made about the Amex Plan.

- In Counts VIII and IX, Plaintiff asserts catchall legal claims encompassing the factual and legal theories previously asserted.

Plaintiff has failed to state any claims upon which relief can be granted.  This Plan – and cash balance pension plans in general – do not violate ERISA's age discrimination provisions, nor does this Plan violate ERISA's nonforfeitability provisions or ERISA's accrual rules.  To the contrary, under the cash balance formula, older participants do at least as well as (and generally better than) similarly situated younger participants.  Moreover, all previously accrued benefits are protected under the express terms of the Plan and as required by law.  Plaintiff's attempt to

obtain greater benefits by mischaracterizing the terms of the Plan, the summary plan description ("SPD") and ERISA's statutory and regulatory provisions does not withstand scrutiny. Accordingly, the Complaint should be dismissed in its entirety.

## II.    BACKGROUND

In order to understand why Plaintiff's claims fail, a basic understanding of traditional pension plans, and cash balance plans, may be helpful.[1]

### A.    Traditional Defined Benefit Plans

When a person retires, a traditional defined benefit pension plan typically pays a participating retiree a fixed amount of money each year for life, payable in monthly installments. Typically, the annual pension benefit that an individual receives under a traditional defined benefit plan is a percentage of an employee's final salary multiplied by the employee's years of service.  As the Second Circuit explained in Esden v. Bank of Boston, 229 F.3d 154 (2d Cir. 2000):

> A conventional defined benefit plan, adopting a final-pay formula would credit the employee with a specific percentage of salary for each year of employment. For instance, an employee might accrue a pension of 1.5% of "salary" for every year of service. After 30 years of service he would have a pension equivalent to 45% of "salary." Salary may be defined as final salary, or the average of salary in the last five years.

Id. at 158 n.4 (citation omitted).

By design, participants under traditional pension plans earn most of their benefits in their last years of service.  The annual pension benefit for life that the participant is entitled to receive is generally referred to as an annuity, and has an actuarially equivalent present value based on interest rates and the participant's age and life expectancy.  In other words, using certain

---

[1]    For the convenience of the Court, this section provides background information regarding some relevant concepts under ERISA that is not specific to the facts of this case.

actuarial assumptions, the value of the annuity can be expressed as a lump sum value today. As explained in more detail below, ERISA governs the interest rate to be used in determining the actuarially equivalent value of pension benefits. Esden, 229 F.3d at 159.

Under a traditional plan, an employee who elects to take his benefit before age 65 generally would have his benefit amount actuarially reduced to account for the earlier time for payout. For example, if an employee is entitled to a benefit of $1,000 per month commencing at age 65, he might be entitled to receive a benefit of approximately $500 per month if he commences his benefit 10 years earlier, at age 55. The present value of these two benefits is the same, taking into account mortality (e.g., that payments will be made for an extra 10 years) and discounting to present value at the statutory discount rate.

Traditional plans, however, sometimes have *subsidized* early retirement benefits available as benefit options. A subsidized early retirement benefit is one that has a monthly payment that is greater than the present value of the normal retirement benefit. For example, if the employee in the above example was entitled to an early retirement benefit of $700 per month (instead of $500 per month), then the value of that early retirement benefit would be subsidized (enhanced) by $200 per month.

## B.    Cash Balance Plans

Although cash balance plans differ from traditional plans like those described above, they are a type of defined benefit plan. Esden, 229 F.3d at 158. Cash balance plans use a different formula for calculating the amount of pension benefits that an individual is to receive. Specifically,

> Under a cash balance pension plan, a hypothetical account is established in each participant's name. Benefits are credited to that "account" over time, driven by two variables: (1) the employer's hypothetical "contributions," and (2) hypothetical earnings expressed as interest credits. Employer "contributions" are usually expressed as a percentage of salary, the rate of which may vary with

3

> employee tenure.  Interest credits may be at a fixed interest rate, but more often they are tied to an extrinsic index-for example, U.S. Government securities of a specified maturity-and they vary accordingly.  Each year an employee receives a statement of her "account" balance, and can therefore see the value of her pension benefit.

Id.  These plans operate more like defined contribution arrangements (such as 401(k) plans), but they are subject to the legal constraints and rules applicable to defined benefit plans.

According to the Pension Benefit Guaranty Corporation, over 1,500 cash balance plans and other similar "hybrid" plans were in existence as of 2003, providing pension benefits to over 8 million participants, one quarter of the total population covered by defined benefit plans.  See Pension Benefit Guaranty Corp., Pension Insurance Data Book 2004, at 59 (2005), at http://www.pbgc.gov/docs/2004databook.pdf (last visited February 2, 2006).  This case is a challenge to the fundamental design of all of these plans.

### III.    STATEMENT OF FACTS

#### A.    The American Express Retirement Plan

Prior to 1995, the Amex Plan was a traditional defined benefit plan, whereby benefits were calculated based on an employee's final average compensation and years of service. (Complaint, ¶ 21, attached as Exhibit A).  In 1994, the Amex Plan was amended to a cash balance formula, effective July 1, 1995.  (Id., ¶ 22).

Under the cash balance formula, participants in the Amex Plan earn annual "Contribution Credits" based on a percentage of their salary and also earn interest credits, referred to in the Plan as "Imputed Earnings Credits."  (Plan, §§ 4.4, 4.6, attached as Exhibit B).[2]  These benefits are credited to an employee's account balance.

---

[2]    The Plan documents are properly considered at this juncture.  See Levy v. Southbrook Int'l Invs., Ltd., 263 F.3d 10, 13 n.3 (2d Cir. 2001) ("We note that it was appropriate for the district court to refer to the documents attached to the motion to dismiss since the documents were referred to in the complaint.");  Rothman v. Gregor, 220 F.3d 81, 88 (2d

1.    **Contribution Credits**

Under the Amex Plan, Contribution Credits are added to an employee's account based on a percentage of the employee's covered compensation.  Contribution credit rates *are age and service favored*; that is, older employees receive a Contribution Credit rate that is the same as, or higher than, younger employees with the same service.  Similarly, longer service employees receive a Contribution Credit rate that is the same as, or higher than, shorter service employees of the same age.  The Contribution Credit rates are as follows:[3]

| Participant's Combined Age and Years of Service as of December 31 | Contribution Credit Rate |
|---|---|
| Less than 35 | 2.50% |
| 35-44 | 3.25% |
| 45-59 | 4.25% |
| 60-74 | 5.75% |
| 75-89 | 8.00% |
| 90 or more | 10.00% |

(Plan, § 4.4).  The example alleged in the Complaint (¶ 40) provides a useful illustration of the operation of the Plan.  A 35 year old employee with 8 years of service earning $100,000 per year, would have a combined age and service of 43, and therefore would receive a Contribution Credit for the year of $100,000 x 3.25% = $3,250.  A 50 year old employee with the same 8 years of service earning the same salary would have a combined age and service of 58 and

---

Cir. 2000) ("For purposes of a motion to dismiss, we have deemed a complaint to include any written instrument attached to it as an exhibit or any statements or documents incorporated in it by reference. . . and documents that the plaintiffs either possessed or knew about and upon which they relied in bringing the suit.") (internal citations omitted). To the extent the Court deems certain written communications to be beyond the scope of the pleadings, Amex asks that the Court treat this Motion as one for summary judgment with respect to these communications, in accordance with Fed. R. Civ. P. 12(b)(6).  The attached affidavit of Valeria Christensen authenticates these communications.

[3]    For certain employees designated as "Cost-Center" employees, each of these rates is divided by two.  (Plan, § 4.4).  The formula still favors older and longer service employees.

therefore would receive a Contribution Credit of $100,000 x 4.25% = $4,250.  Assuming these

two employees have the same salary, salary history, and service, their annual Contribution

Credits would be calculated as follows:

**Table 1**

| Year | Year of Service | Salary* | Employee A | | Employee B | |
|---|---|---|---|---|---|---|
| | | | Age | Contribution Credits | Age | Contribution Credits |
| 2006 | 8 | $100,000 | 35 | $3,250 | 50 | $4,250 |
| 2007 | 9 | $106,000 | 36 | $4,505 | 51 | $6,095 |
| 2008 | 10 | $112,360 | 37 | $4,775 | 52 | $6,461 |
| 2009 | 11 | $119,102 | 38 | $5,062 | 53 | $6,848 |
| 2010 | 12 | $126,248 | 39 | $5,366 | 54 | $7,259 |
| 2011 | 13 | $133,823 | 40 | $5,687 | 55 | $7,695 |
| 2012 | 14 | $141,852 | 41 | $6,029 | 56 | $8,156 |
| 2013 | 15 | $150,363 | 42 | $6,390 | 57 | $8,646 |
| 2014 | 16 | $159,385 | 43 | $6,774 | 58 | $9,165 |
| | | Totals | | $47,838 | | $64,575 |

\* - Assumes 6% annual salary increases for both employees.

**2.    Interest**

Participants' accounts also are credited with interest.  The amount of interest is

determined by multiplying the participant's account balance by the interest rate set forth in the

plan.[4]  (Plan, § 2.27, 4.6).  The interest rate is the rate for 5-year Treasury Securities, subject to a

minimum and maximum rate.  (Plan, § 2.27).  The minimum rate is 5%.  (Id.).  The maximum

rate is the lesser of 10% or the rate on 30 year Treasury Securities.  (Plan, §§ 2.9, 2.27).  If,

however, the rate on 30 year Treasury Securities is less than 5%, then the 5% minimum rate

applies.  (Id.).

Importantly, the interest rate is the same for all participants, *regardless of age*.  In

addition, interest is earned regardless of whether the employee continues employment.  That is,

---

[4]    Interest also is earned on the Contribution Credits earned during the year.

interest is earned on the account balance even after an employee's employment ends, until the employee commences receipt of his/her benefits.

### 3.    Account Balances

Employees who joined Amex *after* the cash balance plan was implemented in 1995 were given an initial account balance of zero dollars at the commencement of their employment. (Plan, § 4.2; Complaint, ¶ 24). Employees who participated in the prior traditional defined benefit plan were given opening account balances equal to the present value of their age-65 benefits under the prior plan. (Plan, § 4.2; Complaint, ¶ 24 (opening account balances were "based upon a determination of the present value of their accrued benefits under the Prior Formula")). Older employees, i.e., employees over age 45, then had their opening account balances *increased* by a percentage of the value of the subsidized early retirement benefits the participants earned under the prior formula. (Plan, § 4.2(a)-(d); Complaint, ¶ 24 and n.3). Thus, keeping with the example in the Complaint, a 50 year old employee would receive a higher opening account balance than a similarly situated 35 year old employee.

Every year, the account balances were increased by the amount of the employees' Contribution Credits and interest. For the employees in Chart 1, the account balances would grow as follows:

7

**Table 2**

| Year | Year of Service | Salary | Employee A | | | Employee B | | |
|---|---|---|---|---|---|---|---|---|
| | | | Age | Account Balance | Annual Change | Age | Account Balance | Annual Change |
| 2006 | 8 | $100,000 | 35 | $75,000 | | 50 | $75,000 | |
| 2007 | 9 | $106,000 | 36 | $84,005 | $9,005 | 51 | $85,595 | $10,595 |
| 2008 | 10 | $112,360 | 37 | $93,821 | $9,816 | 52 | $97,191 | $11,596 |
| 2009 | 11 | $119,102 | 38 | $104,512 | $10,691 | 53 | $109,871 | $12,680 |
| 2010 | 12 | $126,248 | 39 | $116,148 | $11,636 | 54 | $123,723 | $13,852 |
| 2011 | 13 | $133,823 | 40 | $128,804 | $12,656 | 55 | $138,841 | $15,118 |
| 2012 | 14 | $141,852 | 41 | $142,561 | $13,757 | 56 | $155,328 | $16,487 |
| 2013 | 15 | $150,363 | 42 | $157,505 | $14,944 | 57 | $173,293 | $17,966 |
| 2014 | 16 | $159,385 | 43 | $173,729 | $16,224 | 58 | $192,856 | $19,562 |

 * - Assumes both employees start with $75,000 in their accounts as of 12/31/06, 6% annual salary increases for both employees, and 6% interest rate.  Interest was not compounded for purposes of these calculations.

Of note, the account balance of the older employee exceeds the account balance of the similarly situated younger employee at every point in time.

Participants in the Amex Plan do not need to wait until any particular age to receive their benefits, but rather may elect to take their benefits at any time after the termination of employment.[5]  (Plan, § 7.5).  Benefits may be paid as an annuity, i.e., a stream of monthly payments, or in a lump sum, at the employee's option.  (Plan, §§ 7.1-7.3).  Generally, the amount of the benefit is the account balance (if a lump sum) or the actuarial equivalent of the employee's account balance (if some other benefit form is elected).  There are, however, two exceptions to this rule:

---

[5]    Normal retirement age is defined in the Plan as age 65.  (Plan, § 2.37).  See also 29 U.S.C. § 1002(24).  Nevertheless, employees who continue working past age 65 continue to earn Contribution Credits and interest like every other employee, and they need not commence their benefits until they terminate employment.

(1)    The Amex Plan contains several provisions to protect the benefits to which an employee was entitled under the prior plan.  In particular, the Plan provides that an employee is entitled in all cases to the greater of his benefit under the cash balance formula or his previously earned benefit.  Accordingly, if a particular employee's prior plan benefit at a particular age is greater than the value of that employee's account balance at that age, the *higher* prior plan benefit is paid.  (Plan, § 2.1; Article 14).  In this way, the Plan ensures that no participant ever receives less than his prior benefit.

(2)    Under the terms of the Plan, the interest rate in the Plan cannot exceed the 30 year Treasury Securities (which, as explained <u>supra</u>, is the statutory discount rate under ERISA for determining present value) *unless* the 5% minimum rate applies <u>and</u> that 5% rate is higher than the rate on 30 year Treasury securities.  (Plan, §§ 2.9, 2.27).  Under these circumstances, the Plan determines the amount of interest the participant would have earned by projecting the employee's account balance forward to age 65 at the Plan's interest rate.  (Plan, § 7.3(c)).  The Plan then requires that the account balance be discounted back to present value at the statutory discount rate.  (<u>Id</u>.).  This process of projecting forward and discounting back is known in ERISA parlance as a "whipsaw."

## IV.    **ARGUMENT**

**A.    Count I Fails To State A Claim, Because The Amex Plan Is Not Age Discriminatory As A Matter Of Law.**

**1.    The Amex Plan Does Not Reduce "The Rate Of An Employee's Benefit Accrual "*Because Of* The Attainment Of Any Age.".**

Count I fails to state a claim for relief because the terms of the Plan demonstrate unequivocally that there is no reduction in the "rate of future benefit accrual[s] . . . *because of the attainment of any age*."  29 U.S.C. § 1054(b)(1)(H)(i) (emphasis added).  To the contrary, benefits under the Amex Plan, and the accrual of those benefits, increase with age.  The

Contribution Credit rate is the same or higher for older employees than similarly situated younger employees. Moreover, the interest rate under the Amex Plan is the same for all participants, regardless of age. As a result, the account balance of the older employee at every point in time will be the same as or higher than the account balance of a younger employee with the same service and salary. Thus, in any given year, the older employee's benefit will equal or exceed the benefit payable to a similarly situated (i.e., same salary history and years of service) younger employee. This, of course, cannot be age discrimination.

For this reason, and with one exception, courts have consistently rejected claims that cash balance plans are age discriminatory.[6] See Eaton v. Onan, Corp., 117 F. Supp. 2d 812 (S.D. Ind. 2000); Tootle v. ARINC, Inc., 222 F.R.D. 88 (D. Md. 2004); Register v. PNC Fin. Servs., Group, No. 04-6097, 2005 WL 3120268 (E.D. Pa. Nov. 21, 2005); Engers v. AT&T Corp., No. 98-3660, 2001 U.S. Dist. LEXIS 25889 (D.N.J. June 6, 2001).[7] These courts have held that age discrimination claims involving a cash balance plan must be examined by looking at changes to the account balance from year to year. See, e.g., Register, 2005 WL 3120268, at *7 ("Cash balance plans are not defined in terms of an age 65 annuity, rather they are defined in terms of an account balance that grows with pay credits and interest. Therefore, it follows logically that the rate of benefit accrual is determined by the change in the account balance."); Eaton, 117 F. Supp. 2d at 832-33 ("[T]he rate of benefit accrual [in a cash balance plan] should be defined as the

---

[6]   Not all of the plans in these other cases favor older employees by providing higher pay credits to such persons. The Amex Plan is actually more generous to older employees in that respect.

[7]   The sole exception is Cooper v. IBM Personal Pension Plan, 274 F. Supp. 2d 1010 (S.D. Ill. 2003), which, Defendants submit, was wrongly decided. Cooper is on appeal to the United States Court of Appeals for the Seventh Circuit, Case No. 05-3588. The American Benefits Council, the ERISA Industry Committee, and several large employers submitted an amicus brief to the Seventh Circuit in Cooper urging reversal of the district court decision because of its implications for the pension plan community as a whole.

change in the employee's cash balance account from one year to the next."); Tootle, 222 F.R.D. at 94 (same). As reflected in Table 2, applying this same test to the Amex Plan confirms that there is no age discrimination.

Nevertheless, and as is clear on the face of the Complaint, Plaintiff engages in a disingenuous arithmetic exercise to try to find age discrimination. Specifically, Plaintiff claims that the Amex Plan is age discriminatory based on the "*comparative annuity values at normal retirement age*" of an older and younger participant. (Complaint, ¶ 39). In other words, Plaintiff argues that the Amex Plan is age discriminatory by comparing the annual payment that a 50 year-old will get *in 2021* (when he turns 65) against the annual payment that a 35 year-old will get *in 2036* (when he turns 65). Such a comparison, however, makes no sense because the 50 year old's benefit is paid out *15 years earlier* than the 35 year old's benefit, and therefore has 15 fewer years to accumulate interest. This is not age discrimination; it merely reflects the time value of money.[8] That is particularly true here, because the younger and older participant can elect to receive their benefits *at the same time* and, if they do so, the older employee will always receive at least as much or more money than the younger employee. In short, under the Amex Plan, the older participant earns interest at the same rate as the younger participant, and has the same, or higher, Contribution Credit rate. At any point in time, the account balance for an older

---

[8]    See, e.g., Metz v. United Techs. Corp., 754 F.2d 63, 66 (2d Cir. 1985) ("[I]n computing the damages recoverable for the deprivation of future benefits, the principle of limiting the recovery to compensation requires that adequate allowance be made, according to circumstances, for the earning power of money; in short, that when future payments or other pecuniary benefits are to be anticipated, the verdict should be made up on the basis of their present value only.") (citations omitted); Jones & Laughlin Steel Corp. v. Pfeifer, 462 U.S. 523, 536-37, 103 S. Ct. 2541, 2550 (1983) ("In all cases where it is reasonable to suppose that interest may safely be earned upon the amount that is awarded, the ascertained future benefits ought to be discounted in the making up of the award.") (internal quotations omitted).

employee will always be the same as or higher than the account balance of a similarly situated younger employee. There is no age discrimination.

### 2.    Plaintiff Errs In Suggesting That Age Discrimination Must Be Measured By Comparing Annual Benefit Amounts Payable At Different Times.

Plaintiff presumably will argue[9] that the Amex Plan – and all cash balance plans – are age discriminatory because this Court is *required* to base its age discrimination analysis on a comparison of benefits payable at different times, i.e., comparing the age 65 annuity payable to the 50-year old *in 15 years* against the age 65 annuity payable to the 35-year old *in 30 years*. Nothing in ERISA requires such an economically unsound and bizarre result.

Plaintiff's position necessarily is premised on stringing together three leaps of faith and a strained statutory construction.  More specifically, Plaintiff's argument requires:

- that the phrase "rate of benefit accrual" in ERISA Section 204(b)(1)(H), 29 U.S.C. § 1054(b)(1)(H), be interpreted to mean the exact same thing as the term "accrued benefit" – a specifically defined term under ERISA.  See 29 U.S.C. § 1002(23);

- that the term "accrued benefit" be limited to a benefit expressed as an age 65 annuity; and

- that these differences are because of age discrimination, as opposed to the effect of the time value of money on the amount of the benefit.

Each of these premises is wrong.

First, the phrase "benefit accrual" is not the same thing as the defined term "accrued benefit" under ERISA.  To the contrary, when Congress intended to refer to the accrued benefit,

---

[9]    Although Plaintiffs have not specifically articulated this argument in their Complaint, this is the same argument raised, and rejected, in all of the other cases cited supra.

it used the words "accrued benefit" in the statute.  See, e.g., 29 U.S.C. §§ 1053, 1054, 1055.

That Congress chose to use different words – "benefit accrual" – in Section 204(b)(1)(H) reflects

that Congress intended a different meaning.  See Barnhart v. Sigmon Coal Co., Inc., 534 U.S.

438, 452, 122 S. Ct. 941, 951 (2002) ("[I]t is a general principle of statutory construction that

when Congress includes particular language in one section of a statute but omits it in another

section of the same Act, it is generally presumed that Congress acts intentionally and purposely

in the disparate inclusion or exclusion.") (internal quotations omitted); U.S. v. Gaggi, 811 F.2d

47, 56 (2d Cir. 1987) ("We presume that the use of different terminology within a body of

legislation evidences a Congressional purpose to differentiate.").[10]  Unlike the term "accrued

benefit," the phrase "benefit accrual" has no specific definition under ERISA.  As the Eaton

court held:

> The concept of the "benefit accrual rate" does not have a single, self-evident
> meaning, especially in the world of pension plan regulation.  The term is used and
> defined in different ways and for different purposes under ERISA and the Internal
> Revenue Code.

---

[10]    Indeed, in a complex statute like ERISA, even the same words in different provisions of
the same statute can be interpreted differently if the provisions serve different purposes.
See Folker v. Johnson, 230 F.2d 906, 908 (2d Cir. 1956) ("[T]he same phrase used in
different parts of a complex statute does not necessarily carry the same meaning in the
two different contexts."); Helvering v. Morgan's Inc., 293 U.S. 121, 128, 55 S. Ct. 60, 63
(1934) ("It is no answer to the arguments of respondent to say, as the Government does,
that the meaning of the phrase 'taxable year' must be the same throughout the section.
The same meaning need not always be attributed to a phrase which, by hypothesis, has
more than one meaning for purposes of statutory construction.").

Eaton, 117 F. Supp. 2d at 830 (also collecting examples).[11]  See also Register, 2005 WL 3120268, at *7 (same).  The Register, Eaton and Tootle courts specifically rejected the argument that "accrued benefit" under ERISA necessarily must mean the same thing as "benefit accrual." See Register, 2005 WL 3120268, at *6 ( "ERISA does not define the 'rate of an employee's benefit accrual' for purposes of applying the ERISA age discrimination provisions."); Eaton, 117 F. Supp. 2d at 829-30 ("[T]hese provisions [Section 204(b)(1)(H)] do not require a measure of a participant's rate of benefit accrual that is based solely on the value of the participant's annuity payable at normal retirement age."); Tootle, 222 F.R.D. at 93-94 (same).

Second, contrary to the premise of Plaintiff's argument, even if the term "benefit accrual" was the same as the term "accrued benefit," there is no reason that such a benefit must be expressed in the form of an age-65 annuity.  ERISA Section 102(23) defines "accrued benefit" as "the individual's accrued benefit determined under the plan and, *except as provided in section 1054(c)(3)* of this title, expressed in the form of an annual benefit commencing at normal retirement age."  29 U.S.C. § 1002(23)(A) (emphasis added).  29 U.S.C. § 1054(c)(3), in turn, provides that:

> For purposes of this Section, in the case of any defined benefit plan, if an employee's accrued benefit is to be determined as an amount other than an annual benefit commencing at normal retirement age. . . the employee's accrued benefit . . . shall be the actuarial equivalent of such benefit.

29 U.S.C. § 1054(c)(3) (emphasis added).  Thus, ERISA specifically permits an accrued benefit "to be determined as an amount other than an annual benefit commencing at" age 65.  Id.

---

[11]    The Eaton court further held:

> The argument distinguishing between "accrued benefit" and "rate of benefit accrual" may seem like pretty fine hair splitting.  Nevertheless, pension law is a highly technical field where hairs are split with ever finer razors.

Eaton, 117 F. Supp. 2d at 830 n.8 (internal parenthetical omitted).

Not surprisingly, when Congress intended to require parties to compare benefits payable at age 65, *it specifically said so in the statute.*  For example, ERISA's "backloading" rules provide in relevant part that "[a] defined benefit plan satisfies the requirements of this paragraph for a particular plan year if under the plan the accrued benefit payable at the normal retirement age is equal to the normal retirement benefit."  29 U.S.C. § 1054(b)(1)(B) (emphasis added).  If the term "accrued benefit" itself automatically requires that the benefit be measured at normal retirement age, as Plaintiff alleges, the emphasized language in the statute – "payable at normal retirement age" – would be superfluous.  Such a tortured interpretation is contrary to the canons of statutory construction.  See, e.g., Sprint Spectrum L.P. v. Willoth, 176 F.3d 630, 640 (2d Cir. 1999) ("It is a well-settled rule of statutory construction that courts should disfavor interpretations of statutes that render language superfluous."), quoting Connecticut Nat'l Bank v. Germain, 503 U.S. 249, 253, 112 S. Ct. 1146, 1149 (1992) (internal quotations omitted).[12]

Lastly, as explained previously, any negative difference in the age-65 annuity benefit of an older participant compared to a younger participant is due exclusively to differences in the number of years to payout of the benefit.  Such differences are not "because of age."  Thus, regardless of how the rate of accrual is measured, there is no age discrimination and Plaintiff's claim fails as a matter of law.

---

[12]    Indeed, the above-quoted statute is instructive specifically because it differs so markedly from the language in Section 204(b)(1)(H), the provision at issue in this case.  Had Congress intended Section 204(b)(1)(H), 29 U.S.C. § 1054(b)(1)(H), to be tested the same way the backloading rules are tested, Congress could have used the same language, or could at least have added the phrase "payable at normal retirement age" to Section 204(b)(1)(H), as it did with the backloading rules.  That different language was used – "rate of benefit accrual" and without any reference to when the benefit was payable – confirms that a different meaning was intended.  See Barnhart, 534 U.S. at 452, 122 S. Ct. at 951; Gaggi, 811 F.2d at 56.

15

**3.      Plaintiff's Interpretation of ERISA Section 204(b)(1)(H) Is Inconsistent With The Legislative History And Leads To Absurd Results.**

Not only does Plaintiff's interpretation of Section 204(b)(1)(H) conflict with any reasonable understanding of age discrimination, ERISA's statutory framework, and the overwhelming weight of precedent, but it also is inconsistent with the legislative history behind the statute and leads to absurd results.

As the Eaton court explained, when Congress enacted Section 204(b)(1)(H), it provided an example in the Conference Report of how the statute should work to ensure that Plans were not discriminating.  See Eaton, 117 F. Supp. 2d at 830, citing H.R. Conf. Rep. 99-1012, 1986 U.S.C.C.A.N. 3868, 4026.  If Plaintiff's interpretation of Section 204(b)(1)(H) were correct, however, the example in the Conference Report would itself be illegal because the accrual formula described – when measured in terms of an age-65 annuity – decreases with age. Specifically, the first accrual described in the example is $10 per month at age 65.  See H.R. Conf. Rep. 99-1012, 1986 U.S.C.C.A.N. 3868, 4026.  The second accrual also is $10 per month, but this time to an age 66 annuity.  See id.  When that amount is converted to an age-65 annuity (as Plaintiff's interpretation of Section 204(b)(1)(H) would require), the amount is less than $10 per month, because $10 per month starting at age 66 is worth less than $10 per month starting at age 65.[13]  See Eaton, 117 F. Supp. 2d at 830.  The same is true with the third accrual of $10 per month at age 67, because that is less than $10 per month at $66 (and even less per month at age 65).  See id.  Yet, the example in the Conference Report reflects how plans are supposed to comply with the statute.  The Eaton court explained:

> Under plaintiffs' interpretation of the statutes, however, if benefit accruals after normal retirement age must be measured in terms of annuities payable at normal retirement age, i.e., in a year before the benefit accruals are earned, then the

---

[13]      This is due to the additional year of payout of the benefit from age 65 to age 66.

> example in the Conference Report itself would become illegal! . . . . <u>Yet the</u>
> <u>OBRA 1986 Conference Report included this example to describe the intended</u>
> <u>effect of compliance with the new law. Plaintiffs' interpretation would transform</u>
> <u>that example of compliance into an example of a violation. That is a strong sign</u>
> <u>that there is a problem with plaintiffs' interpretation.</u>

<u>Eaton</u>, 117 F. Supp. 2d at 830 (emphasis added, internal citation omitted).  The Conference

Report is "the most authoritative source[] on the meaning of legislation."  <u>Chen v. U.S. Dept. of</u>

<u>Justice</u>, 434 F.3d 144, 153 (2d Cir. 2006).[14]  Congress could not have intended the statute to

render its own example – in its own Conference Report – illegal.  Plaintiff's interpretation of

Section 204(b)(1)(H) cannot stand.

Plaintiff's construction of Section 204(b)(1)(H) also would render certain types of

traditional defined benefit plans (plans that are specifically authorized in ERISA Section

204(c)(2), 29 U.S.C. § 1054(c)(2)) illegal because the age 65 annuity benefit in such plans is

affected by the number of years to payout of the benefit.  <u>See</u> <u>Eaton</u>, 117 F. Supp. 2d at 830.

Indeed, as an economics matter, the interest earned in cash balance plans over time is no

different than the effects of interest in defined contribution plans, or of cost of living increases

under the Social Security system.  <u>See</u> <u>id.</u> at 831.  Such economic realities are perfectly lawful in

these contexts.  As the <u>Eaton</u> court explained, "[i]t is difficult to fathom why Congress might

have wanted to outlaw similar effects under defined benefit plans."  <u>Id.</u>[15]  To the contrary, the

Treasury Department – the agency charged with interpreting and enforcing ERISA – has already

---

[14]    <u>See also</u> <u>Thornburg v. Gingles</u>, 478 U.S. 30, 43, 106 S. Ct. 2752, 2763 n.7 (1986) ("We
have repeatedly recognized that the authoritative source for legislative intent lies in the
Committee Reports on the bill."); <u>U.S. v. Awadallah</u>, 349 F.3d 42, 54 (2d Cir. 2003)
("[T]he authoritative source for finding the Legislature's intent lies in the Committee
Reports on the bill, which represen[t] the considered and collective understanding of
those Congressmen involved in drafting and studying proposed legislation.") (internal
quotation marks omitted).

[15]    The <u>Eaton</u> court also identified a number of other policy reasons undercutting the
interpretation of ERISA's age discrimination provision advanced by Plaintiff here.  <u>See</u>
<u>Eaton</u>, 117 F. Supp. 2d at 829-834.

determined that the mere fact that interest credits grow with time does not render cash balance plans age discriminatory. As stated in the preamble to regulations issued by the Treasury Department under Code § 401(a)(4) (dealing with benefits that favor highly compensated employees):

> The fact that interest adjustments through normal retirement age are accrued in the year of the related hypothetical allocation will not cause a cash balance plan to fail to satisfy the requirements of § 411(b)(1)(H), relating to age-based reductions in the rate at which benefits accrue under the plan.

56 Fed. Reg. 47,524, 47,528 (Sept. 19, 1991). Such an interpretation by the Treasury Department is not surprising when one considers that "cash balance plans fix the problem Congress was trying to solve" when it enacted Section 204(b)(1)(H):

> An employee who continues to work past the normal retirement age continues to accrue pay credits (unless the plan has a lawful cap not tied to age, such as a maximum number of years of service that can be credited). She also continues to accrue interest credits on her entire cash balance, so that her benefits continue to grow beyond normal retirement age. In fact, a cash balance plan will make many such older workers better off than the law requires. Federal law allows a plan not only to suspend payment of benefits for a plan participant who works past normal retirement age, but to do so without increasing the benefits to account for the fact that they are paid later.

Eaton, 117 F. Supp. 2d at 831.

In sum, Plaintiff's interpretation of ERISA's age discrimination provision is inconsistent with precedent, statutory text and legislative history, common sense and fundamental economic principles. Under the Amex Plan, the interest rate used in the Plan is the same for all participants and the Contribution Credit rate increases with age. An older participant is provided a benefit that is at least as valuable as – and generally more valuable than – the benefit provided to a similarly situated younger employee. There is no age discrimination, so Count I should be dismissed.

**B.** **Counts II And III Fail To State A Claim Because The Opening Account Balances Were Not Age Discriminatory And Did Not Result In Any Impermissible Forfeitures.**

Counts II and III of the Complaint essentially challenge the Plan's formula for calculating opening account balance as: (1) age discriminatory (Count II) or (2) causing an impermissible forfeiture of benefits (Count III).

At a fundamental level, Plaintiff's challenges to the formula for calculating opening account balances fail because:

> [C]urrent federal law does not govern how plan sponsors set opening hypothetical account balances for cash balance plans, provided that a plan ensures that participants do not receive less than the present value of prior accrued benefits if they separate from the employer.

United States General Accounting Office, Report to Congressional Requesters, Private Pensions, Implications of Conversions to Cash Balance Plans, September, 2000, p.30 (emphasis added). Here, the terms of the Plan unambiguously do exactly what is required. Specifically, Section 2.1 of the Plan provides that:

> A Participant's Accrued Benefit shall, in no event, be less than a Participant's accrued benefit as of June 30, 1995, under the Predecessor Plans, which is preserved pursuant to the provisions of Article 14.

(Plan, § 2.1). Accordingly, for any participant – regardless of age – the participant's previously accrued benefit is protected. ERISA requires nothing more. There is no age discrimination and no impermissible forfeiture.

Furthermore, Plaintiff's claims in this case fail to state any claim upon which relief could be granted for the reasons set forth below.

**1.** **Count III Fails To State A Claim Because The Plan Does Not Cause Any Impermissible Forfeitures.**

Under ERISA § 203, every pension plan must "provide that an employee's right to his normal retirement benefit is non-forfeitable upon the attainment of normal retirement age . . ."

and satisfaction of the Plan's vesting rules. 29 U.S.C. § 1053 (emphasis added). Without

providing any details, Plaintiff claims that the Amex Plan somehow violates this provision of

ERISA because it provides employees the greater of two benefit formulas. (Complaint, ¶¶

50,51). Plaintiff is wrong.

In Alessi v. Raybestos-Manhattan, Inc., 451 U.S. 504, 101 S. Ct. 1895 (1981), the

Supreme Court held that:

> the statutory definition of "nonforfeitable" assures that an employee's claim to the
> protected benefit is legally enforceable, but it does not guarantee a particular
> amount or a method for calculating the benefits.

Id. at 512, 1900 (emphasis added and citation omitted). Consistent with Alessi, courts repeatedly

have held that ERISA's nonforfeitability provision does not prohibit a plan from providing

participants with the greater of two benefit formulas. Rather, ERISA's nonforfeitability

provision simply requires that whatever benefits the plan provides – and whatever formula or

combination of formulas are used – those benefits are actually paid to participants. The Seventh

Circuit explained in White v. Sundstrand Corp., 256 F.3d 580 (7th Cir. 2001), that:

> Any pension plan giving retirees the greater of two amounts, as opposed to the
> sum of these amounts, can be described as confiscating the difference. . . . But
> under ERISA that is neither here nor there. The Employee Retirement Income
> Security Act does not require employers to establish plans that are particularly
> favorable to employees.

Id. at 582-83.

Recognizing this totally acceptable, and lawful, form of pension plan design, courts have

rejected challenges virtually identical to those asserted here. In Williams v. Caterpillar, Inc., 944

F.2d 658 (9th Cir. 1991), for example, Caterpillar maintained union and management pension

plans that were part of an "integrated system." Id. at 662. Under the integrated plan, employees

who retired would receive the greater of either their management pension or their union pension,

but would not receive both.  Id. at 663.  A number of former employees who had been demoted from management into the union 1 to 5 years before their retirements filed suit.  Like Plaintiff in the instant case, they alleged that the benefits they accrued under the union plan were forfeitable because they would not receive those benefits if they received their management plan benefits. Id. at 662.  Specifically, these former employees claimed – as Plaintiff contends here – that:

> Although receiving the higher of these two figures [the management or union pensions] would appear to be the result that appellants would want, appellants contend that even the Management Plan figure is impermissibly low.  Because that [management] plan did not give credit for any years of service *after their demotions*, it does not literally compensate appellants for those years.  Technically, appellants fell under the coverage of the Union Plan for their final years, but because that plan produced a lower figure [of retirement benefits] and was "offset" by the Management Plan amount, appellants actually received no additional incremental benefit allocable to those final years.  In short, under Caterpillar's calculations, appellants would have received the very same pensions that they are now receiving if they had been eligible to retire and had retired on the dates on which they received their demotions, rather than one to five years later.

Id. at 663 (italics in original).  Therefore, the plaintiffs argued, the plans "worked an impermissible forfeiture of nonforfeitable vested benefits" and violated ERISA.  Id. at 662 (internal quotations omitted).  The Ninth Circuit rejected the plaintiffs' claim, holding that:

> [T]he Caterpillar plans *do* take all of appellants' years of service into account.  It only appears otherwise because of the offset provision:  the Union Plan, which credits appellants for 100% of the time they have devoted to the company, would yield a lower pension benefit than the Management Plan, which does not, and so pursuant to the offset, Caterpillar has given appellants the greater Management Plan amount.

Id. at 663 (emphasis in original).

The same is true here.  Plaintiff's years of service are taken into account under the cash balance formula.  If the cash balance formula yields a lower benefit than the prior plan's benefit formula, however, the higher benefit is paid.  This can only work to the advantage of employees because it ensures that employees always receive the highest benefit to which they are entitled.

Under Section 2.1 and Article 14 of the Amex Plan, every participant's right to his or her normal retirement benefit is nonforfeitable upon the attainment of normal retirement age and satisfaction of the Plan's vesting rules. It is impossible under the Amex Plan for any employee to receive a lower benefit amount than that to which the employee was entitled previously. Consistent with White and Williams, supra, there is no forfeiture and Count III fails to state a claim for relief.[16]

**2.      Count II Fails To State A Claim Because The Setting Of Opening Account Balances Was Not Age Discriminatory.**

In Count II, Plaintiff alleges that the Plan's formula for calculating opening account balances is age discriminatory. As explained previously, however, opening account balances for all employees were based on the present value of the benefit earned under the prior formula. Employees over age 45 then had their opening account balances *increased* to account for the value of early retirement subsidized benefits to which the employee was entitled. Thus, the formula for calculating opening account balances favored older employees. This was not age discrimination.

Plaintiff also suggests that there was age discrimination because there was a longer "wear-away" period[17] for older employees. That conclusory assertion is devoid of any factual

---

[16]    See also Rev. Rul. 81-12, 1981-1 C.B. 228 (approving "greater of" feature to protect accrued benefits following amendment of a plan's actuarial factors); Lunn v. Montgomery Ward & Co., Inc. Ret. Sec. Plan, No. 97 C 3026, 1998 WL 102751, at *6 (N.D. Ill. Feb. 26, 1998) (granting a motion to dismiss and holding that "[b]enefits provided by one plan may be offset by benefits received under other plans provided by the same employer"); Bonovich v. Knights of Columbus, 963 F. Supp. 143, 146-48 (D. Conn. 1997) (dismissing forfeiture claim because "plaintiffs overlook the fact that deduction of their benefit-like renewal commissions is itself part of the formula for determining the amount of their pension benefits, and because ERISA does not control the content and calculation method of plan benefits, [defendant] may integrate participants' pension plan benefits with their renewal commissions.").

[17]    Wear-away is a period of time during which a participant accrues new benefits under one benefit formula, but because those benefits are less than benefits earned under a different formula, the overall amount of benefits does not change for a period of time. In other

allegations and is based solely on legal conclusions or generalizations having no relationship to the Amex Plan, let alone to Plaintiff's benefit under the Plan. Plaintiff's theory in Count II appears to be that because the prior formula under the pre-cash balance arrangement was so heavily age-favored, switching to a less age favored formula constitutes age discrimination. That is nonsensical. Under the cash balance formula, older employees and younger employees accrue benefits each time they receive Contribution Credits or interest. As explained, these cash balance accruals are age-favored. As in <u>Williams</u>, these accruals are taken into account for all participants, regardless of age. Older employees may have a longer wear-away period, but that is not age discrimination. To the contrary, the longer wear-away period (to the extent it actually exists) merely reflects that older employees had a higher benefit under the prior formula than similar situated younger employees. In all cases, the older employee's benefit will still be higher than the younger employee's benefit and the older employee will accrue benefits under the cash balance formula at a greater rate than the younger employee. As a matter of law, this cannot be age discrimination, and Count II must fail.

**C.    Count IV Fails To State A Claim Because The Amex Plan Does not Violate ERISA's 133 ⅓ Percent Rule.**

ERISA's backloading rules limit a plan's ability to "backload" certain retirement benefits in later years of service. This means that there is a limitation on the extent to which benefit accruals can be delayed until the end of an employee's career. In order to satisfy ERISA's accrual rules, a defined benefit plan need only meet one of three separate tests: (1) the "3 percent method;" (2) the "133 ⅓ percent rule;" and (3) the "fractional rule." <u>See</u> 29 U.S.C. § 1054(b)(1)(A)-(C); 29 C.F.R. § 1.411(b)-1(a); 29 C.F.R. § 1.411(b)-1(b)(1), (2), and (3)

---

words, although benefits are accrued under the new formula, the overall benefit does not increase until the employee "catches up" to the old formula benefit.

(describing the "3 percent method," the "133 ⅓ percent rule," and the "fractional rule").  The

challenges to cash balance plans in other cases, and in this case, involve application of the 133 ⅓

percent rule.

> The 133 ⅓ percent rule generally requires that:
>
> the annual rate at which any individual who is or could be a participant can accrue
> the retirement benefits payable at normal retirement age under the plan for any
> later plan year is not more than 133 ⅓ percent of the annual rate at which he can
> accrue benefits for any plan year beginning on or after such particular plan year
> and before such later plan year.

29 U.S.C. § 1054(b)(1)(B).  See also 29 C.F.R. § 1.411(b)-1(b)(2) (providing examples).

Critically, the 133⅓ rule must be examined without consideration of any prior benefit

formulas or prior plans.  29 U.S.C. § 1054(b)(1)(B)(i) specifically provides that when testing

compliance with the 133⅓ rule, "any amendment which is in effect for the current year shall be

treated as in effect for all other plan years."  29 U.S.C. § 1054(b)(1)(B)(i).  This means that in

testing compliance with the 133⅓ rule, the current operative plan is assumed to have existed for

all time; it is impermissible to compare benefits under the current formula with benefits under a

prior formula.

Plaintiff's argument that the Plan violates the 133⅓ rule, however, depends on just such a

prohibited comparison.  (Complaint, ¶ 55).  Specifically, Plaintiff alleges that because of the

wear-away created by the protected "frozen benefit" under the prior plan, the Amex Plan violates

the 133⅓ rule.  (Complaint, ¶ 55).[18]  Because the frozen protected benefit is based solely on the

prior plan's benefit formula, it must be disregarded for testing compliance with the 133⅓ rule.

As the Register court held in dismissing an identical claim:

---

[18]    The frozen benefit is the benefit to which a participant was entitled under the prior
formula at any given age.

> When a company changes its pension plan, ERISA protects benefits previously earned under the prior plan provisions. 29 U.S.C. § 1054(g)(1). At no point can the participant receive less than his accrued benefit at the time the plan was changed. Id. In order to comply with this provision of ERISA, the new [employer] plan provides that a participant receives the greater of his cash balance benefit and his frozen accrued benefit, including any applicable early retirement subsidies, under the prior plan. For some participants, the frozen prior plan benefit may be greater than the benefit under the new plan for a few years. When this occurs, the participant's benefit will not accrue any additional value. Plaintiffs claim that since some employees' benefits will not increase for a few years after the plan change, it is inevitable that the plan will fail the 133-1/3% test, as no accrual followed by the resumption of accruals will inevitably be more than a third higher. While it is certainly true that the resumption of accruals after a time of no accrual will result in a change in accrual rate that is higher than one third, the 133-1/3% test has provisions that address a situation such as this one, where the period of no accrual results from a plan amendment. See 29 U.S.C. § 1054(b)(1)(B)(I). The test states that "any amendment to the plan which is in effect for the current year shall be treated as in effect for all other plan years." Id. Once a plan amendment occurs, only the new plan is taken into consideration when performing the test. Since the protected prior benefits under the old plan are disregarded, no wearaway of the benefit occurs. Plaintiffs do not allege that the cash balance plan, when viewed by itself, violates the 133-1/3% test. Therefore, Plaintiffs have failed to state a claim for relief.

Register, 2005 WL 3120268, at *3 (internal citation omitted).

Plaintiff does not allege the Amex Plan on its own, when considered as if "in effect for all other plan years," fails the 133⅓ rule. 29 U.S.C. § 1054(b)(1)(B)(i). Accordingly, Count IV fails to state a claim for relief.

**D.    Count V Fails To State A Claim, Because The Amex Plan Complies With The Second Circuit's Decision In Esden v. Bank of Boston And IRS Notice 96-8.**

Under the Amex Plan, participants may elect to receive their benefits as a lump sum or as an annuity. In Count V, Plaintiff challenges the way lump sum benefits are calculated and paid. Specifically, Plaintiff alleges that the Plan "ignores scenarios where the projection rate would exceed the discount rate, resulting in benefit entitlements greater than the account balance." (Complaint, ¶ 64). This claim fails as a matter of law, because the Amex Plan contains specific

language – ignored in the Complaint – that satisfies the requirements of the Second Circuit's

decision in <u>Esden v. Bank of Boston</u> and the Treasury Department's Notice 96-8.

### 1.    **The Governing Law.**

Plaintiff correctly alleges that "if an employer offers a participant the option of receiving

a lump sum payment, rather than an annuity commencing at normal retirement age, the

participant's cash benefit must be *at least equal* to the actuarial equivalent of that annuity."

(Complaint, ¶ 58) (emphasis added).  The process of calculating the actuarial equivalent of an

annuity is known as "whipsaw."  <u>Esden</u>, 229 F.3d at 165-66.  Whether the whipsaw process will

yield a benefit that is higher or lower than the account balance – and hence whether the whipsaw

process must be performed[19] – depends on whether the interest rate in the plan is less than, equal

to, or greater than the statutory discount rate:

(1)    If the interest rate in the plan is less than the discount rate (as in the example

above), the whipsaw process will yield a benefit *less than* the account balance.  Under such

circumstances, paying out the more valuable account balance is lawful.  <u>See</u> IRS Notice 96-8

(where the interest rate in the plan is "no greater than" the statutory discount rate, "a single sum

distribution equal to the employee's hypothetical account balance under such a plan will satisfy"

ERISA).

(2)    If the interest rate in the plan equals the statutory discount rate, the whipsaw

process will yield the exact same benefit as the account balance.  <u>See</u> <u>Esden</u>, 229 F.3d at 165 ("If

the plan's projection rate (that is the hypothetical interest credits it provides) and the statutorily

prescribed discount rate are identical, then the present value of the hypothetical account

---

[19]    If the whipsaw calculation will lead to a lower benefit than the account balance, the
actual mechanical calculations need not be performed, because the higher account
balance would be paid in any event.

projected forward to normal retirement age determined by this computation will be exactly the current cash account balance."). Under such circumstances, paying out the account balance is lawful. <u>See</u> IRS Notice 96-8; <u>Esden</u>, 229 F.3d at 165 ("[A] plan which provides for interest credits at the [statutory discount rate] may pay out the cash account balance as the actuarial equivalent of the accrued benefit.").

(3)  If the interest rate in the plan is <u>more than</u> the discount rate, the whipsaw process will yield a benefit more valuable than the account balance. Under such circumstances, the higher "whipsaw" benefit must be paid. (Complaint, ¶ 62); <u>Esden</u>, 229 F.3d at 165-66 ("[W]hen the plan provides for interest credits that exceed the statutory discount rate," the plan must pay out the higher whipsaw benefit.).

### 2. The Amex Plan Complies With Esden And Notice 96-8.

The Amex Plan satisfies the above rules. As Plaintiff admits, the statutory discount rate is the interest rate on 30 year Treasury securities. (Complaint, ¶ 60). Under the terms of the Plan, the interest crediting rate is the rate on 5 year Treasury securities, subject to a maximum of the lesser of 10% or the rate on 30 year Treasury Securities. (Plan, §§ 2.9, 2.27). In other words, and with one exception discussed <u>infra</u>, the interest rate in the Plan <u>will never exceed</u> the rate on 30 year Treasury securities. Under these circumstances, the account balance will always exceed the whipsaw amount. Thus, paying the account balance is lawful under <u>Esden</u> and Notice 96-8, because the account balance will always equal or exceed the whipsaw benefit amount.

The only time the interest rate in the Plan can exceed the statutory discount rate – such that the whipsaw calculation would need to be performed – is if the five percent minimum rate applies <u>and</u> the rate on 30 year Treasury Securities is less than five percent. (Plan, § 2.27). Plaintiff does not allege that this ever occurred. Nevertheless, to ensure compliance with <u>Esden</u> and Notice 96-8 under these circumstances, the Amex Plan specifically requires the Plan to

27

engage in the whipsaw process (projecting forward at the interest crediting rate and discounting back at the statutory discount rate) to calculate an employee's benefit, and pay the higher whipsaw benefit.  (Plan, § 7.3(c)).  Thus, the Amex Plan fully complies with <u>Esden</u> and the requirements of Notice 96-8.  Count V should be dismissed.

**E.    Count VI Fails Because Amex Provided A Summary Of Material Modification That Accurately Described The Terms Of The Cash Balance Plan And, In Any Event, This Claim Is Time-Barred.**

In Count VI, Plaintiff asserts that Amex violated ERISA § 102, 29 U.S.C. § 1022, by failing to provide a summary of the 1995 amendments adopting the cash balance formula.  Count VI fails because it is time-barred and because the communications Amex provided accurately described the terms of the cash balance plan amendment.

**1.    Amex Provided Participants Summaries Of Material Modifications And Summary Plan Descriptions That Accurately Described The Terms Of The Cash Balance Plan.**

ERISA § 102 requires Plan Administrators to publish a "summary of any material modification in the terms of the plan."  29 U.S.C. § 1022(a).  As demonstrated below, the communications Amex provided in 1994, 1995, and 1996 provided a comprehensive summary of the amendment adopting the cash balance plan and satisfied ERISA's disclosure obligations.

- In June 1994 Amex published a Benefits Brief describing the conversion to the cash balance formula to take effect in 2005.  (Exhibit D).  This communication described how benefits are earned under the cash balance formula, how opening account balances were to be calculated, when benefits are payable, and provided 11 examples of how participants at different ages were likely to be affected by the cash balance amendment.

- In September 1994, March 1995, and April 1995, Amex published additional Benefits Briefs with additional information about the cash balance plan and announcing an

effective date of July 1, 1995. (Exhibits E, F and G). Amex also disclosed that it was protecting benefits earned under the prior plan.

- In June 1995, Amex published another Benefits Brief describing the cash balance plan. (Exhibit H). Although not required by law, that communication also specifically advised that:

> The changes to the Retirement Plan may cause a reduction in future benefit accruals for some participants; for others future accruals may be more than under the prior plan. How you are affected depends on your age, service and when you leave the Company.

(Exhibit H, p. 3).

- In July, 1995, Amex published a "Retirement Plan Overview." (Exhibit I). The Overview described in detail how opening account balances are calculated under the Plan, how benefits were earned, and provided examples.

- In 1996, Amex published an SPD for the cash balance formula. (Exhibit J). Again, this communication described in detail how opening account balances were determined, how benefits were accrued under the cash balance formula, and when and how benefits were payable. (Exhibit J).

As a matter of law, these communications, individually and collectively, satisfied any obligation to publish a summary of material modifications of the Plan.

Plaintiff suggests that Amex was required to provide "explanations of the reduction in the rate of benefit accrual with increasing age and the wear-away effect." (Complaint, ¶ 70). This assertion is incorrect. First, as explained above, the cash balance formula does not result in a reduction in the rate of benefit accrual with increasing age. Second, as the court held in Register, "ERISA § 102 does not require that [a summary of material modifications or SPD] describe how the benefit accrual rates change as participants age." Register, supra at *9. Nor does ERISA

29

require an SPD or summary of material modifications to describe "wear-away."  Rather, to comply with ERISA § 102, such communications need only "accurately outline[] how the benefit accrual works."  Id.  Amex's comprehensive descriptions of the cash balance formula do just that.  These communications describe how benefits are earned and how the minimum benefit protection of prior plan benefits (related to wear-away) might apply.  Accordingly, Count VI fails as a matter of law.

### 2.    Count VI Is Time-Barred Because Plaintiff Filed This Action More Than Six Years After Any Summary Of Material Modifications Was Required.

ERISA does not set forth a statute of limitations for statutory claims other than claims for breach of fiduciary duty.  See Miles v. New York State Teamsters Conf. Pen. and Ret. Fund Employee Pension Benefit Plan, 698 F.2d 593, 598 (2d Cir. 1983).  Accordingly, for such non-fiduciary claims "the controlling limitations period is that specified in the most nearly analogous state limitations statute."  Id.  In New York, "the six-year limitations period prescribed by New York's CPLR § 213 controls."[20]  (citation omitted).

ERISA Section 104(b)(1) requires that any summary of material modifications be provided "not later than 210 days after the end of the plan year in which the change is adopted to each participant, and to each beneficiary who is receiving benefits under the plan."  29 U.S.C. § 1024(b)(1).  Here, as the challenged amendment was effective July 1, 1995, any summary of material modifications was required as of 210 days after November 30, 1995.[21]  This action was

---

[20]    The Plan contains a shorter limitations period, which is enforceable under New York law.  See, e.g., Smith v. First Unum Life Ins. Co., No. 98-2415, 1999 U.S. Dist. LEXIS 8381, at*9 (E.D.N.Y. June 2, 1999) ("Where a benefit plan specifies a limitations period shorter than six years, therefore, the contractual limitation period governs.").  Nevertheless, for purposes of this Motion, Defendants assume that the longer six year limitations period controls.

[21]    At the time, the Amex Plan was on a fiscal year ending November 30.  (Exhibit J at 68).

filed on January 11, 2006, which is over three years after the six-year statute of limitations had run.  The claim, therefore, is time-barred.

**F.    Count VII Fails Because Amex Provided The Requisite Notice And Because It Is Time-Barred.**

In Count VII, Plaintiff asserts that Amex violated ERISA § 204(h), 29 U.S.C. § 1054, by failing to provide plan participants with sufficient advance notice of the 1995 amendments to the Retirement Plan which resulted in the adoption of the cash balance formula.  Specifically, without any explanation, Plaintiff merely asserts that "Defendants violated ERISA § 204(h), 29 U.S.C. § 1054(h) by failing to provide the requisite notice in compliance with § 1.411(d)-6 of the Income Tax Regulations.  (Complaint, ¶ 76).  Count VII fails because Amex's disclosures about the cash balance plan amendment satisfied any disclosure obligations under Section 204(h) of ERISA and because this claim is time-barred.

First, as explained previously, "the six-year limitations period prescribed by New York's CPLR § 213 controls" non-fiduciary claims such as that set forth in Count VII.  Miles, 698 F.2d at 598 (citation omitted).  Here, as the challenged amendment was effective July 1, 1995, any claim alleging a violation of ERISA § 204(h) had to be filed no later than 2001.  This action, filed on January 11, 2006, five years after the statute of limitations had run, is time-barred.

Moreover, Count VII fails because the communications Amex provided in 1994 and 1995 complied with ERISA § 204(h).  The version of ERISA § 204(h) in effect in 1995[22] provided in relevant part:

> A plan described in paragraph (2) [a defined benefit plan] may not be amended so as to provide for a significant reduction in the rate of future benefit accrual, unless, after the adoption of the plan amendment and not less than 15 days before the effective date of the plan amendment, the plan administrator provides a written notice, setting forth the plan amendment and its effective date . . . .

---

[22]    Congress amended ERISA § 204(h) in 2001.  See Pub. L. 107-16, § 659(b).

29 U.S.C. § 1054(h).  A summary of an amendment satisfied these requirements "if the summary [was] written in a manner calculated to be understood by the average plan participant and contains the effective date."  26 C.F.R. § 1.411(d)-6T, Q&A 10 (1996).  "The summary need not explain how the individual benefit of each participant . . . will be affected by the amendment." Id.  Rather, "the Treasury Regulations make it clear that all that is required in the § 204(h) notice is the effective date and an understandable summary of the plan amendment."  Register, supra at *9 (citations omitted).

The communications described above that Amex provided to plan participants in June 1994, September 1994, March 1995, April 1995, and June, 1995 satisfy these requirements. These Benefits Briefs comprehensively summarized the new cash balance formula and its effective date, and were written in a manner easily understood by an average person.  The Benefits Briefs also disclosed that the cash balance formula may "cause a reduction in future benefit accruals for some participants," depending on "your age, service and when you leave the Company."  ERISA § 204(h) requires nothing more.  Accordingly, Count VII fails as matter of law.

**G.    Counts VIII Is Duplicative Of Other Claims In The Complaint And Fails To State A Claim.**

In Count VIII, Plaintiff alleges that Defendants breached their fiduciary duty because they failed to disclose information about the conversion from the prior formula to the cash balance plan, adopted a plan that was age discriminatory, and failed to disclose that the Amex Plan was age discriminatory.

As explained previously, the Amex Plan is not age discriminatory as a matter of law, and the SPD for the Plan disclosed all of the operative terms of the Plan, including information about

the conversion and how opening account balances were calculated.[23]   Count VIII is merely

duplicative of other claims (Counts I and VI) that fail for the reasons previously stated.

Accordingly, Count VIII should be dismissed.

**H.**     **Count IX Is Duplicative Of Other Claims In The Complaint And Fails To State A
            Claim.**

        In Count IX, Plaintiff alleges a claim for benefits.   This claim does not allege any new

facts or legal theories and is merely duplicative of Plaintiff's other claims challenging the design

of the Amex Plan, Counts I – V.   As explained previously, each of these claim fail as a matter of

law.  Count IX for the same reasons so it should be dismissed.

---

[23]     Plaintiff's breach of fiduciary duty claim also fails to the extent based on Amex's
        decision to amend the Plan to adopt the cash balance formula.  Amending a plan is a
        settlor function not subject to ERISA's fiduciary duties.  See, e.g., Flanigan v. Gen. Elec.
        Co., 242 F.3d 78, 87 (2d Cir. 2001) ("Fiduciary duty and prohibited transaction rules
        apply only to decisions by an employer acting in its fiduciary capacity."); Siskind v.
        Sperry Ret. Program, 47 F.3d 498, 505 (2d Cir. 1995) ("An employer that designs a
        retirement plan or amends an existing plan's design does not come within ERISA's
        definition of a fiduciary.").

## V.    <u>CONCLUSION</u>

For each and all of the foregoing reasons, Defendants respectfully request that the

Complaint be dismissed and that Judgment be entered in favor of Defendants.


Dated: March 14, 2006
      New York, New York          Respectfully submitted,

          MORGAN, LEWIS & BOCKIUS LLP

          By: /s  Christopher A. Parlo
               Christopher A. Parlo (CP-4310)

          cparlo@morganlewis.com
          101 Park Avenue
          New York, New York 10178
          (212) 309-6000

          OF COUNSEL

          Michael L. Banks
          Jeremy P. Blumenfeld*
          Morgan, Lewis & Bockius LLP
          1701 Market Street
          Philadelphia, Pennsylvania  19103-2921
          Tel.  (215) 963-5000
          Fax:  (215) 963-5001

          *Attorneys for Defendants*


* *Pro Hac Vice* admission pending.