# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

PAULA KRITZMAN,                                                      :
                                                                    :
               Plaintiff,                                :
                                                                    :
               v.                                        :      **CIVIL ACTION NO. 06-CV-0233**
                                                                    :
AMERICAN EXPRESS RETIREMENT :
PLAN, AMERICAN EXPRESS                                              :
COMPANY, AMERICAN EXPRESS                                           :
COMPANY EMPLOYEE BENEFITS                                           :
ADMINISTRATION COMMITTEE,                                           :
JOHN DOES 1-100                                                     :
                                                                    :
               Defendants.                               :
                                                                    :

## DECLARATION OF VALERIA CHRISTENSEN

I, Valeria Christensen, do depose and state of my own personal knowledge as follows:

1.      I am the Director, Operations & Compliance, for the American Express Company ("Amex"). I have been employed by Amex or its affiliates companies since 1984.

2.      A copy of the Complaint in this matter is attached as Exhibit A.

3.      A copy of the American Express Retirement Plan, as amended and restated as of July 25, 2005, is attached as Exhibit B.

4.      A copy of the "Benefits Briefs" newsletter provided to participants in the Amex Retirement Plan in April 1994 is attached as Exhibit C.

5.      A copy of the "Benefits Briefs" newsletter provided to participants in the Amex Retirement Plan in June 1994 is attached as Exhibit D.

6.      A copy of the "Benefits Briefs" newsletter provided to participants in the Amex

Retirement Plan in September 1994 is attached as Exhibit E.

7.      A copy of the "Benefits Briefs" newsletter provided to participants in the Amex Retirement Plan in March 1995 is attached as Exhibit F.

8.      A copy of the "Benefits Briefs" newsletter provided to participants in the Amex Retirement Plan in April 1995 is attached as Exhibit G.

9.      A copy of the "Benefits Briefs" newsletter provided to participants in the Amex Retirement Plan in June 1995 is attached as Exhibit H.

10.      A copy of the "Retirement Plan Overview" provided to participants in the Amex Retirement Plan in July 1995 is attached as Exhibit I.

11.      A copy of the relevant portions of the Summary Plan Description for the Amex Retirement Plan provided to participants in 1996 is attached as Exhibit J.

I declare under penalty of perjury that the foregoing is true and correct and that these documents are records maintained by American Express in the ordinary course of business.

Executed on this 10th day of March, 2006.

Valeria Christensen

Valeria Christensen

**EXHIBIT A**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK



| | |
|---|---|
| Paula Kritzman, Individually and on behalf of all others similarly situated, ) | **JUDGE KAPLAN** |
| ) | |
| Plaintiff, ) | **06 CV 0233** |
| ) | |
| v. ) | Civil Action No. |
| ) | |
| AMERICAN EXPRESS RETIREMENT ) | **CLASS ACTION** |
| PLAN, AMERICAN EXPRESS ) | |
| COMPANY, AMERICAN EXPRESS ) | JURY TRIAL REQUESTED |
| COMPANY EMPLOYEE BENEFITS ) | |
| ADMINISTRATION COMMITTEE, ) | |
| JOHN DOES 1-100 ) | |
| Defendants. | |

Plaintiff Paula Kritzman ("Plaintiff"), a participant in the "American Express Retirement Plan" (the "Plan"), on behalf of herself and a class of all others similarly situated, alleges as follows:

## INTRODUCTION

1.    This is a class action brought pursuant to § 502 of the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1132, on behalf of the participants in and beneficiaries of the Plan, a defined benefit plan established and sponsored by American Express Company ("American Express" or the "Company").

2.    This action is brought on behalf of Plaintiff and all individuals who participated in the Plan at any time on or after July 1, 1995 (the "Class Period") whose retirement benefits have been converted to and/or calculated according to the Plan's cash balance formula. The Plan, as amended effective July 1, 1995, converted from a final average pay formula to a "cash balance" formula for the calculation of benefits accrued under the Plan.  Generally, Plaintiff alleges that

the terms of the amended Plan violated ERISA in at least the following ways: (1) the Plan violated ERISA's prohibition on reducing rates of benefit accrual due to the increasing age of a plan participant, ERISA § 204(b)(1)(H)(i), 29 U.S.C. § 1054(b)(1)(H)(i); (2) the Plan violated ERISA's prohibition on forfeiture of accrued benefits, ERISA § 203(a), 29 U.S.C. § 1053(a) and I.R.C. § 411(a)(2); and (3) the Plan violated ERISA's present value calculation rules, ERISA §§ 203(e)(2), 29 U.S.C. § 1053(a)(2), 205(g)(3), 29 U.S.C. § 1055(g)(3) and IRC § 417(e)(3).

## JURISDICTION AND VENUE

3.    This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331(a) and ERISA § 502(e)(1), 29 U.S.C. § 1132(e)(1).

4.    Venue is proper in this district pursuant to ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2), because the Plan was administered in this district, some or all of the fiduciary breaches for which relief is sought occurred in this district, and/or some Defendants reside or maintain their primary place of business in this district.

5.    More specifically, this district is an appropriate venue for this action because the principal executive offices of Defendant American Express, the sponsor and administrator of the Plan, are located in the American Express Tower in the World Financial Center in lower Manhattan, New York. The Company's Manhattan headquarters is listed on a recent Plan Form 5500 annual filing with the Internal Revenue Service and Department of Labor as the Plan sponsor's address. Further, it is likely that many of the parties and potential witnesses, including Company directors, Plan committee members, corporate executives and many plan participants are located in close proximity to this district.

## PARTIES

### Plaintiff

6.      Plaintiff Kritzman is a citizen of the United States who was employed full-time with the Company from approximately October 1975 to September 30, 2005 during the Class Period, as defined below, and is or was a "participant" in the Plan within the meaning of ERISA § 3(7), 29 U.S.C. § 1002(7).

### Defendants

### American Express Retirement Plan

7.      Defendant American Express Retirement Plan is an employee pension benefit plan pursuant to ERISA § 3(2)(A), 29 U.S.C. § 1002(2)(A). Specifically, the Plan is a defined benefit plan within the meaning of ERISA § 3(35), 29 U.S.C. § 1002(35).

8.      The Plan is a noncontributory defined benefit plan covering domestic and U.S. citizen career expatriate employees of the Company and its participating subsidiaries. Generally, eligible employees include full and part-time employees of the Company and its participating subsidiaries who have completed one year of service.

### American Express Company

9.      Defendant American Express is a New York corporation with its principal offices located in New York, NY. The Company provides payment services, travel related services, financial advisory services and international banking services throughout the world.

10.     American Express is the Plan sponsor within the meaning of ERISA § 3(16)(B), 29 U.S.C. § 1002(16)(B), and is the ultimate Plan administrator pursuant to ERISA § 3(16)(A), 29 U.S.C. § 1002(16)(A). The Company is a fiduciary of the Plan pursuant to ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), in that it has discretionary authority and control regarding

3

the administration and management of the Plan and/or the Plan's assets.

**American Express Company Employee Benefits Administration Committee**

11.    According to the Plan's Form 5500 for Plan year 2002 ("2002 Form 5500") submitted to the Internal Revenue Service and the U.S. Department of Labor, Defendant American Express Employee Benefits Administration Committee, appointed by the Compensation and Benefits Committee of the Company's Board of Directors, administers the Plan and is a named fiduciary of the Plan. The Employee Benefits Administration Committee is a fiduciary of the Plan within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), in that it has discretionary authority and control regarding the administration and/or management of the Plan and/or the Plan's assets.

12.    Defendants include individual members of the Employee Benefits Administration Committee. Their identities are currently unknown to Plaintiff. Once their identities are ascertained, Plaintiff will seek leave to join them to the instant action.

**Additional "John Doe" Defendants**

13.    Unknown "John Doe" Defendants 1-100 are residents of the United States and are or were fiduciaries of the Plan during the Class Period, in that they had discretionary authority and control regarding the administration and/or management of the Plan and/or the Plan's assets. Their identities are currently unknown to Plaintiff; once their identities are ascertained, Plaintiff will seek leave to join them under their true names.

## CLASS ACTION ALLEGATIONS

14.    Plaintiff brings this action as a class action pursuant to Rules 23(a), (b)(1) and/or (b)(2) of the Federal Rules of Civil Procedure on behalf of herself and the following class of persons similarly situated (the "Class"):

4

All individuals, excluding Defendants, who have participated in the American Express Retirement Plan at any time on or after July 1, 1995 (the "Class Period") whose accrued or pension benefits are based, in whole or in part, on the Plan's Cash Balance Formula.[1]

15.    The members of the Class are so numerous and geographically dispersed that joinder of all members is impracticable. While the exact number of Class members is unknown to Plaintiff at this time, and can only be ascertained through appropriate discovery, Plaintiff believes there are, at a minimum, over 35,000 members of the Class who participated in, or were beneficiaries of, the Plan during the Class Period.[2]

16.    Common questions of law and fact exist as to all members of the Class and predominate over any questions affecting solely individual members of the Class. Among the questions of law and fact common to the Class are:

(a)    whether the benefits earned by the Plan participants have been calculated correctly as required by ERISA;

(b)    whether the benefits provided under the terms of the Plan accrue at a rate which is reduced because of age;

(c)    whether the terms of the Plan provide for impermissible forfeiture of accrued benefits;

(d)    whether, following the conversion to the Cash Balance Formula, the Plan violated the minimum accrual provisions of ERISA § 204(b)(1), 29 U.S.C. § 1054(b)(1);

---

[1] Plaintiff notes that, upon conversion of the Plan, certain participants were made eligible for "grandfather provisions" (see footnote 3 *infra*). Upon information and belief, these provisions may affect the breadth of Plaintiff's wear-away claims described in Counts II-IV herein. However, such provisions have no bearing on Plaintiff's remaining claims as to any members of the Class.

[2] *See* the 2002 Form 5500, *available at* http://www.freeerisa.com, which indicated that, as of December 31, 2002, the Plan had 38,511 active participants.

5

(e)    what remedies are needed to bring the Plan into compliance with the dictates of ERISA;

(f)    whether the Class is entitled to a clarification of future benefits pursuant to ERISA § 502(a)(1)(B), 29 U.S.C. § 1132(a)(1)(B);

(g)    whether the Class is entitled to an injunction pursuant to ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3); and

(h)    whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

17.    Plaintiff's claims are typical of the claims of the members of the Class because Plaintiff and the other members of the Class each sustained damages and/or were negatively affected by Defendants' wrongful conduct in violation of federal law as complained of herein.

18.    Plaintiff will fairly and adequately protect the interests of the members of the Class and have retained counsel highly competent and experienced in class action and complex litigation, including actions involving ERISA employee pension plans. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

19.    Class action status in this ERISA action is warranted under Rule 23(b)(1)(B) because prosecution of separate actions by the members of the Class would create a risk of adjudications with respect to individual members of the Class which would, as a practical matter, be dispositive of the interests of the other members not parties to the actions, or substantially impair or impede their ability to protect their interests.

20.    Class action status is also warranted under the other subsections of Rule 23(b) because: (i) prosecution of separate actions by the members of the Class would create a risk of establishing incompatible standards of conduct for Defendants and/or (ii) Defendants have acted

or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive, declaratory, or other appropriate equitable relief with respect to the Class as a whole.

## FACTUAL ALLEGATIONS

21.    The Plan was established on May 31, 1985 to replace the terminated American Express Funded Pension Plan. 2002 Form 5500. Prior to July 1, 1995, (the "Conversion Date"), the Plan provided retirement benefits based upon a traditional final average pay formula (the "Prior Formula").   Under the Prior Formula, a participant's normal pension benefit was an annuity calculated with respect to final average compensation and years of service.

22.    In 1994, the Company's Board of Directors voted to amend the Plan, effective as of the Conversion Date, to convert the Prior Formula to a cash balance formula (the "Cash Balance Formula"), finding that such conversion would "significantly decrease the Plan's projected benefit obligation and annual pension cost." *See* American Express Company Form 10-K, Note 9, filed March 31, 1995 with the U.S. Securities and Exchange Commission ("SEC").

23.    Generally, under the Cash Balance Formula, each participant has a hypothetical individual account, which accumulates credits ("Pay Credits") each pay period based upon a percentage ("Applicable Percentage") of the participant's compensation.   Each participant's Applicable Percentage is based upon the sum of his/her age and years of service.

24.    Employees who were participants in the Plan before and after the Conversion Date received opening account balances based upon a determination of the present value of their accrued benefits under the Prior Formula, with certain participants receiving increased transitional benefits.[3]   Participants who joined the Plan on or after the Conversion Date had opening account balances of zero.

---

[3] For participants who were age 46 or older on June 30, 1995, the present value of the accrued benefit under the Prior Formula was increased by a percentage of the value of the early retirement benefit payable under the prior

25.     Additionally, accounts earn interest credits ("Interest Credits") annually, based on the average of the daily five-year U.S. Treasury note yields for the previous plan year, with a minimum rate of 5% and a maximum rate equal to "the lesser of 10% or the annual maximum interest rate set by the U.S. government for determining lump sum values." *See* 2002 Form 5500.

26.     Generally, participants become vested in their account balances after five years of service.

27.     Under the Plan, a participant's pension benefit is stated as being the participant's account balance, including any opening account balance and pay credits, together with interest credits accrued thereon up to the payment date.

28.     The normal form of payment is an annuity; optional forms of payment include various annuity options, as well as a lump sum distribution equal to the participant's cash balance account.

29.     Employees who were participants in a predecessor plan prior to the Conversion Date are guaranteed a minimum benefit equal to their accrued benefit under their prior formula, *frozen as of the Conversion Date*. This means that they receive the greater of: (a) their benefits as calculated under the Cash Balance Formula; or (b) their benefits as determined under their prior traditional formula, calculated as if they terminated employment on June 30, 1995 (the "Frozen Benefit"). Accordingly, they accrue no new benefits unless and until their cash balance accounts catch up to and exceed their Frozen Benefits.

30.     Normal retirement age under the Plan is 65.

---

plan at the participant's earliest retirement date (age 55 with ten years of service, or age 55 for prior participants of IDS, a subsidiary of the Company). The percentage for participants eligible for early retirement on June 30, 1995 was 100%. The percentage for participants not eligible for early retirement on June 30, 1995 was 100% minus 10% for each year from June 30, 1995 to the participant's earliest retirement date (but not less than 0%). *See* 2002 Form 5500.

31.   Upon termination of employment with vested benefits, a participant may elect to receive distribution or defer payment up to age 65, with continuing interest credits.

32.   The Plan's assets are held by American Express Trust Company, a wholly-owned subsidiary of American Express Financial Corporation, which is a wholly-owned subsidiary of American Express.

33.   Although the Plan provides for a hypothetical individual account for each participant, it is not a "defined contribution plan," as that term is defined in ERISA Section 3(34), 29 USC § 1002(34).  Rather, the Plan is a "defined benefit plan," as defined in ERISA Section 3(35), 29 USC § 1002(35).  As such, the Plan must provide for a definitely determinable, non-forfeitable, accrued benefit. *Cooper v. IBM Pers. Pension Plan*, 274 F. Supp. 2d 1010, 1021 (N.D. Ill. 2003) (citing ERISA § 203(a), 29 U.S.C. § 1053(a).

34.   Under ERISA, a participant's accrued benefit is not measured by his/her account balance; rather, ERISA defines a participant's accrued benefit under a defined benefit plan in the form of an annual benefit commencing at normal retirement age.  *West v. AK Steel Corp. Retirement Accumulation Pension Plan*, 318 F.Supp. 2d 579, 582 (S.D. Ohio April 8, 2004). ERISA § 3(23)(A), 29 U.S.C. § 1002(23)(A).

35.   Lastly, Plaintiff has not filed a claim for benefits under the Plan's claims procedures because she seeks relief from violations of ERISA statutory provisions which do not require the exercise of discretion by a Plan fiduciary.  In addition, Plaintiff has not attempted to exhaust her administrative remedies because to do so would be futile, as the issues involved in this action are only issues of law.

**COUNT I**

36.    Plaintiff incorporates the allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

37.    Pursuant to ERISA § 204(b)(1)(H)(i), 29 U.S.C. § 1054(b)(1)(H)(i), the rate of accrual of a defined benefit under a plan may not be reduced because of the attainment of any age by a plan participant.

38.    Interest credits are a part of the accrued benefit. As such, they must be: (a) valued as an annual benefit commencing at age 65; and (b) taken into account in determining whether the Plan satisfies ERISA's benefit accrual requirements set forth in ERISA § 204(b)(1), 29 U.S.C. § 1054(b)(1). *Cooper*, 274 F. Supp. 2d 1010, 1021.

39.    As of July 1, 1995, and at all times thereafter, the Plan reduces the rate of benefit accrual as a participant ages. The Plan provides a declining rate of accrual based on age because, among other reasons, evaluated as comparative annuity values at normal retirement age, the Plan's annual benefit to a worker for one year of service will accrue at a lower rate going forward than that of the same, otherwise similarly situated worker, at a younger age. This is because the value of the accrued benefit attributable to interest credits decreases as a participant approaches normal retirement age.

40.    By way of example, the Plan's annual benefit to a worker at age 50 for one year of service will accrue at a lower rate going forward than that of the same, otherwise similarly situated worker at age 35. Interest credits are inherently more valuable to a younger participant than to an otherwise similarly situated older participant.

41.    Accordingly, the Plan violates ERISA § 204(b)(1)(H)(i), 29 U.S.C. § 1054(b)(1)(H)(i).

42.     Pursuant to ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3), Plaintiff and the Class are entitled to a judgment enjoining the Plan and the Company from continuing to violate the foregoing provision of ERISA and to determine and calculate their benefits in a manner which is consistent with such provision, as well as other appropriate equitable relief.

<u>COUNT II</u>

43.     Plaintiff incorporates the allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

44.     ERISA § 204(b)(1)(H), 29 U.S.C. § 1054(b)(1)(H), prohibits the reduction of the rate of benefit accrual or the cessation of benefit accrual because of the attainment of any age.

45.     By providing that the guaranteed minimum benefit for employees who were participants in a predecessor plan prior to the Conversion Date was equal to their Frozen Benefit, the Plan effectively provided that participants whose Frozen Benefits exceeded their opening account balances would accrue no new retirement benefits unless and until their cash balance accounts caught up to and exceeded their Frozen Benefits.

46.     This effect, known as "wear-away," primarily affects older workers, who generally have greater Frozen Benefits than younger workers.[4]  Naturally, older workers generally suffer longer wear-away periods on account of age.  In other words, an older worker has to wait more years after the conversion to the cash balance formula to actually begin earning new retirement benefits.  Thus, while two similarly situated (of identical work tenure, *e.g.*) workers may both see amounts being added by the Company to their hypothetical accounts, the younger worker's retirement benefits are actually growing, while an older worker stuck with "wear-away" may actually be gaining nothing because the Plan has caused his or her benefit accrual to cease until his or her cash balance account exceeds their Frozen Benefit.

---

[4] *See* Edward A. Zelinsky, "The Cash Balance Controversy," <u>19 Va. Tax Rev. 683</u> (2000).

47.    Accordingly, the Plan violates ERISA § 204(b)(1)(H), 29 U.S.C. § 1054(b)(1)(H) and Plaintiff and the Class are entitled to appropriate relief under ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3).

## COUNT III

48.    Plaintiff incorporates the allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

49.    With respect to participants stuck with "wear-away," the terms of the Plan completely eroded the economic value of any cash balance benefits provided to such participants during any wear-away periods.

50.    This is because participants could receive their cash balance benefits accrued during any "wear-away" period only by forfeiting their accrued, vested Frozen Benefits. Such participants were not permitted to simply take their Frozen Benefits and add their cash balance benefits, accrued on or after the Conversion Date, to them.

51.    Accordingly, the Plan violated the nonforfeiture provisions of ERISA § 203(a), 29 U.S.C. § 1053(a) and I.R.C. § 411(a)(2), and Plaintiff and the Class are entitled to appropriate relief under ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3).

## COUNT IV

52.    Plaintiff incorporates the allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

53.    Under ERISA, a defined benefit plan's benefits must accrue in accordance with one of three alternative accrual rules in ERISA § 204(b)(1)(A)-(C), 29 U.S.C. § 1054(b)(1)(A)-(C), commonly known as the three percent rule, the 133 1/3% rule and the fractional rule, designed to support ERISA's early vesting requirements.

12

54.     Cash balance plans typically must satisfy this requirement by complying with the 133 1/3% rule of ERISA § 204(b)(1)(B), 29 U.S.C. § 1054(b)(1)(B), which provides, in pertinent part, that "a defined benefit plan satisfies the requirements of this paragraph for a particular plan year if under the plan . . .the annual rate at which any individual who is or could be a participant can accrue the retirement benefits payable at normal retirement age under the plan for any later plan year is not more than 133 1/3% of the annual rate at which he can accrue benefits for any plan year beginning on or after such particular plan year and before such later plan year."

55.     The Plan violated this rule by effectively reducing the rate of benefit accrual to zero for those participants with Frozen Benefits in excess of their opening account balances. With respect to any participant who earns a benefit following one or more years of zero benefit accrual, the Plan fails the 133 1/3% rule.

56.     Accordingly, the Plan violates the accrual rules of ERISA by failing to comply with any of the rules set forth in § 204(b)(1)(A)-(C), 29 U.S.C. § 1054(b)(1)(A)-(C), and Plaintiff is entitled to appropriate relief under ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3).

## COUNT V

57.     Plaintiff incorporates the allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

58.     Under ERISA, if an employer offers a participant the option of receiving a lump sum payment, rather than an annuity commencing at normal retirement age, the participant's cash benefit must at least equal the actuarial equivalent of that annuity. *Esden v. Bank of Boston*, 229 F.3d 154, 163 (2nd Cir. 2000).

13

59.    For cash balance plans, this is determined by projecting the cash balance forward with the plan-prescribed interest credits and then discounting it back to present value at the applicable statutory interest rate.

60.    The maximum discount rate for this calculation is prescribed by statute in IRC § 417(e) and ERISA § 205(g), 29 U.S.C. § 1055(g), and is currently the 30-year Treasury rate.

61.    Interest credits are a part of the accrued benefit.  Accordingly, once they have accrued and vested, they are nonforfeitable.  *Esden*, 229 F.3d at 165.  Therefore, they must be valued as an annual benefit commencing at age 65.  *Cooper*, 274 F. Supp. 2d at 1021.

62.    A plan which provides for interest credits at the statutorily-prescribed rate may merely pay out the balance of a participant's account as the actuarial equivalent of the age 65 annuity.  Where a plan's rate for interest credits exceeds the statutory discount rate, simply paying out a participant's account balance results in smaller benefits than participants are entitled to receive.  Where the actuarial equivalent exceeds the account balance, this higher figure must be paid out, or an impermissible forfeiture will have occurred in violation of ERISA § 203(a), 29 U.S.C. § 1053(a) and I.R.C. § 411(a)(2).

63.    For the purposes of lump sum distributions, the Plan does not provide participants with the actuarial equivalent of their account balances; rather, a participant's lump sum distribution is simply equal to the balance of his/her account.

64.    By not projecting the value of accrued interest credits to normal retirement age, then discounting them to present value for the purposes of lump sum distributions, the Plan blatantly ignores scenarios where the projection rate would exceed the discount rate, resulting in benefit entitlements greater than account balances.

14

65.    Accordingly, the Plan violates the present value calculation rules of ERISA §§ 203(e)(2), 29 U.S.C. § 1053(e)(2), 205(g)(3), 29 U.S.C. § 1055(g)(3) and IRC § 417(e)(3), resulting in impermissible forfeiture of accrued benefits under ERISA § 203(a), 29 U.S.C. § 1053(a) and I.R.C. § 411(a)(2), where the Plan rate for Interest Credits exceeds the statutory maximum discount rate.

66.    Therefore, Plaintiff and the Class are entitled to appropriate relief under ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3).

## COUNT VI

67.    Plaintiff incorporates the allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

68.    ERISA § 102, 29 U.S.C. § 1022 requires a plan administrator to provide a summary of any material modification in the terms of the plan...written in a manner calculated to be understood by the average plan participant..."

69.    The conversion to the Cash Balance Formula and its disparate, negative impact constituted a material modification in the terms of the plan, as described in ERISA § 102, 29 U.S.C. 1022.

70.    The summary plan description provided by the Company failed to adequately describe, in a manner calculated to be understood by the average plan participant, the full effects of the conversion to the Cash Balance Formula, including explanations of the reduction in the rate of benefit accrual with increasing age and the wear-away effect.

71.    Accordingly, the Company violated the provisions of ERISA § 102, 29 U.S.C. § 1022.

72. Therefore, Plaintiff is entitled to appropriate relief under ERISA 502(a)(3), 29 U.S.C. § 1132(a)(3).

## COUNT VII

73. Plaintiff incorporates the allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

74. At the time of the implementation of the Cash Balance Formula, ERISA § 204(h), 29 U.S.C. § 1054(h) provided that a defined benefit plan may not be amended so as to provide for a significant reduction in the rate of future benefit accrual, unless the plan administrator provides a written notice setting forth the plan amendment and its effective date to each plan participant. Such notice was required to have been given after the adoption of the plan amendment and not less than 15 days before the effective date of the amendment.

75. The implementation of the Cash Balance Formula constituted a plan amendment providing for significant reductions in the rate of future benefit accrual.

76. Upon information and belief, Defendants violated ERISA § 204(h), 29 U.S.C. § 1054(h) by failing to provide the requisite notice in compliance therewith and in accordance with § 1.411(d)-6 of the Income Tax Regulations.

## COUNT VIII

77. Plaintiff repeats and re-alleges the allegations contained in the foregoing paragraphs of this Complaint as if fully set forth herein.

78. Upon information and belief, Defendants failed to adequately inform participants of material information as to how their benefits would be affected by the conversion to the Cash Balance Formula, and how their benefits under the Cash Balance Formula compare to the benefits they would have earned under the Prior Formula.

79.     By failing to ensure that the Plan complied with ERISA's anti age-discrimination accrual rules, Defendants reduced the Plan's accrued liability and the Company's funding obligations at the expense of older participants.

80.     Accordingly, Defendants violated their fiduciary duties owed to participants under ERISA § 404, 29 U.S.C. 1104, by failing to discharge their duties with respect to the plan solely in the interest of the participants and beneficiaries.

### COUNT IX

81.     Plaintiff incorporates the allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

82.     Pursuant to ERISA § 502(a)(1)(B), 29 U.S.C. § 1132(a)(1)(B), Plaintiff and the Class are entitled to a judgment clarifying their right to receive future benefits from the Plan, calculated under the terms of the Plan, to the extent those terms are not inconsistent with the applicable provisions of ERISA.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for the following relief:

A.     Certification of this action as a class action pursuant to Fed. R. Civ. P. 23 with the Class defined as aforesaid and Plaintiff as a proper Class representative;

B.     Judgment for Plaintiff and the Class against defendants on all claims asserted herein, including an amount of money sufficient to satisfy their claims;

C.     Injunctive relief entitling Plaintiff and the Class to benefits which are the greater of: (1) the benefits to which the would have been entitled without regard to the conversion to the Cash Balance Formula; (2) or the benefits under the Plan with regard to the Cash Balance Formula;

D.    Injunctive and other equitable relief recounted above, including the enjoining of Defendants from enforcement of the Plan's unlawful provisions described above, the amendment of the Plan to make all of its relevant provisions age-neutral, and the modification of the Plan so as to eliminate any unlawful forfeiture of accrued benefits;

E.    Pre-and post-judgment interest;

F.    Attorneys' fees and costs pursuant to the common fund/benefit doctrine or any other applicable law; and

G.    Any other and further relief as the Court deems appropriate under the circumstances.

Dated: January 11, 2006

Respectfully submitted,

Curtis V. Trinko (CT-1838)
LAW OFFICES OF CURTIS V. TRINKO, LLP
16 West 46th Street
Seventh Floor
New York, NY 10036

SCHIFFRIN & BARROWAY, LLP
Richard S. Schiffrin, Esq.
Joseph H. Meltzer, Esq.
Edward W. Ciolko, Esq.
Joseph A. Weeden, Esq.
280 King of Prussia Road
Radnor, Pennsylvania 19087
Telephone: (610) 667-7706
Facsimile: (610) 667-7056

Attorneys for Plaintiff

18

**EXHIBIT B**

**AMERICAN EXPRESS**
**RETIREMENT PLAN**
(As amended and restated as of July 25, 2005)

# AMERICAN EXPRESS RETIREMENT PLAN

## TABLE OF CONTENTS

| | | |
|---|---|---|
| ARTICLE 1 | GENERAL PROVISIONS | 1 |
| ARTICLE 2 | DEFINITIONS | 3 |
| ARTICLE 3 | ELIGIBILITY AND PARTICIPATION | 18 |
| ARTICLE 4 | NORMAL RETIREMENT BENEFIT | 19 |
| ARTICLE 5 | POSTPONED RETIREMENT | 22 |
| ARTICLE 6 | VESTING | 22 |
| ARTICLE 7 | FORM OF BENEFIT PAYMENTS | 23 |
| ARTICLE 8 | SURVIVOR BENEFITS | 30 |
| ARTICLE 9 | LIMITATION ON BENEFITS | 34 |
| ARTICLE 10 | PAYMENT OF BENEFITS; GENERAL PROVISIONS | 36 |
| ARTICLE 11 | ADMINISTRATION; ALLOCATION OF FIDUCIARY RESPONSIBILITIES | 38 |
| ARTICLE 12 | AMENDMENT, TERMINATION AND MERGER | 43 |
| ARTICLE 13 | MISCELLANEOUS PROVISIONS | 47 |
| ARTICLE 14 | PRESERVATION OF BENEFITS, GRANDFATHER RULES AND EFFECTIVE DATES | 47 |
| ARTICLE 15 | COORDINATION WITH OTHER PLANS AND ADDITION OF PARTICIPATING COMPANIES | 49 |
| ARTICLE 16 | TOP HEAVY RULES | 49 |
| ARTICLE 17 | *AMERIPRISE CREDITING* | 52 |
| *ADDENDUM A* | | *53* |
| *ADDENDUM B* | | *55* |
| *ADDENDUM C* | | *56* |
| *ADDENDUM D* | | *60* |

# ARTICLE 1
# GENERAL PROVISIONS

### 1.1    History

This American Express Retirement Plan ("Plan") is an amendment and restatement of the American Express Retirement Plan (the "Predecessor AMEX Plan"). The Plan includes the merger and transfer of the IDS Retirement Plan (the "Predecessor IDS Plan"). Effective July 1, 1995, the assets and liabilities of the Predecessor IDS Plan were transferred to and merged with this Plan. The provisions of this amendment and restatement are generally effective July 25, 2005.

### 1.2    Effective Date

The Plan is hereby amended and restated in its entirety effective July 25, 2005. Except as may otherwise be specifically provided herein, an employee who terminated employment with all Participating Companies prior to July 25, 2005, shall be subject to the terms and conditions of the particular Predecessor Plan covering him or her at the time of termination of employment. Individuals who were receiving benefits under the provisions of the Predecessor AMEX Plan or the Predecessor IDS Plan on July 24, 2005, shall continue to receive benefits in accordance with the provisions of said Predecessor Plan and shall not be entitled to receive any form of benefit under the terms of this amended and restated Plan. Employees who terminate employment with a Participating Company on or after July 25, 2005, shall be subject to the terms of this Plan. Notwithstanding the foregoing, except where specifically provided to the contrary, the terms of this amendment and restatement shall only apply to benefits accrued on or after July 25, 2005.

**The following amendment is contingent on the distribution of Ameriprise Financial, Inc. on September 30, 2005:** *Notwithstanding the above, effective as of October 1, 2005, Ameriprise Financial, Inc. ("Ameriprise") and its subsidiaries, shall cease to be Participating Companies in the Plan. As soon as administratively practicable after October 1, 2005, the portion of the Plan attributable to Ameriprise Participants, Ameriprise alternate payees and Ameriprise beneficiaries will be transferred to a new qualified defined benefit pension plan established by Ameriprise; provided, however, that the portion of the Plan attributable to former Ameriprise Participants whose accounts have been forfeited pursuant to Section 10.7 shall not be transferred. Upon such transfer, Ameriprise Participants, Ameriprise alternate payees and Ameriprise beneficiaries will cease participation in, and will no longer have any benefits under, the Plan.*

The Company reserves the right to amend the Plan, including retroactive amendments, as required by the Internal Revenue Service in order for the Company to obtain a determination that the Plan qualifies under Section 401(a) of the Code and the related trust is exempt from tax under Section 501(a) of the Code.

### 1.3    Plan for Exclusive Benefit of Employees

All contributions made by Participating Companies and all assets held pursuant to the Plan shall be administered and held for the exclusive benefit of Participants, alternate payees

and beneficiaries who qualify for Plan benefits hereunder. It shall be impossible at any time prior to the satisfaction of all liabilities to Participants, alternate payees and beneficiaries who qualify for Plan benefits, for any part of the corpus or income of the Plan to be used for, or diverted to, purposes other than their exclusive benefit, except as provided in Section 12.6 and Section 13.3.

### 1.4    Construction and Applicable Law

The purpose of this Plan is to provide retirement income for Participants, alternate payees, and beneficiaries who qualify for Plan benefits. The Plan, as amended and restated, is intended to continue to be a qualified plan under Section 401(a) of the Code and the related trust exempt under Section 501(a) of the Code. The Plan shall be administered and construed consistent with such intent. It shall also be construed and administered according to ERISA and the laws of the State of New York to the extent that such laws are not preempted by the laws of the United States of America. Subject to the Plan's administrative review processes, all controversies, disputes, and claims arising hereunder shall be submitted to the United States District Court for the District of New York. To the maximum extent permitted by ERISA, each person who is a "fiduciary" (as defined in ERISA) with respect to the Plan shall be responsible only for the proper exercise of his own powers, duties, responsibilities and obligations under the Plan and Fund and no fiduciary shall be liable for any act or omission of any other fiduciary.

**The following amendment is contingent on the distribution of Ameriprise Financial, Inc. on September 30, 2005:** *Notwithstanding anything herein to the contrary, on and after October 1, 2005, the designated fiduciary under the successor Ameriprise plan shall have discretionary authority to interpret and construe the terms of this Plan which relate to benefits payable (or claimed to be payable) from the Ameriprise plan (including the right to supply any omission, construe any ambiguous or uncertain terms, and reconcile any inconsistencies), and the discretionary authority to determine and resolve any and all questions related thereto.*

The Plan shall be construed in accordance with the following rules:

(a)    Headings at the beginning of Articles and Sections hereof are for convenience of reference, shall not be considered a part of the text of the Plan, and shall not influence its construction.

(b)    Capitalized terms used in the Plan shall have the meaning defined in the Plan unless the context clearly indicates otherwise.

(c)    Any references to the masculine gender include the feminine and vice versa.

(d)    Use of the words "hereof," "herein," "hereunder," or similar compounds of the word "here" shall mean and refer to the entire Plan unless the context clearly indicates otherwise.

(e)    Nothing in this Section shall be deemed to limit the discretion of the Administration Committee to interpret and construe the provisions of the Plan as provided in Article 11 hereof.

The provisions of the Plan shall be construed as a whole in such manner as to carry out the provisions thereof and shall not be construed separately without relation to the context.

## ARTICLE 2
## DEFINITIONS

### 2.1     Accrued Benefit

"Accrued Benefit" means a Participant's Normal Retirement Benefit, determined by taking the Participant's Defined Benefit Account Balance as of the date his or her Accrued Benefit is determined, increased by the Imputed Earnings Credit (as in effect for the Limitation Year in which the Participant's Accrued Benefit is determined) from such date until the Participant's Normal Retirement Age (or actual retirement date if the Participant has attained Normal Retirement Age), and then converted to the Normal Benefit Form using the Applicable Interest Rate and the Applicable Mortality Table. For purposes of calculating a Participant's Accrued Benefit on his or her Annuity Starting Date, the Imputed Earnings Credit applied shall be the Imputed Earnings Credit actually credited to the Participant's Defined Benefit Account Balance for each of the Limitation Years or partial Limitation Years up to the Participant's Annuity Starting Date.

A Participant's Accrued Benefit shall, in no event, be less than a Participant's accrued benefit as of June 30, 1995, under the Predecessor Plans, which is preserved pursuant to the provisions of Article 14.

### 2.2     Active Participant or Active Participation

"Active Participant" or "Active Participation" means, a Participant who is an Eligible Employee of a Participating Company. The term shall also refer to a Disabled Participant who has not elected a termination benefit under Section 6.4 and who is accruing benefits under the Plan.

### 2.3     Actuarial Equivalent

"Actuarial Equivalent" shall mean an amount or series of amounts equivalent to another amount or series of amounts utilizing the actuarial assumptions specified in the Plan.

### 2.4     Actuary

"Actuary" shall mean the actuary or actuarial consulting firm appointed by the Administration Committee pursuant to Section 11.7.

### 2.5     Administration Committee

"Administration Committee" means the Employee Benefits Administration Committee or any Administrative Delegate appointed by the Administration Committee to act on its behalf.

### 2.6    Administrative Delegate

"Administrative Delegate" means the person(s), if any, appointed by the Administration Committee pursuant to Section 11.2.

### 2.7    Affiliated Company

"Affiliated Company" means (a) any corporation which is a part of a controlled group of corporations (as defined in Section 414(b) of the Code) which includes a Participating Company, (b) any trade or business (whether or not incorporated) which is under common control (as defined in Section 414(c) of the Code) with a Participating Company, (c) any organization (whether or not incorporated) which is a part of an affiliated service group (as defined in Section 414(m) of the Code) which includes a Participating Company, and (d) any other entity required to be aggregated with a Participating Company pursuant to Treasury Regulations under Section 414(o) of the Code.

### 2.8    Annuity Starting Date

"Annuity Starting Date" means the first day of the first period for which an amount is paid as an annuity or any other form of payment, including a lump sum distribution. The Plan does not provide for retroactive annuity starting dates.

### 2.9    Applicable Interest Rate

"Applicable Interest Rate" means the arithmetical average of the daily annual yields on 30-year U.S. Treasury Securities as published by the Department of the Treasury and the Federal Reserve (or such equivalent as determined by the Department of the Treasury and the Federal Reserve) as in effect for the third month preceding the "stability period." The "stability period" shall be the Limitation Year.

### 2.10    Applicable Mortality Table

"Applicable Mortality Table" means the mortality table based on the Commissioners' standard table used to determine reserves for group annuity contracts issued on the date as of which a calculation required by the Plan is performed, as published by the Department of the Treasury for purposes of Section 417(e) of the Code. The Applicable Mortality Table is the table prescribed in Revenue Ruling 2001-62.

### 2.11    Code

"Code" means the Internal Revenue Code of 1986, as amended.

### 2.12    Company

"Company" means American Express Company, a New York corporation.

### 2.13    Compensation

"Compensation" means amounts paid to an Employee by a Participating Company for the Limitation Year, subject to the following subsections. In the case of an Employee who was not employed by a Participating Company on the first day of the Limitation Year, Compensation shall be determined for the Limitation Year as of the date the Employee becomes an Active Participant.

(a)    "Compensation" shall include, but is not limited to, the following: regular earnings, incentive pay as described in Addendum C, shift differential, overtime, SkyGuide subscription commissions, Travel Protection Plan sales commissions, Publishing Sales Incentive Plan commissions, Customer Focused Sales Commission (CFS Incentive), formerly known as Cardmember Telephone Service Center sales commissions, holiday earnings, regular earnings adjustments, vacation, company holidays, personal holidays, discretionary holidays, compensated health-related time off, Company-paid workers compensation consisting of pay for services provided, purchased vacation, termination vacation, pay in lieu of notice, annual incentive cash awards from the American Express Company 1998 Incentive Compensation Plan and 1989 Long-Term Incentive Plan, transition pay, UK earnings, level income, draw, FVP coordinating compensation, training payments, gross dealer concessions paid to a member of the Field Force who has signed an "American Express Financial Advisors Inc. Financial Advisor's Agreement" on or after August 1, 1999 and who has not signed an Independent Advisor Business Franchise Agreement, non-exempt salary, non-exempt variance, advisor coaching compensation, non-exempt level income, non-exempt client ready variance and non-exempt bonus. "Compensation" for a Limitation Year shall also include (1) incentive pay paid to a former Employee by a Participating Company on account of services performed as an Employee during the immediately preceding Limitation Year and (2) Compensation paid to a former Employee for a regular payroll period that began in the Limitation Year during which the former Employee terminated employment and which ends in the current Limitation Year. "Compensation" shall not include lump-sum severance pay, imputed income, long-term incentive pay, special awards pay, non-qualified deferred compensation, bonuses other than incentive pay and non-exempt bonus and serial severance pay received by an individual covered by the Company's Senior Executive Severance Policy while such individual is employed by a corporation, trade, business or other organization which is not an Affiliated Company, and serial severance pay received by individuals that were tendered severance agreements on or after January 1, 2004.

(b)    If an Employee is a participant in an arrangement maintained by a Participating Company or Affiliated Company which is described in Section 401(k) of the Code, "Compensation" shall also include any amount which would be included in Compensation but for the Employee's election to reduce his or her Compensation and have the amount of the reduction contributed to the 401(k) arrangement on the Employee's behalf.

(c)    If an Employee is a participant in a plan maintained by a Participating Company or Affiliated Company which is described in Section 125 and/or 132(f) of the Code, "Compensation" shall also include any amounts which would be included in Compensation but for the employee's election to reduce his or her Compensation and apply the same toward a benefit or benefits under that plan, excluding any funds or credits made available by a Participating Company or Affiliated Company other than through salary reduction.

(d)    "Compensation" shall not include any amounts paid or credited under this Plan or any other plan of deferred compensation, except as provided in subsection (b).

(e)    "Compensation" for the Limitation Year shall not exceed $200,000 or such different amounts prescribed by the Secretary of the Treasury (as adjusted for the cost-of-living increase in accordance with Section 401(a)(17)(B) of the Code) as in effect on the Plan Anniversary immediately preceding the Limitation Year.

(f)    In the case of a former Employee who is on Military Leave, "Compensation" shall include amounts paid to such former Employee by a Participating Company and amounts required under Section 414(u) of the Code.

**The above definition of "Compensation" shall be replaced in its entirety effective on October 1, 2005 contingent on the distribution of Ameriprise Financial, Inc. on September 30, 2005, to read as follows:** *"Compensation" means amounts paid to an Employee by a Participating Company for the Limitation Year, subject to the following subsections. In the case of an Employee who was not employed by a Participating Company on the first day of the Limitation Year, Compensation shall be determined for the Limitation Year as of the date the Employee becomes an Active Participant.*

*(a)    "Compensation" shall include, but is not limited to, the following: regular earnings, incentive pay as described in Addendum C, shift differential, overtime, SkyGuide subscription commissions, Travel Protection Plan sales commissions, Publishing Sales Incentive Plan commissions, Customer Focused Sales Commission (CFS Incentive), formerly known as Cardmember Telephone Service Center sales commissions, holiday earnings, regular earnings adjustments, vacation, company holidays, personal holidays, discretionary holidays, compensated health-related time off, Company-paid workers compensation consisting of pay for services provided, purchased vacation, termination vacation, pay in lieu of notice, annual incentive cash awards from the American Express Company 1998 Incentive Compensation Plan and 1989 Long-Term Incentive Plan. "Compensation" for a Limitation Year shall also include (1) incentive pay paid to a former Employee by a Participating Company on account of services performed as an Employee during the immediately preceding Limitation Year and (2) Compensation paid to a former Employee for a regular payroll period that began in the Limitation Year during which the former Employee terminated employment and which ends in the current Limitation Year. "Compensation" shall not include lump-sum severance pay, imputed income, long-term incentive pay, special awards pay, non-qualified deferred compensation, bonuses other than incentive pay, and serial severance pay received by individuals that were tendered severance agreements on or after January 1, 2004.*

*(b)    If an Employee is a participant in an arrangement maintained by a Participating Company or Affiliated Company which is described in Section 401(k) of the Code, "Compensation" shall also include any amount which would be included in Compensation but for the Employee's election to reduce his or her Compensation and have the amount of the reduction contributed to the 401(k) arrangement on the Employee's behalf.*

*(c)    If an Employee is a participant in a plan maintained by a Participating Company or Affiliated Company which is described in Section 125 and/or 132(f) of the Code,*

*"Compensation" shall also include any amounts which would be included in Compensation but for the employee's election to reduce his or her Compensation and apply the same toward a benefit or benefits under that plan, excluding any funds or credits made available by a Participating Company or Affiliated Company other than through salary reduction.*

*(d)    "Compensation" shall not include any amounts paid or credited under this Plan or any other plan of deferred compensation, except as provided in subsection (b).*

*(e)    "Compensation" for the Limitation Year shall not exceed $200,000 or such different amounts prescribed by the Secretary of the Treasury (as adjusted for the cost-of-living increase in accordance with Section 401(a)(17)(B) of the Code) as in effect on the Plan Anniversary immediately preceding the Limitation Year.*

*(f)    In the case of a former Employee who is on Military Leave, "Compensation" shall include amounts paid to such former Employee by a Participating Company and amounts required under Section 414(u) of the Code.*

### 2.14    Contribution Credits

"Contribution Credits" means the deemed contributions credited to a Participant's Defined Benefit Account Balance in accordance with Section 4.4.

### 2.15    Cost Center

"Cost Center" means a unit or Employee grouping of a Participating Company recognized by the Company as a separate cost center for internal bookkeeping purposes and listed in Addendum D to this Plan.  To the extent a cost center is not set forth or described in Addendum D, the provisions of the Plan specifically relating to or referencing "Cost Center(s)" shall have no application.

### 2.16    Cost Center Participant

"Cost Center Participant" means any Participant who, for the relevant period, is assigned to a Cost Center excluding any Employee who attained age forty (40) and five (5) Years of Service as of December 31, 2004, and who was employed by a Participating Company on December 31, 2004.

### 2.17    Defined Benefit Account Balance

"Defined Benefit Account Balance" means the sum of a Participant's Initial Defined Benefit Account Balance, and the Contribution Credits and Imputed Earnings Credit credited from July 1, 1995 to the date the Defined Benefit Account Balance is determined.

### 2.18    Disability or Disabled

"Disability" or "Disabled" means a physical or mental condition that renders the Participant eligible for disability benefits under the federal Social Security Act as now enacted or hereinafter amended.  As proof of Disability, the Participant must provide the official written determination of Disability by the Social Security Administration to the Administration

Committee. Each year thereafter, the Participant must provide a written confirmation of continued Disability status issued by the Social Security Administration to the Administration Committee. Notwithstanding the foregoing, no Participant will be considered to have a Disability unless an official Social Security determination is received by the Administration Committee within two (2) years after the Participant's last day of eligibility for coverage under the Company's separate salary continuation benefit.

### 2.19    Eligible Employee

"Eligible Employee" means any Employee of a Participating Company who is (a) employed within the United States, or (b) traditionally employed within the United States and currently on temporary assignment outside the United States, or (c) employed outside the United States if the Employee is (1) a U.S. citizen, or (2) a non-U.S. citizen who is a Lawful Permanent Resident, and the Employee is a career expatriate in the Participating Company's international expatriate program and receives from a Participating Company a regular stated compensation, paid in whole or in part in U.S. currency. A "Lawful Permanent Resident" as used herein, is an individual who has been lawfully granted the privilege of residing permanently in the United States as an immigrant in accordance with immigration laws.

(a)    Notwithstanding the foregoing, an Eligible Employee does not include an Employee who is a member of any of the following classifications:

(1)    any member of the Field Force who:

(i)    has entered into an Independent Advisor Business Franchise Agreement with an Affiliated Company;

(ii)    has his or her NASD registration held by an Affiliated Company that is not a Participating Company; or

(iii)    is an individual supervised by an individual described in (i) or (ii) above;

(2)    temporary or casual Employees unless the temporary or casual Employee actually worked one thousand (1,000) hours during the period that would otherwise be deemed to be a Year of Service;

(3)    Employees routinely scheduled to work less than twenty (20) hours per week unless the Employee actually worked one thousand (1,000) hours during the period that would otherwise be deemed to be a Year of Service;

(4)    co-op student interns and other intern personnel unless the co-op student intern or other intern personnel actually worked one thousand (1,000) hours during the period that would otherwise be deemed to be a Year of Service;

(5)    members of a collective bargaining unit unless the applicable collective bargaining agreement specifically provides for participation by such Employees;

(6)    Employees paid pursuant to a contract unless such contract specifically describes the Employee as an Eligible Employee for purposes of this Plan;

(7)    any individual whose services are leased from or provided through a third party, regardless of whether such individual would be considered a Leased Employee;

(8)    any Employee who is entitled to benefits under a non-United States retirement plan to which any Participating Company makes contributions;

(9)    Employees who have waived their rights to participate in the Plan or agreed to be excluded from participation in the Plan; and

(10)    any Employee who is not a U.S. citizen or Lawful Permanent Resident, is employed in the U.S., and is on assignment as a career expatriate in the Participating Company's international expatriate program.

(b)    For purposes of this Section, the term "United States" shall include such territories and protectorates of the United States as the Administration Committee shall from time to time determine; and the term "temporary or casual" Employee (who may be a part-time or full-time Employee) shall mean an Employee who is categorized under the Participating Company's normal employee classification system as a temporary or casual Employee. An Eligible Employee who performs services for more than one Participating Company as an officer or in any other capacity shall be deemed to be employed by the Participating Company from which he or she receives his or her primary Compensation.

(c)    Notwithstanding anything herein to the contrary, an individual is not an Eligible Employee during any period during which the individual is classified by a Participating Company or an Affiliated Company for tax withholding purposes as an independent contractor (or any other status in which the individual is not treated as a common law employee). The Participating or Affiliated Company's classification as in existence at the time shall control, even if the individual is subsequently retroactively reclassified as an employee for tax withholding purposes or for some other purpose.

(d)    "Field Force" means an individual or individuals who pursuant to a written agreement, is acting as a financial advisor, (field) director, (field) supervisor, (field) manager, OSJ Branch Manager, Branch Manager, Associate Vice President, Field Vice President or Group Vice President of a Participating Company.

**The above definition of "Eligible Employee" shall be replaced in its entirety effective on October 1, 2005 contingent on the distribution of Ameriprise Financial, Inc. on September 30, 2005, to read as follows:** *"Eligible Employee" means any Employee of a Participating Company who is (a) employed within the United States, or (b) traditionally employed within the United States and currently on temporary assignment outside the United States, or (c) employed outside the United States if the Employee is (1) a U.S. citizen, or (2 a non-U.S. citizen who is a Lawful Permanent Resident, and the Employee is a career expatriate in the Participating Company's international expatriate program and receives from a Participating Company a regular stated compensation, paid in whole or in part in U.S.*

*currency. A "Lawful Permanent Resident" as used herein, is an individual who has been lawfully granted the privilege of residing permanently in the United States as an immigrant in accordance with immigration laws.*

*(a)    Notwithstanding the foregoing, an Eligible Employee does not include an Employee who is a member of any of the following classifications:*

*(1)    temporary or casual Employees unless the temporary or casual Employee actually worked one thousand (1,000) hours during the period that would otherwise be deemed to be a Year of Service;*

*(2)    Employees routinely scheduled to work less than twenty (20) hours per week unless the Employee actually worked one thousand (1,000) hours during the period that would otherwise be deemed to be a Year of Service;*

*(3)    co-op student interns and other intern personnel unless the co-op student intern or other intern personnel actually worked one thousand (1,000) hours during the period that would otherwise be deemed to be a Year of Service;*

*(4)    members of a collective bargaining unit unless the applicable collective bargaining agreement specifically provides for participation by such Employees;*

*(5)    Employees paid pursuant to a contract unless such contract specifically describes the Employee as an Eligible Employee for purposes of this Plan;*

*(6)    any individual whose services are leased from or provided through a third party, regardless of whether such individual would be considered a Leased Employee;*

*(7)    any Employee who is entitled to benefits under a non-United States retirement plan to which any Participating Company makes contributions;*

*(8)    Employees who have waived their rights to participate in the Plan or agreed to be excluded from participation in the Plan; and*

*(9)    any Employee who is not a U.S. citizen or Lawful Permanent Resident, is employed in the U.S., and is on assignment as a career expatriate in the Participating Company's international expatriate program.*

*(b)    For purposes of this Section, the term "United States" shall include such territories and protectorates of the United States as the Administration Committee shall from time to time determine; and the term "temporary or casual" Employee (who may be a part-time or full-time Employee) shall mean an Employee who is categorized under the Participating Company's normal employee classification system as a temporary or casual Employee. An Eligible Employee who performs services for more than one Participating Company as an officer or in any other capacity shall be deemed to be employed by the Participating Company from which he or she receives his or her primary Compensation.*

(c)    *Notwithstanding anything herein to the contrary, an individual is not an Eligible Employee during any period during which the individual is classified by a Participating Company or an Affiliated Company for tax withholding purposes as an independent contractor (or any other status in which the individual is not treated as a common law employee). The Participating or Affiliated Company's classification as in existence at the time shall control, even if the individual is subsequently retroactively reclassified as an employee for tax withholding purposes or for some other purpose.*

### 2.20    Employee

"Employee" means any person, including an officer, who is employed as a common law employee by a Participating Company or Affiliated Company.

### 2.21    Employment or Re-Employment

"Employment" or "Re-employment" means the completion of an Hour of Service for which the Employee is paid or entitled to payment for service with a Participating Company, an Affiliated Company or a Predecessor Company either initially (in the case of Employment) or upon reemployment following the Employee's termination of employment (in the case of Re-employment).

### 2.22    ERISA

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended.

### 2.23    Fund

"Fund" means the trust, custodial account, insurance contract or other assets comprising the assets of the Plan.

### 2.24    Funding Agent

"Funding Agent" shall mean the Trustee, insurance company or other custodian of the Plan's assets.

### 2.25    Highly Compensated Employee

"Highly Compensated Employee" means an Employee who (1) was a five percent (5%) owner during the Limitation Year or the preceding Limitation Year, or (2) for the preceding Limitation Year, had Compensation from the Company greater than $90,000 (as indexed under the Code) and was in the top-paid group of Employees for such preceding Limitation Year, to the extent consistent with, and pursuant to, the provisions of the Code. A Highly Compensated Former Employee is based on the rules applicable to determining Highly Compensated Employee status as in effect for that determination year, in accordance with Section 1.414(q)-1T, A-4 of the temporary Treasury Regulations and Notice 97-45. For this purpose, the applicable year of the Plan for which a determination is being made is called a "determination year."

### 2.26    Hour of Service

"Hour of Service" means:

(a)    Each hour for which an Employee is paid, or entitled to payment, for the performance of duties for a Participating Company or an Affiliated Company.

(b)    Each hour for which an Employee is paid, or entitled to payment, by a Participating Company or an Affiliated Company on account of a period of time during which no duties are performed (irrespective of whether the employment relationship has terminated) due to vacation, holiday, illness, incapacity (including disability), layoff, jury duty, military duty or leave of absence. No more than 501 Hours of Service shall be credited under this paragraph for any single continuous period (whether or not that period occurs in a single computation year). Notwithstanding the foregoing, Hours of Service shall not be credited on account of payments made under a plan maintained solely for the purpose of complying with applicable workers' compensation, unemployment compensation, or disability insurance laws nor shall Hours of Service be credited on account of a payment which solely reimburses an Employee for medical or medically related expenses incurred by the Employee.

(c)    Each hour for which back pay, irrespective of mitigation of damages, is either awarded or agreed to by a Participating Company or an Affiliated Company. The same Hours of Service shall not be credited both under subsection (a) or subsection (b), as the case may be, and under this subsection. These hours shall be credited to the Employee for the computation year or years to which the award or agreement pertains rather than the computation year in which the award, agreement or payment is made.

(d)    Hours required to be credited for any period of service with the armed forces of the United States which the Employee entered from employment with a Participating Company or an Affiliated Company on account of induction or enlistment under federal law, provided the Employee returns to employment with a Participating Company or Affiliated Company within the period prescribed by federal law during which the Employee's reemployment rights are protected by law or, in the absence of such a law, within ninety (90) days from the date release or discharge from military service is available.

(e)    For purposes of subsections (a) and (b), a payment shall be deemed to be made by or due from a Participating Company or an Affiliated Company regardless of whether such payment is made by or due from the Participating Company or the Affiliated Company directly or indirectly through, among others, a trust fund or insurer to which the Participating Company or an Affiliated Company contributes or pays premiums, regardless of whether contributions made or due to the trust fund, insurer or other entity are for the benefit of particular Employees or are on behalf of a group of Employees in the aggregate.

(f)    For purposes of subsections (b) and (c), in the case of an Employee without a regular work schedule, Hours of Service shall be credited based on a daily average of the Employee's Hours of Service otherwise determined under subsections (a), (b) and (c) for the twelve (12) months immediately preceding the date of determination, or during the Employee's entire employment with a Participating Company or an Affiliated Company ending immediately

prior to the date of determination if employed by a Participating Company or an Affiliated Company for less than twelve (12) months.

(g)    To the extent not otherwise provided in the Plan, Hours of Service under this Section shall be calculated and credited pursuant to Sections 2530.200b-2 of the Department of Labor Regulations, which are incorporated by reference.

(h)    Credit for Hours of Service shall not be given for service with predecessors of the Participating Companies or Affiliated Companies or for periods during which any Affiliated Companies were not considered as Affiliated Companies, except to the extent required by the provisions of any agreement executed by a current or former Affiliated Company relating to an acquisition, merger or spin-off, or as otherwise provided in Addendum A.

(i)    Credit for Hours of Service shall be given to the extent and for the purposes provided by the Family and Medical Leave Act.

(j)    An Employee shall not receive credit under more than one (1) subsection of this Section for the same period of time, but shall receive credit under the subsection which produces the greatest credit.

Hours of Service shall be determined by the Plan Administrator from the records determined by it to accurately reflect this information.

## 2.27    Imputed Earnings Credit

"Imputed Earnings Credit" means the earnings credited to a Participant's Defined Benefit Account Balance. Earnings shall be credited at the interest rate determined by the arithmetic average of the daily annual yields on five (5) year U.S. Treasury Securities as published by the Department of the Treasury and the Federal Reserve as in effect for the second month and third months preceding the first day of the Limitation Year. By action of the Administration Committee, the Company may amend the Plan to change the Imputed Earnings Credit, but any such change shall be effective only for the Limitation Year or Years for which it is made, shall not reduce Imputed Earnings Credit already credited to Defined Benefit Account Balances and shall not be effective for any other prior or subsequent Limitation Years. In no event shall the Imputed Earnings Credit for any Limitation Year be less than five percent (5%) nor more than the lesser of ten percent (10%) or the Applicable Interest Rate (if greater than five percent (5%)).

## 2.28    Inactive Participant

"Inactive Participant" means a Participant who (a) is not an Active Participant; (b) is not accruing benefits under the Plan, but whose service entitles him or her to credit for computing eligibility or vesting or both under the Plan; (c) transfers to an Affiliated Company that is not a Participating Company; or (d) is on Leave.

### 2.29   Initial Defined Benefit Account Balance

"Initial Defined Benefit Account Balance" means the value assigned to a Participant's Defined Benefit Account Balance attributable to the Predecessor Plan on June 30, 1995, as provided in Section 4.2.

### 2.30   Investment Committee

"Investment Committee" means the Benefit Plans Investment Committee of the Company.

### 2.31   Joint and 50% Survivor Annuity

"Joint and 50% Survivor Annuity" means an annuity which is the Actuarial Equivalent of the Normal Benefit Form based upon the Applicable Interest Rate and the Applicable Mortality Table and which is payable for the life of the Participant with an annuity payable thereafter to the Participant's Surviving Spouse or beneficiary for the Surviving Spouse's or beneficiary's life in an amount equal to fifty percent (50%) of the annuity payable to the Participant.

### 2.32   Leased Employee

"Leased Employee" means an individual who is not otherwise an Employee of a Participating Company or Affiliated Company who provides services to a Participating Company or Affiliated Company pursuant to an agreement between the Participating Company or Affiliated Company and a leasing organization, on a substantially full-time basis for a period of at least one (1) year and such services are performed under the primary direction or control by the recipient, as described in Section 414(n) of the Code and the Treasury Regulations thereunder. In the event a Leased Employee becomes an Eligible Employee under the Plan, for purposes of computing the Leased Employee's Years of Service, the Leased Employee shall be treated as an Employee from the date he or she first provided services to a Participating Company or Affiliated Company upon the Employee providing appropriate documentation necessary to compute the Leased Employee's Years of Service.

### 2.33   Leave

"Leave" means any period during which a person who was employed immediately prior to the commencement of such period is absent without compensation pursuant to a leave of absence granted by the Participating Company.

### 2.34   Limitation Year

"Limitation Year" means the twelve (12) consecutive month period beginning January 1, unless otherwise established by the Administration Committee.

### 2.35    Military Leave

"Military Leave" means any period during which an Employee is absent because of qualified service in the uniformed services as defined in the Uniformed Services Employment and Reemployment Rights Act of 1994, as amended. Contributions, benefits and service credit with respect to Military Leave in the uniformed services will be provided in accordance with Code Section 414(u).

### 2.36    Normal Benefit Form

"Normal Benefit Form" means a monthly annuity payable in the form of a single life annuity.

### 2.37    Normal Retirement Age

"Normal Retirement Age" means age sixty-five (65).

### 2.38    Normal Retirement Benefit

"Normal Retirement Benefit" means the monthly benefit payable on the Participant's Normal Retirement Date in the Normal Benefit Form.

### 2.39    Normal Retirement Date

"Normal Retirement Date" means the first day of the calendar month after the Participant attains Normal Retirement Age.

### 2.40    Participant

"Participant" means an Employee who has satisfied the eligibility requirements of the Plan and has commenced participation in the Plan, but has not yet received a complete distribution of his benefits under the Plan. The term shall include an Active Participant, an Inactive Participant, a former Eligible Employee with a deferred Vested Interest under the Plan and a former Eligible Employee who is receiving benefits under the Plan.

### 2.41    Participating Company

"Participating Company" means the Company and any Affiliated Company that adopts this Plan with the consent of the Company.

### 2.42    Period of Service

"Period of Service" means each period of time commencing on an Employee's initial date of Employment or date of Re-employment, whichever is applicable, and ending on such Employee's next Termination Date. A Period of Service shall include the following:

(a)    Any period of service because of Military Leave which the Employee entered from employment with a Participating Company or an Affiliated Company, provided the Employee returns to employment with the Participating Company or an Affiliated Company

within the period prescribed by the Uniformed Services Employment and Reemployment Rights Act of 1994, as amended, or any other period for which credit is required to be given under such Act.

(b)     In the event an Employee has a Termination Date and the Employee subsequently performs an Hour of Service and the Hour of Service is performed within twelve (12) months of his or her Termination Date, "Period of Service" shall include the Termination Period.

(c)     Any period for which credit is required under the Family and Medical Leave Act, for such purposes described in that Act, except that credit shall not be given under this subsection if it would otherwise be given under any other provision of this Section.

**2.43     Plan**

"Plan" means the American Express Retirement Plan.

**2.44     Plan Anniversary**

"Plan Anniversary" means October 1 of each calendar year.

**2.45     Plan Year**

"Plan Year" means the consecutive twelve (12) month period measured from a given Plan Anniversary.

**2.46     Predecessor AMEX Plan or Predecessor Plan**

"Predecessor AMEX Plan" means the American Express Retirement Plan as in existence prior to July 1, 1995. "Predecessor Plan" refers to both the Predecessor AMEX Plan and the Predecessor IDS Plan.

**2.47     Predecessor Company**

"Predecessor Company" means any corporation or unincorporated entity heretofore or hereafter merged or consolidated with or otherwise absorbed by an Affiliated Company or any part of the business of which has been acquired by an Affiliated Company.

**2.48     Predecessor IDS Plan or Predecessor Plan**

"Predecessor IDS Plan" means the IDS Retirement Plan as in existence prior to July 1, 1995. "Predecessor Plan" refers to both the Predecessor AMEX Plan and the Predecessor IDS Plan.

**2.49     Surviving Spouse**

"Surviving Spouse" means the spouse to whom the Participant is married on the earlier of the Annuity Starting Date or the date of the Participant's death, except as otherwise provided in a qualified domestic relations order.

**2.50    Termination Date**

"Termination Date" means the date on which an Employee quits, retires, or is discharged from all Affiliated Companies or dies.

**2.51    Termination Period**

"Termination Period" means a period of time commencing on an Employee's Termination Date and ending on the first subsequent date such Employee again performs an Hour of Service.

**2.52    Trust Agreement**

"Trust Agreement" means the Trust Agreement and/or trust between the Investment Committee and the Trustee.

**2.53    Trustee**

"Trustee" means any banking corporation duly qualified and appointed to so act under the Trust Agreement, and any additional or successor Trustee appointed and acting pursuant to said Trust Agreement.

**2.54    Vested Interest or Vesting**

"Vested Interest" or "Vesting" means a Participant's right to an Accrued Benefit that is nonforfeitable.

**2.55    Year of Service**

"Year of Service" means a Period of Service of twelve (12) months, determined as follows:

(a)    For purposes of determining an individual's first Year of Service for eligibility and Vesting, the following shall apply:

(1)    One (1) Year of Service shall be credited for an Employee's first year of Employment provided such Employee is employed as of the day preceding the one (1) year anniversary of such Employee's initial date of Employment.

(2)    For an Employee who is not credited with his or her first Year of Service under the provisions of Section 2.55(a)(1), such Employee's first Year of Service shall be measured from the Employee's Employment date and each anniversary thereof, and shall include any Termination Period of less than one (1) year. If the Employee has a Termination Period that equals or exceeds one (1) year, the Employee's first Year of Service for eligibility and Vesting shall be determined from his or her most recent Re-employment date.

(b)    For an Employee who is credited with his or her first Year of Service under the provisions of Section 2.55(a), Years of Service for Vesting shall include such

Employee's initial Year of Service and all Periods of Service, subsequent to such Employee's initial Year of Service.

(c)    For purposes of this Section 2.55, any Termination Period that consists of a period of less than one (1) year shall be included for purposes of determining an Employee's Periods of Service and his or her Years of Service.

(d)    For an Employee who was a Participant in a Predecessor Plan on or before June 30, 1995, Years of Service for periods prior to July 1, 1995 shall be determined in accordance with the provisions of the applicable Predecessor Plan.

## ARTICLE 3
## ELIGIBILITY AND PARTICIPATION

### 3.1    Eligibility for Participation

An Eligible Employee who has completed one (1) or more Years of Service is eligible to participate in the Plan.  An Employee who is routinely scheduled to work less than one thousand (1,000) hours annually shall nevertheless be considered to have met the eligibility requirement of a Year of Service if he or she completes one thousand (1,000) Hours of Service in the initial eligibility computation period or any subsequent eligibility computation period.  For this purpose, the eligibility computation period is a twelve (12) month Period of Service commencing on the Eligible Employee's Employment date.  If such Employee fails to complete one thousand (1,000) Hours of Service during such initial eligibility computation period, the computation period shall be the Plan Year.

### 3.2    Participation

All Eligible Employees shall commence participation in the Plan on the first day of the pay period following the date such Employee satisfies the eligibility requirements of Section 3.1.  As a condition precedent for participation in the Plan, the Administration Committee may require an Employee to complete such forms and furnish such information as the Administration Committee deems appropriate.  An Eligible Employee who commences participation in the Plan shall continue to participate until all benefits payable under the Plan to such Eligible Employee have been distributed.

### 3.3    Special Rules for Certain Employees

Notwithstanding anything in Section 3.2 to the contrary:

(a)    A Participant who ceases to be an Eligible Employee shall terminate Active Participation in the Plan as of the date he or she ceases to be an Eligible Employee, and shall resume Active Participation on the date he or she again becomes an Eligible Employee.

(b)    An Eligible Employee who has satisfied the service requirement of Section 3.1, but who terminates employment with a Participating Company or otherwise ceases to be an Eligible Employee before the entry date described in Section 3.2, shall commence participating in the Plan on the later of the date he or she again becomes an Eligible Employee or the entry date applicable to him or her if he or she had remained an Eligible Employee.

(c)     An Employee who has satisfied the service requirement of Section 3.1 and would have become a Participant in the Plan had he or she been an Eligible Employee, shall commence participation in the Plan on the date he or she becomes an Eligible Employee.

## ARTICLE 4
## NORMAL RETIREMENT BENEFIT

### 4.1    Normal Retirement Benefit

The Normal Retirement Benefit of a Participant who retires on his Normal Retirement Date shall be equal to his Accrued Benefit on such date.

### 4.2    Initial Defined Benefit Account Balance

A Participant's Initial Defined Benefit Account Balance shall be zero unless the Participant was also a participant in the Predecessor AMEX Plan or the Predecessor IDS Plan. In the case of a Participant who was a participant in the Predecessor AMEX Plan or the Predecessor IDS Plan, such Participant's Initial Defined Benefit Account Balance shall be equal to the Actuarially Equivalent present value of the Participant's accrued benefit under such Predecessor Plan on June 30, 1995, as determined in accordance with this Section. For a Participant who was more than forty-five (45) years of age on June 30, 1995 and a Participant in a Predecessor Plan on that date, the Participant's Initial Defined Benefit Account Balance as determined above shall include, in addition, a percentage of the Actuarially Equivalent present value of the early retirement subsidy provided by the applicable Predecessor Plan as of June 30, 1995. The early retirement subsidy and the percentage of the Actuarially Equivalent present value of the subsidy shall be determined as follows:

(a)     In the case of a Participant who was a participant in the Predecessor AMEX Plan who attained age fifty-five (55) and who was credited with ten (10) or more years of service under the Predecessor AMEX Plan on or before June 30, 1995, one hundred percent (100%) of the Actuarially Equivalent present value of the early retirement subsidy applicable to the Participant if he or she had taken early retirement on July 1, 1995.

(b)     In the case of a Participant who was a participant in the Predecessor IDS Plan who attained age fifty-five (55) on or before June 30, 1995, one hundred percent (100%) of the Actuarially Equivalent present value of the early retirement subsidy applicable to the Participant if he or she had taken early retirement on July 1, 1995.

(c)     In the case of a Participant who was a participant in the Predecessor AMEX Plan on June 30, 1995, and who had not attained age fifty-five (55) and/or did not have ten (10) years of service under the Predecessor AMEX Plan on that date, the Actuarially Equivalent present value of the subsidy applicable to the Participant on the first day of the month coinciding with or immediately following the date the Participant would have first qualified for an early retirement benefit under the Predecessor AMEX Plan, multiplied by a fraction, not to exceed one (1), the numerator of which is one hundred twenty (120) minus the number of months by which June 30, 1995 precedes the first day of the month coinciding with or immediately following the month in which the Participant would have attained age fifty-five (55) and had ten (10) years of service, and the denominator of which is one hundred twenty (120).

(d)    In the case of a Participant who was a participant in the Predecessor IDS Plan on June 30, 1995, the Actuarially Equivalent present value of the subsidy applicable to the Participant on the first day of the month coinciding with or immediately following the date the Participant would have first attained age fifty-five (55), multiplied by a fraction, not to exceed one (1), the numerator of which is one hundred twenty (120) minus the number of months by which June 30, 1995 precedes the month coinciding with or immediately following the month in which the Participant would have attained age fifty-five (55), and the denominator of which is one hundred twenty (120).

For purposes of this Section, the Actuarially Equivalent present value of the Participant's accrued benefit and the early retirement subsidy applicable to the Participant shall be determined by applying an interest rate of six percent (6%) and the 1984 Unisex Pensioner Mortality Table.

### 4.3    Calculation of Accrued Benefit Under Predecessor Plans

A Participant's accrued benefit under the Predecessor AMEX Plan or the Predecessor IDS Plan, as applicable, shall be equal to the benefit expressed as the single life annuity the Participant would have been entitled to at the normal retirement age under the applicable Predecessor Plan if he or she had been fully Vested and had terminated Employment on June 30, 1995, or the benefit payable at the Participant's actual age if the Participant was older than such normal retirement age on June 30, 1995.

### 4.4    Contribution Credits

The Contribution Credits used to determine a Participant's Defined Benefit Account Balance shall be credited each pay period in accordance with the terms of the table set forth below. For purposes of this Section 4.4, Compensation shall be determined separately for the portion of the Limitation Year that a Participant is a Cost Center Participant and the portion of the Limitation Year that the Participant is not a Cost Center Participant.

| Participant's Combined Age and Years of Service as of December 31 of the current Limitation Year | Applicable Percentage of Compensation of Non-Cost Center Participants | Applicable Percentage of Compensation of Cost Center Participants |
|---|---|---|
| Less than 35 | 2.50% | 1.25% |
| 35-44 | 3.25% | 1.625% |
| 45-59 | 4.25% | 2.125% |
| 60-74 | 5.75% | 2.875% |
| 75-89 | 8.00% | 4.00% |
| 90 or more | 10.00% | 5.00% |

For purposes of this Section 4.4:

(a)    A Participant's Years of Service shall mean such Participant's aggregate Years of Service for Vesting determined under Section 6.2.

(b)    Notwithstanding other Plan provisions, in the case of an Active Participant who terminates Employment with a Participating Company on account of Disability at a time when the Participant is not otherwise one hundred percent (100%) Vested, such Disabled Participant shall be one hundred percent (100%) Vested and entitled to a termination benefit under Section 6.4. In the case of a Disabled Participant who has a one hundred percent (100%) Vested Interest in his or her Accrued Benefit hereunder (without regard to Vesting that occurs as a result of Disability), Contribution Credits shall continue and shall be based on such Participant's Compensation in effect on the date of the Disability. Notwithstanding anything herein to the contrary, benefit accruals for a Disabled Participant shall cease upon the earlier of: (1) cessation of such Disabled Participant's Disability; (2) attainment of Normal Retirement Age by such Disabled Participant; or (3) election by the Disabled Participant of a termination benefit under Section 6.4.

(c)    "Applicable Percentage" shall mean the percentage of a Participant's Compensation for the Limitation Year specified in the above table for the applicable Limitation Year. In the event a Participant first becomes a Participant on a date other than the first day of the Limitation Year or ceases to be an Eligible Employee during the Limitation Year but remains an Employee, the Applicable Percentage shall be applied to the Participant's Compensation while an Eligible Employee.

### 4.5    Contributions, Benefits and Service Credit with Respect to Qualified Military Service

Contributions, benefits and service credit with respect to qualified Military Leave will be provided in accordance with Code Section 414(u).

### 4.6    Imputed Earnings Credit

For each Limitation Year, a Participant's Defined Benefit Account Balance shall be increased by the Imputed Earnings Credit. The amount of the Imputed Earnings Credit for a Limitation Year shall be computed by multiplying the crediting rate for the Limitation Year by the Defined Benefit Account Balance on the last day of the preceding Limitation Year. For the Contribution Credits added during the current Limitation Year, a pro rated portion of the Imputed Earnings Credit in effect for the Limitation Year shall be credited from the intervals that the Contribution Credits accrue. In the event a Participant terminates Employment with all Affiliated Companies and receives a benefit which commences at any time during the Limitation Year, the Imputed Earnings Credit shall accrue on a prorated basis through the Annuity Starting Date. In the event the Imputed Earnings Credit is changed at any time, the Imputed Earnings Credit shall not be changed with respect to any Participant who has received or commenced receiving a distribution prior to the date a change in the Imputed Earnings Credit is adopted and shall otherwise be prospective only, unless the written action of the Administration Committee changing the Imputed Earnings Credit rate expressly provides to the contrary; provided, however, that no change in the Imputed Earnings Credit shall reduce that Imputed Earnings Credit already accrued on the Participant's Defined Benefit Account Balance.

## ARTICLE 5
## POSTPONED RETIREMENT

### 5.1    Postponed Retirement

A Participant may postpone his retirement beyond his Normal Retirement Date and commence receiving his benefit on the first day of the month following his termination of Employment with all Affiliated Companies. A Participant's benefit on his postponed retirement date shall be equal to his Accrued Benefit on such date. In the event benefits are required to commence prior to the date a Participant actually retires pursuant to the provisions of Section 7.5, the Participant's Accrued Benefit shall be redetermined annually on the last day of each Limitation Year the Participant remains employed by an Affiliated Company and the Participant's benefit shall be adjusted to reflect any change in his or her Accrued Benefit.

## ARTICLE 6
## VESTING

### 6.1    Vesting

A Participant shall have a one hundred percent (100%) Vested Interest in his Accrued Benefit upon completion of five (5) Years of Service for Vesting, or as otherwise provided in Addendum B. Regardless of a Participant's Years of Service for Vesting, a Participant shall have a one hundred percent (100%) Vested Interest in his Accrued Benefit on the date he or she attains his Normal Retirement Age, becomes Disabled or dies. For a Participant who was a participant in a Predecessor Plan on or before June 30, 1995, Years of Service for Vesting for periods prior to July 1, 1995 shall be determined under the provisions of the Predecessor Plan.

### 6.2    Computing Years of Service for Vesting

All Years of Service shall be taken into account for purposes of determining a Participant's Years of Service for Vesting.

### 6.3    Forfeiture of Accrued Benefit

In the event a Participant terminates Employment with all Affiliated Companies at a time when he or she does not have a Vested Interest in his Accrued Benefit, he or she will be deemed to have received a distribution of his entire Vested Interest equal to $0 and shall immediately forfeit his Accrued Benefit. Such forfeiture shall be restored if the Participant again becomes an Eligible Employee before incurring a Termination Period consisting of five (5) consecutive years. Any forfeitures shall be applied to reduce contributions by Participating Companies.

### 6.4    Termination Benefit

A Participant who terminates Employment with all Affiliated Companies at a time when he or she has a Vested Interest in his or her Accrued Benefit shall be entitled to a termination benefit. The termination benefit (expressed in the Normal Benefit Form) shall be equal to an amount determined by dividing the Participant's Defined Benefit Account Balance

on the Annuity Starting Date by an immediate annuity factor based upon the Applicable Interest Rate and the Applicable Mortality Table.

## ARTICLE 7
## FORM OF BENEFIT PAYMENTS

### 7.1    Joint and 50% Survivor Annuity

If a Participant is married on the Annuity Starting Date, the Participant's benefit under the Plan shall be paid in the form of a Joint and 50% Survivor Annuity, unless an election is made as described in Section 7.2. Except as otherwise provided in a qualified domestic relations order, the spouse to whom the Participant is married on the Participant's Annuity Starting Date is entitled to the survivor portion of the Joint and 50% Survivor Annuity, whether or not the Participant and such spouse are married on the date of the Participant's death. The annuity payable to the Participant shall commence on the Participant's Annuity Starting Date and shall terminate on the first day of the month of the Participant's death. The survivor annuity payable to the Participant's Surviving Spouse shall commence on the first day of the month following the Participant's death and shall terminate on the first day of the month of the Surviving Spouse's death. In the event a Participant is not married on the Annuity Starting Date, the Participant's benefit shall be paid in the Normal Benefit Form, unless an election is made as described in Section 7.2.

### 7.2    Election Not to Take a Joint and Survivor Annuity

Within a reasonable time prior to the Annuity Starting Date (and consistent with such Regulations as the Secretary of the Treasury may prescribe) the Administration Committee shall provide the Participant with a written explanation of:

      (a)     The terms and conditions of the Joint and 50% Survivor Annuity.

      (b)     The Participant's right to make, and the effect of, an election to waive the Joint and 50% Survivor Annuity form of benefit.

      (c)     The rights of the Participant's spouse.

      (d)     The right to make, and the effect of, a revocation of a previous election to waive the Joint and 50% Survivor Annuity.

During the ninety (90) day period ending on the Annuity Starting Date, the Participant shall have the right to waive the Joint and 50% Survivor Annuity and have his or her benefit paid in any one of the optional forms of benefit described in Section 7.3. Any waiver or revocation of a previous waiver shall not be effective unless it is in writing, on such form or forms as the Administration Committee may prescribe and filed with the Administration Committee during the ninety (90) day election period. Any waiver shall be consented to by the Participant's spouse, shall be limited to the optional form of benefit and beneficiary specified in the waiver, shall acknowledge the effect of such consent and waiver, and the spouse's signature shall be witnessed by a notary public. Notwithstanding the requirement for spousal consent, if the Participant establishes to the satisfaction of a Plan representative designated by the Administration Committee that the written consent of the Participant's spouse cannot be obtained

because there is no spouse, such spouse cannot be located or because of such other circumstances as the Secretary of the Treasury may by Regulation prescribe, a waiver shall be effective without spousal consent. Any spousal consent necessary under this Section shall be valid only with respect to the spouse who signs the consent or, in the event of a deemed consent where the spouse's signature is not required, the applicable spouse. The Participant may revoke a previous waiver at any time prior to the Annuity Starting Date and the number of revocations shall not be limited. The spouse may not revoke his or her consent to a waiver. In the event the Participant is not married on the Annuity Starting Date, the written explanation and waiver requirements described in this Section (except the requirement for spousal consent) shall apply to the Normal Benefit Form.

### 7.3    Optional Forms of Benefit

Instead of having benefits paid in the form of a Joint and 50% Survivor Annuity, a Participant may elect, in the manner described in Section 7.2, to have his or her benefit paid in one of the following optional forms of benefit:

(a)    The Normal Benefit Form, which shall be a single life annuity commencing on the Participant's Annuity Starting Date and terminating on the first day of the month of the Participant's death.

(b)    A Joint and 50% Survivor Annuity commencing on the Participant's Annuity Starting Date and terminating on the first day of the month of the Participant's death with a fifty percent (50%) survivor annuity payable to the Participant's beneficiary (who need not be the Participant's Surviving Spouse) commencing on the first day of the month following the Participant's death and terminating on the first day of the month of the beneficiary's death.

(c)    A lump sum distribution equal to the greatest of (1) the Participant's Defined Benefit Account Balance on the Annuity Starting Date, (2) the present value of the Participant's accrued benefit under a Predecessor Plan on June 30, 1995, or (3) to the extent required by law, for benefit payments in Limitation Years during which the Applicable Interest Rate is less than five percent (5%), the Defined Benefit Account Balance projected from the Annuity Starting Date to the Participant's Normal Retirement Age using the Imputed Earnings Credit (as in effect for the Limitation Year in which the benefit is determined) and then discounted from the Participant's Normal Retirement Age to the Annuity Starting Date using the Applicable Interest Rate. For purposes of this subsection (c), present value shall be computed using the Applicable Interest Rate and the Applicable Mortality Table.

### 7.4    Involuntary Lump Sum Distribution

Notwithstanding a Participant's or alternate payee's election or the other provisions of this Article, a Participant or alternate payee shall be paid his benefit in the form of a lump sum if the present value of such Participant's or alternate payee's total Vested Interest in his Accrued Benefit is $1,000 or less on the date of distribution. Present value shall be computed under the provisions of subsection (c) of Section 7.3.

Any change in the present value dollar limitation referenced in this Section 7.4 shall apply to the Vested Interest of Participants, Inactive Participants and alternate payees as of

the date of such change. In addition, the present value of the total Vested Interest in the Accrued Benefit of an alternate payee (if the QDRO so provides), and notwithstanding Section 1.2, an Inactive Participant who terminated employment prior to July 1, 1995, shall be computed under the applicable Predecessor Plan using the Applicable Interest Rate and Applicable Mortality Table as in effect on the Annuity Starting Date.

### 7.5    Commencement of Benefits

(a)    Benefits payable on account of termination of Employment or retirement shall commence as soon as administratively feasible following the date elected by the Participant for commencement of benefits; provided, however, that a Participant may not defer commencement of his or her benefit beyond his or her Required Beginning Date (as defined in Section 7.5(b)). If a Participating Company ceases to be a member of a controlled group of corporations with the Company (as defined in Section 2.7), such Participating Company will no longer be a Participating Company and a Participant employed by such Participating Company shall be considered to have terminated employment for purposes of commencing benefits. In the case of a Participant who has not terminated employment with all Affiliated Companies by the April 1 of the calendar year following the calendar year in which he or she attains age seventy and one-half (70½), benefits shall commence on the first day of the month following the Participant's termination of Employment with all Affiliated Companies.

(b)    Notwithstanding the foregoing, in accordance with Section 7.7 and Code Section 401(a)(9), Plan distributions must commence by the "Required Beginning Date," which is April 1 of the calendar year following the later of (1) the calendar year in which the Participant attains age seventy and one-half (70½) or (2) the calendar year in which the Participant retires, except that subclause (2) shall not apply in the case of an Employee who is a five percent (5%) owner (as defined in Code Section 416) with respect to the Plan Year ending in the calendar year in which the Employee attains age seventy and one-half (70½).

### 7.6    Direct Rollovers and Mandatory Withholding

(a)    A Participant, the surviving spouse of a Participant, or an alternate payee who is a spouse or former spouse is subject to the rights and requirements of this Section 7.6 for a calendar year if such individual (hereafter referred to as the "distributee") is eligible to receive a benefit under the Plan that meets the following conditions:

(1)    Such benefit is not to be paid in a series of substantially equal periodic payments, not less frequently than annually, for the life or life expectancy of the distributee or the joint lives or life expectancies of the distributee and his surviving spouse or dependent or for a specified period of ten (10) years or more, all as determined at the time payments begin without regard to contingencies that have not yet occurred; and

(2)    Such benefit is not a distribution required under Code Section 401(a)(9).

(b)    A distributee subject to this Section 7.6 is entitled to elect to have his or her benefit payments or a portion thereof paid in a direct rollover to an "eligible retirement plan"

(as defined below), provided the distributee specifies the eligible retirement plan to which such benefit is to be paid in the form and at the time required by the Administration Committee. If the distributee does so elect and timely provide the information required by the Administration Committee, the Administration Committee shall make a direct rollover of the distributee's benefit to the trustee or custodian of the eligible retirement plan identified by the distributee, for the benefit of the distributee.

(c)    If the distributee does not so elect or does not provide the required information in the form and at the time required by the Administration Committee, the Administration Committee shall pay the distributee's benefit directly to the distributee. The Administration Committee shall withhold income taxes on such benefit equal to twenty percent (20%) (or such other percentage as may be required by the Code of the amount of such benefit.

(d)    No less than thirty (30) days and no more than ninety (90) days before paying any benefit to a distributee subject to this Section 7.6, the Administration Committee shall provide to the distributee a written explanation of the rules concerning direct rollovers, rollovers of benefits after payment to the distributee, withholding of tax on benefits not directly rolled over, and lump sum averaging of certain benefits. Notwithstanding anything herein to the contrary, a distribution may commence less than thirty (30) days after such written explanation is given, provided that (1) the Administration Committee clearly informs the distributee that the distributee has a right to a period of at least thirty (30) days after receiving the notice to consider the decision of whether or not to elect a distribution, and (2) the distributee, after receiving the notice, affirmatively waives the thirty (30) day notice period and elects a direct rollover or a distribution.

(e)    If a distribution subject to this Section 7.6 is to be paid in the form of installments over a period of time not extending beyond ten (10) years, the following rules shall also apply:

(1)    A distributee's election to make or not make a direct rollover with respect to a single payment shall control whether a direct rollover is made of all subsequent payments, unless the distributee changes the previous election; and

(2)    In addition to the notice that must be provided prior to commencement of payment of such benefit, the Administration Committee shall provide the notice described in the foregoing paragraph at least once annually for as long as the installment payments continue.

(f)    For purposes of this Section 7.6, a "distribution required under Code Section 401(a)(9)" means a distribution required under Section 7.7.

(g)    "Eligible retirement plan" means a defined contribution plan qualified under Code Section 401(a) which accepts rollover distributions, an individual retirement account described in Code Section 408(a), an individual retirement annuity described in Code Section 408(b) which is not an endowment contract, or an annuity plan described in Code Section 403(a). An "eligible retirement plan" shall also mean an annuity contract or custodial account described in Section 403(b) of the Code and an eligible plan under Section 457(b) of the Code which is maintained by a state, political subdivision of a state, or any agency or instrumentality of a state

or political subdivision of a state and which agrees to separately account for amounts transferred into such plan from this Plan. However, if the distributee is the surviving spouse of an employee, "eligible retirement plan" shall be limited to an individual retirement account or individual retirement annuity, as described above.

### 7.7    Required Minimum Distributions

This Section sets forth certain rules which apply to all distributions from the Plan. Other Sections of the Plan establish additional rules with which specified distributions must comply. In the event of any conflict between rules set forth in this Section and those established by other provisions of the Plan, making compliance with both rules impossible, the rule shall control which requires the earliest distribution(s) to be made from the Plan. This Section is effective for distributions on or after January 1, 1996.

(a)    Notwithstanding the other provisions of this Section (except for the incorporation by reference of the Treasury Regulations under Code Section 401(a)(9)), distributions may be made under a designation made before January 1, 1984, in accordance with Section 242(b)(2) of the Tax Equity and Fiscal Responsibility Act ("TEFRA") and the provisions of the applicable Predecessor Plan that relate to Section 242(b)(2) of TEFRA.

(b)    The Participant's entire interest will be distributed, or begin to be distributed, to the Participant no later than his "Required Beginning Date," as determined in accordance with Section 7.5.

(c)    If the Participant dies before distributions begin, the Participant's entire interest will be distributed, or begin to be distributed, no later than as follows:

(1)    If the Participant's surviving spouse is the Participant's sole designated beneficiary, then distributions to the surviving spouse will begin by December 31 of the calendar year immediately following the calendar year in which the Participant died, or by December 31 of the calendar year in which the Participant would have attained age seventy and one-half (70½), if later.

(2)    If the Participant's surviving spouse is not the Participant's sole designated beneficiary, then distributions to the designated beneficiary will begin by December 31 of the calendar year immediately following the calendar year in which the Participant died. Notwithstanding the foregoing, distribution to the designated beneficiary is not required to begin by such date if the Participant's entire interest will be distributed to the designated beneficiary by December 31 of the calendar year containing the fifth anniversary of the Participant's death. A Participant who has not elected or been required to commence distributions by September 30 of the calendar year in which distributions are required to begin under the first sentence of this subsection (ii) will be deemed to have elected to receive payment in full by the end of the calendar year containing the fifth anniversary of the Participant's death.

(3)    If there is no designated beneficiary as of September 30 of the year following the year of the Participant's death, the Participant's entire interest will be

distributed by December 31 of the calendar year containing the fifth (5th) anniversary of the Participant's death.

(4)    If the Participant's surviving spouse is the Participant's sole designated beneficiary and the surviving spouse dies after the Participant but before distributions to the surviving spouse begin, this Section 7.7(c), other than Section 8.7(c)(1), will apply as if the surviving spouse were the Participant.

For purposes of this Section 7.7(c) and Section 7.7(j), distributions are considered to begin on the Participant's Required Beginning Date (or, if Section 7.7(c)(4) applies, the date distributions are required to begin to the surviving spouse under Section 7.7(c)(1)). If annuity payments irrevocably commence to the Participant before the Participant's Required Beginning Date (or to the Participant's surviving spouse before the date distributions are required to begin to the surviving spouse under Section 7.7(c)(1)), the date distributions are considered to begin is the date distributions actually commence.

(d)    Unless the Participant's interest is distributed in the form of an annuity purchased from an insurance company or in a single sum on or before the Required Beginning Date, as of the first distribution calendar year distributions will be made in accordance with Sections 7.7(e), (f), (g), (h), (i), and (j). If the Participant's interest is distributed in the form of an annuity purchased from an insurance company, distributions thereunder will be made in accordance with the requirements of Code Section 401(a)(9) and the Treasury Regulations. Any part of the Participant's interest which is in the form of an individual account described in Code Section 414(k) will be distributed in a manner satisfying the requirements of Code Section 401(a)(9) and the Treasury Regulations that apply to individual accounts.

(e)    If the Participant's interest is paid in the form of annuity distributions under the Plan, payments under the annuity will satisfy the following requirements:

(1)    the annuity distributions will be paid in periodic payments made at intervals not longer than one (1) year;

(2)    the distribution period will be over a life (or lives) or over a period certain not longer than the period described in Section 7.7(h), (i), or (j);

(3)    once payments have begun over a period certain, the period certain will not be changed even if the period certain is shorter than the maximum permitted, except as permitted by the Treasury Regulations; and

(4)    payments will either be nonincreasing or increase only as permitted under the Treasury Regulations.

(f)    The amount that must be distributed on or before the Participant's Required Beginning Date (or, if the Participant dies before distributions begin, the date distributions are required to begin under Section 7.7(c)(1) or (2)) is the payment that is required for one (1) payment interval. The second payment need not be made until the end of the next payment interval even if that payment interval ends in the next calendar year. Payment intervals are the periods for which payments are received, e.g., bi-monthly, monthly, semi-annually, or annually. All of the Participant's benefit accruals as of the last day of the first distribution

calendar year will be included in the calculation of the amount of the annuity payments for payment intervals ending on or after the Participant's Required Beginning Date.

(g)    Any additional benefits accruing to the Participant in a calendar year after the first distribution calendar year will be distributed beginning with the first payment interval ending in the calendar year immediately following the calendar year in which such amount accrues.

(h)    If the Participant's interest is being distributed in the form of a joint and survivor annuity for the joint lives of the Participant and a nonspouse beneficiary, annuity payments to be made on or after the Participant's Required Beginning Date to the designated beneficiary after the Participant's death must not at any time exceed the applicable percentage of the annuity payment for such period that would have been payable to the Participant using the table set forth in Section 1.401(a)(9)-6 Q&A #2 of the Treasury Regulations. If the form of distribution combines a joint and survivor annuity for the joint lives of the Participant and a nonspouse beneficiary and a period certain annuity, the requirement in the preceding sentence will apply to annuity payments to be made to the designated beneficiary after the expiration of the period certain.

(i)    Unless the Participant's spouse is the sole designated beneficiary and the form of distribution is a period certain and no life annuity, the period certain for an annuity distribution commencing during the Participant's lifetime may not exceed the applicable distribution period for the Participant under the Uniform Lifetime Table set forth in Section 1.401(a)(9)-9 of the Treasury Regulations for the calendar year that contains the Annuity Starting Date. If the Annuity Starting Date precedes the year in which the Participant reaches age seventy (70), the applicable distribution period for the Participant is the distribution period for age seventy (70) under the Uniform Lifetime Table set forth in Section 1.401(a)(9)-9 of the Treasury Regulations plus the excess of seventy (70) over the age of the Participant as of the Participant's birthday in the year that contains the Annuity Starting Date. If the Participant's spouse is the Participant's sole designated beneficiary and the form of distribution is a period certain and no life annuity, the period certain may not exceed the longer of the Participant's applicable distribution period, as determined under this Section 7.7(i), or the joint life and last survivor expectancy of the Participant and the Participant's spouse as determined under the Joint and Last Survivor Table set forth in Section 1.401(a)(9)-9 of the Treasury Regulations, using the Participant's and spouse's attained ages as of the Participant's and spouse's birthdays in the calendar year that contains the Annuity Starting Date.

(j)    If a Participant dies before distributions begin, distributions will be determined as follows:

(1)    If the Participant dies before the date distribution of his or her interest begins and there is a designated beneficiary, the Participant's entire interest will be distributed, beginning no later than the time described in Section 7.7(c)(1) or (2), over the life of the designated beneficiary or over a period certain not exceeding:

(i)    unless the Annuity Starting Date is before the first distribution calendar year, the life expectancy of the designated beneficiary determined using the beneficiary's age as of the beneficiary's birthday in the

calendar year immediately following the calendar year of the Participant's death; or

(ii)     if the Annuity Starting Date is before the first distribution calendar year, the life expectancy of the designated beneficiary determined using the beneficiary's age as of the beneficiary's birthday in the calendar year that contains the Annuity Starting Date.

Notwithstanding the foregoing, to the extent benefits to the beneficiary are required to be paid in a lump sum, the benefit must be paid in full.

(2)     If the Participant dies before the date distributions begin and there is no designated beneficiary as of September 30 of the year following the year of the Participant's death, distribution of the Participant's entire interest will be completed by December 31 of the calendar year containing the fifth anniversary of the Participant's death.

(3)     If the Participant dies before the date distribution of his or her interest begins, the Participant's surviving spouse is the Participant's sole designated beneficiary, and the surviving spouse dies before distributions to the surviving spouse begin, this Section 7.7(j) will apply as if the surviving spouse were the Participant, except that the time by which distributions must begin will be determined without regard to Section 7.7(c)(1).

(k)     For purposes of this Section 7.7, the following definitions will apply:

(1)     A "designated beneficiary" is the individual who is designated as the beneficiary under the Plan and is the designated beneficiary under Section 401(a)(9) of the Code and Section 1.401(a)(9)-4 of the Treasury Regulations.

(2)     A "distribution calendar year" is a calendar year for which a minimum distribution is required. For distributions beginning before the Participant's death, the first distribution calendar year is the calendar year immediately preceding the calendar year which contains the Participant's Required Beginning Date. For distributions beginning after the Participant's death, the first distribution calendar year is the calendar year in which distributions are required to begin pursuant to Section 7.7(c).

(3)     "Life expectancy" means the life expectancy computed by use of the Single Life Table in Section 1.401(a)(9)-9 of the Treasury Regulations.

## ARTICLE 8
## SURVIVOR BENEFITS

### 8.1     Preretirement Survivor Annuity

In the event a Participant dies before his or her Annuity Starting Date and is married on the date of his or her death, the Participant's Surviving Spouse shall be entitled to a "Preretirement Survivor Annuity" as described in this Section. The "Preretirement Survivor Annuity" shall be a single life annuity payable to the Participant's Surviving Spouse equal to an

amount determined by dividing the Participant's Defined Benefit Account Balance on the Surviving Spouse's Annuity Starting Date by an immediate annuity factor based upon the Applicable Interest Rate and the Applicable Mortality Table. In no event shall the Preretirement Survivor Annuity be less than the survivor portion of the Joint and 50% Survivor Annuity that would be paid if the Participant had terminated employment with all Affiliated Companies, began receiving an immediate Joint and 50% Survivor Annuity and died the next day.

### 8.2    Waiver of Preretirement Survivor Annuity

A Participant, with the consent of his or her spouse as provided herein, may elect to waive the Preretirement Survivor Annuity. In the event of a waiver of the Preretirement Survivor Annuity or if the Participant is not married on the date of his or her death, benefits shall be paid to the Participant's beneficiary in a lump sum.

(a)    Within the time period provided herein, the Administration Committee shall provide the Participant with a written explanation of:

(1)    The terms and conditions of the Preretirement Survivor Annuity.

(2)    The Participant's right to make, and the effect of, an election to waive the Preretirement Survivor Annuity.

(3)    The rights of the Participant's spouse.

(4)    The right to make, and the effect of, a previous waiver of the Preretirement Survivor Annuity.

(b)    Notice of the Preretirement Survivor Annuity must be furnished as of the later of:

(1)    The period beginning with the first day of the Plan Year in which the Participant attains age thirty-two (32) and the close of the Plan Year preceding the Plan Year in which the Participant attains age thirty-five (35).

(2)    The period beginning one (1) year before and ending one (1) year after the date a Participant first becomes a Participant in the Plan.

The Administration Committee may provide the written explanation described in this Section at a different time in the case of a Participant who has not attained the age of thirty-five (35). If a Participant terminates employment with all Participating Companies and Affiliated Companies prior to attaining age thirty-five (35), the written explanation may be provided at any time within one (1) year prior to and one (1) year after such termination of employment and an otherwise effective waiver of the Preretirement Survivor Annuity made after such notice shall be valid. If a Participant does not terminate employment with all Affiliated Companies prior to attaining age thirty-five (35), an otherwise effective waiver pursuant to a written explanation provided at a time other than the applicable period described in this Section shall be valid, but only until the last day of the Plan Year preceding the Plan Year in which the Participant attains age thirty-five (35).

A waiver, or revocation of a previous waiver, of the Preretirement Survivor Annuity shall be in writing on such form or forms as the Administration Committee may prescribe. Any waiver shall be consented to by the Participant's spouse; shall be limited to the optional form of benefit selected and beneficiary named; shall acknowledge the effect of the consent and waiver; and the spouse's signature shall be witnessed by a notary public. Notwithstanding the requirement for spousal consent, if the Participant established to the satisfaction of a Plan representative designated by the Administration Committee that the written consent of the Participant's spouse cannot be obtained because there is no spouse, such spouse cannot be located or because of such other circumstances as the Secretary of the Treasury may by Regulation prescribe, a waiver shall be effective without spousal consent. Any spousal consent necessary under this Section shall be valid only with respect to the spouse who signs the consent or, in the event of deemed consent where the spouse's signature is not required, the applicable spouse. A Participant may revoke a previous waiver at any time prior to his or her death, and the number of revocations shall not be limited. The spouse may not revoke his or her consent to a waiver.

### 8.3    Election by Spouse After Participant's Death

A Surviving Spouse may elect:

(a)    To commence receipt of the Preretirement Survivor Annuity effective as of the first day of the month following the Participant's death.

(b)    To defer the commencement of the Preretirement Survivor Annuity until the first day of any month following the Participant's death, provided, however, that commencement of the Preretirement Survivor Annuity may not be deferred beyond the date specified in Section 8.4.

(c)    To receive a lump sum distribution of the Participant's Vested Interest in his Accrued Benefit, computed as provided in Section 7.3(c).

The Surviving Spouse shall make the election described in this Section on such form or forms as the Administration Committee may prescribe. In the event no election is made, payment shall be made in the form of a Preretirement Survivor Annuity commencing on the later of the Participant's Normal Retirement Date or the first day of the month following the date of the Participant's death, subject, however, to the provisions of Section 8.4.

### 8.4    Commencement of Preretirement Death Benefits

Benefits payable on account of the Participant's death prior to the Annuity Starting Date shall be paid:

(a)    On the date elected by the Surviving Spouse, in the case of payment in the form of a Preretirement Survivor Annuity.

(b)    On the date elected by the Participant, in the case of a valid waiver of the Preretirement Survivor Annuity and a designation by the Participant specifying when benefits are to be paid.

(c)    In the case of a valid waiver of the Preretirement Survivor Annuity and where there is no designation by the Participant specifying when benefits are to be paid, as elected by the Participant's beneficiary.

Notwithstanding an election by a Surviving Spouse, payment of the Preretirement Survivor Annuity shall commence no later than the date the Participant would have attained his Normal Retirement Date or, if the Participant was beyond his Normal Retirement Date on the date of death, on the first day of the month following the Participant's death. Furthermore, payment must commence by the date specified in Section 7.7(c).

### 8.5    Death Benefits After Annuity Starting Date

In the event the Participant dies after the Annuity Starting Date, the death benefit shall be limited to the death benefit, if any, payable under the optional form of benefit applicable on the Annuity Starting Date.

### 8.6    Involuntary Lump Sum Distribution

Notwithstanding the other provisions of this Article, the death benefit shall be paid in the form of a lump sum if the present value of the death benefit is $1,000 or less on the date of distribution. Such lump sum shall be paid as soon as administratively practicable after the Participant's or alternate payee's death, and in no event later than five (5) years after the date of the Participant's or alternate payee's death. Present value shall be computed under the provisions of Section 7.3(c).

### 8.7    Designation of Beneficiary

Subject to the spousal consent requirements of Section 8.2, a Participant shall be entitled to name a beneficiary or beneficiaries to receive any death benefits payable under the Plan. The Participant shall name a beneficiary or beneficiaries by filing a beneficiary designation with the Administration Committee before his or her death. The beneficiary designation shall be made in writing, signed by the Participant and on such form or forms as the Administration Committee may prescribe. The beneficiary designation may be revoked or modified by filing a new designation at any time before the Participant's death.

If a Participant designates more than one person to receive a death benefit, and if any of those persons predeceases the Participant or dies prior to a complete distribution of the Participant's Accrued Benefit without provision having been made for such contingency in the designation, the Administration Committee shall direct the Funding Agent to distribute the remaining payments to the surviving designee or designees proportionately as the portion designated by the Participant for each bears to the total portion designated for all survivors.

Subject to the spousal consent requirements of Section 8.2 and the other provisions of this Section, if a Participant files no designation, revokes a designation previously filed without filing a new designation, fails to file a valid designation or if all persons designated shall predecease the Participant or die prior to complete distribution to them, the Participant shall be deemed to have named the following as his or her beneficiary: (a) the Participant's Surviving Spouse; or (b) if none, the Participant's estate.

## ARTICLE 9
## LIMITATION ON BENEFITS

### 9.1    Limitations Under this Plan

The Maximum Permissible Amount of a Participant's Annual Benefit shall be the lesser of (a) $160,000, as adjusted, effective January 1 of each year, under Code Section 415(d) in such manner as the Secretary shall prescribe; and (b) one hundred percent (100%) of the Participant's Average Credited Compensation. If the benefit the Participant would accrue in a Limitation Year would produce an Annual Benefit in excess of the Maximum Permissible Amount, the benefit must be limited (or the rate of accrual reduced) to a benefit that does not exceed the Maximum Permissible Amount.

### 9.2    Adjustments for Short Service and Participation

The dollar limitation of Section 9.1(a) shall be reduced in the case of a Participant who has fewer than ten (10) years of participation in the Plan or the Predecessor Plans by multiplying such limitation by a fraction, the numerator of which is the Participant's aggregate years of participation (computed to fractional parts of a year), and the denominator of which is ten (10). The limitation of Section 9.1(b) shall be reduced in the case of a Participant who has fewer than ten (10) years of service with all Participating Companies and Affiliated Companies by multiplying such limitation by a fraction, the numerator of which is the Participant's aggregate years of service with all Participating Companies and Affiliated Companies and the denominator of which is ten (10). Notwithstanding the foregoing, the limitations of Section 9.1 shall not be reduced to less than one-tenth (1/10) of such limitations.

### 9.3    Adjustments for Certain Benefits

In the event the Participant receives a benefit which commences prior to age sixty-five (65), the dollar limitation described in Section 9.1(a) which would otherwise apply to that benefit shall be reduced as follows:

(a)    In the case of a benefit commencing on or after the date the Participant attains age sixty-two (62), but before age sixty-five (65), the dollar limitation described in Section 9.1(a) shall be unreduced.

(b)    In the case of a benefit commencing before the Participant attains age sixty-two (62), the dollar limitation described in Section 9.1(a) shall be reduced to the Actuarial Equivalent of the dollar limitation at age sixty-two (62), adjusted under 10.2 above, if required. For this purpose, the Actuarial Equivalent shall be the lesser of (1) the Actuarial Equivalent (at such age) of the defined benefit dollar limitation computed using the Applicable Interest Rate and Applicable Mortality Table as the immediate annuity factor at age sixty-two (62) and the immediate annuity factor as of the Annuity Starting Date and applying the Imputed Earnings Credit rate as the discount factor, or (2) the Actuarial Equivalent (at such age) of the defined benefit dollar limitation computed using a five percent (5%) interest rate and the Applicable Mortality Table. Any decrease in the defined benefit dollar limitation shall not reflect a mortality decrement if benefits are not forfeited upon the death of the Participant. If any benefits are forfeited upon death, the full mortality decrement is taken into account.

(c)    In the event the Participant receives a benefit which commences after the Participant attains age sixty-five (65), the dollar limitation described in Section 9.1(a) which would otherwise apply to such benefit shall be increased to the Actuarial Equivalent of such dollar limitation payable at age sixty-five (65) (adjusted under Section 9.2, if required). The Actuarial Equivalent shall be the lesser of (1) the Actuarial Equivalent (at such age) of the defined benefit dollar limitation computed using the Applicable Interest Rate and the Applicable Mortality Table, or (2) the Actuarial Equivalent (at such age) of the defined benefit dollar limitation computed using a five percent (5%) interest rate and the Applicable Mortality Table. For these purposes, mortality between age sixty-five (65) and the age at which benefits commence shall be ignored.

### 9.4    Limitations Under All Defined Benefit Plans

In the event a Participant is covered under more than one qualified defined benefit pension plan of an Affiliated Company, including the Predecessor Plans and terminated defined benefit pension plans, the limitations described in Sections 9.1 through 9.3 shall apply to the Participant as if all such defined benefit pension plans are a single plan. If the Participant is entitled to or has received a benefit from a terminated defined benefit pension plan, the benefit from the terminated plan will be applied first to the limitations described in Sections 9.1 through 9.3, with any reduction necessary being made to benefits under this Plan before a reduction is made to benefits under the terminated plan.

### 9.5    Definitions

For purposes of this Article only, the following terms shall have the following meanings ascribed to them and, when the defined meaning is intended, the term is capitalized:

(a)    "Affiliated Company" means a group of Companies which includes any Participating Company and which constitute a controlled group of corporations, as defined in Code Section 414(b), as modified by Code Section 415(h), trades or businesses under common control, as defined in Code Section 414(c), as modified by Code Section 415(h), or an affiliated service group, as defined in Code Section 414(m), and any other entity required to be aggregated with the Company under Code Section 414(o).

(b)    "Annual Benefit" shall mean the Normal Benefit Form. In the case of a benefit which is payable in a form other than the Normal Benefit Form or the spousal Joint and 50% Survivor Annuity, the Maximum Permissible Amount of such benefit shall be determined by first converting such benefit into the Normal Benefit Form, which shall be the greater of (1) the Normal Benefit Form payment which is the Actuarial Equivalent of the actual benefit form computed using the interest rate and mortality table (or other tabular factor) specified in the Plan for adjusting benefits in such form, or (2) the Normal Benefit Form payment which is the Actuarial Equivalent of the actual benefit form computed using a five percent (5%) interest rate and the Applicable Mortality Table (provided, however, that in the case of benefits subject to Code Section 417(e), the Applicable Interest Rate will be substituted for the five percent (5%) interest rate, except that a five-and-one-half percent (5.5%) interest rate shall be used in 2004 and 2005).

(c)     "Average Credited Compensation" shall mean the Participant's average Credited Compensation for the three consecutive Limitation Years in which the Participant's Credited Compensation was the highest (or the actual number of Limitation Years if the Participant is employed for less than three Limitation Years).

(d)     "Credited Compensation" means, for a Limitation Year, all compensation paid to the Participant by all Affiliated Companies that is included under Treasury Regulation Section 1.415-2(d)(1), but expressly excluding all types of compensation described in Treasury Regulation Section 1.415-2(d)(2). The term "Credited Compensation" for the purpose of applying the Code Section 415 percentage-of-compensation limits on contributions and benefits from the Plan shall include any elective deferrals (as defined in Code Section 402(g)(3)) and any amount which is contributed or deferred by the Company at the election of the Employee and which is not includible in the gross income of the Employee by reason of Code Sections 125 or 457, to the extent consistent with and pursuant to the provisions of the Code. In the case of an Employee who is a participant in a transportation fringe benefit plan described in Section 132(f) of the Code, "Credited Compensation" shall include any amounts which would be included in the definition of "Credited Compensation" but for the Employee's election to reduce his compensation and apply the same toward a benefit or benefits under such transportation plan.

(e)     "Maximum Permissible Amount" shall be the amount determined under Section 9.1, adjusted as provided by Sections 9.2 and 9.3.

## ARTICLE 10
## PAYMENT OF BENEFITS; GENERAL PROVISIONS

### 10.1    Erroneous Statement of Participant

If, in furnishing information or data required by the Administration Committee, a Participant should misstate his or her age or sex or that of his or her spouse or beneficiary or any other material fact, and the fact which was misstated would alter the computation of the benefits payable to the Participant or the Participant's spouse or beneficiary, the benefits payable shall not be terminated, but the amount of the benefit payable to that Participant or that Participant's spouse or beneficiary shall be adjusted to equal the amount which would have been payable if such fact or facts had not been misstated. The adjustment may be retroactive and/or prospective, as determined on the basis of such factors as the Administration Committee deems appropriate.

### 10.2    Incompetents

The Administration Committee shall have no duty to make inquiry as to the competence of any person entitled to receive payments hereunder. Notwithstanding the above, if the Administration Committee determines that any person to whom a benefit is payable under the Plan is unable to handle his or her affairs by reason of that person's physical or mental condition, the Administration Committee may cause payments to be made for the person's benefit to a member of the individual's family or to anyone else providing for that person's care; and the Plan, Administration Committee, the Participating Companies and the Funding Agent shall be relieved of liability for any such payments made in good faith.

### 10.3    No Duplication of Benefits

No Participant shall be eligible for a benefit under more than one (1) provision of this Plan at the same time based in whole or in part on the same Years of Service or Compensation.

### 10.4    Non-Alienation of Benefits

Except as otherwise required by law, a Participant, alternate payee or beneficiary's interest under this Plan shall not be transferred, assigned or alienated prior to the actual payment of such interest to him, and such interest shall be payable only in the manner provided under the Plan. This Section shall not apply to the creation, assignment or recognition of a right to any benefit payable to an alternate payee pursuant to a qualified domestic relations order as defined in Code Section 414(p) and corresponding Treasury Regulations. Benefits shall be paid under the preceding sentence only upon the satisfaction and completion of certain reasonable rules and procedures as established by the Administration Committee.

### 10.5    Distributions Under Qualified Domestic Relations Orders

The Plan specifically permits distribution to an alternate payee under a qualified domestic relations order at any time, irrespective of whether the Participant has attained his or her earliest retirement age under the Plan.

### 10.6    Adjustment for Other Benefits

Notwithstanding anything herein to the contrary, Employees who entered the Plan prior to July 1, 1995 with accrued benefits under a non-U.S. plan sponsored by an Affiliated Company will receive the greater of: (i) a benefit based on all Periods of Service (including service with non-U.S. Affiliated Companies) less an offset for benefits accrued under non-U.S. plans, or (ii) a benefit based solely on Periods of Service with only U.S. Affiliated Companies. Provided, however, any such Employees that have been permitted to stay in a local social security plan when transferring to the U.S. will receive no benefits from the Plan.

### 10.7    Missing Persons/Outstanding Checks

Neither the Funding Agent nor Administration Committee shall be obliged to search for, or ascertain the whereabouts of, any Participant, alternate payee or beneficiary. If, prior to the issuance of a check and after reasonable efforts to locate a missing Participant, alternate payee or beneficiary, the Plan Administrator is unable to locate the Participant, alternate payee or beneficiary, then the amount distributable to such Participant, alternate payee or beneficiary will be treated as a forfeiture under the Plan.

If a check has been issued and is outstanding for more than one hundred eighty (180) days and the Administration Committee has been unable to locate the endorsee after reasonable efforts have been made to do so, then the amount of the check will be treated, unless otherwise directed by the Administration Committee, as a forfeiture under the Plan. Notwithstanding the above, in the case of a Participant who is still an Employee of a Participating Company, the check amount, other than an amount made for minimum distribution

required under Section 401(a) (9) of the Code, shall be returned to the Plan, and such Participant's Accrued Benefit shall be appropriately adjusted.

If a Participant, alternate payee or beneficiary is located subsequent to the forfeiture, the benefit will be reinstated by the Administration Committee without any investment gains or losses from the date of the forfeiture. The reinstatement will not be treated as an annual addition under Section 415 of the Code. If the Plan is joined as a party to escheat proceedings involving a forfeited amount, the Plan will comply with the final judgment as if it were a claim filed by the former Participant, alternate payee or beneficiary and will make payment in accordance with the judgment.

At the end of each Plan Year any forfeiture shall at the direction of the Administration Committee be used to pay Plan expenses or reduce contributions by Participating Companies, unless otherwise directed by the Administration Committee.

## ARTICLE 11
## ADMINISTRATION; ALLOCATION OF FIDUCIARY RESPONSIBILITIES

### 11.1    Named Fiduciaries

The Administration Committee (which shall also be the Plan Administrator) and the Investment Committee are "named fiduciaries" under the Plan. Each Committee shall consist at all times of such individuals as the Compensation and Benefits Committee of the Board (the "CBC") may from time to time appoint, each such individual to serve at the pleasure of the CBC. Vacancies shall be filled by the CBC.

The Administration Committee shall discharge the duties and responsibilities and shall have the authority specified in the Plan or Trust Agreement. The Investment Committee shall discharge the duties and responsibilities and shall have the authority specified in the Plan or Trust Agreement. Committee members shall serve without compensation for such service but shall be entitled to be reimbursed for any amounts reasonably and necessarily expended by them in the performance of their duties hereunder.

### 11.2    Duties and Powers of Administration Committee

(a)    In General. Without limiting the scope of such other duties, responsibilities and authority as may elsewhere in the Plan or Trust Agreement be specified as belonging to it, the Administration Committee shall have the power, the duty, and the complete and exclusive discretion to:  administer the Plan and to establish such rules and regulations in connection therewith as it determines to be necessary or appropriate in the circumstances; conclusively make all determinations necessary for the administration of the Plan, including without limitation determinations as to eligibility to participate and eligibility for benefits; construe, interpret, and supplement the Plan whenever necessary to carry out its intent and purpose and to facilitate the Plan's administration; provide for the bonding of all fiduciaries, Plan officials and other similar persons at least to the extent required by ERISA; and prepare, file with the appropriate governmental agency, furnish or make available to appropriate Participants, alternate payees and beneficiaries, the various statements, reports, descriptions, registrations and other documents all as required by ERISA, or cause such filings to be prepared and made.  In

addition, the Administration Committee shall have the power, the duty, and the complete and exclusive discretion to appoint one or more independent fiduciaries or other independent service providers to provide such services and perform such functions in furtherance of the Administration Committee's duties and responsibilities hereunder as the Administration Committee in its discretion determines. Any such appointed fiduciary or other service provider shall have such powers and authority (otherwise exercisable by the Administration Committee), other than the authority to appoint other fiduciaries, as the Administration Committee determines.

(b)    Administrative Delegates. Persons (other than subcommittees of the Administration Committee) to whom the Administration Committee delegates duties, responsibilities and authority pursuant to Section 11.3 are referred to herein as "Administrative Delegates." Each Administrative Delegate shall have the authority to take such administrative actions and make such determinations, in each case within the scope of his or her delegation, as are within the authority of the Administration Committee. Each Administrative Delegate will perform his or her duties within the framework of the policies, interpretations, rules, practices, and procedures made by the Administration Committee. An Administrative Delegate's functions may include, by way of illustration and not limitation, the following: application of rules determining eligibility for participation or benefits; calculation of participation service and compensation used for determining contributions or benefits; preparation of employee communications material; maintenance of an individual's service and employment records; preparation of reports required by government agencies; calculation of contributions or benefits; orientation of new Participants and advising Participants of their rights and options under the Plan; collection of contributions and application of contributions as provided in the Plan; preparation of reports concerning Participants' benefits; processing of claims, and distribution requests; and making recommendations to others for decisions with respect to administration of the Plan.

(c)    Claims Procedures. Any determination or action by the Administrative Delegate may be appealed by the affected Participant, alternate payee or beneficiary to the Administration Committee for review. Without limiting the generality of the foregoing, any claim brought under such procedures as the Administration Committee may prescribe pursuant to Section 503 of ERISA shall be heard by an Administrative Delegate appointed for that purpose, but any appeal from the denial of any such claim shall be heard by the Administration Committee. The Administration Committee shall be the Plan's agent for service of process. Other than with respect to claims to which ERISA expressly provides a limitations period, no action may be commenced against any Plan party after the earliest to occur of the following dates: the date that is ninety (90) days after the date of the final denial of the appeal, or the date that is one (1) year from the date a cause of action accrued. For purposes of this Section 11.2(c), a cause of action is considered to have accrued when the person bringing the legal action knew, or in the exercise of reasonable diligence should have known, that a Plan party has clearly repudiated the claim or legal position which is the subject of the action, regardless of whether such person has filed a claim for benefits in accordance with the provisions of this Section.

## 11.3    Committee Procedures

The Administration Committee and the Investment Committee shall each (a) hold such meetings as it determines to be necessary or appropriate for the proper performance of its

duties hereunder; (2) elect from its own number a Chairperson; (c) elect or appoint a Secretary who may, but need not be, a member of the Committee; and (d) keep such records of its meetings and actions taken as it determines to be necessary or appropriate in the circumstances.

The Administration Committee and the Investment Committee shall each act by majority vote of a quorum of its members either at a meeting or in writing; provided, however, that each Committee may by a vote so taken constitute a subcommittee consisting of one (1) or more of its members (including a subcommittee of the whole), or may appoint one (1) or more delegates, with such duties, responsibilities and authority and operating under such rules as the Committee may specify; provided, however, such delegate or subcommittee may only further delegate its duties, responsibilities and authority with the express written consent of the Committee. When such subcommittee or delegate(s) are acting within the scope of the duties, responsibilities and powers so specified, references to the applicable Committee herein shall include a reference to such subcommittee or delegate(s). In all events, Committee members shall be disqualified from acting upon any matter affecting only themselves.

By appropriate action, the Administration Committee and the Investment Committee may each authorize one or more of its members or its Secretary (or, in the case of the Administration Committee, any Administrative Delegate) to execute documents on its behalf, and the Funding Agent, upon written notification of such authorization, shall accept and rely upon such documents until notified in writing that such authorization has been revoked by the Administration Committee or the Investment Committee, as the case may be.

The Administration Committee and the Investment Committee shall each have the authority to employ or retain such accounting, legal, medical and clerical services as it may determine to be necessary or appropriate for the proper discharge of its functions.

**11.4    Duties and Powers of Investment Management**

Without limiting the scope of such other duties, responsibilities and authority as may elsewhere in the Plan or Trust Agreement be specified as belonging to it, the Investment Committee shall (a) maintain a funding policy for the Plan consistent with the needs of the Plan and in accordance with applicable law, and (b) communicate this policy to the Funding Agent. The Investment Committee shall be the named fiduciary with respect to management of Plan assets. As such named fiduciary, it shall have authority to manage Plan assets (including the power to acquire and dispose of Plan assets) except to the extent that under a Trust Agreement with the Trustee the authority to manage Plan assets is reserved to or exercised by the Trustee or an Investment Manager, as defined in ERISA ("Investment Manager"), and except to the extent that under a contract with an insurance company such authority is reserved to or exercised by the insurance company. As named fiduciary for management of Plan assets, the Investment Committee shall have the power, the duty, and the complete and exclusive discretion to: (a) appoint Investment Managers in accordance with Section 402 of ERISA and enter into agreements the Investment Committee deems appropriate; (b) remove any Investment Manager; (c) allocate and delegate to others from time to time such of its duties for management of Plan assets as it may determine; (d) employ other persons to render advice with regard to any responsibility for management of Plan assets which are held under the Plan, Trust Agreement or contract with an insurance company; (e) direct the Funding Agent or insurance company as to the investment of Plan assets; (f) determine and implement policy for the investment and

management of Plan assets; (g) take such measures as it determines to be necessary or advisable to monitor the performance of each Investment Manager; (h) prepare and submit periodic reports summarizing the assets, liabilities and investment performance of the Plan; (i) maintain such records as it determines to be necessary or advisable to discharge its duties hereunder; and (j) appoint one or more independent fiduciaries (including, without limitation, investment advisers) or other independent service providers to provide such services and perform such functions in furtherance of the Investment Committee's duties and responsibilities hereunder as the Investment Committee in its discretion determines, any such appointed fiduciary or other service provider to have such powers and authority (otherwise exercisable by the Investment Committee), other than the authority to appoint other fiduciaries, as the Investment Committee determines.

### 11.5    Funding Policy

Subject to Article 12, the Participating Companies shall contribute to the Fund from time to time such amounts which may be required to fund on an actuarially sound basis the benefits provided by the Plan for Participants, alternate payees and beneficiaries. Based on information supplied by the Administration Committee, the Actuary shall advise the Participating Companies each Plan Year as to the amount the Participating Companies should contribute to the Fund in order to maintain the Plan on an actuarially sound basis. Consistent with the purposes of this Plan and subject to the other provisions of this Plan, the Participating Companies may, in their discretion, suspend contributions for one (1) or more years. No contributions to the Fund are to be made by Participants. In determining whether Accrued Benefits are fully funded, the Participating Companies may rely upon the opinion of the Actuary. Contributions by the Participating Companies to the Fund may be made in cash or in any other form of asset that is acceptable to the Funding Agent. The Investment Committee may appoint an Investment Manager who, in such event, shall be charged with the power to direct the Funding Agent as to the management, acquisition or disposal of any or all assets of the Fund (as designated in the delegation).

### 11.6    Payment of Expenses

The reasonable expenses of administering the Plan and/or Fund including, but not limited to the Funding Agent's fees, attorney fees, actuarial fees and expenses incurred by persons or entities to whom fiduciary duties have been delegated, shall be paid from the assets of the Plan unless paid by a Participating Company.

### 11.7    Appointment and Duties of Actuary

The Administration Committee shall appoint an entity that employs an individual (or appoint the individual) who is enrolled as an actuary by the Joint Board for the Enrollment of Actuaries to perform the duties of the Actuary specified in the Plan and such other duties in connection with the administration of the Plan as may be conferred upon the Actuary by the Administration Committee and which are not contrary to the Plan. All determinations of equivalent values permitted or required to be made under the Plan or otherwise shall be made only in accordance with the advice of the Actuary, and the rules, regulations and tables relating to equivalent values shall be applied in a uniform manner, and shall become effective only in a manner consistent with the Actuary's recommendations.

### 11.8    Removal of Actuary

The Administration Committee shall have the right at any time to remove the Actuary, to appoint a successor or successors and to fill vacancies to the office of Actuary.

### 11.9    Freedom from Liability

(a)    Members of the Administration Committee or the Investment Committee, and any delegate of either Committee, may rely upon all certificates and reports made by any accountant selected or approved by the Company; and upon all opinions given by legal counsel retained by the Company or either Committee.

(b)    Subject to the fiduciary requirements of ERISA, members of the Administration Committee or the Investment Committee, and any delegate of either Committee, shall be fully protected in respect of any action taken or not taken in good faith and in reliance upon advice and recommendation of any accountant or legal counsel. Furthermore, subject to the right of review granted by Section 11.2(c) hereof in the case of matters subject thereto, all action taken or not taken by the foregoing bodies or individuals shall be conclusive upon all parties having any interest under the Plan or Fund to the maximum extent permitted by law.

(c)    Should circumstances beyond its control render the Administration Committee, the Investment Committee, or the Funding Agent unable to perform or incapable of performing any action within the time constraints or in the manner set forth herein or pursuant to rules established hereunder, such Committee or the Funding Agent, as the case may be, shall be free from any liability arising therefrom.

(d)    To the extent permitted by law, the Participating Companies shall indemnify the members of the Administration Committee, Investment Committee, individual Trustees and others to whom fiduciary duties have been delegated who are either employees, officers or directors of any Affiliated Company against any and all claims, losses, damages, expenses and liabilities arising from their responsibilities in connection with the Plan which are not covered by insurance (without recourse) paid for by the Participating Companies, unless they are determined to be due to gross negligence or intentional misconduct.

### 11.10    Correction of Errors

In the event of a mathematical or accounting error made, or other mistake arising, by reason of factual errors in information supplied to the Administration Committee or the Funding Agent, the Administration Committee shall have power in its discretion to cause such equitable adjustments to be made to correct for such errors as it considers appropriate in the circumstances. In addition, the Administration Committee may correct obvious and unambiguous typographical errors and/or cross references that merely correct a reference, but that do not change the original intended meaning of the provisions. All adjustments and corrections made pursuant to this Section 11.10 shall be final and binding on all persons.

## ARTICLE 12
## AMENDMENT, TERMINATION AND MERGER

### 12.1    Duration of Plan

It is the expectation of the Participating Companies that they will continue the Plan and the payment of the contributions under the Plan indefinitely, but continuance of the Plan is not assumed as a contractual obligation or liability of the Participating Companies, and each Participating Company reserves the right to reduce, suspend or discontinue its contributions or terminate its participation in the Plan with respect to its Employees at any time without any liability whatsoever for the reduction, suspension, discontinuance or termination. The right is further reserved by the Company as one of the Participating Companies to amend or merge the Plan as provided in this Article.

### 12.2    Amendment of Plan

(a)    The Company, acting by way of its applicable governance process, reserves the right at any time or times to amend the Plan and Fund (including the trust) to any extent and in any manner that it may deem advisable. Each such action shall constitute an act of the Company as settlor acting in such capacity, not as an assumption or exercise of fiduciary responsibility. Notwithstanding the foregoing, to the extent determined by a named fiduciary, reasonable expenses involved in any amendment, or the implementation of any amendment, that is necessary or appropriate in the circumstances to preserve the tax qualification of the Plan or otherwise to cause the Plan to maintain compliance with applicable law may be paid from the Fund (including the trust) unless separately paid by a Participating Company.

(b)    No amendment shall reduce the Vested Interest of a Participant, alternate payee or beneficiary without that person's consent, except to the extent necessary or advisable, in the judgment of the Company, acting by way of its applicable governance process, to comply with any requirement of statutory or general law or to enable the Plan to qualify or remain qualified as an employees' plan exempt from taxation under federal laws or to enable the contributions under the Plan to be deductible under the provisions of any applicable law or regulation in computing income subject to any tax based on or measured by income by Participating Companies that are not tax exempt entities.

(c)    No amendment shall have the effect of changing the computation of a Participant, alternate payee or beneficiary's Vested Interest in his or her Accrued Benefit unless each such person having three or more Years of Service for Vesting elects, after being notified by the Administration Committee in writing, to have his or her Vested Interest computed under the Plan as amended. The election must be made within a time period beginning no later than the date the amendment is adopted and ending no earlier than the latest of the following dates: (1) sixty (60) days after the amendment is adopted; (2) sixty (60) days after the amendment is effective; or (3) sixty (60) days after such person is given written notice of the amendment by the Administration Committee. An individual who fails to make an election within the period provided shall be deemed to have assented to the amendment.

(d)    No amendment shall reduce the Accrued Benefit of a Participant, except to the extent permitted under Section 412(c)(8) of the Code. Under this subsection, a Plan

amendment which has the effect of reducing or eliminating an early retirement benefit or a retirement-type subsidy or eliminating an optional form of distribution with respect to benefits attributable to service before the amendment, shall be considered an amendment reducing a person's Accrued Benefit; provided, however: (1) in the case of a retirement-type subsidy, the foregoing prohibition shall apply only to a person who satisfies, either before or after the amendment, the pre-amendment conditions for the subsidy; (2) in the case of a retirement-type subsidy, the person's Accrued Benefit, plus the value of the retirement-type subsidy, if any, after the amendment shall not be less than his or her Accrued Benefit, plus the value of the subsidy on the date of the amendment; (3) the term "early retirement benefit" and "retirement-type subsidy" shall have the meanings provided in Section 411(d)(6) of the Code and the corresponding Treasury Regulations; and (4) notwithstanding the provisions of this subsection, an optional form of distribution, early retirement benefit, or retirement-type subsidy may be eliminated or reduced pursuant to Regulations issued by the Secretary of the Treasury or his or her delegate.

(e)     Subsequent to amendment of the Plan, the Company shall cause to be delivered to the Funding Agent a copy of such amendment. Upon amendment of the Plan, all persons claiming any interest under the Plan and Fund (including the trust) shall be bound thereby; provided, however, that no amendment shall have the effect of changing the rights, duties, and liabilities of the Funding Agent without its written consent. In addition, no amendment shall have the effect of vesting in any Participating Company any interest in any property held subject to the terms of the Fund (including the trust), or cause or permit any property held subject to the Fund (including the trust) to be diverted to purposes other than the exclusive benefit of Participants, alternate payees and beneficiaries.

(f)     Amendments required to be made for the purpose of qualifying the Plan and Fund (including the trust) under the Code, or for the purpose of conforming the Plan and Fund (including the trust) to ERISA and other applicable Federal and state laws may be retroactive. Any amendment which does not reduce the Accrued Benefit of any Participant and which is adopted within the time for filing the Company's federal income tax return for the tax year corresponding to a Plan Year may, at the election of the Company, be deemed to have been made as of any date within such Plan Year.

(g)     A Participating Company may withdraw from the Plan at any time by adopting a resolution of its Board of Directors stating the date of its withdrawal. A certified copy of any such resolution shall be served on all other Participating Companies, and the Company, acting by way of its applicable governance process, shall certify the withdrawal to the Funding Agent. If the withdrawing Participating Company elects to continue a separate, but substantially similar, qualified plan, the assets and liabilities attributable to Employees of the Participating Company (as determined upon the advice of the Actuary) may be transferred to such plan, provided all remaining Participating Companies consent.

(h)     Any amendment adopted under the provision of this Section shall be deemed a part of the Plan as if incorporated into the Plan, and the Plan shall be deemed amended accordingly.

### 12.3    Termination of Plan

The Company, acting by way of its applicable governance process, shall have the right to terminate the Plan at any time. Upon termination of the Plan, all Participants shall have a one hundred percent (100%) Vested Interest in their Accrued Benefits to the extent those Accrued Benefits are funded on the date of termination.

In the event of termination of the Plan, the assets of the Fund shall be applied for the benefit of Participants and beneficiaries in accordance with the priorities set forth under ERISA. If the assets of the Fund applicable to any of the priority categories set forth under ERISA are insufficient to provide full benefits for all persons in such group, the benefits otherwise payable to those persons shall be reduced proportionately. The Actuary shall calculate the allocation of the available assets of the Fund in accordance with the ERISA priority categories and certify its calculations to the Administration Committee and the Funding Agent. No liquidation of assets and payment of benefits (or provision to that effect) shall actually be made by the Funding Agent until after the Funding Agent is advised by the Administration Committee in writing that applicable requirements, if any, of ERISA, governing termination of "Employee Pension Benefit Plans" have been, or are being, complied with or that appropriate authorizations, waivers, exemptions or variances have been, or are being, obtained. The first Plan Year in which an amendment became effective, or was adopted, if later, shall constitute the first year an amendment was in effect.

### 12.4    Restrictions on Benefits Payable to Certain Highly Compensated Employees

(a)    In the event of the termination of the Plan, the benefit of any Highly Compensated Employee shall be limited to a benefit that is nondiscriminatory under Section 401(a)(4) of the Code. In addition, in any Plan Year, the payment of benefits to or on behalf of a restricted Employee shall not exceed an amount equal to the payments that would have been made to or on behalf of a restricted Employee in that year under:

(1)    The Normal Benefit Form that is the Actuarial Equivalent of the Accrued Benefit and other benefits to which the restricted Employee is entitled under the Plan (other than a Social Security supplement), and

(2)    A Social Security supplement, if any, that the restricted Employee is entitled to receive.

(b)    For purposes of this Section:

(1)    A "restricted Employee" means a Highly Compensated Employee or Highly Compensated Former Employee who is one of the twenty-five (25) nonexcludable Employees and former Employees of the Participating Companies with the largest annual Compensation in the current or any prior Plan Year.

(2)    A benefit shall include any periodic income or other form of benefit (including a death benefit payable with respect to the restricted Employee).

(3)    "Actuarial Equivalent" shall be determined by applying the Applicable Interest Rate and the Applicable Mortality Table.

(c)    The restrictions provided by this Section shall not apply if any one of the following requirements is satisfied:

(1)    After taking into account the payment of all benefits made to or on behalf of the restricted Employee under the Plan, the value of Plan assets equals or exceeds one hundred ten percent (110%) of the value of Plan current liabilities, as defined in Section 412(l)(7) of the Code;

(2)    The value of benefits payable to or on behalf of the restricted Employee must be less than one percent (1%) of the value of current liabilities as defined in Section 412(l)(7) of the Code before the distribution; or

(3)    The value of the benefits payable on behalf of the restricted Employee does not exceed the amount described in Section 411(a)(11)(A) of the Code.

### 12.5    Partial Termination

Upon partial termination of the Plan, each affected Participant shall have a one hundred percent (100%) Vested Interest in his or her Accrued Benefit to the extent then funded.

### 12.6    Residual Assets

The Participating Companies shall not receive any amounts from the Fund upon termination of the Plan, except that and notwithstanding any other provision of the Plan, the Participating Companies shall receive such amounts, if any, that remain after the satisfaction of all liabilities and benefit commitments of the Plan and arising out of any variations between actual requirements and expected actuarial requirements, which shall then be transferred to the Participating Companies in such proportions as the Administration Committee, upon the advice of the Actuary, may determine.

### 12.7    General Limitation on Distributions

Subject to Section 12.3, any distributions made upon termination or partial termination of the Plan shall be allocated, to the extent possible as determined by the Administration Committee, upon the advice of the Actuary, so that the Participants who are considered to be non-Highly Compensated Employees receive from the Plan at least the same proportion of the present value of their Accrued Benefits as Participants who are Highly Compensated Employees.

### 12.8    Merger, Consolidation or Transfer of Plan Assets

The Company, acting by way of its applicable governance process, and acting in its capacity as settlor and not as a fiduciary, shall have the right to cause the Plan to be merged or consolidated with another Plan; provided, however, that the Plan shall not be merged or consolidated with any other plan, and no assets or liabilities of the Plan shall be transferred to any other plan unless each Participant in the Plan would (if the Plan were then terminated) receive a benefit immediately after the merger, consolidation or transfer which is equal to or greater than the benefit each Participant would have been entitled to receive immediately before the merger, consolidation or transfer (if the Plan had then terminated).

## ARTICLE 13
## MISCELLANEOUS PROVISIONS

### 13.1    No Guaranty of Employment

The adoption and maintenance of the Plan and Fund shall not be deemed to be a contract between a Participating Company and any Employee.  Nothing in the Plan shall be deemed to give any Employee the right to be retained in the employ of a Participating Company or to interfere with the right of a Participating Company to discharge any Employee at any time, nor shall it be deemed to give a Participating Company the right to require any Employee to remain in its employ, nor shall it interfere with the Employee's right to terminate employment at any time.

### 13.2    Limitation on Participating Companies' and Funding Agents' Liability

Neither the Funding Agent nor the Participating Companies guarantee the benefits payable under the Plan, and payments which are specified to be made to Participants, their spouses and beneficiaries shall be made exclusively from the assets of the Fund.

### 13.3    Return of Contributions

Notwithstanding the prohibition against reversion described in Section 1.3, contributions of a Participating Company may be returned if:

(a)    The contribution was made due to a mistake of fact, the contribution is returned within one (1) year of the mistaken payment of the contribution and the return satisfies the requirements of the last paragraph of this Section.

(b)    The contribution was conditioned on its deductibility, the deduction is disallowed or treated as disallowed under applicable IRS procedures, the contribution is returned within one (1) year of the disallowance of the deduction and the return satisfies the requirements of the last paragraph of this Section.

The return of a contribution (or a portion of a contribution) to a Participating Company satisfies the requirements of this paragraph if the amount so returned (1) does not exceed the excess of the contribution over the amount which could have been contributed had there been no mistake of fact or error in determining the deduction; (2) does not include the net earnings attributable to the excess contributions; and (3) is reduced by any net losses attributable to the excess contribution.

## ARTICLE 14
## PRESERVATION OF BENEFITS,
## GRANDFATHER RULES AND EFFECTIVE DATES

### 14.1    Preservation of Accrued Benefits on June 30, 1995 Under Predecessor Plans

The Accrued Benefit of a Participant who was a participant in the Predecessor AMEX Plan or the Predecessor IDS Plan shall not be less than the aggregate accrued benefit maintained for such Participant under the respective Predecessor Plan on June 30, 1995.  For

purposes of this Article, the accrued benefit under the applicable Predecessor AMEX Plan or Predecessor IDS Plan shall mean the benefit payable under such Predecessor Plan if the Participant had been fully Vested and had terminated employment on June 30, 1995, survived until his normal retirement age under the applicable Predecessor Plan (or his actual age on June 30, 1995 if he or she is older than such normal retirement age on June 30, 1995) and received his benefit in the form of a single life annuity.

### 14.2    Lump Sum Distribution

The lump sum distribution payable to a Participant who is otherwise entitled to a lump sum distribution under this Plan shall not be less than the present value of the Participant's accrued benefit as of June 30, 1995 under the applicable Predecessor Plan. For purposes of this Section, present value shall be determined using the Applicable Interest Rate and the Applicable Mortality Table.

### 14.3    Other Forms of Distribution

A participant may elect to receive his or her Predecessor Plan benefit in a form of payment other than a lump sum. For this purpose, the Actuarial Equivalent value of those Predecessor Plan benefits is determined using the current Applicable Interest Rate and Applicable Mortality Table, and then deducted from the Defined Benefit Account Balance to determine the remaining lump sum benefit payable to the participant.

### 14.4    Preservation of Early Retirement Subsidies

A Participant who had an accrued benefit under a Predecessor Plan on June 30, 1995, and who, on or after June 30, 1995, satisfies the conditions for early retirement or early commencement in effect under the terms of the applicable Predecessor Plan on June 30, 1995, shall be entitled to an annuity benefit under this Plan upon early retirement or early commencement which is not less than the Actuarial Equivalent of the single life annuity early retirement or early commencement of benefit the Participant would have been entitled to under the applicable Predecessor Plan based on the Participant's accrued benefit under the applicable Predecessor Plan on June 30, 1995. For purposes of this Section, Actuarial Equivalent for an optional annuity form shall be as determined under the applicable Predecessor Plan.

### 14.5    Preservation of Optional Benefit Forms

In the event a Participant is entitled to a benefit under the Plan which represents his accrued benefit under the applicable Predecessor Plan as provided in Section 14.1, the Participant may elect the optional forms of benefit available with respect to that accrued benefit under the applicable Predecessor Plan as of June 30, 1995 as described in this Section. The optional forms of benefit for the respective Predecessor Plans shall be as follows:

Predecessor AMEX Plan:

50% Survivor Benefit Option
100% Survivor Benefit Option
25% or 100% Contingent Annuitant Option
Level Income Option

Predecessor IDS Plan:

Life Benefit
Life Benefit with Payments Guaranteed for Period Certain
50% Contingent Annuitant Benefit
50% or 100% Joint and Survivor Benefit
50% Joint and Survivor with Payments Guaranteed for Period Certain
50% Contingent Annuitant Benefit with Payments Guaranteed for Period Certain

## ARTICLE 15
## COORDINATION WITH OTHER PLANS
## AND ADDITION OF PARTICIPATING COMPANIES

### 15.1    Addition of Participating Company

A company shall become a Participating Company under the Plan only with the consent of the Company by its Board of Directors or its authorized delegate. The Board of Directors of the Company or its authorized delegate shall specify the effective date of the application of the Plan to the Employees of the new Participating Company and, in the event credit is given in accordance with Section 2.26(h) for any service with the new Participating Company for periods prior to such effective date, the nature and extent of such credit.

## ARTICLE 16
## TOP HEAVY RULES

### 16.1    Scope of Article

This Article shall apply, notwithstanding any provisions of the Plan to the contrary, for any Plan Year for which the Plan is Top Heavy as defined in this Article.

### 16.2    Definitions

For purposes of this Article only, the following terms shall have the meanings ascribed to them and when a defined meaning is intended, the term is capitalized.

(a)    "Compensation" means an Employee's Credited Compensation for the Limitation Year as defined in Section 9.5(d) of the Plan.

(b)    "Determination Date" means the last day of the preceding Plan Year. In the event an Affiliated Company maintains another plan or plans in addition to this Plan, "Determination Date" shall mean the determination dates of all those plans which fall within the same calendar year as the Determination Date for this Plan.

(c)    "Key Employee" means, any Employee or former Employee (including any deceased Employee) who at any time during the Plan Year that includes the Determination Date was an officer of any Affiliated Company having annual compensation greater than $130,000 (as adjusted under Section 416(i)(1) of the Code), a five percent (5%) owner of the Affiliated Company, or a one percent (1%) owner of the Affiliated Company having annual

compensation of more than $150,000. For this purpose, annual compensation means compensation within the meaning of Section 415(c)(3) of the Code. The determination of who is a Key Employee will be made in accordance with Section 416(i)(1) of the Code and the applicable Treasury Regulations and other guidance of general applicability issued thereunder. For purposes of determining whether an officer should be considered a Key Employee, no more than fifty (50) Employees or, if lesser, the greater of three percent (3%) or ten percent (10%) of all Employees shall be considered officers. The ten percent factor will apply to the greatest number of Employees employed during the five (5) year testing period by any Affiliated Companies. If the maximum number of officers that must be counted is reached, the officers that shall be considered Key Employees shall be those who had the largest Compensation for any Plan Year during which they were officers in the five (5) year testing period. The constructive ownership rules of Code Section 318 (or the principles of that Section, in the case of an unincorporated Affiliated Company) will apply to determine ownership in the Affiliated Company to the extent provided in Code Section 416(i)(1) and the Treasury Regulations under that Code Section.

(d)    "Top Heavy" means a condition of the Plan whereby the Top Heavy Ratio for the Plan, or the Top Heavy Ratio for the required or permissive aggregation group of which the Plan is a part, exceeds sixty percent (60%). The required aggregation group shall include each qualified plan of an Affiliated Company in which at least one (1) Key Employee participates and any other qualified plan of an Affiliated Company which enables a plan in which at least one Key Employee participates to meet the requirements of Sections 401(a)(4) or 410 of the Code. The permissive aggregation group shall include the required aggregation group, plus any other plan or plans of an Affiliated Company which, when considered as a group with the required aggregation group, would continue to satisfy the requirements of Sections 401(a)(4) and 410 of the Code.

(e)    "Top Heavy Ratio" for this Plan means a fraction, the numerator of which is the present value of accrued benefits for Key Employees under this Plan as of the Determination Date, and the denominator of which is the present value of accrued benefits for all Participants under this Plan as of the Determination Date. The "Top Heavy Ratio" for any required or permissive aggregation group described in subsection (d) above is a fraction, the numerator of which is the sum of account balances under the aggregated defined contribution plan or plans for all Key Employees as of the Determination Date and the present value of accrued benefits under this Plan and all other aggregated defined plans for Key Employees as of the Determination Date, and the denominator of which is a similar sum determined for all Participants in this Plan and all aggregated plans. When determining the account balances under any defined contribution plans: (1) any part of an account balance distributed in the five (5) year period ending on the Determination Date; and (2) the account balances shall be adjusted to reflect any contributions not actually made as of the Determination Date, but which is required to be taken into account on that date under Section 416 of the Code and the Treasury Regulations under that Section. The present value of a Participant's accrued benefit under a defined benefit plan shall be computed using a five percent (5%) interest assumption and the 1984 Unisex Pension Mortality Table.

With respect to both account balances under a defined contribution plan and the present value of accrued benefits under a defined benefit plan, the account balances and present value of accrued benefits shall be determined as of the most recent valuation date that falls

within or ends with the twelve (12) month period ending on the Determination Date, except as provided in Section 416 of the Code and the Treasury Regulations under that Section for the first and second plan years of a defined benefit plan. The account balances and accrued benefits of a Participant (1) who is not a Key Employee but who was a Key Employee in a prior year; or (2) who has not received any compensation from any Company maintaining the plan at any time during the five (5) year period ending on the Determination Date, will be disregarded. The calculation of the Top Heavy Ratio, and the extent to which distributions, rollovers and transfers are taken into account will be made in accordance with Section 416 of the Code and the Treasury Regulations under that Section. Deductible employee contributions will not be taken into account for purposes of computing the Top Heavy Ratio.

For purposes of this Section, "valuation date" means the last day of the Plan Year when used with respect to this Plan. With respect to any other plan of an Affiliated Company, "valuation date" means the date on which contributions are credited and gains and losses allocated under a defined contribution plan or the date used for computing plan costs for minimum funding.

### 16.3    Vesting for Top Heavy Plan Years

For any Plan Year for which the Plan is Top Heavy, the Participant's Vested Interest in his or her Accrued Benefit shall be determined in accordance with the following schedule and the provisions of this Section notwithstanding anything herein to the contrary:

| Years of Service For Vesting | Percentage Vested |
|---|---|
| Less than three (3) | 0% |
| Three (3) or more | 100% |

All Years of Service for Vesting shall be taken into account in determining a Participant's Vested Interest under this Section, except as follows:

(a)    Years of Service prior to the Plan Year in which Participant attains age seventeen (17).

(b)    Years of Service for Vesting before a Break in Service shall not be taken into account if the Employee has no Vested Interest in his or her Accrued Benefit at the time the Employee separates from service and the Employee's number of consecutive one (1) year Breaks in Service equals or exceeds the greater of five (5) or the Employee's number of Years of Service for Vesting.

### 16.4    Benefits for Top Heavy Plan Years

For any Plan Year for which the Plan is Top Heavy, the accrued benefit of any Participant who is not a Key Employee shall be equal to at least the product of (a) the Participant's average annual Compensation for the period of consecutive Plan Years (not exceeding five (5)) when the Participant had the highest aggregate Compensation from an Affiliated Company; and (b) the lesser of two percent (2%) per Year of Service for Vesting

credited after January 1, 1984, or twenty percent (20%). In determining the average annual Compensation for a period of consecutive years during which the Participant had the largest aggregate Compensation, only Periods of Service for Vesting or Years of Service for Vesting for which the Plan was Top Heavy and Periods of Service for Vesting or Years of Service for Vesting credited after January 1, 1984 shall be taken into account. For purposes of this Section, the accrued benefit shall be a single life annuity with no ancillary benefits commencing at the Participant's Normal Retirement Age and without regard to any benefits payable under the Social Security Act.

In the event the Participant is entitled to a benefit from any other defined benefit plan maintained by an Affiliated Company, the minimum benefit required by this Section shall be reduced by the accrued benefit provided under the other plan or plans. If the Participant participates in any defined contribution plan maintained by an Affiliated Company, the minimum benefits and contributions required by Section 416 of the Code and Treasury Regulations under that Section shall be provided by this Plan pursuant to this Section.

**The following amendment is effective on October 1, 2005 contingent on the distribution of Ameriprise Financial, Inc. on September 30, 2005:**

### ARTICLE 17
### *AMERIPRISE CREDITING*

*Notwithstanding anything herein to the contrary, the Plan shall take into consideration compensation and hours of service of Ameriprise participants following September 30, 2005, to the extent required under the Employee Benefits Agreement by and between the Company and Ameriprise.*

# ADDENDUM A

**A.1    Special crediting of past service rule for AT&T Capital and Capitafinance Participants.**

Effective June 11, 1998, past service with AT&T Capital and Capitafinance credited to any Participant employed by Capitafinance as of June 11, 1998, shall hereby be recognized for purposes of determining eligibility, vesting, and the computation of service related credits for future services with the Company.

**A.2    Special crediting of past service rule for Rockford Industries, Inc. employees.**

Effective February 18, 1999, past service with Rockford Industries, Inc. credited to any employee employed by Rockford Industries, Inc. on February 18, 1999, shall hereby be recognized for purposes of determining eligibility, vesting and service related credits under the Plan.

**A.3    Special crediting of past service rule for Travel One, Inc. employees.**

Effective November 16, 1998, past service with Travel One, Inc. credited to any employee employed by Travel One, Inc. on November 16, 1998, shall hereby be recognized only for purposes of determining vesting and service related credits under the Plan.

**A.4    Special crediting of past service rule for ADP employees.**

Effective November 16, 1998, past service with ADP from November 16, 1998 credited to any employee employed per contract agreement with ADP shall hereby be recognized for determining eligibility only, and all past service with ADP credited to any employee employed per contract agreement with ADP shall hereby be recognized for determining vesting and service related credits under the Plan.

**A.5    Special crediting of past service rule for Electronic Data Systems Corporation (EDS) employees.**

Past service with Electronic Data Systems Corporation (EDS) credited to any employee who joins the Company pursuant to an agreement between the Company and EDS on or about June 21, 1999, shall hereby be recognized for past service with EDS for determining eligibility, vesting and service related credits under the Plan.

**A.6    Special crediting of past service rule for Morris Travel employees.**

Effective June 7, 1999, past service with Morris Travel credited to any employee employed by Morris Travel who joined American Express concurrent with the Company's acquisition of Morris Travel shall hereby be recognized for determining eligibility, vesting and service related credits under the Plan.

**A.7     Special crediting of past service rule for Chubb & Sons employees.**

Effective January 1, 1999, per agreement with Chubb & Sons, past service with Chubb & Sons credited to three employees that were employed by Chubb & Sons shall hereby be recognized for determining eligibility, vesting and service related credits under the Plan.

**A.8     Special crediting of past service rule for The Educational Funding Company LLC (EFC) employees.**

Effective April 26, 1999, past service with The Educational Funding Company LLC credited to any employee employed by The Educational Funding Company LLC on or after date of acquisition by the Company shall hereby be recognized for determining eligibility, vesting and service related credits under the Plan.

**A.9     Special crediting of past service rule for SierraCities.com Inc. employees.**

Effective March 30, 2001, past service with SierraCities.com Inc. credited to any employee employed by SierraCities.com Inc. on March 30, 2001, shall hereby be recognized for purposes of determining eligibility and vesting under the Plan.

**The following amendment is effective on October 1, 2005 contingent on the distribution of Ameriprise Financial, Inc. on September 30, 2005:**

*A.10     Special service crediting rule for Ameriprise employees.*

*Effective October 1, 2005, if an individual was a participant in the Ameriprise U.S. Retirement Plan having been assigned to and being employed by Ameriprise or an Ameriprise Affiliate on October 1, 2005, and is later employed by a Participating Company prior to the Delayed Transfer Date as defined in the Master Spin Agreement by and between the Company and Ameriprise, having been continuously employed by Ameriprise or an Ameriprise Affiliate until the date of hire by a Participating Company, service credit under the Plan will take into consideration all such individual's service with Ameriprise or an Ameriprise Affiliate.*

# ADDENDUM B

### B.1    Special vesting rule for Epsilon Data Management, Inc. Participants.

Effective November 7, 1997, the Defined Benefit Account Balance of any Participant employed by Epsilon Data Management, Inc. ("Epsilon") as of November 7, 1997, shall be, and hereby is, one hundred percent (100%) vested.

### B.2    Special vesting rule for American Express Incentive Services ("AEIS") Participants.

All Participants who transfer employment from the Company to American Express Incentive Services before January 1, 1999, shall be, and hereby are, one hundred percent (100%) vested.

### B.3    Special vesting rule for International Business Machines Corporation ("IBM") Participants.

All Participants who transfer employment from the Company to International Business Machines Corporation or one of its affiliates pursuant to the Services Agreement dated February 21, 2002, provided that such transfer occurs between February 21, 2002 through December 31, 2002, shall be, and hereby are, one hundred percent (100%) vested.

### B.4    Special vesting rule for Participants transitioning employment to Key Equipment Finance.

All Participants who transition employment from the Company to Key Equipment Finance (KEF) pursuant to the sales agreement dated December 1, 2004, provided that such transition occurs between December 1, 2004 through December 31, 2004, shall be, and hereby are, one hundred percent (100%) vested.

## ADDENDUM C

### PENSIONABLE INCENTIVES

S/E Sales

TBS Tax Plan (National Tax & Business Services Incentive Plan)

Real Estate Incnt Plan

Business Finance Bonus

Performance Challenge

Growth Bonus

Leadership Bonus

Scorecard Bonus

Transfer Bonus

Ret. Trv. ICP

Tms Incentive

Cons Tvl ICP

Gtms Incentive

Morris Incentive

Institutional Services Incentive

PSIA

American Express Equipment Finance Bonus

Travel Incentive

Advisory Incentive Plan

Technology Incentive Award

IDVC Payment

- Hedge Fund Sales Incentive Compensation Plan

- Equity Investment Management-Variable Compensation Plan

- Fixed Income Investment Management-Variable Compensation Plan
- Single Strategy Hedge Fund Investment Management-Variable Compensation Plan
- Fund of Hedge Funds Investment Management-Variable Compensation Plan
- Boston Equity Team Research Analysts, Traders & Marketers Compensation Plan

Team Perf Rewd

Travelers Checks Quality Incentive Award

EICP Spec Awd

Team Inc Plan

Bus Travel Inc

American Express One Business Travel Incentive

Sales Incentive

FES Incentive

Property Casualty Sales Incentive

Travel Incent

Interpretation

ES Rewrd&Recog

Temporary Assignment Awards

- Lump Sum Merits

- Lump Sum Promotions

T/C Bonus

Oak Ridge Sales Incentive Plan

Special Merit

AEB Bonus

Nat'l Acct Inc

RVP Sales Incentive Plan, AEL Sales Incentive Plan

Performance Pays

AIA

Foreign Market Premium

Product Wholesaler Compensation Plan

- Products SCG

- Products RVP

Tpd Sales Consultant/Internal Wholesaler Incentive Plan (TPD SCG Plan)

Tpd Sales Incentive Plan (TPD RVP Plan)

AERS Client Relationship Incentive Plan (AERS Region Dir)

AERS Sales & Distribution Incentive Plan

Asset Management Group (AMG Plan) Incentive Compensation Plan

FEPS Sales Financial Education & Planning Services Plan

Annuity Conservation Incentive Plan

Financial Resource Consultant Center (FRCC) Incentive Plan

Enterprise Cross-Sell Incentive Plan for Remote Financial Advisors

American Express Life Insurance Compensation Plan

AEFA P1 Insurance Manager Incentive Plan

Financial Advice Sales Incentive Plan

**Addendum C is amended effective October 1, 2005 contingent on the distribution of Ameriprise Financial, Inc. on September 30, 2005, to read in its entirety as follows:**

### C.1    PENSIONABLE INCENTIVES

- *S/E Sales*
- *TBS Tax Plan (National Tax & Business Services Incentive Plan)*
- *Real Estate Incnt Plan*
- *Business Finance Bonus*
- *Performance Challenge*
- *Ret. Trv. ICP*
- *Tms Incentive*

- *Cons Tvl ICP*
- *GTMS Incentive*
- *Morris Incentive*
- *PSIA*
- *American Express Equipment Finance Bonus*
- *Travel Incentive*
- *Technology Incentive Award*
- *Team Perf Rewd*
- *Travelers Checks Quality Incentive Award*
- *EICP Spec Awd*
- *Team Inc Plan*
- *Bus Travel Inc*
- *American Express One Business Travel Incentive*
- *Sales Incentive*
- *Interpretation*
- *ES Rewrd&Recog*
- *Temporary Assignment Awards*
  - *Lump Sum Merits*
  - *Lump Sum Promotions*
- *T/C Bonus*
- *Special Merit*
- *AEB Bonus*
- *Nat'l Acct Inc*
- *AIA*
- *Foreign Market Premium*
- *Fund of Hedge Funds Investment Management – Variable Compensation Plan*

## ADDENDUM D

**D.1    For purposes of Plan Section 2.15, the following are designated as Cost Centers effective January 1, 2005:**

Cost Centers

- U.S. Business Travel Cost Centers:  All

- Global Business Travel Cost Centers:

  - 028413543; 028610675; 028610677; 028610682; 028610690; 028678560; 049935783; 041227711; 086202711; 086702711.

- Global Commercial Card Cost Centers:

  - 028477678; 028477681; 028477682; 028477683; 028477684; 028477686; 028477687; 028477690; 028477692; 028477694; 028490717; 028490718; 028490720; 028490722; 028490723; 028490725; 028490727; 028490765; 086269711; 086589711.

**EXHIBIT C**



April 1994

# BENEFITS BRIEFS

for American Express employees

## RETIREMENT PROGRAM Q&A

We're currently in the process of developing a comprehensive communication program to answer all your questions. More details will be coming soon in the form of newsletters, booklets, and telephone assistance. Because we are still working out many details, we are asking employees to mail any questions to the Employee Service Center at P.O. Box 31534, Salt Lake City, UT 84131-0961. Employee questions will be answered in future newsletters. Please do not call the Employee Service Center with questions at this time. Following are answers to a few questions you may have now.



**Q** Will I lose any benefits I have earned to date under the Retirement Plan, ISP or SOP?

**A** No. Your ISP and SOP balances remain intact. The lump sum value of your Retirement Plan accrued benefit will become your starting balance in the new Cash Balance Plan. Your ISP vested balance will remain in the ISP. And your SOP shares will be automatically transferred into the ISP.



**Q** When does the new Retirement Program begin for me? Will I be as well off under the new program as I was under the old?

**A** There's no simple answer. It all depends on your current age and service, as well as when you actually leave the Company or retire. Generally, most employees will be better off under the new program. To help you determine where you personally stand, you will have access to a telephone system that will allow you to project benefits under the new program at different ages.



**Q** Why is the Company moving to a Cash Balance pension plan?

**A** A "cash balance" approach offers some features that are very valuable to employees. This type of plan is portable, which means you're entitled to your vested benefit no matter when you leave the Company. A traditional pension plan is designed to pay benefits at retirement. Also, the cash balance approach is simplified. It works more like a bank account, as you can watch your account grow from year to year. Traditional pension plans use complicated formulas and are, consequently, more difficult to understand and calculate benefits.

## PREVIEW: RETIREMENT PROGRAM CHANGES

In our first issue of Benefits Briefs, we told you about the Blue Box benefits re-engineering efforts. Since that time, you've seen a new Flexible Benefits program.

We promised to keep you posted on the status of our ongoing re-engineering projects. We're planning some changes to your Retirement Program, which will begin to roll-out mid-1994. All of the Retirement Program changes are designed to establish a common benefit program throughout the Blue Box, provide greater flexibility to employees, be easier to understand, and streamline administration, while continuing to be competitive in meeting employees' retirement needs. While we're still working out the details, we wanted to share information with you as we know things.

Here are highlights of the upcoming Retirement Program changes.

- **Incentive Savings Plan (ISP)** — There will be some changes to the ISP effective July, 1994. We'll be offering even more investment options. We'll keep the 100% Company match on your before-tax savings of up to 3% of your base salary. Future service-related contributions, however, will be eliminated. But we're adding an annual Profit Sharing Plan contribution for every employee — even if you don't elect to participate in the ISP (see below).

- **Profit Sharing Plan** — A new Profit Sharing component will be added to the Incentive Savings Plan (ISP). Company contributions will be in two parts:
  - an automatic Company contribution of American Express stock equal to 1% of your annual base salary, plus
  - annual Company contributions of up to 7% of your annual base salary, based on Company performance.

- **Retirement Plan** — The current pension plan will be replaced with a "cash balance" plan at year end. The lump sum value of your accrued benefits under the current Retirement Plan will become your starting balance going forward. Each year, you'll receive a Company contribution to your account based on your pensionable earnings, age and service. You'll actually be able to watch your account balance grow each year and you'll know its exact value. And the plan is portable! Your vested accrued balance is payable to you whenever you leave the Company — even if you don't stay until retirement. You'll have a choice of a lump sum or monthly annuity payments.

- **Stock Ownership Plan (SOP)** — While eligible employees will receive a 15-share allocation for 1993, the SOP will be terminated in 1994 (turn this page over for more information). Your SOP balance will automatically be transferred to the ISP. You will continue to be a shareholder through the 1% annual Profit Sharing contribution in American Express stock described above.

You'll be seeing more details over the next six months. For now, take a look at the Communication Calendar below for an overview of what's coming.

*This newsletter is not intended to, and does not supersede the applicable plan documents, which in all cases are the final authority.*

## COMMUNICATION CALENDAR

You'll soon begin receiving more details about the Retirement Program. This communication strategy is largely the result of input from employees who heard about the revised Retirement Program in recently-held focus groups. In advance, here's what to expect and when.

**APRIL/MAY**
Benefits Briefs Newsletters — additional information on the new Retirement Program and Q&As based on actual employee questions.

**JUNE**
Retirement Program Folder including a detailed ISP booklet, investment education booklets, and prospectuses.

**FALL**
Retirement Plan Booklet which provides details — to complete the materials in your Retirement Program Folder.

Telephone Modeling Hotline for those who want to project benefits under the new program.

## STOCK OWNERSHIP PLAN (SOP) Q&A



**Why terminate the SOP?**

The SOP is designed to reward employees based on the profitability of American Express — specifically, the stock price. The structure of the new Retirement Program is a better vehicle for aligning individual and Company goals. That's because many of the positive things you do as employees and we do as a Company may not be reflected in the stock price.



**What will happen to my current SOP account balance?**

The shares allocated to your account will be transferred to the ISP and will still be payable upon retirement or termination. You'll still receive the 15-share allocation for 1993 if you meet the eligibility requirements.



**What about the Company's commitment to employee stock ownership?**

We remain committed to employee stock ownership, which is why the new Retirement Program will continue to include opportunities for employees to own stock.



**Where can I find more information on the SOP termination?**

You will be receiving more details about the SOP termination and the transfer of SOP accounts to the ISP in future communications. Below is a formal notice of the SOP amendment and termination which we are required to provide to you to comply with Internal Revenue Service regulations. The notice does not require any action by you.

# NOTICE TO INTERESTED PARTIES

1. Notice To: (a) all present employees of American Express Company (the "Company") and those of its present participating subsidiaries, including American Express Travel Related Services Company, Inc. ("TRS"), American Express Bank Ltd. ("AEB") and IDS Financial Corporation ("IDS") and certain subsidiaries of the Company, TRS, AEB and IDS, who are or would be eligible to participate in the American Express Stock Ownership Plan (the "Plan") without regard to the minimum service requirement under the Plan (the Company and such participating subsidiaries shall be collectively referred to in this Notice as the "Employing Companies"); and (b) all present employees, former employees and beneficiaries of deceased former employees of the Employing Companies and those of the Company's former participating subsidiaries, including Lehman Brothers Holdings Inc. ("LBH") and certain subsidiaries of LBH, who have account balances in the Plan.

An application is to be made to the Internal Revenue Service for an advance determination on the qualification of the following employee pension benefit plan:

2. American Express Stock Ownership Plan
   *(name of plan)*

3. 002
   *(plan number)*

4. American Express Company, 200 Vesey Street, New York, NY 10285
   *(name and address of applicant)*

5. 13-4922250
   *(applicant EIN)*

6. Employee Benefits Administration Committee
   American Express Company, 200 Vesey Street, New York, NY 10285
   *(name and address of administrator)*

7. The application will be filed on April 28, 1994 with the Key District Director, Internal Revenue Service, EP/EO Division, P.O. Box 1680, GPO, Brooklyn, New York 11202 for an advance determination as to whether the Plan meets the qualification requirements of sections 401, 409 and 4975(e) of the Internal Revenue Code of 1986, with respect to the Plan's amendment and its termination. All allocations of Employing Company Contributions (as defined in the Plan) shall cease after the Plan Year ending December 31, 1992.

8. The employees eligible to participate under the Plan are generally employees of Employing Companies who have completed one year of Eligibility Service (as defined in the Plan). A person generally qualifies as an employee if employed by an Employing Company (i) within the United States or (ii) outside the United States if (A) a United States citizen and (B) a career or residual expatriate in an Employing Company's international expatriate program, who receives from an Employing Company a regular stated compensation, other than a pension, vested benefit, severance pay, retainer or fee under contract, but does not qualify as an independent contractor or employee of an independent contractor. Employees who are members of a qualifying collective bargaining unit are generally not eligible to participate under the Plan.

9. The Internal Revenue Service has previously issued a determination letter with respect to the qualification of this Plan.

## RIGHTS OF INTERESTED PARTIES

10. You have the right to submit to the Key District Director, at the above address, either individually or jointly with other interested parties, your comments as to whether this Plan meets the qualification requirements of the Internal Revenue Code.

You may instead, individually or jointly with other interested parties, request the Department of Labor to submit, on your behalf, comments to the Key District Director regarding qualification of the Plan. If the Department declines to comment on all or some of the matters you raise, you may, individually, or jointly if your request was made to the Department jointly, submit your comments on these matters directly to the Key District Director.

## REQUESTS FOR COMMENTS BY THE DEPARTMENT OF LABOR

11. The Department of Labor may not comment on behalf of interested parties unless requested to do so by the lesser of 10 employees or 10 percent of the employees who qualify as interested parties. The number of persons needed for the Department to comment with respect to this Plan is 10. If you request the Department to comment, your request must be in writing and must specify the matters upon which comments are requested, and must also include:

   (1) the information contained in items 2 through 5 of this Notice; and

   (2) the number of persons needed for the Department to comment (that is, 10).

   A request to the Department to comment should be addressed as follows:

   Deputy Assistant Secretary
   Pension and Welfare Benefits Administration
   ATTN: 3001 Comment Request
   U.S. Department of Labor
   200 Constitution Avenue, N.W.
   Washington, D.C. 20210

## COMMENTS TO THE INTERNAL REVENUE SERVICE

12. Comments submitted by you to the Key District Director must be in writing and received by him by June 6, 1994. However, if there are matters that you request the Department of Labor to comment upon on your behalf, and the Department declines, you may submit comments on these matters to the Key District Director to be received by him within 15 days from the date the Department notifies you that it will not comment on a particular matter, or by June 6, 1994, whichever is later, but not after June 30, 1994. A request to the Department to comment on your behalf must be received by it by May 5, 1994 if you wish to preserve your right to comment on a matter upon which the Department declines to comment, or by May 16, 1994 if you wish to waive that right.

## ADDITIONAL INFORMATION

13. Detailed instructions regarding the requirements for notification of interested parties may be found in sections 17, 18, and 19 of Revenue Procedure 94-6. Additional information concerning this application (including, where applicable, an updated copy of the Plan and related trust agreement, the application for determination, any additional documents dealing with this application that have been submitted to the IRS, and copies of section 17 of Revenue Procedure 94-6) is available from the Corporate Benefits Department, located at American Express Company, 200 Vesey Street, 47th Floor, New York, New York 10285, telephone no. (212)-640-3044, during the hours of 9:00 a.m. to 5:00 p.m. on regular business days, for inspection and copying. (There may be a nominal charge for copying and/or mailing.)

April 8, 1994

**EXHIBIT D**



June 1994

# BENEFITS BRIEFS

for American Express employees

**INSIDE THIS NEWSLETTER**

## Page 2-3

Overview of New Retirement Program



in Brief

## Page 4

Comparison of Current and New Retirement Programs



Glossary of Terms

## Page 5-7



A Few Examples

Communication Calendar

## Page 8-10



## Page 10-12



Prospectus Supplement

Page 10 through 12 of this document constitute part of a prospectus for the American Express Incentive Savings Plan covering securities that have been registered under the Securities Act of 1933.

The information under the heading "Special Rules for Participants in the ISS Savings Plan" on page 11 of this document also constitutes part of a prospectus for the ISS Savings Plan covering securities that have been registered under the Securities Act of 1933.

## INTRODUCING A NEW RETIREMENT PROGRAM

**We value every employee at American Express.** And we recognize that our workforce is made up of people who look at their careers with us very differently.

Some join us at mid-career and stay for around ten years. Others join us later in life and remain with us until retirement. And some spend their entire careers with American Express. But our most representative profile is the employee who joins American Express at the beginning of their career and stays with us a relatively short period of time. The new Retirement Program has been designed to be flexible enough to reward the different "workforce profiles" that exist in our Company.

Below is a chart showing where the new Retirement Program stands competitively. See pages 5 – 7 for examples that compare benefits under the new and current programs for an idea of where you may stand.

### You Talked...We Listened

In recently-held focus groups, employees told us what would be most important in communicating the new Retirement Program. Here's what you said ... and what we've done to respond.

**BE HONEST**

Be direct, even if there are some "take-aways." Just give it to us straight.

We Did: This newsletter shows an overview of both the new and current plans, so you can compare for yourself. Also, our examples show some people who may not be as well off under the new program.

**TELL US WHY**

Make the reasons behind the changes clear.

We Did: We told you the reasons the changes were being made. In short, they're designed to establish a common benefit program throughout the Blue Box. They provide greater flexibility to employees, be easier to understand, ensure fine administration, and be competitive in meeting employees' retirement needs.

**KEEP IT SIMPLE**

Try and make the communications easy for us to understand.

We Did: We created a Glossary of Terms (see page 4) and tried to make sure that our explanations are so clear and understandable as possible.

**MAKE IT COMPLETE**

Show us the big picture first, then give us detailed information.

We Did: This newsletter provides an overview of every component of the new Retirement Program. Detailed information about the ISP, including investment information and fund prospectuses, is included in this package. Upcoming communication materials will provide more details. (See the Communication Calendar on page 7.)

### Are We Competitive?

We compared our new Retirement Program with 14 Fortune 100 companies. Here's how we stack up.





Retirement Benefit At Age 65 / Retirement Benefit At Age 50

■ American Express
■ Survey Companies

The companies in our survey group all offer different retirement programs — some better than others. We want to be above the average (the 50th percentile) of the companies we compare ourselves to.

As you can see, our new Retirement Program puts us exactly where we want to be — above the 50th percentile.

**SURVEY COMPANIES**

AT&T
Chase Manhattan
Citibank
GE
General Mills
GTE
HJ Heinz
IBM
Merck
Merrill Lynch
PepsiCo
Philip Morris
Procter & Gamble
Quaker Oats

# OVERVIEW OF NEW RETIREMENT PROGRAM

This graphic shows that the Incentive Savings Plan (ISP) and the Retirement Plan both contribute to your total retirement income. Let's look at both parts separately and then we'll see how they combine.

| Incentive Savings Plan (ISP) | | Retirement Plan |
|---|---|---|
| Employee Contributions | Company Contributions | (Cash Balance Pension) |
| 0% – 15% of base salary. | Company matching Contributions 0% – 2% of base salary. | Company allocates cash amount to each employee's account based on age, service and Pensionable Earnings. (See the chart below.) |
| | Company Stock Contributions 1% of base salary to American Express stock. | |
| | Profit Sharing Contributions Company contributes 0% to 7% of base salary, depending on total Blue Box performance. | |

## Here are some key features of the Retirement Plan:

### SIMPLIFIED APPROACH

Benefits are calculated each biweekly pay period, so you can watch your cash balance grow on quarterly statements.

### FIVE-YEAR VESTING

You are vested, or own, your cash balance under the Retirement Plan after just five years of Company service.

### PORTABILITY

The plan is portable. That means your vested cash balance is payable to you whenever you leave the Company – even if you don't stay until age 55.

### PAYMENT OPTIONS

When you retire or leave the Company, you'll have a choice of a lump sum payment or monthly annuity payments.

The new Cash Balance feature of the Retirement Plan will begin January 1, 1995. Benefits you have accrued under the current Retirement Plan will be converted to your starting balance as of January 1, 1995.

Retirement Plan allocations will be credited each biweekly pay period, beginning with the first pay period in 1995. Shortly after that date, you will receive a statement that shows your starting balance and your first Company allocation. Each quarter, you will receive a statement showing your new cash balance.

## RETIREMENT PLAN

Beginning in 1995, you'll receive Company allocations to your cash balance under the Retirement Plan. Allocations are based on these three factors:

- your age each year;
- your years of Company service; and
- your Pensionable Earnings (your base salary, plus overtime, commissions, shift differential and most bonus payments).

Here's the way we'll determine an annual Retirement Plan allocation:

| If the sum of your age plus years of Company service (at year end) is: | Your annual Company allocation percent will be: |
|---|---|
| Less than 35 | 2.50% |
| 35 – 44 | 3.25% |
| 45 – 59 | 4.25% |
| 60 – 74 | 5.75% |
| 75 – 89 | 8.00% |
| 90 and over | 10.00% |

For example, here's a person who is 30 years old and has six years of Company service as of December 31, 1995 with 1995 Pensionable Earnings of $30,000. Here's how the total cash balance Retirement Plan allocation for 1995 would be calculated:

### Step 1

Add together age and service. In this case, they total 36.

### Step 2

Locate 36 in the chart above, in the column on the left; then find the corresponding percentage on the right. In this case, it's 3.25%.

### Step 3

Multiply 3.25% by the Pensionable Earnings. In this case, $30,000 (3.25% x $30,000 = $975). The total is $975. That's the total amount the Company will allocate in 1995 to this employee's cash balance. Allocations will be made each pay period.

Let's look at another example. Here's a person who is 50 years old and has 15 years of Company service as of December 31, 1995 with 1995 Pensionable Earnings of $55,000. Let's walk through the steps:

### Step 1

Add together age and service. In this case, they total 65.

### Step 2

Locate 65 in the chart above, in the column on the left; then find the corresponding percentage on the right. In this case, it's 5.75%.

### Step 3

Multiply 5.75% by the Pensionable Earnings. In this case $55,000 (5.75% x $55,000 = $3,162.50). The total is $3,162.50. That's the total amount the Company will allocate in 1995 to this employee's cash balance. Allocations will be made each pay period.

2

## INCENTIVE SAVINGS PLAN (ISP)



You can still contribute up to 15% of your base salary each year to your ISP account. Just as now, the amount you can contribute on a before-tax basis is limited by the federal government.

The Company will continue to match – dollar-for-dollar – your before-tax contributions, up to 3% of your base salary each pay period. Beginning July 1, 1994 you'll be vested in your past and future Company Matching Contributions immediately.

Here's an example to show how your before-tax contributions and Company Matching Contributions combine to make your savings grow quickly. Suppose your annual base salary is $30,000 and you elect to contribute 3% before-tax to the ISP. Here's how your ISP account would be credited:

| | |
|---|---|
| Your before-tax contributions ($30,000 x 3.0%) = | $ 900 |
| Company Matching Contributions = | $ 900 |
| | $1,800 |

And that doesn't include any investment earnings you may receive.

# Manage your account on a daily basis by simply calling 1-800-ISP-1800



### Company Stock Contributions

Company Stock Contributions will equal 1% of your base salary and will be automatically invested in the ISP in the American Express Stock Fund. This 1% contribution will be made each biweekly pay period after you complete the one-year service requirement, beginning with the first pay period following July 1, 1994. You are immediately vested in your 1% Company Stock Contributions.

### Profit Sharing Contributions

Profit Sharing Contributions are based primarily on Company performance, and will range from 0% to 7% of your base salary. This contribution will be deposited into your ISP account and invested according to your election. This contribution will generally be made early each year, based upon the Company's performance in the prior year and other factors. You are vested in the Profit Sharing Contributions after five years of service.

If your annual base salary is $25,000 and the annual Profit Sharing Contribution is 4%, here's an example of how it would be calculated:

The first Profit Sharing Contribution will be made in the first quarter of 1995, if you are eligible (that is, if you complete the one-year service requirement and are still employed on December 31, 1994). This first contribution will be pro-rated for the period from July 1, 1994 to December 31, 1994. Future Profit Sharing Contributions will generally be based on a full calendar year.

## Here are some other important features of the ISP:

### CHOICE OF INVESTMENT OPTIONS

You choose how to invest your contributions, as well as the Company Matching Contributions and Profit Sharing Contributions, from among these investment options:

- American Express Stock Fund
- IDS International Fund, Inc.
- IDS Discovery Fund, Inc.
- IDS New Dimensions Fund, Inc.
- IDS Stock Fund, Inc.
- IDS Mutual,
- IDS Bond Fund, Inc.
- IDS Federal Income Fund, Inc. and
- ISP Income Fund.

### ACCESS THROUGH LOANS AND WITHDRAWALS

Just as now, you will have access to your ISP accounts through loans and financial hardship withdrawals. But loan access will be more frequent and more flexible. Your loan and withdrawal options are spelled out in detail in the ISP booklet included in this package.

### IMMEDIATE VESTING

Company Matching Contributions will be vested immediately. (Currently, they are not vested until you have five years of service or two years of ISP participation.)

### CALL ISP DAILY SERVICE

You will continue to be able to manage your account on a daily basis by simply calling 1-800-ISP-1800. See page 9 for information about requesting investment changes in advance.

Included in this package is more detailed information about the ISP and its investment options, including fund prospectuses and general investment information.

3



## COMPARISON OF CURRENT AND NEW RETIREMENT PROGRAMS

As you can see, the new Retirement Program is simpler and easier to understand. This chart shows you "at-a-glance" how the current and new Retirement Programs compare.

### RETIREMENT PLAN

| | Current Program | New Program |
|---|---|---|
| Vesting | 5 years of service. | 5 years of service. |
| Benefit Formula | For Credited Service after November 30, 1989: 1% x AFC* for years of Credited Service*** from 0 – 4; 1.15% for 5 – 9 years; 1.3% for 10 years and above. For Credited Service through November 30, 1989: 1.6% x AFC x years of Credited Service offset by 1.4% x Social Security benefit x years of Credited Service. | (see table below) |
| Early retirement benefit (for employees who are at least age 55 with 10 years of service) | Unreduced at age 60*** with 10 years of service; reduced for retirements between ages 55 and 60***, unless the total of your age and service equals 90 or more. | Account balance or monthly annuity payable upon termination (or at any time up to age 65). |
| Vested benefit for employees who leave before becoming eligible for early retirement benefit | Annuity deferred until age 65; payable as early as age 55 with reductions. | Account balance or monthly annuity payable upon termination (or at any time up to age 65). |
| Normal retirement age | 65 | 65 |

**Benefit Formula — New Program table:**

| Age + Service | % of Pensionable Earnings |
|---|---|
| Less than 35 | 2.50% |
| 35 – 44 | 3.25% |
| 45 – 59 | 4.25% |
| 60 – 74 | 5.75% |
| 75 – 89 | 8.00% |
| 90 and over | 10.00% |

* Average Final Compensation (AFC) is the average of your five highest consecutive years' Pensionable Earnings during the last ten years of Credited Service.

** Credited Service equals all of your years of service for the period before January 1, 1976. Beginning January 1, 1976, you earn a full year of Credited Service if you complete at least 1,800 hours in a calendar year.

*** Based on the current Social Security Normal Retirement Age minus five years. The Social Security Normal Retirement Age increases periodically.

### ISP

| | Current Program | New Program |
|---|---|---|
| Company Matching Contributions | 100% on the first 3% of base salary you save on a before-tax basis; or 50% on the first 3% of base salary you save on an after-tax basis. | 100% on the first 3% of base salary you save on a before-tax basis only. |
| Service-related Contributions | 0% for 0 – 4 years of service; 1.5% for 5 – 9 years; 3.0% for 10 years and above. | Not offered. |
| Company Stock Contributions | Not offered. | 1% of base salary. |
| Profit Sharing Contributions | Not offered. | 0% – 7% of base salary, based on Company performance. |
| **Vesting** | | |
| Your contributions | Immediate. | Immediate. |
| Company Matching Contributions | After five years of service or two years of participation. | Immediate. |
| Company Stock Contributions | Not offered. | Immediate. |
| Profit Sharing Contributions | Not offered. | After five years of service. |
| Maximum employee contribution | 15% of base salary. | 15% of base salary. |
| Investment options | American Express Stock Fund, IDS New Dimensions Fund, IDS Selective Fund, ISP Income Fund (Fixed Interest Account) | American Express Stock Fund, IDS New Dimensions Fund, IDS International Fund, IDS Discovery Fund, IDS Stock Fund, IDS Mutual, IDS Bond Fund, IDS Federal Income Fund, ISP Income Fund. |

### PENSION PROFIT SHARING PLAN

| | Current Program | New Program |
|---|---|---|
| Annual allocation | Varies year-to-year based on Company performance. | Not offered. |

Benefit rights and features of the current plans are maintained for the Retirement Plan benefit accrued prior to January 1, 1995 and the ISP benefit accrued prior to July 1, 1994.

- Average Final Compensation (AFC) is the average of your five highest consecutive years' Pensionable Earnings during the last ten years of Credited Service.

- Credited Service equals all of your years of service for the period before January 1, 1976. Beginning January 1, 1976, you earn a full year of Credited Service if you complete at least 1,800 hours in a calendar year.

- Based on the current Social Security Normal Retirement Age minus five years. The Social Security Normal Retirement Age increases periodically.

## GLOSSARY OF TERMS

**Annuity** – A benefit that is payable in monthly installments. The duration of the payments is determined by the form of the annuity. Some annuities pay monthly benefits over the course of your lifetime; others end upon certain ages or circumstances.

**Pensionable Earnings** – Base salary, overtime, commissions, shift differential and most bonus payments.

**Prospectus** – A legal document that describes the ISP in detail, including how each fund is invested and a description of past fund performance.

**Vested Accrued Benefit** – Your vested benefit is calculated under the ISP or Retirement Plan benefit formula. Once your accrued benefit is "vested," you own it – no matter when or why you leave the Company.

**Vesting** – Vesting is the process of "earning" your benefit. For example, you vest in a benefit after five years; you own it at the end of the five-year period. During the five years, however, you are becoming vested in that benefit.

4

# A FEW EXAMPLES

The examples that follow focus on many different people. You can see how benefits under the new and current Retirement Programs compare (assuming the current Retirement Program were continuing).

It's very important to notice that in order to give you a meaningful comparison, we show the current Retirement Plan benefit as a lump sum. However, a lump sum payment option is not available under the current Retirement Plan.

Please note that every example makes these assumptions:

- all personal data is listed on January 1, 1995,
- 3% of annual base salary is contributed to the ISP and is matched by the Company,
- ISP balances shown include Company Matching Contributions and any Service-Related Contributions, but do not include employee contributions,
- Company Stock Contributions to the ISP are 1% of annual base salary,
- annual Profit Sharing Contributions are 3% of annual base salary,
- investment earnings equal 7.5% in the ISP and interest is credited at 6% in the cash balance Retirement Plan, and
- Pensionable Earnings increases are 5% each year.

## LOUIS

| | |
|---|---|
| Age | 25 |
| Pensionable Earnings | $20,000 |
| Years of Company Service | 2 |
| Opening Cash Balance | $271 |
| ISP Balance (Company contributions only) | $592 |

Louis is 25 years old at January 1, 1995 and wants to know what his Retirement Program benefit would be after a total of five years with American Express. He has a small accrued benefit under the current Retirement Plan which is not yet vested. However, this benefit becomes his opening balance in the new Retirement Plan. He's contributed to the ISP during the one year in which he was eligible.

Here's what Louis's Retirement Program benefits would look like under the current and new Retirement Programs after a total of five years of Company service.

### At Age 29

| | Current | New |
|---|---|---|
| Retirement Plan | | |
| | $ 465 | |
| ISP Balance | | |
| | $ 3,188 | |
| Total Retirement Account | | |
| | $ 3,653 | |

\* includes opening balance

In addition, Louis's personal contributions to the ISP add another $4,978 to his total retirement account.

## JOSEPH

| | |
|---|---|
| Age | 29 |
| Pensionable Earnings | $30,000 |
| Years of Company Service | 5 |
| Opening Cash Balance | $1,197 |
| ISP Balance (Company contributions only) | $4,151 |

Joseph is 29 years old at January 1, 1995 and wants to know what his Retirement Program benefit would be after a total of seven years with American Express. His accrued benefit under the current Retirement Plan becomes his opening balance in the new Retirement Plan. He's contributed to the ISP during the entire time he was eligible.

Here's what Joseph's Retirement Program benefits would look like under the current and new Retirement Programs after a total of seven years of Company service.

### At Age 31

| | Current | New |
|---|---|---|
| Retirement Plan | | |
| | $ 1,210 | |
| ISP Balance | | |
| | $ 7,750 | |
| Total Retirement Account | | |
| | $ 8,960 | |

\* includes opening balance

In addition, Joseph's personal contributions to the ISP add another $6,344 to his total retirement account.

## DONNA



| | |
|---|---|
| Age | 35 |
| Pensionable Earnings | $50,000 |
| Years of Company Service | |
| Opening Cash Balance | $626 |
| ISP Balance (Company contributions only) | $0 |

Donna is 35 years old at January 1, 1995 and wants to know what her Retirement Program benefit would be after a total of five years with American Express. She has a small accrued benefit under the current Retirement Plan which is not yet vested. However, this benefit becomes her opening balance in the new Retirement Plan. She's just become eligible for the ISP, after meeting her one-year service requirement.

Here's what Donna's Retirement Program benefits would look like under the current and new Retirement Programs after a total of five years of Company service.

### At Age 39

| | Current | New |
|---|---|---|
| Retirement Plan | | |
| | $ 876 | $ 2,446 |
| ISP Balance | | |
| | $ 8,368 | |
| Total Retirement Account | | |
| | $ 11,114 | |

\* includes opening balance

In addition, Donna's personal contributions to the ISP add another $7,466 to her total retirement account.

## ELLEN

| | |
|---|---|
| Age | 22 |
| Pensionable Earnings | $18,000 |
| Years of Company Service | 1 |
| Opening Cash Balance | $105 |
| ISP Balance (Company contributions only) | $0 |

Ellen is 22 years old at January 1, 1995 and wants to know what her Retirement Program benefit would be after staying with American Express for about eight years. She's just become eligible for the ISP, after meeting her one-year service requirement.

Here's what Ellen's Retirement Program benefits would look like under the current and new Retirement Programs after a total of eight years of Company service.

### At Age 29

| | Current | New |
|---|---|---|
| Retirement Plan | | |
| | $ 926 | |
| ISP Balance | | |
| | $ 7,802 | |
| Total Retirement Account | | |
| | $ 8,128 | |

\* includes opening balance

In addition, Ellen's personal contributions to the ISP add another $5,644 to her total retirement account.

## Portability is Key

Keep in mind that the new Retirement Plan lets employees take their vested benefits with them no matter when they leave the Company, unlike under the current plan where no benefits are payable before age 55.

5

# Portability is Key

**Keep in mind that the new Retirement Plan lets employees take their vested benefits with them no matter when they leave the Company, unlike under the current plan where no benefits are payable before age 55.**



### KATHLEEN

| | |
|---|---|
| Age | 40 |
| Pensionable Earnings | $45,000 |
| Years of Company Service | 10 |
| Opening Cash Balance | $16,314 |
| ISP Balance (Company contributions only) | $23,344 |



### JOHN

| | |
|---|---|
| Age | 35 |
| Pensionable Earnings | $35,000 |
| Years of Company Service | 11 |
| Opening Cash Balance | $5,605 |
| ISP Balance (Company contributions only) | $11,794 |

Kathleen is 40 years old as of January 1, 1995 and has been with American Express for ten years. She's not sure when she'll leave the Company, but wants to know what her retirement income would be at age 45. She has an accrued benefit under the current Retirement Plan, which becomes her opening balance in the new Retirement Plan. She's contributed to the ISP every year since she became eligible to participate.

Here's how Kathleen's Retirement Program benefits would be calculated at age 45 under the current and new Retirement Programs.

John is 35 years old as of January 1, 1995 and has been with American Express for eleven years. He's considering leaving at age 40 and would like to know what his benefit would be at that time. He has an accrued benefit under the current Retirement Plan, which becomes his opening balance in the new Retirement Plan. He's contributed to the ISP every year since he became eligible to participate.

Here's how John's Retirement Program benefits would be calculated at age 40 under the current and new Retirement Programs.



### ALEX

| | |
|---|---|
| Age | 50 |
| Pensionable Earnings | $45,000 |
| Years of Company Service | 5 |
| Opening Cash Balance | $11,342 |
| ISP Balance (Company contributions only) | $6,196 |



### MELISSA

| | |
|---|---|
| Age | 38 |
| Pensionable Earnings | $40,000 |
| Years of Company Service | 8 |
| Opening Cash Balance | $4,912 |
| ISP Balance (Company contributions only) | $11,374 |

Alex is 50 years old as of January 1, 1995 and has been with American Express for five years. He's considering leaving the Company at age 51 and would like to know what his benefit would be at that time. He has an accrued benefit under the current Retirement Plan, which becomes his opening balance in the new Retirement Plan. He's contributed to the ISP every year since he became eligible to participate.

Here's how Alex's Retirement Program benefits would be calculated at age 51 under the current and new Retirement Program.

#### At Age 51

| | Current | New |
|---|---|---|
| **Retirement Plan** | $ 9,723 | $ 14,093 |
| **ISP Balance** | $ 8,763 | $ 9,929 |
| **Total Retirement Account** | $ 18,483 | $ 24,022 |

*includes opening balance

In addition, Alex's personal contributions to the ISP add another $7,345 to his total retirement account.

Melissa is 38 years old as of January 1, 1995 and has been with American Express for eight years. She's not sure when she'll leave the Company, but likes knowing she has the flexibility to take her Retirement Program account with her if she does leave before retirement. She's considering leaving at age 40 and would like to know what her benefit would be at that time. She has an accrued benefit under the current Retirement Plan, which becomes her opening balance in the new Retirement Plan. She's contributed to the ISP every year since she became eligible to participate.

Here's how Melissa's Retirement Program benefits would be calculated at age 40 under the current and new Retirement Programs.

#### At Age 40

| | Current | New |
|---|---|---|
| **Retirement Plan** | $ 4,906 | |
| **ISP Balance** | $ 17,767 | |
| **Total Retirement Account** | $ 22,672 | |

*includes opening balance

In addition, Melissa's personal contributions to the ISP add another $12,950 to her total retirement account.

#### At Age 45

| | Current | New |
|---|---|---|
| **Retirement Plan** | $ 29,506 | $ 40,310 |
| **ISP Balance** | $ 82,886 | $ 88,504 |
| **Total Retirement Account** | $112,474 | $128,814 |

*includes opening balance

In addition, Kathleen's personal contributions to the ISP add another $52,698 to her total retirement account.

#### At Age 40

| | Current | New |
|---|---|---|
| **Retirement Plan** | $ 6,138 | $ 12,202 |
| **ISP Balance** | $ 24,851 | $ 28,506 |
| **Total Retirement Account** | $ 32,989 | $ 40,708 |

*includes opening balance

In addition, John's personal contributions to the ISP add another $16,813 to his total retirement account.



# Special Assistance

### FOR EMPLOYEES NEARING RETIREMENT

Employees nearing retirement may be particularly interested in projecting benefits under the new Retirement Program. We're preparing tools to help you look at your benefits at various retirement dates, determine if your investment strategies are appropriate, and understand how to maximize your benefits under the program.

**ERIC**

| | |
|---|---|
| Age | 33 |
| Pensionable Earnings | $33,000 |
| Years of Company Service | 20 |
| Opening Cash Balance | $79,660 |
| ISP Balance (Company contributions only) | $44,370 |

Eric is 33 years old as of January 1, 1995 and wants information about retirement at various ages. He's already earned a vested accrued benefit under the current Retirement Plan, which becomes his opening balance in the new Retirement Plan. He's also been contributing steadily to the ISP since he became eligible. Here's how his benefits compare under the new and current Retirement Programs.

**At Age 55**

**Retirement Plan**

| Current | New |
|---|---|
| $108,367 | $351,731 |

**ISP Balance**

| Current | New |
|---|---|
| $81,663 | $82,875 |

**Total Retirement Account**

| | |
|---|---|
| $190,030 | $182,986 |

* Includes opening balance

**At Age 65**

**Retirement Plan**

| Current | New |
|---|---|
| $312,947 | $332,002 |

**ISP Balance**

| Current | New |
|---|---|
| $233,557 | $346,922 |

**Total Retirement Account**

| | |
|---|---|
| $546,504 | $678,925 |

* Includes opening balance

In addition, Eric's personal contributions to the ISP add another $48,248 to his total retirement account if he leaves at age 55 and $132,065 if he leaves at age 65. Although Eric's total retirement account is less under the new program at age 55, note that it is higher at age 65. Also, if he leaves before age 55, he can take his Retirement Plan benefit with him, unlike under the current plan.

**RICHARD**

| | |
|---|---|
| Age | 47 |
| Pensionable Earnings | $35,000 |
| Years of Company Service | 23 |
| Opening Cash Balance | $24,007 |
| ISP Balance (Company contributions only) | $20,333 |

Richard is 47 years old as of January 1, 1995 and wants information about retirement at various ages. He's already earned a vested accrued benefit under the current Retirement Plan, which becomes his opening balance in the new Retirement Plan. He's also been contributing steadily to the ISP since he became eligible. Here's how his benefits compare under the new and current Retirement Programs.

**At Age 50**

**Retirement Plan**

| Current | New |
|---|---|
| $27,078 | $357,265 |

**ISP Balance**

| Current | New |
|---|---|
| $69,906 | $71,236 |

**Total Retirement Account**

| | |
|---|---|
| $96,984 | $110,501 |

* Includes opening balance

**At Age 60**

**Retirement Plan**

| Current | New |
|---|---|
| $259,043 | $143,279 |

**ISP Balance**

| Current | New |
|---|---|
| $187,676 | $197,671 |

**Total Retirement Account**

| | |
|---|---|
| $446,719 | $340,742 |

* Includes opening balance

**At Age 65**

**Retirement Plan**

| Current | New |
|---|---|
| $341,332 | $349,327 |

**ISP Balance**

| Current | New |
|---|---|
| $295,619 | $374,553 |

**Total Retirement Account**

| | |
|---|---|
| $636,951 | $643,347 |

* Includes opening balance

In addition, Richard's personal contributions to the ISP add another $40,397 to his total retirement account if he stays until age 50, $100,889 if he stays until age 60 and $163,919 if he stays until age 65. Although Richard's total retirement account is less under the new program at ages 60 and 65, note that it is higher at age 50. Also, if he leaves before age 55, he can take his Retirement Plan benefit with him, unlike under the current plan.



**CAROL**

| | |
|---|---|
| Age | 58 |
| Pensionable Earnings | $60,000 |
| Years of Company Service | 32 |
| Opening Cash Balance | $330,841 |
| ISP Balance (Company contributions only) | $189,173 |

Carol is 58 years old as of January 1, 1995 and is thinking of retiring from American Express when she's age 60, although she wants to know what her benefits would be at age 65. She's already earned a vested accrued benefit under the current Retirement Plan, which becomes her opening balance in the new Retirement Plan. She's also eligible for the "Rule of 90", since her age and service total at least 90. She's been contributing steadily to the ISP since she became eligible. Here's how her benefits compare under the new and current Retirement Programs.

**At Age 60**

**Retirement Plan**

| Current | New |
|---|---|
| $334,054 | $399,041 |

**ISP Balance**

| Current | New |
|---|---|
| $229,194 | $230,358 |

**Total Retirement Account**

| | |
|---|---|
| $563,248 | $629,399 |

* Includes opening balance

**At Age 65**

**Retirement Plan**

| Current | New |
|---|---|
| $445,507 | $683,300 |

**ISP Balance**

| Current | New |
|---|---|
| $364,034 | $519,203 |

**Total Retirement Account**

| | |
|---|---|
| $809,541 | $1,202,603 |

* Includes opening balance

In addition, Carol's personal contributions to the ISP add another $128,906 to her total retirement account if she stays until age 60 and $202,559 if she stays until age 65.



## Communication Calendar

### WHAT...WHEN

More information about the new Retirement Program is coming in the fall. Here's what to expect.

### FALL

Retirement Plan Booklet which provides details that complete the materials in the enclosed Retirement Program Folder.

Telephone Modeling Hotline for those who want to look at projected benefits under the new program.

7



In the last issue of *Benefits Briefs*, we asked for your questions. Here they are, along with answers.

## GENERAL

**Why is the Company making changes to the Retirement Program?**

All of the Retirement Program changes are designed to establish a common benefit program throughout the Blue Box (TRS, AEB, CHQ and IDS), provide greater flexibility to employees, be easier to understand, and streamline administration, while continuing to be competitive in meeting employees' retirement needs. The changes are also designed to help control costs by tying a portion of the benefits to Blue Box performance.

As part of our ongoing reengineering efforts, we wanted to make sure our Retirement Program was able to meet the retirement needs of our diverse workforce. Our workforce is made up of people who look at their careers with us in different ways. While some employees spend their entire career with us, most stay less than 10 years. The new program has been designed to be responsive to these different workforce profiles.

**When do the changes become effective?**

Changes to the ISP become effective July 1, 1994. Changes to the Retirement Plan are expected to take effect January 1, 1995.



**Will I have a choice between the new Retirement Program and the old Retirement Program?**

No. The new Retirement Program will be the only program offered. However, keep in mind that your vested ISP balance will remain in the ISP. The lump sum value of your current Retirement Plan accrued benefit will become your starting balance in the new cash balance Retirement Plan. And your Stock Ownership Plan shares will automatically be transferred into the ISP (pending Internal Revenue Service (IRS) approval of the plan termination).



**Given the changes, is our Retirement Program still competitive?**

Yes, it is competitive with what the top companies in the nation provide for their employees. We compared our new Retirement Program with the 14 Fortune 100 companies we traditionally survey on compensation and benefits, as well as 300 large national firms. We were competitive with both groups. (On page 1 is a graphic illustration that shows exactly how we measure up.

**Is the new program made up of three separate plans? Or, are Profit Sharing Contributions and the cash balance Retirement Plan now part of the ISP?**

The American Express Retirement Plan, which will now be in the form of a cash balance pension plan, is still a separate plan from the American Express Incentive Savings Plan (ISP). Profit Sharing Contributions are actually a component of the ISP. Therefore, the new Retirement Program consists of two separate plans: the ISP and the Retirement Plan (see "Overview" on page 2).

**When will we receive more details about the new Retirement Program?**

The Communications Calendar on page 7 outlines what to expect in the fall. Included in this package are a detailed ISP booklet, investment education booklet and investment fund prospectuses. The ISP booklet will answer all your questions on vesting, new loan and withdrawal provisions and new investment funds. In the fall, you will receive a detailed Retirement Plan booklet which should answer all your questions about the Retirement Plan changes.

**Why is the Employee Service Center (ESC) only accepting written questions at this time about the new Retirement Program?**

The Benefits Reengineering Task Force is still working out many of the details of the new Retirement Program. Until these details are finalized, the ESC will not be able to answer your telephone questions. We will continue to use the *Benefits Briefs* newsletter as our main vehicle for ongoing communications. While we won't be able to answer your questions individually at this time, we believe it's important for employees to understand the program. So, we'll group questions together and answer them in future communications.

## STOCK OWNERSHIP PLAN (SOP)



**When will my SOP account be transferred to the ISP? Where will it be invested?**

We expect the SOP account balances to be transferred to the ISP during the last quarter of 1994, after all required IRS approvals have been received. The SOP balances will be invested in the American Express Stock Fund of the ISP.

**I'm currently working with an IDS Financial Planner to plan my retirement. Will the IDS Planners be informed of all the Retirement Program changes?**

The IDS Planners have been given general information about the changes. However, they are not yet prepared to give benefit projections under the new program, since not all details are known at this time. After the provisions of the Retirement Plan are finalized, IDS Planners will be informed of all the details and will be able to provide you with projections.





## INCENTIVE SAVINGS PLAN (ISP)

**Q: Are the vesting rules changing under the ISP?**

A: Yes. All Company Matching Contributions (past and future) will be immediately and fully vested as of July 1, 1994. Currently, Company Matching Contributions are not vested until the earlier of two years of plan participation or five years of service.

The automatic 1% (of base salary) Company Stock Contribution is always fully vested. However, there is a five-year service requirement before employees are vested in the Profit Sharing Contributions.

**Q: Is there still a one-year service requirement to participate in the ISP?**

A: Yes. You must complete one year of service before you can begin contributing to the ISP. The one-year service requirement also applies to the ISP Company Stock Contributions and Profit Sharing Contributions.

**Q: Will the Company still match employee contributions up to 3% of base salary?**

A: Yes, however, beginning July 1, 1994, the Company will only match 100% of before-tax employee contributions up to 3% of base salary; there will be no Company match on after-tax contributions beginning July 1, 1994.

**Q: Do Company Matching Contributions still have to be invested in the American Express Stock Fund?**

A: No. Beginning July 1, 1994, Company Matching Contributions will be invested in the same way employees choose to invest their own contributions. In addition, Company Matching Contributions already in the American Express Stock Fund can be transferred to any of the other investment funds beginning in July.

**Q: Do I have to wait until July 1, 1994 if I want to change my investment elections?**

A: No. Due to anticipated heavy telephone volume, IDS Trust is taking investment change requests in advance for both past and future investments. All requests will be held and processed after July 1st. We strongly suggest you call IDS Trust at 1-800-ISP-1800 before July 1, 1994 to request an investment change or transfer. If you call during times of heavy phone volume (which are expected in early July), you may experience a delay in connecting with an IDS Trust representative and in completing your investment change or transfer.

## RETIREMENT PLAN (CASH BALANCE)

**Q: Are the vesting rules changing under the Retirement Plan?**

A: No. Employees will still be fully vested in their accrued benefit after five years of service.

**Q: How will my opening cash balance under the Retirement Plan be determined?**

A: First, we'll calculate your accrued benefit under the current Retirement Plan as of December 31, 1994, whether or not you are vested at that time. This monthly benefit will then be converted to a lump sum using actuarial assumptions. This lump sum becomes your opening cash balance.

**Q: How much of an allocation will I receive each year under the plan?**

A: Allocations under the Retirement Plan will be a percentage of your Pensionable Earnings based upon a table which indicates total age plus service "points"; for example, if you are age 35 with 5 years of service, you would have a total of 40 points. The higher your points, the higher the annual percentage allocation to your cash balance (allocations range from 2.5% for employees with less than 35 points to 10% for employees with 90 or more points). See the chart on page 2.

**Q: How many investments will now be offered under the ISP?**

A: A total of nine investment options will be offered. Full details about the new investment are provided in the Retirement Program folder, included in this package.

**Q: Will we have to change our current investment elections on July 1, 1994?**

A: No. You will not be required to change your current investment elections. Any funds invested in the IDS Selective Fund (Income Yield Account), which will no longer be an investment option after July 1, 1994, will be automatically reinvested in the IDS Bond Fund if you decide not to change your current elections. Full details about the additional investment options are provided in the Retirement Program folder, included in this package.

**Q: Now that we're adding new investment options, do my future contributions after July 1, 1994 have to be split between only two of the investment options, the way they are now?**

A: No. Employees can choose to have their contributions spread among the nine investment options as they wish, in increments of at least 1%.

**Q: I understand that Company Matching Contributions on after-tax contributions will be eliminated July 1, 1994. Will I still be able to make after-tax contributions to the ISP?**

A: Yes. However, you must first contribute at least 3% of base salary on a before-tax basis before you can make after-tax contributions.

**Q: If I'm currently contributing 1% of my base salary before-tax and 4% after-tax, does that mean I have to change my contribution rate by July 1, 1994 if I still want to make after-tax contributions?**

A: Yes. Employees making after-tax contributions who have elected to contribute less than 3% before-tax must change their contribution rates before July 1, 1994 if they want to continue making after-tax contributions, since after-tax contributions will no longer be permitted unless before-tax contributions of at least 3% are also elected. In your case, your 4% after-tax election will automatically change to 0% after-tax unless you change your contribution rate election (your 1% before-tax election would continue, however).

**Q: I'm currently receiving Service-related Contributions at the 3% level. Since the Service-related Contributions are being eliminated July 1, 1994, am I guaranteed to receive at least the same percentage through Profit Sharing Contributions?**

A: No. Profit Sharing Contributions were not intended to be an exact replacement of the Service-related Contributions under the ISP, or of the terminating Stock Ownership Plan. Since Profit Sharing Contributions will be based on Company performance, there can be no guarantee that each employee will receive the same amount they would have received if Service-related Contributions had continued. It is important for employees to look at their entire benefit under the total Retirement Program, rather than comparing a portion of the new program, such as Profit Sharing Contributions, to provisions of the current plans.

**Q: How will my ISP account be affected by the recent announcement that all American Express shareholders will receive one share of Lehman Brothers Holdings Inc. stock for every five shares of American Express common stock?**

A: Lehman Brothers common shares are not currently an authorized investment under the ISP. The plan's fiduciary committee will determine how the special dividend will be handled under the plan (for example, whether the Lehman Brothers common shares will be sold, and if so, when), in accordance with the plan and applicable law. You will be informed later about the fiduciary committee's decision. In any event, the value attributable to the special dividend will be reflected in the value of the American Express Stock Fund of the ISP.



**Q: How are Pensionable Earnings defined under the Retirement Plan?**

A: Pensionable Earnings are defined as your base salary plus overtime, shift differential, commissions and most bonus payments (certain bonus payments, such as special awards, are not pensionable, as under the current plan).

**Q: Can I roll over my cash balance payout into an Individual Retirement Account (IRA) after I retire or leave the Company?**

A: Yes. Since the Retirement Plan is a qualified plan, your lump sum cash balance payment can be rolled over into an IRA or another qualified plan offered by a different employer.

9

## RETIREMENT PLAN (CONT.)

**I was a participant in the Funded Pension Plan that was terminated in 1985. I'm entitled to a monthly annuity at age 65 from Metropolitan Life Insurance Company for my benefit accrued through April 30, 1985. Will the upcoming changes affect my Met Life annuity?**

Your Met Life annuity will be part of your accrued benefit under the current Retirement Plan as of December 31, 1994. As mentioned in the previous Benefits Briefs, all details of the new plan have not yet been worked out, and we do not know at this time what the payment options for the Met Life annuity will be. That is, we may not be able to convert it to a lump sum balance. However, in any event, you will not lose your April 30, 1985 accrued benefit.

**Will my benefits under the Retirement Plan be dependent on investment performance?**

No. Each year, the Company will determine a crediting rate similar to an interest rate, which will apply to your Retirement Plan cash balance that year. You'll be told the crediting rate at the beginning of each year and will be able to see your cash balance grow. After the crediting rate has been established for the year, it will not change due to market fluctuations.

**If I'm already eligible for retirement, should I consider retiring in 1994, before the cash balance feature takes effect, so that I don't lose any benefits I've accrued so far?**

There is no danger of losing any benefits you've accrued under the current plan. All employees have the right to receive a benefit at termination that is no less than their vested accrued benefit under the current plan as of December 31, 1994. Although all employees can take their vested benefit as a lump sum beginning in 1995, the payment options under the current plan would still be available for your December 31, 1994 vested accrued benefit.

**Can I take loans or withdrawals from my cash balance?**

No. Just like the current Retirement Plan, loans and withdrawals are not available. However, loans and withdrawals will still be permitted under the ISP.

**How will the benefit reduction factors for early retirement and the Rule of 90 be affected?**

Under the cash balance Retirement Plan, reduction factors and the Rule of 90 no longer have any relevance, since all employees are entitled to receive the full, unreduced amount of their vested cash balance upon retirement or termination, regardless of their age.

**What happens to my cash balance amount if I die?**

If you die while still employed, your vested cash balance amount would be payable to your beneficiary. If you have already terminated or retired and have already received your full cash balance payment, no further benefits are payable under the Retirement Plan.

---

# AMERICAN EXPRESS INCENTIVE SAVINGS PLAN
## PROSPECTUS SUPPLEMENT - MAY 16, 1994

This Prospectus Supplement describes important changes to the American Express Incentive Savings Plan (ISP). It updates certain of the information contained in the ISP Prospectus dated April 30, 1993, as supplemented on February 28, 1994.

These changes to the ISP will be effective no later than July 5, 1994, except that special transition rules apply to participants in the IDS Savings Plan who will become participants in the ISP at that time. These transition rules, which are described below, update certain of the information in the IDS Savings Plan Prospectus dated March 31, 1994.

The highlights of the ISP changes are as follows:

**Company Matching Contributions.** — All Company Matching Contributions previously made and those made in the future will be immediately vested. You may invest these contributions in the various investment alternatives at your election. Company Matching Contributions will continue to be made on before-tax Employee Contributions, but will no longer be made on after-tax Employee Contributions.

**Profit Sharing Contributions.** — Discretionary Profit Sharing Contributions ranging from 0% to 7% of your base salary will be made to your account on an annual basis regardless of whether you save through the ISP, so long as you meet certain service requirements.

**Company Stock Contributions.** — An additional contribution (Company Stock Contribution) equal to 1% of your base salary paid each payroll period will be made to your account in each such period and invested in the American Express Stock Fund regardless of whether you save through the ISP, so long as you meet certain service requirements.

**New Investment Alternatives.** — Six new investment alternatives will be added, one of which will replace IDS Selective Fund, Inc. You will be able to allocate your investments among the new investment alternatives in 1% increments.

**Service-related Contributions.** — Service-related Contributions will be discontinued.

**Other Changes.** — Certain changes will also be made as to the eligibility requirements, the permitted allocation of Employee Contributions between before- and after-tax Employee Contributions, in-service withdrawals, loans and distributions.

### COMPANY MATCHING CONTRIBUTIONS

The Company will continue to match part of your savings up to 3% of your base salary each payroll period with contributions to your account. Before-tax Employee Contributions will continue to be matched dollar-for-dollar, while after-tax Employee Contributions will no longer be matched. All Company Matching Contributions previously made to your account and those to be made in the future will be fully vested at all times. The requirement that these contributions remain invested in the American Express Stock Fund will no longer be applicable. Instead, you may elect to invest Company Matching Contributions among other new investment alternatives. See "Allocation to Investment Alternatives" and "Investment Accounts" below. You may also elect to transfer existing balances in the American Express Stock Fund arising from Company Matching Contributions to other investment alternatives.

### COMPANY STOCK CONTRIBUTION

The Company will make a contribution (Company Stock Contribution) each payroll period equal to 1% of your base salary paid in such period if you have completed one year of service as described below, even if you are not saving in the ISP. The Company Stock Contribution will be made in American Express Company common shares, to be held in the American Express Stock Fund, valued at fair market value at the time of the contributions. The Company Stock Contribution will be made to your account regardless of whether you save through the ISP, so long as you meet the one-year service requirement, and will be immediately vested. These contributions may not be transferred out of the American Express Stock Fund or other investment alternatives until the participant reaches age 55.

### PROFIT SHARING CONTRIBUTIONS

The Company will make annual Profit Sharing Contributions to your ISP account in an amount ranging from 0% to 7% of your base salary. You will be eligible to receive this contribution if you are employed on the last day of the plan year (December 30) and have completed one year of service as described below. The contribution will be made annually following the end of the plan year. The amount of the contribution will be in the sole discretion of the Board of Directors or a committee of the Board of American Express Company, whose decision is final and binding. It is expected that the amount of any contribution attributable to a given year will be based, in part, on the Company's performance in that year, taking into account financial and other measures of performance. For 1994, it is expected that if a contribution is made, it will be pro-rated based on the July–December 1994 period. There is no assurance that Profit Sharing Contributions will be made to your account in any particular year.

All Profit Sharing Contributions will be fully vested once you have completed five years of service, as described below. Generally, if your employment terminates for reasons other than retirement or disability and your Profit Sharing Contributions are not vested at that time, then such contributions will be forfeited. If you are rehired and had met the eligibility requirements during your previous period of employment, you may rejoin the ISP following your rehire, and the forfeited portion of your Profit Sharing Contributions will be restored, adjusted by gains or losses to and including the date of forfeiture, but unadjusted by any gains or losses after forfeiture, if:

**if you are a former member who did not receive a distribution, and**

**if you again become a member prior to the occurrence of a "five-year break in service."**

A "five-year break in service" is a period of five consecutive calendar years (beginning with the calendar year in which your membership terminated) during which you are not a member or a suspended member under the ISP on the last day of each such calendar year. If you are absent because of a maternity or paternity absence and are not paid or entitled to payment, your ISP membership will not be deemed to be terminated as of the last day of such calendar year. For this purpose, a "maternity or paternity absence" means an absence from work for any period because of the (a) pregnancy of the employee, (b) birth of a child of the employee, (c) placement of a child with the employee in connection with the adoption of such child by the employee, or (d) caring for such child for a period beginning immediately after such birth or placement.

If the forfeited portion of your account is restored, you will become vested in Profit Sharing Contributions upon completion of a combined total of five years of service, inclusive of the years of service to your credit prior to your termination.

### SERVICE-RELATED CONTRIBUTIONS

Service-related Contributions will be discontinued. Prior Service-related Contributions will remain fully vested, and you may transfer these contributions among the investment alternatives as in the past.

### EMPLOYEE CONTRIBUTIONS

For Employee Contributions, the first 3% of your base salary each payroll period must be made in before-tax dollars. Additional Employee Contributions may be made in any combination of before- and after-tax dollars, subject to an overall limit of 15% of base salary

10

the four highest ratings by independent rating agencies), unrated corporate bonds the investment

The fund invests primarily in common stocks and securities convertible into common stocks of foreign issuers. It

operated in areas where dynamic economic and technological changes are occurring. They also may exhibit

The foregoing description is for informational purposes only and is based on tax laws and regulations

and the limits imposed by the Internal Revenue Code of 1986, as amended, and regulations thereunder (the "Code"). Individuals whose maximum amount of before-tax Employee Contributions have been reduced to less than 3% of base salary due to the limitations of the Code may contribute additional after-tax contributions if they are contributing the maximum amount of before-tax contributions than permitted.

If your before-tax contribution rate is currently less than 3% and you are currently making after-tax contributions, you may wish to call 1-800-ISP-1800 prior to June 27, 1994 to change your contribution rate. After July 1, 1994, if your before-tax contribution rate is less than 3% and you are also contributing after-tax dollars, your after-tax rate will automatically go to zero. There will be no automatic change to your before-tax contribution rate.

## CONTRIBUTIONS IN AMERICAN EXPRESS SHARES

The ISP will permit American Express Company to make Company Matching Contributions, Company Stock Contributions, and Profit Sharing Contributions in the form of common stock or cash. American Express Company currently intends to pay in common shares, valued at the fair market value at the time of contribution, Company Matching Contributions, Company Stock Contributions, Profit Sharing Contributions and Employee Contributions that you have elected to invest in the American Express Stock Fund. To enable the ISP trustee to invest Company Matching Contributions and Profit Sharing Contributions in accordance with participants' investment elections, as soon as practicable after the contributions are made or in anticipation of such contributions, the trustee will sell common shares (in market transactions or otherwise as determined pursuant to the ISP) on behalf of the ISP as required. The value of the trust and the amounts invested will reflect the proceeds from the sale of such shares which may differ from the value of these shares at the time they are contributed to the trust. All commissions on such sales are paid by American Express Company. In addition, the procedures relating to contributions in the event of "Blackout Periods" as described on page 6 of the Prospectus dated March 31, 1993 will continue to apply. A Blackout Period could delay investment election changes and the processing of your distribution withdrawal or loan request if any of your account balance is invested in the American Express Stock Fund.

## ALLOCATION TO INVESTMENT ALTERNATIVES

You can elect to have your Employee Contributions, Company Matching Contributions and Profit Sharing Contributions invested in one or more of the various investment alternatives described below. Commencing July 1, 1994, you may elect to invest in 1% increments in any number of funds. For example, you could elect that all amounts allocated to your account be invested in five different funds, with 24%, 35%, 28%, 12% and 1% of your contributions allocated to the various funds. All contributions to the aggregate are subject to your allocation instructions (i.e., you may not provide separate allocation instructions for your own Employee Contributions, Company Matching and Profit Sharing Contributions). In addition, there will be no limitation on the percentage of your total contributions that can be invested in the American Express Stock Fund.

## INVESTMENT ALTERNATIVES

Effective July 1, 1994, changes will be made to the ISP's investment alternatives, as follows:

■ Six new investment alternatives will be available.

■ IDS Selective Fund, Inc. managed by IDS Bond Fund, Inc. and all account balances in IDS Selective Fund, Inc. will be transferred to IDS Bond Fund, Inc.

■ The name of the Fixed Interest Account will be changed to the ISP Income Fund and the name of the Company Stock Account will be changed to the American Express Stock Fund.

■ The investment guidelines applicable to the ISP Income Fund will change slightly.

You may choose to change (i) your current investment choices for existing account balances (including balances in the American Express Stock Fund) and/or (ii) the investment directions for future Employee Contributions, Company Matching Contributions and Profit Sharing Contributions. If you do not make any election to change the investment of your existing balance and/or future contributions, your current elections to invest in the various investment alternatives will remain in effect (except that any election to invest in IDS Selective Fund, Inc. will be automatically changed to an election to invest in IDS Bond Fund, Inc.).

The investment alternatives effective July 1, 1994 are described below.

American Express Stock Fund — This fund invests in American Express Company common shares. The fund also usually maintains from approximately 1% to 2% of its assets in cash in order to meet requests for transfers, withdrawals and the like. Dividends are automatically invested in additional common shares. The value of this fund is determined predominately by the fluctuation in the market value of American Express Company common shares. There is no guarantee of investment performance. You will have full voting rights to the American Express Company common shares credited to your account.

ISP Income Fund — The ISP Income Fund (formerly the Fixed Interest Account) seeks to maximize current income consistent with the preservation of principal. IDS Trust Company ("IDS Trust"), as fund investment manager, invests the assets of the ISP Income Fund primarily with one or more insurance companies or other financial institutions (collectively, "Institutions") which issue investment contracts ("Contracts") providing for repayment of principal with a specified annual rate of interest for a specified period, including "synthetic investment contracts," and in the IDS Trust Collective Income Fund (the "Collective Income Fund"). A synthetic investment contract is a Contract about where the fund's trustee to directly hold the underlying securities and to have the results of those securities guaranteed by a third party (the "Guarantor") for a fee. To a lesser extent, IDS Trust also invests assets of the ISP Income Fund in the IDS Trust Collective Cash Fund (the "Collective Cash Fund"), other pooled investment vehicles commonly known as "money market" funds, and/or directly in money market instruments (i.e., short-term debt instruments which mature in one year or less). Money market instruments include securities issued or guaranteed as to principal by the government of the U.S. or by instrumentalities or agencies thereof, repurchase agreements collateralized by U.S. government securities, commercial paper, bank certificates of deposit, time deposits, bankers acceptances and letters of credit issued or backed by U.S. banks and U.S. subsidiaries or branches of foreign banks

## SPECIAL RULES FOR PARTICIPANTS IN IDS SAVINGS PLAN

On May 24, 1994, the IDS Savings Plan will enter a transition period in preparation for its scheduled merger into the ISP on June 30, 1994. On June 30, 1994, account balances in three of the investment funds under the IDS Savings Plan will be transferred to new investment alternatives under the ISP, as follows:

| ISP Savings Plan Fund | transferred to... | New ISP Fund |
|---|---|---|
| IDS Collective Income Fund | | ISP Income Fund |
| IDS Trust Balanced Collective Fund A | | IDS Mutual |
| IDS Trust Collective Equity Fund A | | IDS Stock Fund, Inc. |

The American Express Stock Fund will not change and will continue to be available under the ISP.

During the transition period from May 24, 1994 through approximately August 31, 1994, participants in the IDS Savings Plan who become participants in the ISP as a result of the merger will not be able to make changes to or otherwise access their accounts in order to allow enough time for a changeover in recordkeeping and accounting functions. These participants will not be able to change investment elections, transfer balances among investment funds, take out a loan, effect a withdrawal or make any other transaction under the ISP until approximately September 1, 1994, except that Employee Contributions will continue to be made in accordance with your instructions given prior to May 24, 1994.

Former IDS Savings Plan participants who do not make an investment election prior after September 1, 1994 will continue to have new contributions to their accounts invested in the ISP Income Fund, IDS Mutual and/or IDS Stock Fund in the same proportion previously elected for IDS Collective Income Fund, IDS Trust Balanced Collective Fund A and/or IDS Trust Collective Equity Fund A.

with capital, surplus and undivided profits in excess of $100 million. The Collective Income Fund invests primarily in Contracts, including synthetic investment contracts. To a lesser extent, the Collective Income Fund invests in money market instruments of the types listed above. The Collective Income Fund may invest in short-term investment funds that invest primarily in the types of securities in which the Collective Income Fund may invest directly. The Collective Cash Fund invests in money market instruments of the types described above and in short-term pooled investment funds that invest primarily in the types of securities in which the Collective Cash Fund may invest directly.

When IDS Trust began an investment manager for the ISP Income Fund in 1991, substantially all of the assets were invested in a Contract with Aetna Life Insurance Company, which provided for a fixed rate of return for successive six-month periods. Over the past three years, IDS Trust has diversified the ISP Income Fund which, as of March 31, 1994, consisted of Contracts from 13 different Institutions.

The rate of return on the ISP Income Fund is a composite of the rates being earned on each Contract, the Collective Income Fund and the yield on the money market instruments held directly or indirectly by the ISP Income Fund.

IDS Trust performs a credit analysis of each Institution and each Guarantor (in the case of a synthetic investment contract) prior to the time a Contract is entered into, including an analysis of credit ratings and financial characteristics. There is no assurance that an Institution or Guarantor will maintain its ratings or financial characteristics after a Contract is entered into. A Contract is an obligation only of the Institution that issues the Contract (and of the Guarantor in the case of a synthetic investment contract) and is not an obligation of or guaranty by anyone else, including, but not limited to, the ISP, American Express Company or any of its subsidiaries, any governmental entity or any other entity. Accordingly, the performance of the ISP Income Fund will be adversely affected if an Institution is unable to meet its obligations under a Contract (or, in the case of a synthetic investment contract, the Guarantor is unable to meet its obligations). The performance of the ISP Income Fund may also be affected if an Individual Contract or a Contract included in the Collective Income Fund is terminated in whole or in part prior

to its maturity, because funds returned to the trustee or to the Collective Income Fund will be subject to a market value adjustment which may, depending on investment market conditions, result in the receipt by the trustee or the Collective Income Fund of an amount which could be less than (or greater than) the book value of the funds held by the Institution.

IDS Trust, an indirect wholly-owned subsidiary of American Express Company, will be compensated by the participating companies for acting as investment manager of the assets in the ISP Income Fund. The Collective Income Fund and the Collective Cash Fund are pooled investment vehicles managed by IDS Trust and are available to tax-exempt plan customers of IDS Trust generally. IDS Trust is not separately compensated by the Collective Income Fund or the Collective Cash Fund for acting as investment manager of those funds.

IDS Selective Fund, Inc. — The goal of IDS Selective Fund, Inc. is to provide shareholders with current income and preservation of capital by investing in investment grade debt securities. The fund invests primarily in corporate bonds and other debt securities. The fund intends to invest at least 90% of its net assets, based on market value, in debt securities rated in the four highest investment grades of corporate debt securities (as rated by independent rating agencies), certain unrated debt securities the investment manager believes have the same investment qualities, government securities, derivative instruments (e.g. futures, options and forward contracts) and money market instruments. There can be no assurance that these ratings will be maintained after an investment is made. Other investments may include common and preferred stocks and convertible securities. As described above, IDS Selective Fund, Inc. will no longer be available as an investment alternative on and after July 1, 1994.

IDS Bond Fund, Inc. — The goal of IDS Bond Fund, Inc. is to provide shareholders with a high level of current income while attempting to conserve the value of the investment and to continue a high level of income for the longest period of time. The fund invests primarily in bonds and other debt securities issued by U.S. and foreign corporations and governments. At least 50% of the fund's net assets will be invested in investment grade corporate bonds (i.e. bonds rated in

**11**

**EXHIBIT E**



September 1994

# BENEFITS BRIEFS

for American Express and IDS employees

CASH BALANCE
RETIREMENT PLAN
REVIEW

Here's a quick review of how the proposed cash balance Retirement Plan will work.



**1 Simplified Approach.** The Company will make allocations to your cash balance each biweekly pay period. Allocations are based on these three factors: your age each year, your years of Company service, and your Pensionable Earnings (your base salary, plus overtime, commissions, shift differential and most bonus payments). You will receive quarterly statements, so you can watch your cash balance grow.

**2 Five-Year Vesting.** You are vested in your cash balance after just five years of Company service.

**3 Portability.** Your vested cash balance is payable to you whenever you leave the Company — even if you don't stay until age 55.

**4 Payment Options.** When you retire or leave the Company, you'll have a choice of a lump sum payment or monthly annuity payments.

## RETIREMENT PROGRAM UPDATES

In communicating our new Retirement Program, we've tried to tell you what we know... when we know it. One of the risks of communicating before we know all the facts is that the information we give you might change. And that's the situation we have now.

Earlier this year, we told you the direction we were headed with our Retirement Plan and Stock Ownership Plan. We announced the introduction of a "cash balance" Retirement Plan we expected to take effect January 1, 1995. We also said the Stock Ownership Plan (SOP) would be terminated. Since these announcements were made, we've had to make some adjustments to our plans and our schedule.

Here's where we stand at this time.

■ The introduction of our cash balance Retirement Plan will be delayed. We are now targeting the introduction for later in 1995. We will keep you informed on the new timetable.

Updating our Retirement Program has proven to be much more difficult than we originally anticipated. We are still developing the systems support for the new program as well as a personalized modeling program that will help you estimate your benefits at different ages. Also, we need additional time to run a quality check of our employee data. As you might imagine, this is a critical step in the process and we must make sure it happens correctly.

We want to do a good job in making the transition from the old plan to the new one. We'll keep you informed on our progress in resolving these problems.

■ The SOP will be "merged" into the ISP, rather than be "terminated." Although this technically will not affect employees, it still must be communicated. This merger will allow us to better use the remaining unallocated SOP shares by transferring them to the ISP and using them for future Company contributions.

This change will not affect your SOP account balance or the benefits available to you under the ISP. As we told you earlier this year, your SOP account balance will be transferred to the ISP and invested in the American Express Stock Fund. There will no longer be any SOP allocations. However, starting from July 1st, the Company is contributing 1% of your base salary in American Express stock. These Company stock contributions will be reflected in your third quarter ISP statement.

We've tried hard to provide timely, accurate information about our new Retirement Program. We'll continue to do so. And we'll continue to update you as changes occur.

## RETIREMENT PROGRAM SURVEY RESULTS

Recently, we asked a random group of employees their reactions to the new Retirement Program. Here's what we heard.







**85% say the new ISP** investment options are attractive. Several new options were introduced July 1, 1994.

**56% believe that** personalized modeling tools will help them understand how the new Retirement Plan affects them personally. These tools are currently being developed and will be available in 1995.

**70% feel the portability** feature of the new Retirement Plan is important. This feature means you can take your vested accrued benefit with you when you leave the Company — even if you're not yet eligible for retirement. That's an improvement over the current Retirement Plan, which doesn't pay benefits until age 55 at the earliest.

**46% understand they won't** lose any vested benefits they've earned under the current Retirement Plan. But that means there are still many of you who aren't sure. This is an extremely important point and bears repeating. If you have earned a vested benefit under the current Retirement Plan, that amount will be converted to your starting balance under the new cash balance Retirement Plan. You will not lose any benefits you have earned.

Survey responses also let us know a few areas of confusion. These are addressed in the Q & A section.

# Q&A

**When will my SOP account be transferred to the ISP? Where will it be invested?**

We expect the SOP account balances to be transferred to the ISP shortly after the merger date of December 1, 1994. SOP balances will be invested in the American Express Stock Fund of the ISP.



**Will I have a choice between the new cash balance Retirement Plan and the current Retirement Plan?**

No. The current Retirement Plan provides benefits for service up to the date the new Retirement Plan actually takes effect. The lump sum value of your current Retirement Plan accrued benefit will become your starting balance in the cash balance Retirement Plan. The new Retirement Plan provides benefits for all future service.

**Will I still receive a Profit Sharing contribution to my ISP account for the period July 1, 1994 to December 31, 1994?**

Yes. The first Profit Sharing contribution of 0-7% of base salary will be made in the first quarter of 1995, if you are eligible (that is, if you have completed the one-year service requirement and are still employed on December 31, 1994).



**I am under age 55 and was planning to leave the Company in early 1995. Will I be eligible for a lump sum payment?**

If you leave the Company before the new cash balance feature begins, you are not eligible to receive a lump sum payment. Instead, you will be eligible for a benefit under the current plan and you would therefore receive your benefit as a monthly payment, payable no earlier than age 55.

**I'm already eligible for retirement. Should I consider retiring before the cash balance Retirement Plan takes effect so that I don't lose any benefits I've earned so far?**

There is no danger of losing any benefits you've accrued under this current Retirement Plan. All employees have the right to receive a benefit at termination or retirement that is no less than their vested accrued benefit under the current Retirement Plan as of the date the cash balance Retirement Plan takes effect. Although all employees will be able to take their vested benefit in a lump sum under the new cash balance Retirement Plan, the payment options offered under the current Retirement Plan would still be available for the amount of your vested accrued benefit as of the date the cash balance feature takes effect.

**What about retiree medical coverage? Is that affected by the move to a cash balance Retirement Plan?**

Retiree medical coverage is separate from the Retirement Plan. While changes to retiree medical coverage could be made in the future, there are no changes being planned at this time.

**What would my payment options be under the new cash balance Retirement Plan?**

When you retire or leave the Company, regardless of your age, you'll have a choice of a lump sum payment or monthly annuity payments.

**I am 60 years old and was planning to leave the Company in early 1995. If I delay receiving my pension benefits until after the cash balance feature takes effect, can I then receive a lump sum payment?**

No. If the new cash balance feature is not in effect when you leave the Company, you are not eligible to receive a lump sum payment, regardless of when your pension payments actually begin.

This newsletter is not intended to and does not supersede the applicable plan documents, which in all cases are the final authority.

**EXHIBIT F**



March 1995

# BENEFITS BRIEFS

**for American Express employees**

## RETIREMENT PROGRAM UPDATE

The most recent issue of *Benefits Briefs* described the new Profit Sharing Contributions that are part of the Incentive Savings Plan (ISP). In this issue, we'll focus on another part of the American Express Retirement Program — the cash balance Retirement Plan, which will be introduced July 1, 1995. We'll show you how the cash balance Retirement Plan works, and illustrate how benefits you've accrued under the current Retirement Plan will be automatically merged into the new cash balance Retirement Plan.

While much of the information included in this newsletter also appeared in earlier issues of *Benefits Briefs*, we thought it might be helpful to review it now as we approach the introduction of the cash balance Retirement Plan.

### COMMUNICATION CALENDAR

More information about the new Retirement Plan is coming. Here's what to expect and when.

**EARLY APRIL**
☐ Personalized statement showing your estimated starting cash balance and an investment worksheet.

**EARLY MAY**
☐ Due date for changes or corrections to your personalized statement.

**JUNE**
☐ Telephone Modeling Hotline for those who want to look at projected benefits under the new cash balance Retirement Plan.

**JULY**
☐ Retirement Plan Guide, providing more details on the cash balance Retirement Plan.

**AUGUST**
☐ Final personalized statement showing your cash balance on July 1, 1995.

**SEPTEMBER**
☐ American Express Trust hotline (1-800-ISP-1800), providing you with the value of your cash balance Retirement Plan account.

**OCTOBER**
☐ Third-quarter ISP statement, including the value of your cash balance Retirement Plan account.

**NOVEMBER**
☐ Summary plan description, containing comprehensive information about the Retirement Plan and important administrative information.

### AMERICAN EXPRESS RETIREMENT PROGRAM

| Incentive Savings Plan (ISP) | | | | Retirement Plan | |
|---|---|---|---|---|---|
| **Your Savings** | **Company Matching Contribution** | **Company Stock Contributions** | **Profit Sharing Contributions** | **If your age plus your years of Company service is...** | **the annual Company allocation is this % of your Pensionable Earnings** |
| 0% – 15% of base salary can be saved on a before-tax and/ or after-tax basis (Company Matching Contributions are made only on before-tax contributions) | 0% – 3% of base salary (dollar-for-dollar match of employee before-tax contributions up to 3% of base salary) | 1% of base salary in American Express stock | Company contributes 0% – 7% of base salary, depending on total Blue Box performance | Less than 35 | 2.50% |
| | | | | 35 – 44 | 3.25% |
| | | | | 45 – 59 | 4.25% |
| | | | | 60 – 74 | 5.75% |
| | | | | 75 – 89 | 8.00% |
| | | | | 90 and over | 10.00% |

## A CLOSER LOOK AT THE CASH BALANCE RETIREMENT PLAN

Beginning July 1, 1995, American Express will offer a "cash balance" Retirement Plan. Allocations to the plan are based on three factors:

■ your age each year,

■ your years of Company service, and

■ your Pensionable Earnings (your base salary plus overtime, commissions, shift differential and most bonus payments).

In addition to allocations, your cash balance grows each year based on a predetermined crediting rate (see Q&A section on next page).

Here are some key features of the cash balance Retirement Plan:

**1 Early participation.** Generally, as an eligible employee you begin to participate the first pay period after you have completed one year of service.

**2 Simplified approach.** Benefits are allocated each biweekly pay period. In addition, your cash balance grows by a crediting rate, similar to an interest rate. You can watch your cash balance grow on quarterly statements.

**3 Five-year vesting.** You are vested in (have an unforfeitable right to) your cash balance under the Retirement Plan after five years of Company service.

**4 Portability.** The plan is portable. That means your vested cash balance is payable to you whenever you leave the Company — even if you don't stay until age 55.

**5 Payment options.** When you retire or leave the Company, you'll have a choice of a lump-sum payment or monthly annuity payments for life.

In early April you'll receive a personalized statement that shows your estimated accrued benefit and estimated starting cash balance, based on participation in the current Retirement Plan through December 31, 1994. From this statement you can review the accuracy of the personalized information used to calculate your plan benefits.

Keep in mind, the new cash balance feature of the Retirement Plan will begin July 1, 1995. Therefore, your accrued benefit and starting cash balance under the current Retirement Plan will be recalculated through June 30, 1995. A personalized statement confirming your July 1 starting cash balance will be sent to you in August.

Retirement Plan allocations will be credited each biweekly pay period beginning with the first pay period after July 1, 1995. Your balance will also grow by a crediting rate, which is announced by the Company each year. Each quarter, the value of your Retirement Plan cash balance will be shown on your ISP statement, along with your ISP account balance. In addition, you will also be able to find out both points balance by calling 1-800-ISP-1800.



### Are the vesting rules changing under the Retirement Plan?

No. Employees will still be 100% vested in their accrued benefit after five years of service. If you are 100% vested in the current Retirement Plan, you remain 100% vested in the cash balance Retirement Plan.

### How will my opening cash balance under the Retirement Plan be determined?

First, we'll calculate your accrued benefit under the current Retirement Plan as of June 30, 1995, whether or not you are vested at that time. This monthly benefit will then be converted to a lump sum using actuarial assumptions. This lump sum is your starting cash balance — you will not lose any accrued benefits earned under the current Retirement Plan.

### How are Pensionable Earnings defined under the Retirement Plan?

Pensionable Earnings are defined as your base salary plus overtime, shift differential, commissions and most bonus payments. (Certain bonus payments, such as special awards, are not pensionable earnings.)

### How much of an allocation will I receive each year under the plan?

Allocations under the Retirement Plan will be a percentage of your Pensionable Earnings, based on a table which indicates total age plus service "points." For example, if you're age 35 with 5 years of service, you would have a total of 40 points. The higher your points, the higher the annual percentage allocation to your cash balance (allocations range from 2.5% for employees with less than 35 points to 10% for employees with 90 or more points). See the chart on the front page.

This newsletter is not intended to, and does not supersede the applicable plan documents, which in all cases are the final authority.

### Is the lump-sum cash option new under the cash balance Retirement Plan?

Yes. This feature offers you additional flexibility in your payment options.

### Will I still be able to take my Retirement Plan benefit as a monthly payment?

Yes. Just as under the current Retirement Plan, you may elect to take your cash balance Retirement Plan benefit in monthly installments for life.

### Can I roll over my cash balance payout into an Individual Retirement Account (IRA) after I retire or leave the Company?

Yes. Since the Retirement Plan is a qualified plan, your lump-sum cash balance payment can be rolled over into an IRA or another qualified plan offered by a different employer, plan permitting.

### I was a participant in the American Express Funded Pension Plan that was terminated in 1985. I'm entitled to a monthly annuity at age 65 from Metropolitan Life Insurance Company for my benefit accrued through April 30, 1985. Will the upcoming changes affect my Met Life annuity?

No. All of the provisions that apply to the Met Life annuity will be maintained. You will receive more information about the Met Life annuity in future communications. Note: This question does not apply to employees of American Express Financial Advisers (formerly IDS).

### Other than regular allocations, how will my cash balance account grow?

Each year the company will determine a crediting rate similar to an interest rate which will apply to your Retirement Plan cash balance that year. You'll be told the crediting rate at the beginning of each year and will be able to see your cash balance grow. After the crediting rate has been established for the year, it will not change due to market fluctuations. The crediting rate effective July 1, 1995 will be announced later this year.

### Am I responsible for deciding how to invest my cash balance Retirement Plan Account?

No. As in the current Retirement Plan, the Company is responsible for managing plan assets to meet the obligations of the plan. No matter how assets in the plan perform, you are credited with the interest rate that is declared by the Company.

### Can I take loans or withdrawals from my cash balance?

No. Just like the current Retirement Plan, loans and withdrawals are not available. However, loans and withdrawals are permitted under the Incentive Savings Plan (ISP).

### What happens to my cash balance amount if I die?

If you die while still employed, your vested cash balance amount would be payable to your beneficiary. If you had terminated or retired and had received your full cash balance payment, no further benefits would be payable under the Retirement Plan.

**EXHIBIT G**



April 1995

# BENEFITS BRIEFS

### for American Express employees

## Understanding Your Retirement Plan Benefits and Your Personalized Statement

This issue of *Benefits Briefs*, along with your personalized Statement of Estimated Benefits, will help you understand:

■ the benefits you have earned under the current Retirement Plan, and

■ how these benefits will be converted to a starting cash balance under the new Retirement Plan.

Inside this packet is your personalized Statement of Estimated Benefits. On pages 2–3 of this newsletter is a sample statement that includes a section-by-section explanation.

As you review your personalized statement, it's important to make sure that this information we have about you is accurate. Instructions for correcting personal information are found on pages 2–3.

---

Dear Colleague:

As you know, American Express is introducing a new cash balance Retirement Plan effective July 1, 1995. Enclosed in this packet is your personalized Statement of Estimated Benefits, showing your projected opening balance in the Plan. The statement also has other important information about the allocations we will be making to your account. This issue of *Benefits Briefs* is designed to help you understand your statement and how it was prepared.

The new cash balance Retirement Plan converts the Company's promise to pay you a monthly benefit after you retire into a specific amount, based on today's dollars. This amount is then credited to you in a cash balance account. So instead of an estimate of a future monthly benefit payable at age 65, your opening cash balance tells you exactly how much your entire retirement benefit is worth right now, and how it can grow in value over time. The new Plan also gives you more control over your vested retirement benefits if you leave American Express before retirement age.

As you review your statement, keep in mind that it is an estimate, based on our records as of December 31, 1994. After the conversion to cash balance on July 1, 1995 you will receive another statement in August, showing your actual opening balance, which will be based on data as of June 30, 1995.

Please review the information contained in your statement carefully. If you have any questions—either about your statement or about the cash balance Retirement Plan—call the American Express Special Employee Hotline, 1-800-291-1857, Monday through Friday from 8:00 a.m. to 9:00 p.m. eastern time.

Cordially,

*Kevin P. Flatley*

Kevin P. Flatley
Senior Vice President—Employee Benefits

---

## QUESTIONS AND ANSWERS

**Q  Am I losing any benefits because of the conversion to the new cash balance Retirement Plan?**

No. All the benefits you have earned through June 30, 1995, will be converted to the cash balance Retirement Plan. On July 1, you will be credited with the full, present value of your accrued benefit under the current Retirement Plan. In addition, built into this opening balance is an additional sum that recognizes some or all of the early retirement subsidy for those employees who are within ten years of early retirement eligibility, including the Rule of 90.

Present value of your accrued benefit is the amount needed on July 1, 1995 to pay a monthly benefit starting when you reach age 65 and lasting for the rest of your life. The amount needed on July 1, 1995 is projected using the interest rate and mortality assumptions listed in the glossary on page two of your statement, under the heading *Cash Balance Conversion Assumptions.*

### IF THERE'S AN ERROR ON YOUR STATEMENT...

Although every effort has been made to ensure that the data on your personal statement is accurate, you might find that the Company's database has some incorrect information about you and your Retirement Plan participation. If you find an error, call the Special Employee Hotline at 1-800-291-1857 to correct it no later than May 31, 1995.

Depending on the nature of the error you find, specific materials will be needed to confirm the correct information. See pages 2–3 for the necessary proofs.

**Q  If I'm already eligible for retirement, should I consider retiring now, before the cash balance feature takes effect, so that I don't lose any benefits I've accrued so far?**

There is no danger of losing any benefits you've accrued under the current Plan. All employees have the right to receive a benefit under the new cash balance Retirement Plan that is no less than their benefit under the current Plan as of June 30, 1995. Although all employees can take their vested benefit in a lump sum beginning July 1, 1995, the payment options under the current Plan would still be available for your June 30, 1995 vested accrued benefit.

**Q  I'm going to be eligible for early retirement soon. How is that handled in the conversion to the cash balance Retirement Plan?**

Employees who would be eligible for early retirement in ten years or less will receive a special supplemental credit, reflecting the value of their early retirement eligibility, including the Rule of 90. This special supplement is in addition to the amount being credited to your cash balance account as the present value of your monthly accrued retirement benefit through June 30, 1995.

If you are eligible for the supplemental credit, the value of the supplement will be included in your opening cash balance.

(continued on back page)

---

### In This Issue

| A Letter from Kevin Flatley | Understanding Your Statement | Questions and Answers (cont.) |
|---|---|---|
| Questions and Answers | of Estimated Benefits | |

## ...ending Your Statement of Estimated Benefits

...is a sample Statement of Estimated Benefits, similar to the one you received in this ...line. This sample statement is for a fictitious Blue Box employee—C. F. Frost. By ...ing at C. F.'s statement and the calculations that were used, you can see how we ...mined the figures on your personalized statement.

### HERE'S WHAT OUR FILES SAY ABOUT YOU.

Please check to make sure this information is accurate. An incorrect date of birth, for example, can throw off the estimate of your opening balance and affect your future biweekly cash balance allocations.

| If this is incorrect... | you'll need to submit... |
|---|---|
| date of birth | a copy of your birth certificate. |
| Social Security number | a copy of your Social Security card. |
| Vesting Service Date or Pension Service Date | your HR Profile form, Employee Information Change (EIC) form, or other documentation of your service. |

If you find an error, call the Special Employee Hotline at 1-800-291-1857 to correct it no later than May 31, 1995.

### A BENEFIT BASED ON EARNINGS.

Box II shows the earnings used to calculate your benefit under the current Retirement Plan as of December 31, 1994. The benefit that will be converted to your opening cash balance effective July 1, 1995 will reflect your earnings as of June 30, 1995.

Benefits under the current Plan are based on the highest five consecutive years of Pensionable Earnings (as indicated by check marks) in your last ten years working with American Express. Since C. F. Frost, like you, is an active employee, we consider the ten years ending on December 31, 1994. If you've been with American Express less than ten years, or if you had any breaks in service, this section will only include the years you actually worked.

### AN ALLOCATION EVERY PAYCHECK.

Cash balance makes it a lot easier to keep track of your retirement benefits. That's because beginning July 1, 1995 we will make an allocation to your cash balance account each biweekly pay period.

Although your allocation is calculated as a percentage of your Pensionable Earnings, don't look for a new deduction on your paycheck stub. American Express pays the full cost of your Retirement Plan benefits, so nothing extra is subtracted from your pay.

One additional benefit of the cash balance account is that while the account balance grows, you don't pay taxes on it. Taxes aren't due until you take a distribution of benefits from the Plan after you retire or leave the Company.

### WHAT'S YOUR ALLOCATION PERCENTAGE?

The more years of Vesting Service you have and the older you are, the higher your biweekly allocation percentage will be.

To find the percentage of your pay that will be allocated to the cash balance account, add your years of Vesting Service to your age, with both numbers determined as of December 31, 1995. Find the total in the left-hand column in Box V. The percentage on the right in the same row shows the portion of your Pensionable Earnings that will be allocated.

For example, as of the end of 1995 C. F. will have 20 years of Vesting Service, and he will be 40 years old. The sum of 20 and 40 is 60. The table in Box V shows that C. F.'s 60 points translates into a biweekly allocation of 5.75% of Pensionable Earnings.

## You and our fictitious colleague, C. F. Frost, are different.

Your statement may include additional information, depending on your position with the Company. Special information will appear on your statement if:

- you are a part-time employee,
- you had deferred compensation in any year,
- you earned more than the maximum Pensionable Earnings limit under the Internal Revenue Code (currently $150,000 a year) at any time you were with American Express, or
- you participated in a previous Retirement Plan that had benefits converted to a MetLife or Fireman's Fund annuity.

## AMERICAN EXPRE...

### STATEMENT OF E... AS OF DEC...

**I.** Name: C. F. Frost
Social Security Number: 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
Date of Birth: 03/01/1955
Final Average Earnings as of December 31, 1994: $51,000

**II.** Your Final Average Earnings amount represe... years' earnings in the last 10 years (indicated... Pensionable Earnings history below:

| | |
|---|---|
| 1994 | $55,000 |
| 1993 | $53,000 |
| 1992 | $51,000 |
| 1991 | $49,000 |
| 1990 | $48,000 |

**III.** Your December 31, 1994 estimated monthly ... benefit may be reduced if payments begin bef...

**IV.** The estimated value of your opening cash bal... Your estimated opening cash balance is a lum... estimated monthly accrued benefit, determine...

**V.** Your 1995 allocation will be based on 5.76% o... allocation percentage was determined based o... December 31, 1995 and the schedule below:

If the Sum of Your Age Plus Years of Vesting Service is...
Less than 35
35-44
45-59
60-74
75-89
90 or more

Your attained age as of December 31, 1995:
Your completed years of Vesting Service as o...
Your total points as of December 31, 1995:

* The conversion to the opening cash balance i... employees active (or on Paid Extended Notice...

## Present Value

The present value shows how much the benefits you have earned under the current Retirement Plan are worth today. The present value helps you compare your Retirement Plan benefits with your other retirement assets, such as those in the Incentive Savings Plan (ISP). Present value makes this a comparison of apples to apples, not apples to oranges.

Have a look at the sample statement for C. F. Frost. You can see that under the current Retirement Plan C. F. has earned a monthly benefit of $450 as of December 31, 1994. This is the benefit payable starting when C. F. reaches age 65.

Because C. F. is 40 years old, we have 25 years during which funds earmarked to pay his benefits at age 65 can be invested. Assuming that

the Plan can earn 6% a year on its investments, $10,000 invested now will earn enough by the time C. F. is 65 to pay the retirement benefit earned through the end of 1994. Because of compounding, where earnings generate their own earnings, a small amount can grow significantly over time.

## RETIREMENT PLAN

### MATED BENEFITS
### ER 31, 1994*

| | |
|---|---|
| esting Service Date: | 07/01/1976 |
| ension Service Date: | 01/01/1985 |
| Normal Retirement Date: | 03/01/2020 |
| esting % as of | |
| December 31, 1994: | 100% |

average of your highest five consecutive ck marks), based upon your

| 1989 | $47,000 |
|---|---|
| 1988 | $45,000 |
| 1987 | $44,000 |
| 1986 | $42,000 |
| 1985 | $40,000 |

benefit payable at age 65 is $450. This e 65.

s of December 31, 1994 is $10,000. that represents the value of certain assumptions (see Glossary).

1995 Pensionable Earnings. The age and Vesting Service as of

*The Annual Company Allocation is this % of your Pensionable Earnings*

| | |
|---|---|
| | 2.50 |
| | 3.25 |
| | 4.25 |
| | 5.75 |
| | 8.00 |
| | 10.00 |

| | |
|---|---|
| nber 31, 1995: | 40 |
| | 20 |
| | 60 |

uled to occur on July 1, 1995 for all that date.

---

### CONFIRM YOUR EARNINGS.

These are the Pensionable Earnings our files show for you. Under the current Plan, Pensionable Earnings in any given year are calculated based on the following:

- your annual base salary rate as of December 31, plus
- commission, plus
- overtime pay, plus
- shift differential, plus
- most incentive awards (bonus payments) paid during the year. Certain bonus plans such as Special Awards and Chairman's Awards are not pensionable.

For example, if your annual base salary rate as of year-end 1993 was $50,000, and you received a bonus payment in 1993 of $3,000, your 1993 Pensionable Earnings would be $53,000.

W-2 wages are not Pensionable Earnings. Pensionable Earnings do not include items such as tuition reimbursement, moving expenses, special awards, retro pay, expatriate allowances, long-term incentive awards, stock options, imputed income, and so forth.

If your Pensionable Earnings history is incorrect... you'll need to submit appropriate documentation showing your base pay rate (HR Profile or EIC form) and/or your bonus (for example, bonus letter or paycheck stub showing bonus amount). If you find an error, call the Special Employee Hotline at 1-800-291-1857 to correct it no later than May 31, 1995.

### DETERMINING YOUR BENEFIT UNDER THE CURRENT PLAN.

This current Retirement Plan estimate is how much in monthly benefits you've earned as of December 31, 1994, but is payable to you when you reach age 65. Your monthly accrued benefit is a percentage of the highest consecutive five years of Pensionable Earnings you had in the last ten years. The formula used to calculate your monthly benefit is shown in the Calculation of Your Monthly Accrued Benefit box on the next page. This amount includes the monthly MetLife or Fireman's Fund annuity, if any.

### A LUMP SUM THAT WILL GROW.

In Box IV, we show you the same Retirement Plan benefit as shown in Box III, but in a different way. It's still the amount earned through the end of 1994, but now the monthly benefit amount is shown as a lump-sum benefit amount. This lump sum is the present value of your age 65 benefit on December 31, 1994. It will give you some idea of what your opening cash balance will be on July 1, 1995 when the Plan begins. Converting to a cash balance format makes it much easier for you to see the growing value of your retirement benefit. Remember, your actual opening cash balance will be based upon your monthly accrued benefit as of June 30, 1995, plus any Early Retirement Supplement benefits you may be eligible to receive. See the Early Retirement Supplement box on this page for more information. Since the MetLife or Fireman's Fund annuity is only available as a monthly benefit at retirement, its value is not included in this lump-sum amount.

Compared to the estimated monthly retirement benefit, your lump sum value may seem small to you if you have a long way to go until retirement. If this is the case, remember that this is the present value of your benefit. A small present value doesn't mean your benefit will be small at retirement. In fact, the longer you have until you retire, the lower the present value of your retirement benefit will be. That's because there's more time for your cash balance benefit to grow, through the interest credited to your account. (Your cash balance will also grow during your employment with the Company, through future allocations for each biweekly pay period.)

Starting October 1995, your Retirement Plan benefits will be shown in your quarterly ESP statements.

---

## Early Retirement Supplement

If you are age 45 or older on July 1, 1995 and you would have had at least 10 years of service before reaching age 65, or if you are within 10 years of meeting the Rule of 90, your opening cash balance will include a special supplemental credit that will be added to your cash balance account. This special supplement reflects your potential or actual eligibility for early retirement. (You are eligible for early retirement at age 55, if you have ten or more years of vesting service.) The credit is being issued because we want to recognize the fact that you would have been eligible for unreduced (or partially unreduced) benefits and that you will have less time than other employees between the conversion and your retirement to adjust your retirement planning because of the change in the Plan.

If you are eligible, the value of your supplement will be included in your opening cash balance shown in Box IV.

---

## After the Conversion

This end of 1994 estimate gives you a good idea of what your opening cash balance will be when we convert to the new cash balance Retirement Plan on July 1, 1995. After that date, two things will happen:

- First, every time you are paid, we will make an additional allocation to your account. This is the first way your cash balance grows.

- Second, your account will be credited with interest. The interest rate for your account is guaranteed to be at least 5%. However, you could be credited with even more interest,

depending on the interest rate for five-year Treasury notes. The Company will announce the interest crediting rate prior to the beginning of each year. (For July 1, 1995 through December 31, 1995 the interest crediting rate will be available July 1, 1995.)

If you leave the Company after vesting in your Retirement Plan benefit and you decide to keep your balance in the Plan, it will continue to be credited with the same interest as the accounts of active employees.

You also have an opportunity to take your vested cash balance when you leave at any age. However, if

you terminate your employment and elect to receive the cash balance benefit, you will have to roll it over into an IRA or another qualified plan if you want to avoid tax withholding. If you terminate your employment before age 55 and elect to receive the cash balance benefit, you will have to roll it over into an IRA or another qualified plan if you want to avoid additional tax penalties. You can also make a direct rollover into an American Express Financial Advisors IRA without paying a sales commission. You will also have the option of taking a monthly annuity payment from the Plan, rather than a lump-sum payment.

*(continued from front page)*



### Why is age used in the formula that determines the percentage of Pensionable Earnings allocated to my cash balance account?

The Retirement Plan considers age when determining the allocation percentage to factor in the amount of time participants have left before their retirement. Because older employees have less time for their Retirement Plan allocation to grow with interest, more money needs to be put into their accounts to cover the Plan benefits.



### Will the move to a cash balance Retirement Plan affect my ISP balance?

The conversion to a cash balance Retirement Plan has no impact on your ISP balance or ISP participation. The ISP will continue to be a separate Plan. However, the cash balance approach will make it easier for you to see where you stand in terms of your overall retirement strategy. That's because you'll be able to compare your benefit under the Retirement Plan with your balance in the ISP, since both are shown as current dollar amounts.

Starting in October 1995, your quarterly ISP statements will also show the value of your cash balance Retirement Plan account.

### This statement gives me an estimate of my starting cash balance. When will I learn the actual number?

We will send a finalized statement to you in August. That statement will show your actual cash balance as of July 1, 1995, the day the conversion takes effect.

*If you currently work for CHG, TRS, or AEB, but previously worked for American Express Financial Advisors, you may have a benefit under the IDS Retirement Plan, along with your benefit under the American Express Retirement Plan. If you do have a benefit under the IDS Plan, you should receive a separate statement that is similar to this one, but showing an estimated balance under that Plan. When we convert to the cash balance approach on July 1, 1995, any employees with benefits under both the American Express Retirement Plan and the IDS Plan will have those benefits added together. You will have one cash balance, representing the combined benefit, not two separate balances.*



### I'm currently on Paid Extended Notice. Am I eligible to participate in the new cash balance Retirement Plan?

Yes. If your period of Paid Extended Notice extends to July 1, 1995 or later. If your Paid Extended Notice period ends prior to July 1, 1995, you are not eligible to participate in the cash balance Retirement Plan nor to receive a lump-sum payout of your vested pension benefit. Instead, if you are vested under the current Plan and your Paid Extended Notice period ends prior to July 1, 1995, you will be eligible for a monthly benefit payable no earlier than age 55.



### If I terminate before July 1, 1995 will I still be eligible to participate in the new cash balance Retirement Plan?

No, if you terminate prior to July 1, 1995, you will not be eligible to participate in the new Plan, unless you are on Paid Extended Notice on July 1, 1995 or later, as described above.



### What happens to my MetLife annuity (issued in 1985) based on the conversion to the cash balance Retirement Plan?

You are still entitled to the MetLife annuity. If you take a monthly annuity from the Retirement Plan (instead of your cash balance lump sum) and are age 55 or older, your monthly annuity from the Plan will include your MetLife annuity. If, instead, you take your cash balance lump sum, you will still be entitled to your monthly MetLife annuity at age 65 or as early as age 55, with reduction for early commencement. The MetLife annuity is available only as a monthly benefit and not as a lump-sum payment.

### Does the conversion to cash balance change my retirement date or eligibility for retirement benefits?

Your eligibility for benefits is expanded under the cash balance Retirement Plan. The cash balance Retirement Plan makes your benefit more portable if you leave American Express before you reach age 55.



## CALCULATION OF YOUR MONTHLY ACCRUED BENEFIT

Your monthly accrued benefit, payable at age 65 under the current Retirement Plan (listed in Box III of your statement), includes your MetLife or Fireman's Fund annuity and is calculated as follows:

**For Pension Service through 11/30/89:***

- 1.6% of your Final Average Earnings multiplied by your years of Pension Service through 11/30/89.

The benefit produced by this formula is offset by a Social Security reduction formula equal to the following:

- 1.4% of your primary Social Security benefit, determined as of 11/30/89, for each year of Pension Service through 11/30/89.

**For Pension Service after 11/30/89:***

- 1% of your Final Average Earnings for each of the first five years of Pension Service

plus

- 1.15% of your Final Average Earnings for each of the next five years of Pension Service

plus

- 1.3% of your Final Average Earnings for each year of Pension Service over ten (with no service maximum).

*This formula reflects Pension Service earned through 11/30/89. For example, if you had 15 years of Pension Service as of 11/30/89, your Retirement Plan accrued benefit will be determined by the 1.3% portion of this formula for your Pension Service earned after 11/30/89.

If you are vested in your Retirement Plan benefit (generally, you are vested after five years of service with American Express), you can take your cash balance with you, even if you haven't reached age 55. You can take the cash balance as either a lump sum or in monthly payments for the rest of your life. If you take the lump sum, you can roll the cash balance into an IRA or another employer's qualified retirement Plan (if that Plan allows such rollovers).



### Why are the retirement benefits on my personalized statement calculated on December 31, 1994 when the new cash balance Retirement Plan is not effective until July 1, 1995?

Before we can establish a cash balance for you under the new Retirement Plan, we need to know the amount of benefits you have earned under the current Retirement Plan. To make a smooth transition from the current Plan to the new Plan, we selected December 31, 1994 as the date to determine benefits under the current Plan. This gives us an opportunity to produce the enclosed estimated statements so that you have an opportunity to help us review the accuracy of your personal information and make any necessary corrections before final statements are produced. Keep in mind that the final statements will show benefits earned under the current Retirement Plan on June 30, 1995.

### Why are my Vesting Service and Pension Service Dates different?

For most employees, the dates are the same. If they are different, it is because at one time you:

- worked for a company later acquired by American Express, or
- worked for an American Express subsidiary that didn't participate in the American Express Retirement Plan.



### I'm confused by the calculation of Final Average Earnings, since I'm not retiring. How can these be considered "final"? Shouldn't this be the earnings in the last few years before retirement, rather than the ten years that just ended?

This statement calculates your benefit accrued through December 31, 1994, to give you an estimate of your starting balance. When we convert to the cash balance approach on July 1, 1995, your Final Average Earnings under the current Retirement Plan will reflect your earnings as of June 30, 1995.

Once we convert to the cash balance approach, Final Average Earnings will not be used in calculating Retirement Plan benefits. Instead, you'll receive benefits as cash balance account credits each biweekly pay period.

As a result, when you retire or leave the Company, your Retirement Plan benefits will reflect your Pensionable Earnings through the date you leave the Company, but those additional benefits will have been calculated and paid periodically. It won't be necessary to calculate Final Average Earnings under the cash balance approach.

*This newsletter is not intended to, and does not supersede the applicable plan documents, which in all cases are the final authority.*

**EXHIBIT H**



June 1995

# BENEFITS BRIEFS

for American Express Employees

## Moving Forward

By now, you should have received your personalized Statement of Estimated Benefits, estimating your opening balance when the Retirement Plan converts to a cash balance approach. The conversion is moving forward steadily to the July 1, 1995 conversion date.

To help you understand how the cash balance approach will affect your Retirement Plan benefits, the Projection Line (formerly known as the Telephone Modeling Hotline) will reopen in late June. The Projection Line allows you to estimate what your benefit would be at the retirement age or date you choose. It also lets you compare the impact of different increase rates for your Pensionable Earnings (your base salary and most other compensation).

There are still a number of other steps involved in completing the conversion, particularly the updating of the Retirement Plan's record keeping systems. As the conversion advances, more and more information will become available. First, in late August you'll receive your statement of benefits, showing your balance as of July 1, 1995. Then, the American Express Trust Company Service Line (previously described as 1-800-ISP-1800) will start providing expanded informa-

tion, including current Retirement Plan balance. Finally, the first Incentive Savings Plan (ISP) statement to include cash balance account information will arrive, and all future quarterly statements will cover the Company's whole Retirement Program.

This issue of Benefits Briefs gives you the scheduled completion dates for each step, and explains how to use the Projection Line.

### IF YOU DIDN'T RECEIVE A STATEMENT OF ESTIMATED BENEFITS ...

...contact the Special Employee Hotline at 1-800-291-1857, to confirm your address. If necessary, a duplicate estimate statement will be prepared for you.



## Cash Balance Countdown

**MAY 1995**

We sent you your Statement of Estimated Benefits, calculated through December 31, 1994.



**LATE JUNE 1995**

The Retirement Plan Projection Line opens, at 1-800-358-1474.

**JULY 1, 1995**

The American Express Retirement Plan converts to a cash balance approach. Record keeping update begins.



**LATE AUGUST 1995**

You receive your personalized Statement of Benefits, showing your opening balance as of July 1, 1995. This mailing will also include a Retirement Plan Guide, with more details on the cash balance approach.



**EARLY SEPTEMBER 1995**

The American Express Trust Company Service Line (1-800-477-1800) begins providing current cash balance account information, updated daily. This is in addition to the ISP information and transaction processing the line already provides.



**OCTOBER 1995**

Distribution of the third-quarter ISP statement, the first quarterly statement to include your cash balance account. This will show your cash balance account as of September 30, 1995. Future quarterly statements will cover all your Retirement Program benefits, under both ISP and the Retirement Plan.





## What Is My Benefit If . . .

### THE RETIREMENT PLAN PROJECTION LINE

Starting in late June, you can get automated estimates of your Retirement Plan benefit, using projection assumptions you select, tailored to your personal plans for the future.

The Retirement Plan Projection Line at 1-800-358-1474 (previously called the Telephone Modeling Hotline) is an automated voice-response system. The system has your estimated opening balance on file and is programmed to project an estimated benefit payable either in a single lump sum or in monthly annuity payments beginning at retirement. After your call, a printed projection will be mailed to your home within five business days. By this fall, the system will also give you the projection immediately, over the phone.

The Projection Line is easy to use — it's just a matter of following the instructions after you're connected. Before you dial 1-800-358-1474, make sure you have your Social Security number handy. Here are some other tips that can help you make the most of your call.

### TWO VARIABLES YOU CHOOSE

During the call, the voice-response system will ask you when you want your benefit to be paid. You can enter either an expected retirement age or date:

■ If you are younger than 55 years old, you may select any age or date up to your 65th birthday.

■ If you are 55 or older, you may also select a post-65 age or date.

The system assumes that you continue working for American Express through whatever age or date you select.

For example, if you expect to continue working for American Express until your normal retirement date, you might ask for a benefit to be projected through age 65. On the other hand, if you want to know what your benefit will be if you leave the Company at an earlier date, you could enter the date when you expect to leave. (Note: The Projection Line is confidential. No records are kept of any projections you request.)

Because your cash balance allocations are based on your Pensionable Earnings, the system will also ask you to pick a percentage for the average annual increase in your Pensionable Earnings. Remember, Pensionable Earnings include your base pay, shift differential pay, overtime, commissions, and any bonuses you receive.

One way to choose a percentage to use for the increase rate is to look at your past earnings, and see how they've changed over time. (The Statement of Estimated Benefits that you received in May included your past American Express earnings information in Box II.) Just remember that there's no guarantee that your future Pensionable Earnings will increase at the same rate.

### THREE BENEFIT PAYMENT METHODS

Using the figures you select, the Projection Line will give you a projected benefit using three payment methods: a lump-sum payment (also known as the cash balance), a monthly single life annuity, and a monthly 50% joint and survivor annuity.

The 50% joint and survivor annuity is the normal form of payment for people who are married. With a 50% joint and survivor annuity, if your spouse outlives you, he or she will receive monthly payments until his or her death. Your surviving spouse's payments would be equal to 50% of the payments made to you while you were alive.

If you are not married, the normal form of payment is a single life annuity. With a single life annuity you receive monthly payments for your lifetime, and all payments end at your death.

### SPECIAL NOTE

If you were hired during 1995, the Projection Line won't have an opening balance on file for you. This is because you don't begin participating in the Retirement Plan until you have one year of qualifying service. Once you have completed this year of service and begin participating in the Retirement Plan, you'll be able to call the American Express Trust Company Service Line to get current balance information. Then, you can call the Projection Line and enter your current balance when the voice-response system prompts you.

---

The Projection Line (1-800-358-1474) is easy to use – it's just a matter of following the instructions after you're connected.

---

### BEYOND ISP

#### THE WHOLE RETIREMENT PROGRAM

Once the record keeping, statements, and telephone systems are converted to reflect the new cash balance approach, all the retirement information you receive will cover the whole American Express Retirement Program: ISP and the Retirement Plan.

Since ISP is designed for long-term savings, it makes sense to combine it with information on your Retirement Plan benefits. The cash balance approach also makes it easier to compare your ISP balance and your Retirement Plan benefit, so you can see how you are progressing toward your retirement goals.

By the fall of 1995, your personal Retirement Program information will be provided in quarterly statements (expanded versions of your quarterly ISP statements) and on the American Express Trust Company Service Line, 1-800-477-1800.

# Keeping the 800 Numbers Straight

## RETIREMENT PLAN PROJECTION LINE

**1-800-358-1474**

*On-line in late June*

Allows you to estimate your benefit at various ages, using whatever assumption you choose about the average future increase in your Pensionable Earnings. At this time, the Projection Line will estimate benefits based on your estimated opening account balance, using your accrued benefit as of December 31, 1994.

## AMERICAN EXPRESS TRUST COMPANY SERVICE LINE

**1-800-477-1800**

*Expanded service beginning in September*

Formerly referred to as 1-800-ISP-1800, the expanded American Express Trust Company Service Line will give you the latest information, updated daily, on the value of your cash balance account. It will still give you information on your ISP account and the funds' performance, and will allow you to make ISP transactions.

Note: The Projection Line and the American Express Trust Company Service Line are separate from the Employee Service Center Hotline.



# The Total Retirement Program

**Your total retirement benefits include your cash balance benefits under the new Retirement Plan as well as your Incentive Savings Plan account and any retiree medical and life insurance benefits for which you may be eligible. These plans work together to provide you with income during retirement:**

| Retirement Plan | Incentive Savings Plan (ISP) | Retiree Medical and Life Insurance Plans |
|---|---|---|
| ■ Company allocations ranging between 2.5% and 10% of your Pensionable Earnings are credited to you each biweekly pay period. The allocation percentage is based on the sum of your age and service with the Company. | ■ You can elect to contribute between 0% and 15% of your base salary. If you contribute on a before-tax basis, the Company adds Matching Contributions of 0% to 3%. | If you retire at or after age 55 with 10 or more years of service: |
| ■ Your benefits are fully vested and portable after five years of vesting service. You can elect an immediate or deferred payment, as either a single lump sum distribution or monthly annuity payments. | ■ Even if you do not contribute, you may be eligible to receive: <br> – Company Stock Contributions equal to 1% of your base salary <br> – Company Profit Sharing Contributions, depending on Company performance, of 0% to 7% of your base salary. | ■ You can elect to continue medical benefits by electing the retiree portion of the Medical Plan. You and the Company share the cost of coverage. <br> ■ During retirement, the Company pays the full cost of continuing basic life insurance coverage of up to $10,000. |
| ■ The Retirement Plan is funded by the Company. | | |

With the introduction of the new Retirement Plan on July 1, 1995, all the elements of the total Retirement Program for American Express employees defined over one year ago will have been put into place. The new program is flexible, easier to understand and administer and the combination of benefits is competitive with what the top companies in the country provide for their employees.

We know that the total Retirement Program looks different in many ways from the program in effect before changes to ISP took place on July 1, 1994. For example, more employees are now eligible for Company Stock and Profit Sharing Contributions, directed through the ISP.

The changes to the Retirement Plan may cause a reduction in future benefit accruals for some participants; for others, future accruals may be more than under the prior plan. How you are affected depends on your age, service and when you leave the Company.

We are committed to providing you with the information you need to understand the total retirement benefit picture. Upcoming Retirement Plan and ISP personal statements will help you to see how those benefits combine to help you prepare for the future.

*This information is intended to satisfy the obligation to inform you of the timing and effect of plan changes, to the extent applicable, as required by Section 204(h) of the Employee Retirement Income Security Act (ERISA).*

**Your total retirement benefits work together to provide you with income during retirement.**

**EXHIBIT I**

# American Express Company

*Retirement Plan Overview*

**July 1995**

The information in this Overview has been prepared for American Express Company employees. American Express Financial Advisors employees who have questions should contact Jewelie Grape at (612) 671-2953.

**American Express Retirement Program**                Overview/1

This Overview has been prepared to respond to questions, concerns and — in some cases — common areas of misunderstanding about the new American Express Retirement Program, including the cash balance approach under the Retirement Plan. On the following pages, you'll find details about the whys and hows of the new approach. It attempts to answer the following questions as directly as possible:

*TABLE OF CONTENTS*

*Has the Company broken its promise of providing me with retirement benefits?*      *4*

*Why did the Company choose a cash balance approach?*      *5*

*How do the new plan and the old plan compare?  Will my retirement benefits be less under the new Retirement Program? If yes — how much less?*      *6*

*How are opening cash balance amounts calculated?*      *11*

*How is the early retirement supplemental credit calculated?*      *14*

*Am I losing benefits I already earned under the prior plan?*      *15*

*Even though I am not losing benefits I've earned, my future benefits will be less.  Why isn't the Company calculating my benefits under the prior plan formula, since I will be worse off in the future?*      *16*

*What do I need to do now from a retirement planning standpoint?*      *17*

The Company undertook the changes in the Retirement Program after a careful review of the current plans and our competitors' plans.  A variety of alternatives were considered.  We determined that the existing Pension Plan was no longer aligned with the Company's long-term objectives and needed to change.  For employees close to retirement age, special transition provisions were developed to partially compensate for any reductions in benefits that might take place as a result of the change.  However, just as before, the American Express Retirement Program is designed to be a part of your retirement income.  Your own savings and investments, along with Social Security, will provide additional financial resources for your future.

Please read this Overview carefully.  In the coming months you will receive additional information about the Retirement Program, including personal statements showing your Retirement Plan and ISP account balances.

American Express Retirement Program

Overview/2

| RETIREMENT PROGRAM SNAPSHOT: The American Express Retirement Program includes Incentive Savings Plan and Retirement Plan benefits and retiree medical and life insurance coverage. | |
| --- | --- |
| **YOUR CONTRIBUTIONS** | **AMERICAN EXPRESS CONTRIBUTIONS** |
| *Incentive Savings Plan (ISP)* | |
| ■ 0% - 15% of base compensation (up to IRS limits) | ■ Company Matching Contributions: $1 for $1, up to 3% of your before-tax contributions<br>■ Company Stock Contributions: Automatic 1% contribution<br>■ Company Profit Sharing Contributions: 0% to 7%, based on profits (Profit sharing contributions are vested after five years' service) |
| *Retirement Plan* | |
| ■ None required | ■ Company allocations to your cash balance account are based on your age, service and pensionable earnings<br>■ Interest is credited to your account based on five-year Treasury Note rates. For 1995, the rate is 6.96%. (The minimum is 5%; the maximum is 10%)<br>■ You are vested after five years' service |
| *Retiree Medical and Life Insurance Coverage* If you leave the Company at or after age 55 with at least 10 years of service... | |
| ■ Your contributions for retiree medical coverage are based on your years of service<br>■ No contributions are required for retiree life insurance coverage | ■ Company contributions cover a significant portion of the cost to provide retiree medical coverage<br>■ Company contributions cover the full cost of $10,000 in retiree life insurance coverage |

### The Effect of Plan Changes

There have been a number of interpretations of the new Retirement Program. The following statements describe changes to the Retirement Program.

■   Under the prior Retirement Plan, the value of pension benefits increased significantly at and after early retirement age (generally, age 55 with ten years of service). This meant a dramatic increase in the value of benefits if you stayed at the Company until early retirement age. This is no longer the case. Benefits under the new Retirement Plan increase more gradually over the course of a career.

■   If you were age 46 or older on July 1, 1995, you received a special supplemental credit as part of your opening cash balance. This supplemental credit increases the value of your benefit over and above its value on June 30, 1995, to reflect all or part of the value of early retirement benefits for which you are potentially or actually eligible. (See the examples on pages 14 and 15.)

■   Assuming a 3% Profit Sharing Contribution to the ISP, on average, the new American Express Retirement Program generally provides higher benefits before early retirement age and lower benefits after early retirement age than the prior Program.

■   You will not lose benefits earned under the prior plan before July 1, 1995. Your earned benefit is a minimum benefit. This benefit was converted to an opening cash balance on July 1, 1995. As part of your cash balance account, the value of your benefit will grow based on provisions of the new Retirement Plan.

■   Early retirement and "rule of 90" early retirement provisions from the prior plan will apply only to your pre-July 1, 1995 minimum benefit. Under the new Retirement Plan, benefits are payable at any age, as long as you have at least five years of Company Service.

■   If you are eligible for benefits under the American Express Company Funded Pension Plan which terminated on April 30, 1985, your Metropolitan Life annuity payments will be made in addition to your benefit under the cash balance approach.

American Express Retirement Program                                          Overview/4

**Has the Company broken its promise of providing me with retirement benefits?**

No. Just as before, the new American Express Retirement Plan is designed to provide you with retirement benefits that, when combined with Social Security and your other personal resources, will help you to maintain your standard of living during your retirement. In addition, the Retirement Program is competitive with plans of top companies in the country.

The Company voluntarily maintains its commitment to your retirement security through the Retirement Program. But, as with any element of our business, the Company reserves the right to change this program — or any other program — at any time. The changes to the Retirement Program were carefully considered in light of:

- the Company's desire to provide competitive retirement benefits
- the Company's commitment to share with you the responsibility of preparing for your retirement
- the Company's business objectives.

***The Company's commitment:*** The new Retirement Program — ISP, the Retirement Plan and retiree medical and life insurance — compares favorably with the programs of top U.S. companies.

- The new Retirement Program, in total, ranks above the average (50th percentile) of our competitive group.

- The new Retirement Plan is ranked at about average of our competitive group at age 65, and above average before age 65.

**Competitive Group Comparisons**

The companies in our competitive survey group all offer different retirement programs — some better than others. American Express retirement program benefits are above average when compared to the benefits of these companies:

AT&T
Chase Manhattan
Citibank
GE
General Mills
GTE
HJ Heinz
IBM
Merck
Merrill Lynch
Pepsico
Philip Morris
Procter & Gamble
Quaker Oats

American Express Retirement Program                                              Overview/5

**Why did the Company choose a cash balance approach?**

Benefits are no different than any other area of our business. They must evolve to meet changing business strategies, competitive concerns and employee needs.

The changes to the cash balance approach in the Retirement Plan:

- provide competitive benefits
- meet the needs of short, medium and long service employees
- provide benefit portability
- expand payment options.

The prior Retirement Plan encouraged retirement at certain ages by dramatically increasing the value of benefits after early retirement eligibility. The new Plan provides more gradual benefit accruals over the course of a career to help the Company attract and retain employees of all ages.

In addition, the prior Retirement Plan directed most benefit dollars to employees at the end of their careers. Under the new plan, long-service employees will receive increasing Company allocations, but the Plan directs more dollars than before to employees who are with us for only a short time or join mid-career. This approach recognizes that we need to attract all kinds of employees, and it allows the Company to reward employees more fairly for continuous effort throughout their careers.

Recent changes to ISP also support the Company's objectives to:

- share Company success with employees through Profit Sharing Contributions
- maintain employee ownership through automatic Stock Contributions
- encourage and reward employee savings through Matching Contributions
- expand investment options
- provide increased loan access.

Overall, the new Retirement Program is more closely aligned with the Company's objectives to attract and retain talented employees and reward their performance. The recent Retirement Program changes help us to:

- provide competitive, consistent benefits to all employees
- streamline communication and administration
- facilitate employee transfers between business units.

American Express Retirement Program                                    Overview/6

**How do the new plan and the old plan compare?  Will my retirement benefits be less under the new Retirement Program?  If yes — how much less?**

Whether you will receive more or less in total depends on a multitude of factors: your age, service, pay, when you retire, Company performance, future interest rates, salary increases and so on.  Some sample "before" and "after" comparisons are shown below to give you an idea of how benefits compare for different employees.  These comparisons were developed using "income replacement" calculations at various ages.

Financial planners often suggest that, to maintain a comparable lifestyle, a retiree's income from all sources should equal between 70% and 90% of preretirement income at age 65.  Many large companies in the U.S. use income replacement measures as one way to analyze total retirement benefit design.  Income replacement levels are typically measured at age 65 and include income from a variety of sources — Social Security, Company pensions and a reasonable assumption about employee savings and Company Matching Contributions.  More of the financial responsibility for income replacement falls on employees who decide to retire early.

**Income Replacement Comparisons**

Income replacement comparisons combine the components of the Retirement Program — cash balance Retirement Plan, profit sharing contributions, Company matching contributions — and assume they will grow to a lump sum value at retirement or termination.  The total lump sum value is then converted to a monthly benefit payable for life.  This monthly benefit is then compared to income before retirement — salary, bonus and overtime — to find the percentage of income that is replaced by monthly retirement benefits.

To calculate income replacement values at various ages under the new and prior programs, a consistent set of assumptions is used so that the only difference is in plan provisions.  The assumptions used are shown below.

In combination with Social Security, the new cash balance formula can provide more than 70% to employees who work until age 65 and also save for retirement in the Incentive Savings Plan (ISP).  The examples below show income replacement levels at different ages for three different employees.

American Express Retirement Program                                    Overview/7

## Assumptions

The examples below are based on the following assumptions:

- Personal data shown are as of June 30, 1995

- The participant contributes 3% to the ISP and receives:

    — 3% Company Matching Contributions
    — 1% Company Stock Contributions
    — 3% Profit Sharing Contributions (which can range between 0% and
      7% each year)

- Annual investment earnings equal:

    — 7.5% in the ISP
    — 6% in the Retirement Plan

- Pensionable Earnings increase by 4% each year.

- The examples show the ISP and Retirement Plan benefits only; Social
  Security benefits and Metropolitan Life annuity benefits are *not* included.

American Express Retirement Program                                Overview/8

**Examples**

| Joseph | |
|---|---|
| Age | 45 |
| Service | 11 |
| Final Average Salary | $45,000 |



Joseph will receive lower benefits under the new Retirement Program than under the prior Program. Joseph has a number of alternatives to increase his retirement income. He has enough time to increase the amount of his savings and adjust his investment strategy to potentially increase his returns.

American Express Retirement Program                                    Overview/9

| Eric | |
|---|---|
| Age | 50 |
| Service | 26 |
| Final Average Salary | $45,000 |



Eric's benefits under the Retirement Program replace 95% of his pre-retirement income at age 65. At age 55 under the prior Program, the value of Eric's benefits increased because of the value of the early retirement subsidy built into the prior benefit formula. However, Eric's opening balance includes an early retirement supplemental credit to account for the fact that he is within ten years of early retirement age. (See page 11.)

American Express Retirement Program                    Overview/10

| Nadine | |
| --- | --- |
| Age | 55 |
| Service | 26 |
| Final Average Salary | $45,000 |



Nadine's benefits under the prior and current plan are comparable from age 55 to age 65. Because she is eligible for early retirement, her opening account balance includes a 100% early retirement supplemental credit. (See page 11.)

American Express Retirement Program                                    Overview/11

**How are opening cash balance amounts calculated?**

Your opening account balance is the actuarially equivalent *present value* of your accrued benefit under the current Retirement Plan through June 30, 1995. This equivalent value is determined according to rules of actuarial science, and it is affected by the application of mortality tables, interest rates and other provisions of the Retirement Plan. Here are examples of how opening account balances were calculated:

|  | Joseph | Eric | Nadine |
|---|---|---|---|
| Current Age | 45 | 50 | 55 |
| Current Service | 11 | 26 | 26 |
| Final Pay | $40,000 | $40,000 | $40,000 |
| Bonus | $5,000 | $5,000 | $5,000 |
| 1. Accrued annual benefit at age 65 under prior plan formula | $6,200 | $16,040 | $16,040 |
| 2. *Value factor** of age-65 annuity at current age | 2.39229 | 3.26983 | 4.52986 |
| 3. Value of age-65 annuity at current age (Item (1) times Item (2)) | $14,832 | $52,448 | $72,659 |
| 4. Earliest retirement age under prior plan | 55 | 55 | 55 |
| 5. *Subsidized reduction percentage** at earliest retirement age | 70% | 90% | 75% |
| 6. *Value factor** of early retirement age annuity at current age | 6.20214 | 8.47721 | 11.74389 |
| 7. Value of earliest retirement age annuity at current age (Item (1) times Item (5) times Item (6)) | $26,917 | $122,377 | $141,279 |
| 8. *Early retirement supplemental credit percentage** | 0% | 50% | 100% |
| 9. Opening cash balance (Item (3) plus Item (8) times (Item (7) minus Item (3)) | $14,832 | $87,413 | $141,279 |

* The terms *value factor*, *subsidized reduction percentage* and *early retirement supplemental credit percentage* are explained on pages 12, 13 and 14.

### Definitions

*Value Factors.* The value of benefit earned through June 30, 1995 is determined by using a 6% interest rate and the 1984 Unisex Pensioner mortality table. To determine opening cash balance accounts in the examples above, *value factors* are defined to find the value of benefits at different ages

- In Item 2, the value of an age-65 benefit is determined as the amount that would need to be invested in the Plan today to pay a lifetime benefit beginning at age 65 assuming that the account balance returns 6% per year and taking into account the probability of survival before and after 65.

- In Item 6, the value of an age-55 benefit is determined as the amount that would need to be invested in the Plan today to pay a lifetime benefit beginning at age 55 assuming that the account balance returns 6% per year and taking into account the probability of survival before and after age 55.

*Subsidized Reduction Percentage.* The *subsidized reduction percentage* in item 5 is the early retirement reduction factor based upon the prior plan. It also depends on an employee's Social Security Retirement Age (SSRA), which is defined by Social Security as an age between 65 and 67, depending on year of birth. Under the prior plan, early retirement benefits are unreduced at ages within five years of SSRA, and then reduced 5% a year for ages before that. These prior plan reduction percentages were less than the actuarial equivalent reduction factors — and as a result, the reduction in benefits at early retirement was less than would otherwise have been called for by actuarial assumptions regarding life expectancy. As a result, the Company absorbed the cost of the lesser reduction, essentially "subsidizing" the additional cost of early retirement benefits. The derivation of subsidized reduction percentages for Joseph, Eric and Nadine are explained below.

- Joseph's SSRA based on his year of birth is 66. There would be no reduction in his benefit at age 61 and a 5% a year reduction in his benefit between ages 55 and 61 — resulting in a 70% subsidized retirement percentage at early retirement eligibility at age 55 (6 years of reduction at 5%).

- Eric's SSRA is also 66. However, his reduction is different than Joseph's because the prior plan provided unreduced benefits upon attainment of the "Rule of 90" — that is, when the sum of age and service totaled 90 or more. Eric would have satisfied the Rule of 90 at age 57 when his service would have been 33 years. For purpose of determining the opening cash balance account, his subsidized reduction percentage is calculated as a 5% per year reduction between age 55 (his current age) and age 57 (the age he would have been eligible for unreduced benefits). So, Eric's subsidized retirement percentage is 90% (2 years of reduction at 5%).

- Nadine's SSRA based on her year of birth is 65. There is no reduction in her benefit for retirement after age 60 and a 5% a year reduction in her benefit

between ages 55 and 60 — resulting in a 75% subsidized retirement percentage at age 55 (5 years of reduction at 5%).

*Early retirement supplemental credit percentage.* The early retirement supplemental percentage credit percentage amount of the early retirement subsidy that will be included in the opening cash balance. The percentage depends on age and service and is explained in detail on page 14.

### Actuarial Assumptions: Are They Fair?

Actuarial assumptions used to calculate lump sum distributions under pension plans are regulated under the provisions of the Employee Retirement Income Security Act (ERISA) of 1974. ERISA was enacted to protect and ensure benefits of pension plan participants in the United States.

Under ERISA, the government defines assumptions — including mortality tables and interest rates — that it considers to be acceptable and fair to plan participants. The assumptions used to calculate opening account balances under the Retirement Plan — the 6% interest rate and the 1984 Unisex Pension mortality table — actually produce more favorable results for participants than the government assumptions would.

- Under minimum government assumptions, a 40-year-old participant with a $10,000 annual accrued benefit would be eligible to receive a lump sum equivalent of $12,366 using government-recommended interest and mortality. Under the Retirement Plan, the opening account balance for the same 40-year-old participant with a $10,000 annual accrued benefit is $17,647.

- A 30-year-old participant with a $7,500 annual accrued benefit would be eligible to receive a lump sum equivalent of $4,292 using government-recommended interest and mortality. The Retirement Plan opening account balance for this same participant is $7,286.

**How is the early retirement supplemental credit calculated?**

The prior plan provided early retirement benefits that were greater than those provided using normal life expectancy tables. If you are 45 or older, your pre-July 1, 1995 benefit calculated under the prior plan formula will be supplemented by a percentage of the early retirement benefit you would have received if you left the Company after age 55 and completion of ten years of service. The supplement is:

- 100% of the value of your early retirement benefit if you are age 55 or older and have completed ten years of service

- decreased by 10% for each year prior to age 55 and ten years of service back to age 45.

For example, if you have ten years of service, you would receive 90% of the early retirement supplement at age 54, 80% at age 53, and so on. If you are age 54 and have completed six years of service, you are four years from early retirement eligibility, and you would receive 60% of the early retirement supplement.

This supplemental credit is a permanent part of your cash balance account. It is intended to recognize the fact that you would have been eligible for partially reduced benefits and you have less time than other employees between now and retirement to adjust your retirement planning because of the change in the Plan.

The examples below illustrate how the early retirement supplemental credit is determined:

- *No early retirement supplemental credit:* Joseph is 45 years old and has 11 years of service. His pre-July 1, 1995 accrued benefit is $6,200 a year, payable when he reaches age 65. However, Joseph is more than 10 years from early retirement age and has a relatively longer time to prepare for retirement and experience growth in his cash balance account. His opening cash balance is not adjusted by an early retirement supplemental credit. Joseph's opening cash balance account, based on his accrued benefit payable at age 65, is $14,832.

- *Partial early retirement supplemental credit:* Eric is 50 years old and has 26 years of service. His pre-July 1, 1995 benefit payable at age 65 is $16,040 a year and the actuarial equivalent value of his benefit at age 65 is $52,448.

  At age 55, Eric's $16,040 accrued benefit, reduced for early payment according to the terms of the Plan and following opening cash balance account calculation procedures is $14,436 ($16,040 times 90%) with an age-55 value of $122,377. Eric is 50 — five years away from early retirement eligibility. His early retirement supplemental credit will equal 50% of the difference between his age-65 and age-55 present values. As a result, his opening cash balance will equal $87,413 — his age-65 value of $52,448 increased by $34,965 (50% of $122,377 minus $52,448).

- **Full early retirement supplemental credit:** Nadine is 55 years old and has 26 years of service. Nadine's pre-July 1, 1995 accrued benefit is $16,040 a year and the actuarial equivalent value of her benefit at age 65 is $72,659. However, because Nadine met the eligibility requirements for early retirement on July 1, 1995, her opening cash balance is calculated based on her early retirement benefit instead of her age-65 benefit. Nadine's early retirement benefit at age 55 is $12,030 a year ($16,040 time 75%), with a present value of $141,279. The value of her early retirement benefit — $141,279 — becomes her opening cash balance amount (instead of $72,659, the value of her benefit payable at age 65).

**Am I losing benefits already earned under the prior plan?**

No one will experience a reduction in monthly retirement benefits earned before July 1, 1995 as a result of the move to the cash balance approach. Any benefits you've earned under prior American Express retirement plans are guaranteed to you.

- **Your pre-July 1, 1995 benefit is a permanent part of your cash balance account.** The actuarially equivalent present value of your monthly pre-July 1, 1995 benefit is your opening cash balance under the Plan.

- **Your pre-July 1, 1995 benefit is a minimum guarantee.** You will never receive less than the accrued benefit you earned under your prior American Express retirement plan as of June 30, 1995 (as long as you are vested when you leave the Company).

If you were a participant in the American Express Funded Pension Plan that terminated on April 30, 1985, your Metropolitan Life annuity is *not* included as part of your opening cash balance. Provisions that applied before to the payment of this annuity continue: At or after age 55, you can choose to receive monthly payments of your Metropolitan Life annuity in the forms available under the plan in effect at the time it terminated.

**Even though I'm not losing benefits I've earned, my future benefits will be less. Why isn't the Company calculating my benefits under the prior plan formula, since I will be worse off in the future?**

The Company's approach for *all* employees is aligned with its business objectives. It provides competitive benefits to employees of all ages and recognizes that we need to attract, retain and reward employees who spend different portions of their careers at American Express. Keeping the prior plan formula — that is, "grandfathering" — certain employees in the prior plan:

- would not be consistent with the Company's strategy of retaining qualified employees, since the prior plan encouraged early retirement by offering incentives for employees to leave at age 55.

- would not allow us to streamline administration by applying the same Plan provisions to all employees throughout the Company, including American Express Financial Advisors employees.

**American Express Retirement Program**                                             Overview/17

**What do I need to do now from a retirement planning standpoint?**

With all the changes to the Retirement Program, you may be wondering how this affects your retirement planning and what you need to do about it. As before, you should continue saving and planning for your future — take advantage of the ISP by making at least a 3% before-tax contribution. This qualifies you for the 3% Company Matching Contribution.

You are encouraged to identify your retirement goals — for example, when you want to retire and the amount of income you want to have at retirement. Then, to the extent possible, invest accordingly. The reality is that the American Express Retirement Program, while generally providing lower benefits than the prior program, is a better program than most companies offer. However, if you want or need more retirement income, you can:

- increase the amount you are saving
- diversify your investments
- work part time in retirement
- plan carefully how long you will work.

Keep in mind that if your investment returns increase or the Company Profit Sharing Contribution averages more than 3% annually, you could have greater retirement income than the comparisons portray. The opposite, however, is also true. Less favorable Company performance and poor investment returns would reduce retirement income.

The new American Express Retirement Program is designed to be only a part of your retirement income. It is up to you, with guidance from a financial advisor, to complete the retirement funding picture. Your retirement benefits remain highly competitive. But moving forward, it is always a good idea for you to review where you are to help identify any gaps that may exist in reaching your retirement goals.

If you're feeling a bit overwhelmed about planning for retirement and are not currently working with a financial planner, now may be the time to start. You can easily take advantage of all that is available to you at a financial planning company. If you're not currently working with a planner, the American Express Trust Company in Minneapolis can help you find a financial planner — just call.

American Express Retirement Program                              Overview/18

### In Summary

In today's competitive business environment, the Company has to consider carefully how it spends its money. The overall cost of the Retirement Program will be approximately the same as the cost of the prior Retirement Program. However, it is true that those dollars will be spent differently:

- Overall, more dollars are being directed to the ISP.

- The amount contributed will now depend more on Company performance. In years when the Company does well, more dollars can be directed toward your retirement through Company Profit Sharing Contributions to the ISP.

- Compared to the prior plan, your Retirement Plan benefits will accrue more evenly throughout your career, even for employees who stay with American Express for only a short part of their careers. For those who stay longer, Company allocations increase as service grows and retirement age approaches.

In addition, the new Retirement Program offers employees portability. Everyone who leaves the Company after five years of service can decide to leave their cash balance account in the Plan when they leave *or* take their retirement account. Under the prior plan, benefits were payable monthly no earlier than age 55. The new Plan gives you greater flexibility — if you want it — to manage your retirement resources in a way that will suit your financial needs.

The Company's commitment to your future financial security begins with its contributions towards the Retirement Plan, the ISP, retiree medical and life insurance coverage and Social Security. We are also committed to providing you with the information and tools you need to take advantage of the program and to manage your resources to meet your retirement goals.

This Overview is not intended to, and does not supersede, the applicable plan documents, which in all cases are the final authority. American Express Company reserves the right to change or end the plans at any time.

**EXHIBIT J**

# BENEFITS

# Benefits Handbook

## RETIREMENT PROGRAM

## SUMMARY PLAN

## DESCRIPTIONS FOR

## AMERICAN EXPRESS

## EMPLOYEES

## VOLUME 2



# TABLE OF CONTENTS



Introduction                     1

Incentive Savings Plan
(ISP)                            3

Retirement Plan          41

Administrative Information  63

*This Summary Plan Description has been prepared for certain employees of American Express Company. For purposes of the American Express Incentive Savings Plan (the "ISP") and the American Express Retirement Plan (the "Retirement Plan"), unless otherwise indicated, "Company" means American Express Bank Ltd., American Express Company (Corporate Headquarters), American Express Financial Corporation, American Express Travel Related Services Company, Inc. and other subsidiaries that participate in the ISP and the Retirement Plan.*

*This Summary Plan Description for the American Express Retirement Program — including the ISP and the Retirement Plan — contains details about how the Plans work and summaries of Plan provisions that affect your participation. Read each section carefully so that you can understand how to use these Plans to your best advantage.*

*Summary Plan Descriptions for other benefit plans are included in the following documents:*

■ *for employees of American Express Bank Ltd., American Express Company (Corporate Headquarters), American Express Travel Related Services Company, Inc. and their participating subsidiaries — your Benefits Handbook, Volume I and Update '96, and*

■ *for employees of American Express Financial Corporation and its participating subsidiaries — your Total Compensation Handbook and Update '96.*



# Introduction





# INTRODUCTION

## Overview of the Retirement Program

The Company contributes to these programs to help you prepare for retirement security:

- The American Express Incentive Savings Plan,

- The American Express Retirement Plan, and

- Social Security.

These programs are an important part of your total compensation — the pay and benefits you receive as an American Express employee.





The ISP and the Retirement Plan both contribute to your total retirement income. Here's a brief overview of how these plans work:

| ISP | | Retirement Plan |
|---|---|---|
| **Your Contributions** | **Company Contributions** | |
| 0% – 15% of base salary | Company Matching Contributions: 0% – 3% of base salary | Company credits a dollar amount to your account based on your age, service and Pensionable Earnings (see page 47) |
| | Company Stock Contributions: 1% of base salary in the American Express Stock Fund | |
| | Profit Sharing Contributions: 0% – 7% of base salary, depending in part on Company performance | |



## ANSWERING QUESTIONS — AMERICAN EXPRESS TRUST COMPANY

If you have questions about the ISP or the Retirement Plan, you can reach American Express Trust Company by calling the American Express Participant Services Line at 1-800-477-1800. When you call you can:

- learn the value of your ISP account and your Retirement Plan account on a daily basis,

- make ISP transactions, including contribution changes, investment transfers and loan and withdrawal applications, and

- receive information about the ISP and the Retirement Plan.

When you call American Express Trust Company, you may also choose to be connected to the Retirement Program Projection Hotline — an automated retirement benefit calculation system. This automated system estimates projected ISP and Retirement Plan benefits at various ages or retirement dates based on your own assumptions.

## RETIREMENT PROGRAM STATEMENT

Once each quarter, you will receive a Retirement Program Statement showing both your ISP account balance and your Retirement Plan account balance. The combined statement is a valuable financial planning tool, keeping important retirement benefit information in one place. You may also receive information about your Plan accounts by calling the American Express Participant Services Line at 1-800-477-1800.



# Retirement Plan



Retirement Plan



| | |
|---|---|
| Highlights | 43 |
| Eligibility | 44 |
| Naming a Beneficiary | 44 |
| Service | 44 |
| If Your Employment Ends and You Later Return | 45 |
| How the Retirement Plan Works | 46 |
| July 1, 1995 Plan Account Balances | 46 |
| Company Allocations On and After July 1, 1995 | 47 |
| Examples of Company Allocations After July 1, 1995 | 48 |
| Interest on Your Account | 49 |
| Minimum Benefits | 49 |
| Vesting | 50 |
| When Plan Payments Can Be Made | 50 |
| Normal Retirement Benefits | 50 |
| Late Retirement Benefits | 51 |
| If You Become Disabled | 51 |
| If You Die | 51 |
| How Benefits Are Paid | 52 |
| Minimum Distribution Rules | 52 |
| Prior Plan Payment Options | 53 |
| June 30, 1995 Benefit Forms of Payment for Former American Express Retirement Plan Participants | 53 |
| June 30, 1995 Benefit Forms of Payment for Former IDS Retirement Plan Participants | 54 |
| Taxes on Plan Payments | 56 |
| 10% Additional Penalty Tax | 56 |
| 15% Additional Penalty Tax on Large Distributions | 56 |
| 50% Excise Tax | 57 |
| Rollovers | 57 |
| Social Security | 57 |
| When Benefits Are Not Paid | 58 |
| Additional Information | 59 |
| Leaves of Absence and Transfers | 59 |
| Paid Extended Notice Benefits | 59 |
| If You Leave and the Company and Are Rehired | 59 |
| Reemployment After Commencement of Benefits | 60 |
| Plan Funding | 60 |
| If the Plan Becomes Top-Heavy | 61 |
| Limitation on Benefits | 61 |
| Payment Restrictions | 61 |
| Plan Documents | 61 |

*The American Express Retirement Plan is a "Defined Benefit Pension Plan" under the Internal Revenue Code of 1986, as amended.*





# Highlights

After you complete one year of service (as defined on page 44) with the Company, you automatically become a participant in the American Express Retirement Plan. As a Retirement Plan — or "Plan" — participant, you and the Company become partners in reaching a common goal — helping ensure your future financial security. As a part of its commitment to that partnership, American Express pays the full cost of providing Retirement Plan benefits.

Here's how the Retirement Plan works:

- Each pay period, the Company credits allocations to a recordkeeping account held in your name.

- Your allocations are credited with a fixed rate of interest each year and grow tax deferred in the Plan.

- Vesting refers to your right to receive a Retirement Plan benefit when you leave the Company. In general, you're fully vested in your Retirement Plan account after completing five years of service (as defined on page 44) with the Company.

- When you retire or leave the Company after completing five years of service, the full value of your Retirement Plan account will be used to provide your benefit.

- You can choose to receive payment of the value of your vested Retirement Plan account if you leave the Company, regardless of your age. Or, your vested account can stay in the Retirement Plan, earning tax-deferred interest, until you reach age 65.

- You have the option of choosing a lump sum distribution or monthly annuity payments from the Plan.

*Under the Retirement Plan, the Company's contributions are held in trust for all Plan participants. To keep track of your allocations and interest over the course of your career, a recordkeeping account is established in your name to keep track of your benefits under the Plan.*



Retirement Plan

## ELIGIBILITY

If you are an *eligible employee*, you are eligible to participate in the Retirement Plan on the first day of the pay period after you complete one *year of service*.

- A "year of service" is a 12-month period during which you are employed by the *Company*. For this purpose, "Company" means American Express Company, and its subsidiaries.

- You are an "eligible employee" if you are a regular full-time or part-time employee of the Company employed in the United States or outside the United States as a member of the career expatriate staff and you are routinely scheduled to work at least 20 hours in a week.

Temporary (both full-time and part-time) employees, limited part-time employees, employees paid by fee under contract and other contract employees, co-op students, members of the American Express Financial Corporation field force, employees of nonparticipating subsidiaries and other similarly situated employees are not eligible to participate in the Plan.

# Naming a Beneficiary

After you become eligible to participate in the Retirement Plan, you must complete a beneficiary designation form to indicate who will receive payment of your vested Retirement Plan account when you die. If you are married, federal law requires that your spouse automatically be named as your beneficiary unless your spouse consents to your designation of another beneficiary. To name another beneficiary, your spouse must complete the spousal consent on your Retirement Program Beneficiary Form, have his or her signature witnessed by a notary public and you must return the signed Beneficiary Form to American Express Trust Company.

If you do not name a beneficiary for your Retirement Plan benefit, your beneficiary will be your surviving spouse, if you are married; if you are not married, or if your spouse does not survive you, your beneficiary will be your estate.

## SERVICE

Your service is used to determine:

- your eligibility to participate in the Retirement Plan (see "Eligibility" above),

- the amount that will be credited to your Plan account each pay period (see page 47), and

- whether or not you are vested (see page 50).

In general, all your employment with the Company counts as service under the Plan — from the day you begin working to the day you stop working at the Company for any reason. Your service includes time worked and approved/authorized time away from work, including vacations, holidays, sick days, and time away on a paid or unpaid leave of absence.

If you work for the Company in an ineligible status and later become an eligible employee (as defined under "Eligibility" above), all your employment with the Company

counts as service for purposes of eligibility and vesting under the Plan. For example, if you are hired by the Company in an ineligible status and become an eligible employee, you will participate in the Retirement Plan on the first day of the pay period after you become an eligible employee as long as you have already completed one year of service with the Company.

Your service will normally end when your employment terminates. However, brief periods of absence after a termination will be counted as service if you return to work at the Company within one year after you retire, quit or are discharged.

### If Your Employment Ends and You Later Return

If you have completed a year of service, leave the Company or transfer to an ineligible status and later return in an eligible status, you will be eligible to participate in the Plan on the first day of the pay period after you return to work. Your prior service under the Plan will be recognized.

If you leave the Company before completing a year of service, your prior service will be counted only if you return to work within one year of your termination.

If you return to work for the Company within one year of your termination, you will receive service credit for the period of termination, as though you had not terminated.

*Please note: If you were a participant in the American Express Retirement Plan before July 1, 1995, your vesting service before that date will be determined under the provisions of the American Express Retirement Plan (the "Prior Plan"). Under the Prior Plan, you were eligible to receive credit for one year of vesting service for each calendar year during which you worked at least 1,000 hours. (Service counting provisions under the Prior Plan are described in the Summary Plan Description provided to you as a participant in the Prior Plan.) After July 1, 1995, your vesting service will be counted as described under "Service."*

*In addition, if you had completed at least three years of vesting service on June 30, 1995, as defined under the Prior Plan, your service for purposes of vesting and minimum benefit eligibility (described on pages 49 and 50) will be determined as described under "Service," or under the provisions of the Prior Plan, whichever is greater.*

# HOW THE RETIREMENT PLAN WORKS

After you become eligible, each pay period the Company allocates credits to a recordkeeping account held in your name. Allocations are based on your age, years of service and Pensionable Earnings. In addition, your account will accrue interest, which accumulates on a tax-deferred basis from year to year.

If you were an active participant in the American Express Retirement Plan or the IDS Retirement Plan on June 30, 1995, your Plan account was credited with an opening balance as of July 1, 1995, as described below.

## JULY 1, 1995 PLAN ACCOUNT BALANCES

If you participated in the American Express Retirement Plan or the IDS Retirement Plan on June 30, 1995, your July 1, 1995 opening account balance is the actuarially equivalent present value of your accrued benefit through June 30, 1995, determined as follows:

- As an active participant in either the American Express Retirement Plan or the IDS Retirement Plan, your accrued benefit payable at age 65 was determined on June 30, 1995, based upon applicable service, earnings and plan formula in effect on that date. (Plan benefit provisions in effect before July 1, 1995 are described in the Summary Plan Descriptions provided to you as a participant in the American Express Retirement Plan and/or the IDS Retirement Plan.)

- The present value of your June 30, 1995 accrued benefit was determined using a 6% interest rate and the 1984 Unisex Pensioner mortality table. The present value of your age-65 benefit was determined as the amount that would need to be invested as of June 30, 1995, to pay a lifetime benefit beginning at age 65 assuming the account balance returns 6% per year and taking into account the probability of survival before and after age 65. This present value is the opening balance in your Plan account.

If you were age 46 or older as of June 30, 1995, your June 30, 1995 benefit calculated under the Prior Plan formula was supplemented by a percentage of the early retirement benefit you would have received under your Prior Plan if you left the Company after age 55 and completion of ten years of service. The supplement is:

- 100% of the value of your early retirement benefit if you were age 55 or older and had completed ten years of service on June 30, 1995, or

- 100% minus 10% (but not less than 0%) for each year you were younger than age 55 with less than ten years of service as of June 30, 1995.

For example, if you had ten years of service on June 30, 1995, you would receive 90% of the early retirement supplement at age 54, 80% at age 53, and so on. If you were age 54 and had completed six years of service on June 30, 1995, you were four years from early retirement eligibility, and you received 60% of the early retirement supplement.

This supplemental credit is a permanent part of your Retirement Plan account.

# COMPANY ALLOCATIONS ON AND AFTER JULY 1, 1995

Beginning July 1, 1995, the Company makes allocations to your Retirement Plan account based on:

- your attained age on December 31 of each year,

- your completed years of service on December 31 of each year, and

- your Pensionable Earnings.

For purposes of the Retirement Plan, "Pensionable Earnings" means your base salary plus overtime, shift differentials, certain commissions and bonuses. Lump sum severance pay, imputed income and incentive pay are not included in Pensionable Earnings.

The sum of your projected age and years of Company service calculated as of each December 31 determines your allocation percentage for a particular calendar year. Each pay period, the Company allocation is calculated as a percentage of your Pensionable Earnings, as shown in the following chart:

| If the sum of your age and your years of Company service on December 31 is... | the total calendar year Company allocation is the % of your Pensionable Earnings... |
|---|---|
| Less than 35 | 2.50% |
| 35 – 44 | 3.25% |
| 45 – 59 | 4.25% |
| 60 – 74 | 5.75% |
| 75 – 89 | 8.00% |
| 90 and over | 10.00% |

In the year your employment ends, Company allocations will be credited to your account based on your Pensionable Earnings through the date your service ends.

*Please note: Under the Retirement Plan, IRS regulations limit Pensionable Earnings. This limit — which can be adjusted periodically — is $150,000 for 1996. Allocations on earnings above this IRS limit are provided through the unfunded Supplemental Retirement Plan, which offers different payment options than the Retirement Plan. You will be notified if you are eligible for participation in the Supplemental Retirement Plan.*

# EXAMPLES OF COMPANY ALLOCATIONS
## AFTER JULY 1, 1995

| Example 1 | Example 2 |
|---|---|
| Denise is 30 years old and has six years of Company service as of December 31, 1996. Her 1996 Pensionable Earnings equal $30,000. Here's how her total Company allocation for 1996 would be calculated: | John is 50 years old and has 15 years of service as of December 31, 1996. His 1996 Pensionable Earnings equal $55,000. Here's how his total Company allocation for 1996 would be calculated: |

### STEP 1:

Add together age and service. In this case, they equal 36 (30 + 6).

### STEP 1:

Add together age and service. In this case, they equal 65 (50 + 15).

### STEP 2:

Find the allocation percentage that corresponds to 36. In this case, it's 3.25%.

### STEP 2:

Find the allocation percentage that corresponds to 65. In this case, it's 5.75%.

### STEP 3:

Multiply 3.25% by Pensionable Earnings. During 1996, the Company will allocate $975 (3.25% x $30,000) to Denise's account. Allocations will be made each pay period based on Pensionable Earnings paid for that period.

### STEP 3:

Multiply 5.75% by Pensionable Earnings. During 1996, the Company will allocate $3,162.50 (5.75% x $55,000) to John's account. Allocations will be made each pay period based on Pensionable Earnings paid for that period.



## INTEREST ON YOUR ACCOUNT

Your Retirement Plan account earns a fixed rate of interest, which will vary from year to year. The fixed interest rate for a year will be determined at the beginning of each calendar year based on the average of the daily five-year U.S. Treasury Note yields for the previous October 1 through November 30.

The Plan has minimum and maximum rates of interest. The Plan's minimum annual rate of interest is 5%. The maximum is 10% or the annual maximum interest rate set by the government for determining lump sum values, if less.

The Plan's interest rate will be announced each year by the Company. Interest is accrued daily and annual interest will be posted to your Retirement Plan account each December 31. If your employment ends, interest will be credited to your account from your termination date to the date your account is paid from the Plan.

## MINIMUM BENEFITS

Any benefits you had earned under the prior American Express Retirement Plan or the IDS Retirement Plan as of June 30, 1995, are guaranteed to you.

- Your June 30, 1995 accrued benefit is a permanent part of your Retirement Plan account. The actuarially equivalent present value of your monthly June 30, 1995 benefit is your opening account balance under the Plan.

- Your June 30, 1995 accrued benefit is a minimum guarantee. You will never receive less than the accrued benefit you earned under your prior American Express or IDS Retirement Plan as of June 30, 1995 (as long as you are vested when you leave the Company).

In addition, if you earned a benefit from the American Express Funded Pension Plan or the Fireman's Fund Plan that terminated in 1985, you are also entitled to a monthly annuity under those Plans. Payment of this benefit may begin after you leave the Company, but not earlier than age 55. These annuities, which are payable through an insurance contract with Metropolitan Life Insurance Company, pay you the benefit you earned through April 30, 1985. These amounts are paid in addition to any amount payable from your Retirement Plan account and are subject to different payment option provisions.

# VESTING

When you are vested, you will be entitled to the full value of your Retirement Plan account at the time you leave the Company. You will be fully vested after you complete five years of service with the Company (as defined for purposes of a "year of service" on page 44), or if you retire at or after age 65, become disabled or die.

The value of your vested Retirement Plan account is payable when your employment ends for any reason, regardless of your age at the time you leave the Company. You have the option of deferring payment of the value of your Retirement Plan account until you reach age 65. If you defer payment, your account will continue to earn interest until it is paid out to you.

*Please note: If you were a participant in the IDS Retirement Plan before July 1, 1995, and had three or more years of service under that Plan on July 1, 1995, you will be fully vested after completing five years of service or reaching age 55, whichever comes first.*

*If you were a participant in the IDS Retirement Plan and were age 55 or older before July 1, 1995, you are fully vested in your Retirement Plan account regardless of your number of years of service.*

# WHEN PLAN PAYMENTS CAN BE MADE

If your employment ends after you are vested, the value of your Retirement Plan account, including accrued interest for the year, can be paid to you in full. If the value of your Retirement Plan account is $3,500 or less, payment will be made shortly after the time your employment ends in a single lump sum distribution (see page 52). If the value of your Retirement Plan account is greater than $3,500:

■ you may elect immediate payment, or

■ you may defer payment to a later date.

If you defer payment, you may choose to have benefits begin any time between the date your employment ends and the date you reach age 65. However, if your employment with the Company has ended, you may not defer payment beyond age 65.

## Normal Retirement Benefits

Normal retirement benefits can begin on the first day of the month after you reach age 65. You can choose a lump sum or monthly payments (see page 52) of your Retirement Plan account value.

## Late Retirement Benefits

You may continue working for the Company beyond age 65 and your Plan account will continue to grow. Benefits can begin after you retire.

Under federal law, you must begin receiving benefits from the Plan by the April 1 following the end of the year in which you reach age 70½, in accordance with IRS minimum distribution rules, even if you are still actively employed by the Company at that time. You will be notified if this IRS rule affects your payments from the Plan.

## If You Become Disabled

If you are considered to be disabled under the terms of the Plan, you will automatically be fully vested. You may elect to receive immediate payment or you may defer payment of your Retirement Plan account value.

If you elect immediate payment, no further allocations will be made by the Company to your Retirement Plan account. Your election of immediate payment will result in a waiver of your right to earn service credit and Company allocations during the period of your disability.

If you have more than five years of service and you defer payment until you reach age 65 or you are no longer disabled, you will continue to earn service credit throughout your disability. Your Plan account will be credited annually with Company allocations based on your age and service each December 31 and your annualized Pensionable Earnings at the time of your disability. Your account will also continue to be credited with tax-deferred interest until your receive payment of your Plan account.

If you recover from your disability before age 65 and return to active employment, you will be considered to have been on a leave during the period of your disability. If you recover from your disability before age 65 and do not return to active employment, you will be eligible to receive a vested benefit under the Plan.

## If You Die

In the event of your death, you will automatically become fully vested and the full value of your Retirement Plan account will be paid to your beneficiary. Under current law, your spouse is automatically your beneficiary, unless you have written, notarized consent from your husband or wife to name another beneficiary.

If you die before payments begin and have named a beneficiary other than your spouse with your spouse's written notarized consent, your Retirement Plan account value will be paid immediately in a single lump sum. If you die before payments begin and your spouse is your beneficiary, he or she will be able to choose immediate or deferred payment of your account in a lump sum distribution or in monthly payments (see page 52).

If you die after payments begin, death benefits will be paid according to the form of payment you elected (see page 52).

*You are considered to be "disabled" if, during a six-month waiting period and the first 24 months of your disability, you are completely unable to perform any and every material duty of your occupation and you require the regular care of a doctor. After that, you will be considered to be disabled if your physical or mental condition prevents you from performing each of the material duties of any occupation for which you may be reasonably qualified by education, training or experience. The Plan Committee will determine whether you are disabled based on competent medical authority of its choosing.*

# HOW BENEFITS ARE PAID

The Retirement Plan offers you the flexibility to choose a single lump sum distribution or monthly annuity payments. However, if the vested value of your Retirement Plan benefit is $3,500 or less, your account value will be paid to you automatically in a single lump sum payment shortly after termination. If the value of your account is greater than $3,500, you may choose a single lump sum distribution or monthly annuity payments, as described below.

- **Lump sum distribution:** If you choose a lump sum, you'll receive the total vested value of your Retirement Plan account in a single payment.

- **Monthly annuity payments:** You can choose to receive your Retirement Plan account paid either as a single life annuity or as a 50% contingent annuitant benefit.

If you choose a single life annuity, you'll receive your benefit as equal monthly payments for the rest of your life. The amount of your monthly payments will depend on your age. After your death, no further benefits are payable to anyone.

If you choose a 50% contingent annuitant benefit, the amount of your monthly benefit will be reduced so that 50% of your benefit can be paid to your spouse or other beneficiary after your death. The amount of your monthly payments will depend on your age and the age of your spouse or other beneficiary.

If you're married when payments begin, federal law requires that you have your spouse's written, notarized consent to choose a form of payment other than a 50% contingent annuitant benefit with your spouse as your contingent annuitant.

Also, if you are eligible for a benefit under the American Express Funded Pension Plan or the Fireman's Fund Plan which terminated in 1985, that benefit must be paid in the form of a monthly annuity from Metropolitan Life. These payments can begin no earlier than the first of the month following the date you reach age 55 and will be reduced for early retirement, if applicable.

# MINIMUM DISTRIBUTION RULES

Plan distributions must begin no later than April 1 following the year in which you reach age 70½, in accordance with the IRS minimum distribution rules, even if you are still actively employed by the Company at that time.



# PRIOR PLAN PAYMENT OPTIONS

As described on page 52, the Retirement Plan offers both lump sum and monthly benefit payments for your entire benefit under the Plan. Most participants will find that these payment methods meet their needs. However, you may, if you wish, elect a separate form of payment for your benefit accrued as of June 30, 1995, if you participated in the Retirement Plan or the IDS Retirement Plan before July 1, 1995.

## June 30, 1995 Benefit Forms of Payment for Former American Express Retirement Plan Participants

If you were a participant in the American Express Retirement Plan and employed by American Express Company or one of its subsidiaries on June 30, 1995, you may choose one of the forms of payment described on page 52 for your benefit earned after July 1, 1995 and elect a separate form of payment for any June 30, 1995 benefit you earned under the terms of the Plan in effect at that time. Here is a description of the forms of payment available for June 30, 1995 benefit:

- *50% Survivor's Benefit Option:* Monthly benefits are payable to you for your life. At your death, 50% of your benefit is payable to your surviving spouse if you are married; if you are not married, benefits may be paid to your unmarried child(ren) under age 21, or your or your spouse's dependent parent.

- *100% Survivor's Benefit Option:* A reduced monthly benefit is payable to you for life. At your death, your benefit is payable to your surviving spouse if you are married; if you are not married, benefits may be paid to your unmarried child(ren) under age 21, or your or your spouse's dependent parent.

- *25% or 100% Contingent Annuitant Option:* A reduced monthly benefit is payable to you for your life. At your death, 25% or 100% of your benefit — whichever you choose — will be paid to the beneficiary you have named as your contingent annuitant.

- *Level Income Option:* This form of payment is available only if payments start before you reach age 65. An increased monthly benefit is payable until the first day of the month preceding the date you reach age 65 and a reduced monthly benefit is payable after that, so the amount of your Retirement Plan benefit before age 65 will be approximately equal to the sum of your Retirement Plan benefit and your primary Social Security benefit at age 65. At your death, a 50% survivor's benefit may be paid as described under *50% Survivor's Benefit Option.*

### June 30, 1995 Benefit Forms of Payment for Former IDS Retirement Plan Participants

If you were a participant in the IDS Retirement Plan and employed by American Express Company or one of its subsidiaries on June 30, 1995, you may choose one of the forms of payment described on page 52 for your benefit earned after July 1, 1995 and elect a separate form of payment for any June 30, 1995 benefit you earned under the terms of the Plan in effect at that time. Here is a description of the forms of payment available for your June 30, 1995 benefit:

- *Life Benefit:* Monthly benefits are payable to you for your life only; when you die, payments stop.

- *Life Benefit with Payments Guaranteed for Period Certain:* A reduced monthly benefit is payable to you for life, with payments guaranteed for a "period certain" — either 5, 10 or 15 years — according to your election. If you die before the end of the period certain, the benefit will continue for the remainder of the period to your beneficiary. If you die after the period certain ends, no further benefits are payable.

- *50% Contingent Annuitant Benefit:* A reduced monthly benefit is payable to you for life. At your death, 50% of your benefit will be paid to the beneficiary you have named as your contingent annuitant.

- *50% or 100% Joint & Survivor Benefit:* A reduced monthly benefit is payable to you for life. If either you or your beneficiary dies, 50% or 100% of your benefit — whichever you elect — will continue to the survivor.

- *50% Joint & Survivor with Payments Guaranteed for Period Certain:* You may combine a 50% joint and survivor benefit with a ten-year period certain benefit. A reduced monthly benefit is guaranteed for ten years and for life after that. If either you or your beneficiary dies, 50% of your benefit will be paid to the survivor after the ten-year period certain ends.

- *50% Contingent Annuitant Benefit with Payments Guaranteed for Period Certain:* You may combine a 50% contingent annuitant benefit with a ten-year period certain benefit. A reduced monthly benefit is guaranteed for ten years and for life after that. If you die, 50% of your benefit will be paid to the contingent annuitant you have named after the ten-year period certain ends.

**Please note:** *If you were a participant in the IDS Retirement Plan before 1970, that plan required you to contribute part of the cost of funding your retirement benefits. Employee contributions were discontinued when the Plan was amended effective January 1, 1970.*

*Following this 1970 amendment, you were given a one-time option to withdraw your contributions, if any, from the Plan. If you did not elect to withdraw your contributions, a separate fund was established to invest and hold your contributions until your termination or retirement.*

*When you terminate or retire, your pre-1970 contributions will be distributed to you along with your other Retirement Plan benefits. To request distribution of this benefit, you must complete a Request for Benefit Distribution form that will be provided to you.*

*If you are not married when you become eligible for your normal retirement benefit, your payments will be made to you in the form of a single life annuity, unless you elect an optional form of benefit.*

*If you are married when you reach your normal retirement date, your benefits will automatically be paid in the form of a 50% contingent annuity, unless you elect and your spouse consents in writing, with notarization, to receive the benefit under one of the optional methods of payment.*

*The optional distribution methods available to you for distribution of these benefits are:*
— *single-sum payment in cash,*
— *single-sum payment in securities, or*
— *the optional forms of retirement benefits described on page 54.*

*Because this benefit is based on your contributions, you are not taxed on the portion of benefit payments you receive that represent a return to you of your contributions. However, earnings that have accrued on these contributions will be taxable income to you.*

# TAXES ON PLAN PAYMENTS

When you receive payments from the Plan, the amount you receive will generally be treated as taxable income in the year you receive it. However, your tax will depend on how and when you receive payment and the tax laws in effect at the time. Under current tax law:

- Lump sum distributions are subject to income tax unless you roll over your distribution into an Individual Retirement Account (IRA) or into another qualified retirement plan that accepts rollover contributions. Lump sum distributions that are not rolled over directly from the Retirement Plan to an IRA or to another qualified plan are automatically subject to 20% withholding taxes. In addition, if you terminate employment before age 55, you may also be subject to a 10% penalty tax (described below) on the amount of your distribution (unless your account is paid out because of your disability or death or paid out in the event of a qualified domestic relations order).

- Monthly annuity payments are taxed at ordinary income tax rates and are treated as wages for purposes of withholding.

In addition to ordinary income tax, there are three additional taxes that can affect payment from the Plan: 10% additional penalty tax, 15% large distribution penalty tax and 50% excise tax after age 70½.

## 10% Additional Penalty Tax

The IRS imposes a 10% additional penalty tax on lump sum distributions from the Retirement Plan except under these circumstances:

- the distribution is made after you reach age 59½,

- you terminate employment after age 55,

- the distribution is made due to your death or disability,

- you roll over the lump sum distribution to an IRA or another qualified plan (as described on page 57), or

- a distribution to your spouse or dependent is required under the terms of a qualified domestic relations order.

## 15% Additional Penalty Tax on Large Distributions

A 15% penalty tax is imposed if the total amount you receive in any one year from all qualified plans (including the ISP, the American Express Retirement Plan, any IRAs you have and any other tax qualified plans) is greater than $150,000 or a limit indexed for inflation. (Annual payments and lump sum distributions are subject to separate limits.) If you think you could be affected by this tax, you may want to review the timing of Plan payments with your tax advisor. Special rules apply if you elect special averaging treatment or if you made a one-time election regarding benefits accrued as of August 1, 1986.

### 50% Excise Tax

Minimum distributions from the Plan are required to begin no later than April 1 following the year in which you reach age 70½, as specified by IRS rules. (See page 52.) If payments do not begin, a 50% excise tax will be applied to that portion of your Plan benefit (as determined by IRS guidelines) that should have been paid to you. This rule applies whether or not you are employed at the time.

You may qualify for special five- or ten-year averaging tax treatment. To qualify, you must receive your entire balance in a lump sum payment in one taxable year and have participated in the Plan for at least five years.

## ROLLOVERS

If you choose to receive your Retirement Plan account as a lump sum, you can roll over any or all of the amount into an Individual Retirement Account or Annuity (IRA) or another employer's qualified plan, if it accepts rollovers. You may also roll over a lump sum distribution of your Retirement Plan account to the ISP, as long as your vested ISP account (including the rollover amount from the Retirement Plan) exceeds $3,500. You can have the amount made as a direct rollover — that is, your distribution is transferred directly by American Express Trust Company to the eligible plan of your choice. If you make a direct rollover, you will continue to defer paying income tax on the amount until you withdraw it from the rollover plan.

If you want to take a lump sum distribution and then roll over the amount yourself (an indirect rollover), keep in mind the following:

■ Federal income tax withholding — at the rate of 20% — will be deducted automatically from your distribution and sent to the IRS on your behalf.

■ Your rollover must be made within 60 days of the day you receive your distribution.

■ Any portion of the amount not rolled over will be subject to income taxes, and in some cases, additional penalty taxes.

You'll receive more detailed information when you terminate your employment with American Express.

*This summary of tax rules that may apply to distributions from the Plan is based on the Company's understanding of current law. You should consult a tax advisor for specific tax advice.*

## SOCIAL SECURITY

You may be entitled to receive Social Security benefits in addition to Plan benefits. Currently, if you were born before 1938, your full Social Security retirement benefits are payable at age 65. If you were born after 1937, your full Social Security benefits will be payable between ages 65 and 67, depending on your year of birth. You may elect to receive Social Security benefits as early as age 62 if you are retired, but the monthly amount will be somewhat reduced because you will be receiving payments over a longer period.

Your Social Security benefits are calculated using your earnings subject to Social Security taxes. Those taxes are paid equally by you and the Company. You can request a booklet from your local Social Security office that explains, in detail, how to determine your Social Security benefits.

Social Security benefits are not paid automatically. You should apply at the Social Security office nearest your home approximately three months before you want your benefits to begin. When you apply, you should bring your own Social Security card or a record of your number, your birth certificate or other proof of age and your W-2 federal income tax statement for the previous year. If you do not have all of these documents, you should still go to the Social Security office to apply, because the staff there can tell you about other proofs of age and eligibility that can be used instead.



# WHEN BENEFITS ARE NOT PAID

The purpose of this Summary Plan Description is to explain when and how the Plan provides benefits for you and your survivors. It is important, however, that you understand the conditions under which benefits may be less than expected or not paid at all. The following are some — but not all — of these conditions:

- If you die after retiring and have chosen the single life annuity option, no death benefits will be payable from this Plan.

- If your beneficiary dies before you do and after you have started to receive benefits in the form of the contingent annuitant option, the amount of your benefit will not increase.

- Your benefits could be assigned to meet the requirements of a qualified domestic relations order in the event of a divorce. (See page 66.)

- If you have fewer than five years of service or do not meet the definition of disability under the Plan, you will not receive benefit credit during your period of disability.

- If you leave the Company before becoming a Plan participant or before earning a vested right to your benefits and you never return to active employment with the Company, you will not be eligible for benefits from the Plan. Your account in the Plan will be forfeited. Any forfeitures of nonvested benefits are used to offset future Company contributions to the Plan.

# ADDITIONAL INFORMATION

This additional information relates to the operation of the Plan.

## Leaves of Absence and Transfers

Generally, your participation in the Retirement Plan is not interrupted by approved paid leaves of absence or transfers between participating subsidiaries of American Express Company. If you take an unpaid leave of absence or transfer to a nonparticipating subsidiary, you will continue to earn service under the Plan for purposes of vesting. Annual allocations will not be credited to your account during your leave or transfer; however, interest will continue to be credited to your account in the Plan. Distributions from the Plan will not be processed while you are still actively employed by the Company.

## Paid Extended Notice Benefits

If your employment terminates and the Company elects to pay you severance in biweekly installments as "paid extended notice," the Company will continue to credit allocations to your Plan account throughout your paid extended notice period. At the end of your paid extended notice period, you will be entitled to elect an immediate or deferred distribution of your vested Plan account.

## If You Leave the Company and Are Rehired

If you leave the Company and are rehired, you will automatically participate in the Plan on the first day of the pay period following your date of rehire if you had met the eligibility requirements during your previous period of employment. If you received a distribution from the Plan, you must complete a new beneficiary designation form (see page 44).

Generally, if your previous period of employment ended for reasons other than retirement or disability and you were not vested (that is, you were employed with the Company for less than five years), the value of your nonvested account in the Plan will be forfeited. However, the forfeited portion of your Plan account will be restored if you again become a participant before the end of a five-year break in service (defined below).

A "five year break in service" is a period of five consecutive calendar years (beginning with the calendar year in which your participation ended) during which you are not a participant under the Plan on the last day of such calendar year.

If you are absent because of a maternity or paternity absence and are not paid or entitled to payment, your Plan participation will not end as of the first day of such calendar year. For this purpose, a "maternity or paternity absence" means an absence from work for any period because of:

- your pregnancy,
- birth or adoption of your child, and
- your time away to care for your child immediately after birth or adoption.

## Reemployment After Commencement of Benefits

Generally, if you are receiving monthly annuity payments under the Retirement Plan and are reemployed by the Company, your pension benefit or vested benefit payment will continue. Company allocations will be credited to your account based on your Pensionable Earnings from the first day of the pay period following your date of rehire in an eligible status.

## Plan Funding

The Company pays the full cost of funding the Trust associated with the Plan (the sole source of all Plan benefits); no employee contributions are required, nor are they permitted. Certain administrative expenses of the Plan are paid from the Trust, as allowed by law.

Metropolitan Life Insurance Company is responsible for paying vested accrued benefits under the terminated American Express Funded Pension Plan and the Fireman's Fund Plan which have not yet been paid out in full.

Company contributions to the Plan are determined each year based on life expectancies, earnings, service and benefits earned under the Plan. Contributions are sent to American Express Trust Company. All monies in the Trust are held for the exclusive benefit of Plan participants and beneficiaries. The American Express Company Benefit Plans Investment Committee is responsible for investing the assets of the Plan according to the directions of the Company. The Investment Committee also has the power to appoint or remove investment managers for the Plan. The Investment Committee may decide to change the way Plan assets are invested or to appoint alternate investment managers at any time without notice to or approval by Plan participants.

## If the Plan Becomes Top-Heavy

Under current tax law, the Plan is required to contain provisions which will become effective if it becomes "top-heavy." Generally, a plan is considered to be top-heavy only if the present value of the accumulated accrued benefits for certain highly paid employees is more than 60% of the accumulated accrued benefits of all employees under the Plan.

Because only a small number of highly paid employees benefit from the Plan, it is unlikely that the Plan will become top-heavy. If the Plan does become top-heavy, the vesting schedule will be accelerated and additional contributions may be made. A more detailed explanation of these provisions will be provided if and when the Plan ever becomes top-heavy.

## Limitation on Benefits

The Internal Revenue Service puts a limit on the amount of benefits that may be paid from the Plan. Few participants are affected by these limits; if you are, however, you will be notified.

In addition, if you are covered by a tax-qualified defined contribution plan sponsored by the Company, an overall limit applies to your Retirement Plan benefit. If this combined limit applies, your Retirement Plan benefit will be reduced first in order to satisfy the overall limit.

## Payment Restrictions

Under certain rare circumstances, you may not be able to select certain types of payment forms because of restrictions imposed by the government.

## Plan Documents

This Summary Plan Description describes the highlights of the American Express Retirement Plan. It is not intended to give full details. Some additional features of the Plan which apply to a few employees are not included here. Full details of the Plan are contained in the official Plan text and Trust agreement, which are the legal documents governing the operation of the Plan and are, in all cases, the final authority.

# Administrative Information





# ADMINISTRATIVE INFORMATION

**Administrative Information**    65
   Spouse's Rights    65

   Claims Procedures    65

   Claims Review    66

   Assignment of Benefits    66

   Qualified Domestic
   Relations Order    66

   Changing or Ending the Plan    67

**Other Plan Facts**    68
   Plan Committees    69

   Plan Trustee    69

   Pension Benefit Guaranty
   Corporation (PBGC)    69

   ISP Benefits Not Insured    69

   IRS Approval    70

   Agent for Service of
   Legal Process    70

**Applicability of ERISA**    70

**Statement of ERISA Rights**    70

**Sponsoring Employers**    71







# ADMINISTRATIVE INFORMATION

This section contains information on the administration and funding of the American Express Incentive Savings Plan (the "ISP") and the American Express Retirement Plan (the "Retirement Plan"), collectively called the "Plans," and your rights as a participant in the Plans.

For further information about the administration of the Plans or for further information about the Plans in general, please contact the:

*Human Resources Department,*
*Retirement Plans*
*American Express Financial*
*Corporation*
*IDS Tower 10, Unit 360*
*Minneapolis, MN 55440-0010*
*Telephone: (612) 671-1924*

## Spouse's Rights

Under federal law, your spouse has rights to a benefit under the ISP and the Retirement Plan in the event of your death. The law requires that if you are married your spouse is your beneficiary for benefits unless your spouse agrees in writing to your naming another beneficiary. As a result, you must have your spouse's valid consent to name a beneficiary other than your spouse under either Plan.

If you are married when payments begin, federal law requires that you have your spouse's written, notarized consent to choose a form of payment from the Retirement Plan other than a 50% contingent annuitant benefit with your spouse as your contingent annuitant.

To waive these benefits under either Plan, your spouse must sign the spousal consent on the appropriate beneficiary form and have his or her signature witnessed by a notary public. This applies even if you name someone in addition to your spouse as beneficiary under the Plans, or if you name a trust with your spouse as beneficiary of the trust.

## Claims Procedures

If you have been denied benefits under the ISP or Retirement Plan to which you believe you are entitled, you may file a written claim for benefits with the Plan Administrator.

Generally, the Plan Administrator will grant or deny your claim within 90 days from the date your claim is properly filed.

If your claim for benefits is denied either in whole or in part, you or your beneficiary will receive a written notice. The notice will include:

- the specific reasons for the denial,

- specific reference to the Plan provisions on which the denial is based,

- a description of any additional information needed to perfect your claim and an explanation of why this information is necessary, and

- an explanation of the claim review procedure.

The Plan Administrator may extend the claim review period for up to 90 days in special circumstances. You will be notified in writing if this extension of time is required. If you do not receive notice of the status of your claim by the end of the claim review period, you should consider your claim to be denied and proceed to the request for review stage of filing claims.

## Claims Review

No later than 60 days after receiving the denial (or if no notice is received, within 150 days after filing a claim), you, your beneficiary or a duly authorized representative may submit to the Plan Administrator a written request for a review of the decision to deny your claim. You must direct your request to the Plan Administrator at the appropriate address listed in the chart on page 68.

Your request for review should be accompanied by documents or records in support of the appeal. You, your beneficiary or a duly authorized representative may review all pertinent documents relating to the denial of your claim and submit issues and comments in writing.

The Plan Administrator will consider your request for review and within 60 days (or 120 days in special circumstances) provide a written response to the request, explaining the reasons for the decision with specific reference to the Plan provisions on which that decision is based. Generally, if the decision on review is not furnished within such time, the claim shall be deemed denied on review.

The Plan Administrator has the exclusive right to interpret the provisions of the Plans and its decisions are final, conclusive and binding (except as otherwise provided in the Plans or by law).

## Assignment of Benefits

Except as required by law or applicable court order (for example, in the case of a Qualified Domestic Relations Order, described below), your Plan benefits may not be pledged, assigned or garnished in payment of any debts.

## Qualified Domestic Relations Order

A domestic relations order is a legal judgment, decree or order issued under a state domestic relations law that recognizes the rights of an alternate payee under the ISP or the Retirement Plan with respect to child support, alimony payments or marital property rights.

If you become legally separated or divorced, all or a portion of your vested benefits under the ISP and/or the Retirement Plan may be assigned to an alternate payee under a domestic relations order that the Plan Administrator has determined to be "qualified." An alternate payee may be your spouse, former spouse, child or other dependent.

There are specific requirements the domestic relations order must meet to be recognized by the Plan Administrator as "qualified." If the Plan Administrator receives written notice that a domestic relations order intending to be a Qualified Domestic Relations Order ("QDRO") is being drafted, the Plan Administrator will place a hold on your ISP and/or Retirement Plan benefits for a 30-day period. The 30-day period may be extended for an additional 30 days by providing written notice to the Plan Administrators. A Plan Administrator, however, will not place a hold on your

Plan benefits for more than three consecutive 30-day periods. If the Plan Administrator does not receive a domestic relations order within this period, the hold will be lifted.

Upon receiving a domestic relations order you — and the alternate payee — will be notified regarding the receipt of the order and the Plan procedures for determining whether the order is qualified. In addition, upon receiving a state court domestic relations order, the Plan Administrator will place a hold on your ISP and/or Retirement Plan accounts during the time it takes to determine whether the order is qualified. (A hold on your ISP benefits means you will not have access to your account to take ISP loans, withdrawals or distributions. However, during that time, you will be able to direct the investment of your accounts in the ISP. A hold on Retirement Plan benefits applies to distributions.)

If any portion of your vested benefit is payable under either Plan before it is determined whether the order is a QDRO, the Plan Administrator will segregate the amount that would be payable to the alternate payee if the order is determined to be a QDRO. If the order is not a QDRO, the segregated amounts plus any earnings will be payable to you.

If an order is a QDRO and the order provides for it, payment to the alternate payee may begin at any time, even if you continue working.

If you have reason to believe that a court may issue a domestic relations order affecting your ISP or Retirement Plan benefits, you may contact the Plan Administrator at the address shown on page 68 to request additional information regarding QDROs, including sample wording that may be considered to satisfy specific Plan requirements surrounding QDROs and Plan QDRO procedures.

## Changing or Ending the Plan

The Company reserves the right to amend in any respect, suspend contributions or terminate the Plans at any time and for any reason. If the Company decides to change or end these Plans, it may or may not decide to set up different plan(s) to provide similar benefits.

In the event the ISP and/or the Retirement Plan is terminated, you will have a vested, or nonforfeitable, right to your accrued benefits. After all benefits have been paid and legal requirements have been met, any remaining Plan money will remain with the Company and its participating subsidiaries.



# OTHER PLAN FACTS

This information applies to the ISP and the Retirement Plan.

| Plan | Incentive Savings Plan | Retirement Plan |
|---|---|---|
| Type of Plan | Defined Contribution Pension Plan | Defined Benefit Pension Plan |
| Plan Name | American Express Incentive Savings Plan | American Express Retirement Plan |
| Plan Sponsor ■ Address | American Express Company 200 Vesey Street New York, NY 10285 | |
| ■ Telephone | (212) 640-2000 | |
| Plan Administrator | American Express Company Employee Benefits Administration Committee | |
| ■ Address | American Express Company IDS Tower 10, Unit 360 Minneapolis, MN 55440-0010 | |
| ■ Telephone | (612) 671-1924 | |
| Employer Identification Number | 13-4922250 | |
| Plan Identification Number | 002 | 005 |
| Plan Year | January 1 – December 31 | December 1 – November 30 |
| Plan Trustee | American Express Trust Company P.O. Box 534 N11/1232 Minneapolis, MN 55440-0534 | American Express Trust Company P.O. Box 534 N11/1232 Minneapolis, MN 55440-0534 |

## Plan Committees

The ISP and the Retirement Plan are administered by Plan Committees, consisting of five members. Generally, the Plan Committees are responsible for the resolution of all questions arising under the Plans. Members of the Committees serve without compensation.

## Plan Trustee

The Company entered into a Trust agreement with the American Express Trust Company to act as Trustee for the Plans. American Express Trust Company is a wholly owned subsidiary of American Express Financial Corporation. The Trustee, with the Plan Committee, is responsible for the administration of the Trusts established in conjunction with the Plans. Under the terms of the Trust agreements, the Trustee will hold and invest all assets of the Trust. The fees of the Trustee are paid by the Company.

## Pension Benefit Guaranty Corporation (PBGC)

Benefits under the Retirement Plan are insured by the Pension Benefit Guaranty Corporation (the "PBGC") if the Retirement Plan terminates.



Generally, the PBGC guarantees most vested normal retirement age benefits, early retirement benefits and certain disability and survivors' pensions. However, the PBGC does not guarantee all types of benefits under covered plans and the amount of benefit protection is subject to certain limitations.

The PBGC guarantees vested benefits at the level in effect on the date of Plan termination. However, if a plan has been in effect less than five years before it terminates, or if benefits have been increased within the five years before plan termination, the entire amount of the plan's vested benefits or the benefit increase may not be guaranteed. In addition, there is a ceiling on the amount of monthly benefit that the PBGC guarantees, which is adjusted periodically.

For more information on PBGC insurance protection and its limitations, ask the Plan Administrator or the PBGC. Inquiries to the PBGC should be addressed to the Public Affairs Department, Pension Benefit Guaranty Corporation, 1200 K Street N.W., Washington, D.C. 20006-4026. The PBGC Office of Communication may be reached by calling (202) 326-4040.

## ISP Benefits Not Insured

Benefits provided under the ISP are not insured by the PBGC in the event the ISP terminates because PBGC guarantees do not apply to defined contribution plans.

**IRS Approval**

The Plans are subject to continued approval by the Internal Revenue Service. If changes are required, you will be notified.

## Agent for Service of Legal Process

Process can be served on American Express Company or the Plan Administrator by directing service to:

*Plan Administrator*
*c/o General Counsel — Unit 52*
*American Express Financial*
*Corporation*
*IDS Tower 10*
*Minneapolis, MN 55440-0010*

## APPLICABILITY OF ERISA

Titles I and II of the Employee Retirement Income Security Act of 1974 (ERISA) contain provisions which are applicable to the ISP and the Retirement Plan. These provisions include those dealing with declarations of policy, definitions and coverage, reporting, recordkeeping and disclosure, fiduciary responsibilities, administration and enforcement, participation, vesting, mergers and consolidations, assignment or alienation of benefits, payment of benefits, decreases in benefits, forfeitures of benefits, discrimination in favor of officers, shareholders or highly compensated employees, retroactive Plan changes, public inspection of certain Plan information, annual registration and information returns, declaratory judgments relating to Plan qualifications, prohibited transactions, and limitations on benefits and contributions.

Title III, which deals with various administrative matters, is generally applicable to both the ISP and the Retirement Plan except that the provisions of Title III regarding actuaries are relevant only to the Retirement Plan.

## STATEMENT OF ERISA RIGHTS

The ISP and Retirement Plan have been established by American Express Company for the exclusive benefit of its eligible employees and eligible employees of its participating subsidiaries.

As a participant in the Plans, you are entitled to certain rights and protections guaranteed under the Employee Retirement Income Security Act of 1974 (ERISA) as amended. ERISA provides that all participants in the Plans are entitled to:

■ Examine, without charge at the Plan Administrator's office as well as at other specified locations, all Plan documents, including contracts and copies of all documents filed by the Plans with the U.S. Department of Labor, such as detailed annual reports and Plan descriptions.

■ Obtain copies of all Plan documents and other Plan information by making a written request to the Plan Administrator. The Plan Administrator may make a reasonable charge for the copies.

■ Receive a summary of the Plans' annual financial reports from the Plan Administrator, who is required by law to provide a copy of this summary annual report to you.

■ Obtain a statement from the ISP informing you of the value of all accounts maintained under the ISP for you. In addition, as a Retirement Plan participant, you may obtain a statement telling you whether you have a right to receive a pension at normal retirement age (age 65) and if so, what your benefits under the Retirement Plan would be at normal retirement if you stopped working now. If you do not have a right to a pension, the statement will tell you how many more years you must work to have a right to a pension. These statements must be requested in writing and are not required to be given more than once a year. The ISP and Retirement Plan must provide these statements free of charge.

In addition to creating rights for plan participants, ERISA imposes duties on the people who are responsible for the operation of the employee benefit plans. The people who operate your Plans, called fiduciaries, have a duty to do so prudently and in the interest of you and other Plan participants and beneficiaries.

No one, including your employer, may fire you or otherwise discriminate against you for the purpose of preventing you from obtaining pension benefits or exercising any of your rights under ERISA.

If your claim for a pension benefit is denied in whole or in part, you must receive a written explanation of the reason for the denial. You have the right to have the Plan review and reconsider your claim (see pages 65 and 66). Under ERISA, there are steps you can take to enforce the above rights.

For instance, if you request materials from the Plans and do not receive them within 30 days, you may file suit in a federal court. In such a case, the court may require the Plan Administrator to provide the materials and pay you up to $100 a day until you receive the materials, unless the materials were not sent because of reasons beyond the control of the Administrator. If you have a claim for benefits which is denied or ignored, in whole or in part, you may file suit in a state or federal court. If it should happen that Plan fiduciaries misuse the Plans' money, or if you are discriminated against for asserting your rights, you may seek assistance from the U.S. Department of Labor, or you may file suit in a federal court. The court will decide who should pay court costs and legal fees. If you are successful the court may order the person you have sued to pay these costs and fees. If you lose, the court may order you to pay these costs and fees, for example, if it finds your claim is frivolous. If you have any questions about your Plans you should contact the Plan Administrator.

If you have any questions about this statement or about your rights under ERISA, you should contact the nearest Area Offices of the Labor-Management Service Administration, U.S. Department of Labor.

## SPONSORING EMPLOYERS

A complete list of employers sponsoring the Plans is available for examination by participants and beneficiaries and may be obtained upon written request to the Plan Administrator.

These Summary Plan Descriptions contain only certain highlights of the American Express Incentive Savings Plan and the American Express Retirement Plan. They do not supersede the actual provisions of the Plan documents, which in all cases are the final authority. The Plan Administrator has the full authority to exercise discretion in determining eligibility and in interpretation and administration of the Plans.

The Plans described here may be amended (or even terminated) by the Company, through its Board of Directors, at any time without prior notice or consent by employees. The Company's Board of Directors may delegate amendment authority to the Company's Chief Executive Officer, President or any Executive Vice President, as the Board, in its sole discretion, deems appropriate. These Summary Plan Descriptions do not create a contract of employment between the Company and its subsidiaries and any employee.



© 1996 American Express Company
Unpublished.
All rights reserved.
3/96

