## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| Paula Kritzman, Individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>AMERICAN EXPRESS RETIREMENT PLAN, AMERICAN EXPRESS COMPANY, AMERICAN EXPRESS COMPANY EMPLOYEE BENEFITS ADMINISTRATION COMMITTEE, JOHN DOES 1-100,<br><br>Defendants. | : <br> : <br> : <br> : <br> : <br> Civil Action No. 06-CV-0233 (LAK)<br> : <br> **CLASS ACTION**<br> : <br> JURY TRIAL REQUESTED<br> : <br> ***ELECTRONICALLY FILED***<br> : <br> : <br> : |

### PLAINTIFF'S NOTICE OF SUPPLEMENTAL AUTHORITY

Plaintiff Paula Kritzman, by and through her undersigned counsel, respectfully requests that the Court take notice of the attached Opinion and Order on cross-motions for summary judgment in the directly analogous case entitled *In re Citigroup Pension Plan ERISA Litigation*, No. 05 Civ. 5296 (S.D.N.Y. Dec. 11, 2006) ("*Citigroup*") annexed hereto as Exhibit A, as supplemental authority in support of Plaintiff's Memorandum of Law in Opposition to Defendants' Motion to Dismiss ("Plaintiff's Opposition"). This decision was issued after the filing of Plaintiff's Opposition and directly addresses arguments proffered by Defendants in their Memorandum of Law in Support of Defendants' Motion to Dismiss Plaintiff's Complaint ("Def. Mem.") and Reply Memorandum of Law in Support of Defendants' Motion to Dismiss Plaintiff's Complaint ("Def. Reply Mem.").

Plaintiff respectfully requests that the Court take notice of the *Citigroup* decision in its consideration of Plaintiff's Opposition to Defendants' Motion to Dismiss.

Dated: December 14, 2006                    Respectfully submitted,


                                            By: _/S/ Curtis V. Trinko_
                                            Curtis V. Trinko (CT-1838)
                                            **LAW OFFICES OF CURTIS V. TRINKO, LLP**
                                            16 West 46th Street
                                            Seventh Floor
                                            New York, NY 10036
                                            Telephone: (212) 490-9550
                                            Facsimile: (212) 986-0158

                                            **SCHIFFRIN & BARROWAY, LLP**
                                            Joseph H. Meltzer, Esq.
                                            Edward W. Ciolko, Esq.
                                            Mark K. Gyandoh, Esq.
                                            Joseph A. Weeden, Esq
                                            280 King of Prussia Road
                                            Radnor, Pennsylvania 19087
                                            Telephone: (610) 667-7706
                                            Facsimile: (610) 667-7056

                                            **Attorneys for Plaintiff**

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
--------------------------------------------------------X
                                                        :
**In re CITIGROUP PENSION PLAN**                        :
**ERISA LITIGATION**                                    :
                                                        :    **OPINION AND ORDER**
                                                        :
                                                        :    **MASTER FILE:  05 Civ. 5296**
**THIS DOCUMENT RELATES TO:**                           :    **(SAS)**
**ALL ACTIONS**                                         :
--------------------------------------------------------X

**SHIRA A. SCHEINDLIN, U.S.D.J.:**

## I.    INTRODUCTION

Michael Lonecke, Raymond Duffy, Anne Nelson, Robert S. Fash and Craig A. Harris, on behalf of themselves and a class of similarly situated individuals, filed consolidated actions alleging that the Citibuilder Cash Balance Plan ("Plan") violates the Employee Retirement Income Security Act of 1974, as amended ("ERISA"), 29 U.S.C. § 1001 *et seq.*  In summary, plaintiffs lodge three challenges against the Plan. *First*, they challenge the legality of the Plan's accrual formula. *Second*, they assert that because Plan participants never received adequate notice of Plan amendments in 2000 and 2002, those amendments never took effect as a matter of law. *Third,* plaintiffs argue that the Plan unlawfully discriminates on the basis of age.

Specifically, plaintiffs allege in Counts I and II, respectively, that the Plan is impermissibly backloaded due to insufficient interest credits and that even

if this backloading is cured, the Plan will produce an illegal accrual phenomenon known as a "whipsaw." In Count III, plaintiffs allege that the Plan's "fractional test" method of computing accrued benefits is precluded under ERISA and, in the alternative, the test is being wrongfully applied. In Counts IV and V, plaintiffs allege that the Plan discriminates based on age. Count VI has been withdrawn. In Count VII, Plaintiffs allege that Citigroup Inc., and its Plans Administration Committee ("defendants") failed to provide Plan participants proper notice that the 2000 and 2002 cash balance amendments ("CBAs") would reduce the rate of future benefit accrual.

On August 25, 2006, the parties filed cross-motions for summary judgment on all counts.[1]  For the reasons set forth below, summary judgment for plaintiffs is granted in part and denied in part. Summary judgment for defendants is denied.

## II.    BACKGROUND

### A.    Cash Balance Plans

Under a cash balance pension plan, an employer guarantees each participant a retirement benefit premised on a hypothetical account that has been established in each participant's name. These accounts grow over time according to a predetermined formula, driven by two components: (1) the employer's

---

[1]    Plaintiffs also moved for class certification, which I will address in a separate Opinion.

hypothetical "contributions," expressed either in dollars or a specified percentage of the participant's current yearly salary (making it a "career average" formula); and (2) hypothetical earnings expressed as interest credits, which can either increase at a fixed rate or be tied to an extrinsic index, such as 30-year Treasury bonds. Employer contributions and interest credits are usually allocated to the accounts annually. Each year participants receive a balance statement so they can review the value of their pension.

Since 1985, when cash balance plans were first introduced, they have become an increasingly popular way to structure retirement pensions. As of 2004, "nearly one-third of Fortune 100 companies had adopted some form of cash balance plan, and a 2002 survey of firms with pension plans containing more than 1000 participants revealed that 10 percent of plans were cash balance plans."[2] Proponents of cash balance plans maintain that from an employee's perspective, they are superior to traditional defined benefit plans because they are easier to understand and they allow benefits to accrue more evenly over the course of a career. They are also more portable than other defined benefit plans, thus allowing workers to change jobs without experiencing significant reductions in benefits.[3] It

---

[2]    John H. Langbein, et al., *Pension and Employee Benefit Law* 62 (4th ed. 2006) ("Langbein") (citation and quotation marks omitted).

[3]    *See generally* Regina T. Jefferson, *Striking a Balance in the Cash Balance Plan Debate*, 49 Buffalo L. Rev. 513 (2001).

is also commonly accepted that cash balance plans are advantageous for employers

in that: (1) they are cheaper and less administratively burdensome to maintain; (2)

employers retain funding flexibility as long as plans remain solvent; (3) their

simplicity fosters employees' appreciation for the value of their pensions; (4) they

can significantly reduce future payouts overall, thereby boosting their earnings;

and (5) employers reap the benefit of any investment experience on plan assets that

exceeds the interest rate assumption.[4]

### B.    Citigroup's Cash Balance Plan

Both parties have agreed to all material facts.[5]  The named plaintiffs

are present or former employees of either Smith Barney or Citibank, N.A., both of

which are divisions of Citigroup Inc. ("Citigroup").[6]  They all accrued benefits

under the Plan during all or part of the period since January 1, 2000.[7]  Two named

plaintiffs were vested participants at the time their employment terminated.[8]

### 1.    January 1, 2000 CBA

---

[4]    *See Esden v. Bank of Boston*, 229 F.3d 154, 158 (2d Cir. 2000); *see
generally* Dan M. McGill, et al., *Fundamentals of Private Pensions* 262-64 (8th ed.
2005) ("McGill").

[5]    *See* Joint Stipulations ("Joint Stips.").

[6]    *See id.* ¶¶ 1-6.

[7]    *See id.* ¶ 7.  The cash balance plan at issue here is one of three pension plans
that presently comprise the Citigroup Pension Plan ("Citigroup Plan").  *See id.* ¶ 8.

[8]    *See id.* ¶ 7.

In October 1998, Citicorp merged with Travelers Corporation ("Travelers"), and their respective pension plans also merged.[9]  Importantly, the provisions on plan amendments set forth in the Travelers Plan were incorporated into the Citibank Plan as of December 31, 1998.  Pursuant to these provisions, authority to amend the Citibank Plan was vested with the plan sponsor, Citigroup, "by action of its Board of Directors" ("Board").[10]

In a meeting on October 19, 1999, the Board exercised this authority by adopting a series of resolutions going to the heart of plaintiffs' case.  Pertinent excerpts of the meeting minutes state:

> an amendment to the Citigroup Inc. Pension Plan incorporating the cash balance design for certain subsidiaries of the Company, on substantially the terms as previously presented to the Board is hereby approved . . . .[11]

Although the provisions of the amendment were not set forth in an executed Citibuilder Retirement Plan document until May 2001,[12] plan participants

---

[9]    *See id.* ¶¶ 2, 14, 15.

[10]    *Id.* ¶ 14.

[11]    Minutes of the 10/19/99 Board meeting ("10/19/99 Minutes"), Ex. 4 to Joint Stips.  This resolution refers to an earlier presentation on employee benefits made to the Board on March 16, 1999, by Paul J. Collins, Vice Chairman of Citigroup.  Collins' presentation included a report on how a cash balance formula could be incorporated into the Citigroup Pension Plan.  *See* Joint Stips. ¶ 16.

[12]    *See* Joint Stips. ¶ 18; 5/27/01 Action of Senior Human Resources Officer Michael Schlein ("Schlein Action"), Ex. 7 to Joint Stips.  The 2000 CBA was also

did receive notification of the amendment in December 1999 – after the Board's

vote and prior to the CBA's effective date, January 1, 2000. Notice was mailed to

all effected employees by a letter dated December 9, 1999, from Tim Peach,

Director of Retirement Benefits.[13] Attached to the letter was a document entitled –

in large boldfaced letters – "The Citigroup Pension Plan Notice of Significant

Reduction in Benefit Accruals for Certain Employees of Citigroup Inc. and its

Subsidiaries" ("December 1999 § 204(h) notice").[14] This notice contained a

general summary of how the cash balance formula would work, as well as a table

listing the percentages of salaries that would be credited to accounts annually, such

percentages being based on an employee's age and years of service.[15] The notice

did not include specifics or mention the Plan's application of the fractional test for

compliance with statutory accrual principles. Readers with questions were directed

---

described in a summary plan description dated January 1, 2001, but this document
was not made available to employees until June 2001. *See* Joint Stips. ¶ 18. As of
January 2000, information about the 2000 CBA was also available on the
Company intranet, as part of a question and answer document ("Q & A Doc.")
offering information to Plan participants about their new benefits. *See* Q & A
Doc., Ex. 15 to Joint Stips.

[13]    *See* 12/9/99 Letter and Attachments from Tim Peach ("December 1999 §
204(h) notice"), Ex. 16 to Joint Stips.

[14]    *Id.* At least one named plaintiff, Lonecke, recalls receiving this notice at his
residence in late 1999. *See* Joint Stips. ¶ 31.

[15]    *See* December 1999 § 204(h) notice.

to "[p]lease see the brochure titled *Your New Citigroup Benefits,* which [they]

received earlier this year, for more details."[16]

As noted above, the provisions of the newly adopted cash balance

plan were not set forth in a written document until May 27, 2001.[17]  Plan Article

4.1 lays out the funding scheme giving rise to plaintiffs' claims, and states, in

pertinent part, as follows:

4.1    Accounts
    (a)    General.  The Account of a Participant shall be the sum
of the Interest Credits and Benefit Credits credited to the
Account established for such Participant following his
entry into this Plan in accordance with Article II.  The
opening balance for each Participant in his Account shall
be zero.  Notwithstanding any provision to the contrary,
in no event shall an Account be credited with any
amount prior to January 1, 2000.

    (b)    Benefit Credits.  The Account of a Participant shall be
credited with a Benefit Credit as of the last day of each
of the Plan Years in the period beginning with the Plan
and ending with the Plan Year in which a Participant's
employment with an Employer is terminated.  The
Benefit Credit shall be equal to the applicable percentage
of the Participant's Compensation paid by an Employer
during the Plan Year, as determined by the Participant's
age and Years of Credited Service as of the end of such
Plan Year in accordance with Table 4.1(b) below;
provided,

        (1)    [omitted]

---

[16]    *Id.*

[17]    *See* Schlein Action.

(2) with regard to the Plan Year in which the Participant's employment with an Employer is terminated, (A) the Benefit Credit shall be determined by the Participant's age and Years of Credited Service as of the date of termination, (B) Compensation shall be recognized for this purpose only through such date of termination, and (C) such Benefit Credit shall be made as of the date of termination instead of the last day of such Plan Year.

| TABLE 4.1(b) | | | | |
|---|---|---|---|---|
| **Benefit Credits Based on Participant's Age and Years of Credited Service** | | | | |
| | **Percentage of Plan Year Compensation Credited to Participant's Account** | | | |
| **Participant's Age** | Less Than 6 Years of Credited Service | At Least 6 But Less Than 11 Years of Credited Service | At Least 11 But Less Than 15 Years of Credited service | 15 Years of Credited Service or More |
| Up to Age 24 | 2.0% | 2.0% | n/a | n/a |
| Age 25 to 29 | 2.5% | 2.5% | 2.5% | n/a |
| Age 30 to 34 | 3.0% | 3.0% | 3.0% | 3.0% |
| Age 35 to 39 | 4.0% | 4.0% | 4.0% | 4.0% |
| Age 40 to 44 | 4.0% | 4.0% | 4.0% | 4.0% |
| Age 45 to 49 | 4.0% | 5.0% | 6.0% | 6.0% |
| Age 50 and Over | 4.0% | 5.0% | 6.0% | 7.0% |

(c) Minimum Benefit Credit. [T]he minimum Benefit Credit each Plan Year . . . for any Participant who is a Full-Time Employee shall be $500 . . . .

(d) Interest Credits. The Account of a Participant shall be credited with an Interest Credit as of the last day of each of the Plan Years in the period beginning with the Plan Year next following the date on which a Benefit Credit is first made to a Participant's Account and ending with the

Plan Year in which the Participant's Benefit Commencement Date occurs . . . .[18]

Article 4.1(e) establishes the fractional rule as the Plan's mechanism

for complying with ERISA's minimum accrual standards:

(e)    Minimum Account. Notwithstanding the benefit described in § 4.1(a) above, if the Account at the date a Participant ceases to be eligible to earn Benefit Credits ("Determination Date") has accrued so that the accrual does not meet the requirements of § 411(b)(1) of the Code and the Treasury regulations issued thereunder, there shall be added to the Account the amount described in paragraph (4) below calculated as follows:

(1)    The projected value ("Projected Value") of a Participant's Account is calculated by projecting the Account at the Determination Date to the Participant's Normal Retirement date (using the *average* Compensation for the Participant, as determined in accordance with § 411(b)(1)(A) of the Code and the Treasury regulations issued thereunder, and the same rate used to calculate Interest Credit ("Interest Rate") as in the year of the Determination Date) assuming for these purposes that the Participant continued to earn Benefits Credits through the Normal Retirement Date.

(2)    Determine the minimum account ("Minimum Account") by multiplying the Projected value by a fraction, the numerator of which is the Participant's Years of Vesting Service and the denominator of which is the Years of Vesting Service plus the number of years and months from the Participant's Determination Date to the Participant's Normal Retirement Date.

(3)    Calculate the excess, if any, of the Minimum Account, over the Account at Determination Date future valued to the

---

[18]    Plan Article 4.1(a)-(d), Ex. 1 to Joint Stips. ("Plan Article 4.1").

Normal Retirement Age of the Participant using the Interest Rate.

(4) Calculate the quotient of the amount determined in paragraph (3) above divided by a present value factor (equal to 1 plus the Interest Rate, the sum of which is raised to a power equal to the number of months divided by 12 from Determination Date to Normal Retirement Date).[19]

## 2.    January 1, 2002 CBA

The 2002 CBA incorporated the same cash balance regime adopted in 2000, but recalibrated the range of benefit credits that would be allotted annually to employees' hypothetical accounts.  It lowered the floor from 2% to 1.5% of compensation for participants under age twenty-nine in their first five years of credited service.  It also lowered the ceiling from 7% to 6% of compensation for participants fifty-five years or older with fifteen or more years of credited service ("2002-Present Benefit Credits").[20]  The application of the fractional rule under Article 4.1(e) remained unchanged.

The first and only communication to Plan participants in 2001 of an amendment pursuant to ERISA § 204(h) was an information package dated December 2001.[21]  Although different versions of the packages were prepared,

---

[19]    *Id.* (emphasis added).

[20]    *See* Joint Stips. ¶¶ 24-25.

[21]    *See id.* ¶¶ 35-36.

they all contained: (i) a cover letter dated December 5, 2001, from Tyrrell Erbes,

Citigroup's Director of Retirement Benefits; (ii) a document entitled "Notices to

Interested Parties;" and (iii) a document entitled "Citigroup Pension Plan 204(h)

Notice."[22] As with the December 1999 § 204(h) notice, there is no mention of the

Plan's application of the fractional rule.[23] The named plaintiffs do not recall

receiving these packages, nor do they recall being aware in December 2001 that the

2002 CBA "might substantially reduce benefit accruals for themselves or others."[24]

## III.  APPLICABLE LAW

### A.  Standard of Review

Summary judgment is appropriate if the record "show[s] that there is

no genuine issue as to any material fact and that the moving party is entitled to

judgment as a matter of law."[25]  An issue of fact is genuine if "the evidence is such

---

[22]    December 2001 § 204(h) Packages (collectively, "December 2001 § 204(h) notices"), Exs. 19-21 to Joint Stips.  Exhibits 19, 20, and 21 are different versions of the package that were specifically tailored for, respectively, legacy Citibank employees, legacy Travelers employees and legacy employees of Associates First Capital ("Associates"), a company acquired by Citigroup in 2000.

[23]    *See id.*

[24]    Joint Stips. ¶ 37.  Defendants stipulate that had plaintiffs been aware of the implications of the 2002 CBA, they would have initiated legal action earlier than they did.  *See id.*

[25]    Fed. R. Civ. P. 56(c).

that a jury could return a verdict for the nonmoving party."[26]  A fact is material

when it "'might affect the outcome of the suit under the governing law.'"[27]  The

movant has the burden of demonstrating that no genuine issue of material fact

exists.[28]

In turn, to defeat a motion for summary judgment, the non-moving

party must raise a genuine issue of material fact that does "'not rely on conclusory

allegations or unsubstantiated speculation.'"[29]  To do so, it must do more than

show that there is "'metaphysical doubt as to the material facts.'"[30]  In determining

whether a genuine issue of material fact exists, the court must construe the

evidence in the light most favorable to the non-moving party and draw all

justifiable inferences in that party's favor.[31]

---

[26]  *Anderson v. Liberty Lobby*, 477 U.S. 242, 248 (1986).  *Accord Sista v. CDC Ixis N. Am., Inc.*, 445 F.3d 161, 169 (2d Cir. 2006).

[27]  *Jeffreys v. City of New York*, 426 F.3d 549, 553 (2d Cir. 2005) (quoting *Anderson*, 477 U.S. at 248).

[28]  *See Vermont Teddy Bear Co. v. 1-800 Beargram Co.*, 373 F.3d 241, 244 (2d Cir. 2004) (citing *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970)).

[29]  *Jeffreys*, 426 F.3d at 554 (quoting *Fujitsu Ltd. v. Federal Express Corp.*, 247 F.3d 423, 428 (2d Cir. 2002)).

[30]  *Woodman v. WWOR-TV, Inc.*, 411 F.3d 69, 75 (2d Cir. 2005) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)).

[31]  *See Golden Pac. Bancorp v. FDIC*, 375 F.3d 196, 201 (2d Cir. 2004).

## B.    Statute of Limitations

Although ERISA does not prescribe a statute of limitations for civil actions, where parties seek to recover higher benefits from a pension plan, the appropriate statute of limitations is six years – the limitations period specified in the most analogous state statute.[32]  The Second Circuit has held that the six-year statute of limitations does not begin to run until "there has been a repudiation by the fiduciary which is *clear* and made known to the beneficiaries."[33]  Typically, the statute of limitations period begins when a participant's formal application for benefits is denied.[34]  In some circumstances, however, the time period may begin earlier.[35]

## C.    ERISA's Minimum Accrual Rules

Although cash balance plans mimic some of the same features of defined contribution plans, in this Circuit they are treated as defined benefit

---

[32]    *See Miles v. New York State Teamsters Conference Pension and Ret. Fund,* 698 F.2d 593, 598 (2d Cir. 1983) (holding that because employee benefit plans are contracts, under New York law the applicable statute of limitations is six years) (citing N.Y. C.P.L.R. § 213).

[33]    *Davenport v. Harry N. Abrams, Inc.,* 249 F.3d 130, 134 (2d Cir. 2001).

[34]    *See Lewis v. John Hancock Mut. Life Ins. Co.,* 6 F. Supp. 2d 244, 247 (S.D.N.Y. 1998).

[35]    *See Carey v. International Bhd. of Elec. Workers Local 363 Pension Plan,* 201 F.3d 44, 49 (2d Cir. 1999) (holding that the statute of limitations may be triggered upon a participant's receipt of a plan amendment or letter).

plans.[36] "The regulatory consequences of this [defined benefit plan] classification

are wide-reaching."[37] One critical consequence is that the term "accrued benefit"

under a cash balance plan means "a participant's accrued benefit determined under

the plan . . . *expressed in the form of an annual benefit commencing at normal*

*retirement age*."[38]

Although ERISA does not require pension plans to pay out a specific

dollar amount, it does regulate the rate at which benefits accrue.[39] A paramount

reason for this is to prevent "backloading," a term of art describing a plan's use of

a benefit accrual formula that postpones the bulk of an employee's accrual to her

---

[36]    *See Esden*, 229 F.3d at 158.

[37]    *Id.*

[38]    *Id.* at 163 (citation and quotation marks omitted). By contrast, for defined
contribution plans, the term "accrued benefit" is "simply 'the balance of an
individual's [hypothetical] account.'" *Id.* at 162 (citation omitted).

[39]    *See* ERISA § 204(b)(1), 29 U.S.C. § 1054(b)(1). There is significant
statutory overlap between ERISA and the Internal Revenue Code ("I.R.C.") on
matters such as funding, vesting and benefit accrual. This is because much of Title
I of ERISA, codified at Title 29 of the United States Code, was duplicated in Title
II, which was codified as amendments to the I.R.C. While the Internal Revenue
Service ("IRS") has primary jurisdiction and rule-making authority over these
ERISA provisions, "[r]egulations prescribed by the Secretary of the Treasury
[under I.R.C. §§ 440 and 441] shall also be used to implement the related
provisions contained in [ERISA]," and ERISA § 3002(c) specifically adopts the
regulations promulgated under I.R.C. §§ 410(a), 411, and 412. *Esden*, 229 F.3d at
158.

later years of service.  Given the time value of money, it is not surprising that plan

sponsors are often tempted to backload pension benefits.

      To combat backloading, ERISA requires plans to accrue benefits

relatively evenly over the course of an employee's career.[40]  ERISA sets forth three

alternative tests for monitoring accrual rates; in order to be lawful a plan must

satisfy at least one of these formulas.[41]  These formulas are construed as "minimum

accrual standards" to the extent that they tether plans to a controlled, steady

baseline of benefit accrual.[42]  The first alternative is the "3 percent rule."[43]  The

---

[40]    It is well-established that the purpose of section 204(b)(1) is to limit the extent of backloading in benefit plans. *See, e.g., Langman v. Laub*, 328 F.3d 68, 71 (2d Cir. 2003); McGill at 262; Langbein at 157.

[41]    ERISA § 204(b)(1); 29 U.S.C. § 1054(b)(1). *Accord Esden*, 229 F.3d at 158-59.  ERISA's vesting rules by themselves offer insufficient protection against backloading.  Langbein explains this with a simple hypothetical:  "Consider what might happen if the statute prescribed vesting but did not regulate accrual rates.  A plan could be designed that would vest employees in 100 percent of accrued benefits after five years, thereby complying fully with ERISA's five-year cliff vesting schedule; yet the formula for accruing benefits under the plan could provide that employees accrue no benefits (or very skimpy benefits) over, say, the first twenty years of employment.  Thereafter benefits would accrue very rapidly.  Under such a plan, an employee would be 100 percent vested after the fifth year in a pension plan with a benefit of nothing . . . [as] 100 percent of nothing is [still] nothing."  Langbein at 157.

[42]    *See* Plaintiffs' Memorandum in Support of Summary Judgment ("Pl. SJ Mem.") at 3.

[43]    *See* ERISA § 204(b)(1)(A); 29 U.S.C. § 1054(b)(1)(A).  Neither party advocates utilizing this test.

second alternative, set forth in ERISA section 204(b)(1)(B), is known as the "133

⅓ percent rule" and provides that:

> A defined benefit plan satisfies the requirements of this paragraph of a particular plan year if under the plan the accrued benefit payable at the normal retirement age is equal to the normal retirement benefit and the annual rate at which any individual who is or could be a participant can accrue retirement benefits payable at normal retirement age under the plan for any later plan year is not more than 133 1/3 percent of the annual rate at which he can accrue benefits for any plan year beginning on or after such particular plan year and before such later plan year. For purposes of this subparagraph--
>
> (i) any amendment to the plan which is in effect for the current year shall be treated as in effect for all other plan years;
> (ii) any change in an accrual rate which does not apply to any individual who is or could be a participant in the current year shall be disregarded [;]
> (iii) the fact that benefits under the plan may be payable to certain employees before normal retirement age shall be disregarded; and
> (iv) social security benefits and all other relevant factors used to compute benefits shall be treated as remaining constant as of the current year for all years after the current year.[44]

Thus the 133 ⅓ percent rule prevents backloading by constricting the fluctuation of

accrual rates from year to year.

The third alternative, set forth in ERISA section 204(b)(1)(C), is

called the "fractional rule" because it prorates the projected normal retirement

benefit over the years of plan participation.[45]  A plan satisfies the fractional rule

---

[44]    ERISA § 204(b)(1)(B); 29 U.S.C. § 1054(b)(1)(B).

> if the accrued benefit to which any participant is entitled upon
> his separation from the service is not less than a fraction of the
> annual benefit commencing at normal retirement age to which
> he would be entitled under the plan as in effect on the date of
> his separation if he continued to earn annually until normal
> retirement age the same rate of compensation upon which his
> normal retirement benefit would be computed under the plan,
> determined as if he had attained normal retirement age on the
> date on which any such determination is made (but taking into
> account no more than the 10 years of service immediately
> preceding his separation from service).  Such fraction shall be
> a fraction, not exceeding 1, the numerator of which is the total
> number of his years of participation in the plan (as of the date
> of his separation from the service) and the denominator of
> which is the total number of years he would have participated
> in the plan if he separated from the service at the normal
> retirement age.[46]

In simpler terms, under the fractional rule, in any given year, benefit accrual is

"based upon the assumption that the participant will continue, until normal

retirement age, to earn the same rate of compensation that would have been taken

into account under the plan had the employee retired in that year."[47]

### D.    Unlawful Whipsaws

The "whipsaw" phenomenon is "widely recognized in the practice

literature."[48]  Whipsaws occur because in order for cash balance plans to satisfy the

---

[45]    *See* ERISA § 204(b)(1)(C); 29 U.S.C. § 1054(b)(1)(C).

[46]    *Id.*

[47]    McGill at 263.

[48]    *Esden*, 229 F.3d at 159.

interest rate requirements of ERISA and the I.R.C., participants' accrued benefits must not fall below the actuarial equivalents of such benefits.

> [T]his means that: (1) the accrued benefit under a defined benefit plan must be valued in terms of the annuity that it will yield at normal retirement age; and (2) if the benefit is paid at any other time (*e.g.*, on termination rather than retirement) or in any other form (*e.g.*, a lump sum distribution, instead of annuity) it must be worth at least as much as that annuity.[49]

The actuarial equivalent is determined by projecting the account balance forward to normal retirement age using a plan's prescribed "projection interest rate"[50] and then discounting it back to present value using the applicable statutory interest rate ("discount rate").[51] "If the plan's projection rate exceeds the [] discount rate, then the present value of the accrued benefit will exceed the participant's account balance."[52] A "whipsaw" has occurred. If the larger amount is not paid out, an "impermissible forfeiture has occurred in violation of ERISA § 203(a) and I.R.C. § 411(a)(2)."[53]

### E.    Adequate § 204(h) Notice

---

[49]    *Id.* at 163-64.

[50]    This rate is different from the variable interest rate used by a plan to determine the interest credit allocated to account balances each year.

[51]    *See Esden*, 229 F.3d at 159.

[52]    *Id.*

[53]    *Id.*

18

In order "to safeguard benefits that have been promised to employees," Congress enacted notice requirements that forbid plan sponsors to amend "a plan in a way that reduces future benefit accrual without notice to plan participants."[54] Congress predicated the legitimacy of plan amendments on two critically important ERISA provisions.[55] "First, ERISA's anti-cutback rule protects employees' expectations in their accrued benefits" by prohibiting amendments that would decrease "'the accrued benefit of a participant under a plan.'"[56] Second, ERISA § 204(h) forbids plan sponsors to amend "a plan in a way that reduces future benefit accrual without notice to plan participants."[57] Providing adequate notice is a precondition to the effectiveness of plan amendments.[58] As the Second Circuit recently held, an ERISA amendment "tak[es] place at the

---

[54]    *Frommert v. Conkright*, 433 F.3d 254, 263 (2d Cir. 2006).

[55]    *See id.*

[56]    *Id.* (quoting ERISA § 204(g)(1); 29 U.S.C. § 1054(g)(1)).

[57]    *Id.*

[58]    *See, e.g., Hirt v. Equitable Ret. Plan for Employees, Managers and Agents*, 441 F. Supp. 2d 516, 531 (S.D.N.Y. 2006) (citation omitted).

moment when employees are properly *informed* of a change . . . in the text of the

plan."[59]   At all times relevant to the 2000 and 2002 CBAs, § 204(h) stated:

> (h)   Notice of significant reduction in benefit accruals
> > (1) A [pension] plan . . . may not be amended so as to
> > provide for a significant reduction in the rate of
> > future benefit accrual, unless, after adoption of the
> > plan amendment and not less than fifteen days before
> > the effective date of the plan amendment, the plan
> > administrator provides a written notice, setting forth
> > the plan amendment and its effective date, to –
> > (A) each participant in the plan . . . .[60]

Guidelines promulgated by the IRS[61] clarify that § 204(h) notice is required where

an amendment is "reasonably expected to change the amount of the future annual

benefit commencing at normal retirement age." [62]   Specifically, whether an

---

[59]    *Frommert*, 433 F.3d at 262-63 (looking to the "plain meaning" of the term and rejecting defendants' argument that an amendment occurs upon administrators' modification of a plan).

[60]    ERISA § 204(h); 29 U.S.C. 1054 § 204(h).  Section 204(h) was amended in 2001.  *See* Pub. L. 107-16 § 659(b), 115 Stat. 38 (2001).

[61]    Temporary regulations were issued in 1995, and final regulations were issued in 1998.  *See* Temp. Treas. Reg. § 1.411(d)-6T, 60 Fed. Reg. 64,320 (1995); Prop. Treas. Reg. § 54.4980F-1, 60 Fed. Reg. 64,401 (Dec. 15, 1995).  The temporary regulations were applicable for plan amendments adopted on or after December 15, 1995, and effective on or after January 2, 1996, in order to "assure that the rights of participants in plans subject to § 204(h) of ERISA are protected." 60 Fed. Reg. at 64,402.  After notice and comments, final regulations were issued December 14, 1998, and applied to plan amendments adopted on or after December 12, 1998.  *See* Treas. Reg. § 1.411(d)-6, 63 Fed. Reg. 68,678 (1998).

[62]    63 Fed Reg. 68,681 (1998).

amendment provides for a "significant reduction" in accrual rates under § 204(h) is determined "based on reasonable expectations taking account the relevant facts and circumstances at the time the amendment is adopted."[63]  In order to comply, notices may contain "a summary of the amendment, rather than the text of the amendment, if the summary is written in a manner calculated to be understood by the average plan participant."[64]

###    F.    ERISA's Age-Based Accrual Rules

ERISA's anti-age discrimination provision for defined benefit plans states that "[a] defined-benefit plan shall be treated as not satisfying the requirements of this paragraph if, under the plan, an employee's benefit accrual is ceased, or the *rate of an employee's benefit accrual* is reduced, because of the attainment of any age."[65]  Presently, there is a split within this Circuit as to whether cash balance plans violate this provision. Two district courts have held that cash

---

[63]    *Id.*

[64]    *Id.* at 68,682.

[65]    ERISA § 204(b)(1)(H)(i); 29 U.S.C. § 1054(b)(1)(H)(i) (emphasis added). The age discrimination test for defined-contribution plans differs significantly:  "A defined-contribution plan satisfies the requirements of this paragraph if, under the plan, allocations to the employee's account are not ceased, and the rate at which amounts are allocated to the employee's account is not reduced, because of the attainment of any age."  ERISA § 204(b)(2)(A); 29 U.S.C. § 1054(b)(2)(A).

balance plans are age discriminatory, [66] and two have held they are not. [67]  For

reasons set forth in Part IV.D below, I join in finding that cash balance plans

unlawfully discriminate on the basis of age.

### G.    Remedial Measures

ERISA provides for the civil enforcement of its provisions.  Under

section 502(a)(1)(B), a participant or beneficiary may bring an action "to recover

benefits due to him under the terms of his plan, to enforce his rights under the

terms of the plan, or to clarify his rights to future benefits under the terms of the

plan."[68]  The statute further provides that plaintiffs may seek "to enjoin any act or

practice which violates any provision of this subchapter or the terms of the plan, or

(B) to obtain other appropriate equitable relief (i) to redress such violations or (ii)

to enforce any provisions of this subchapter or the terms of the plan."[69]

## IV.    DISCUSSION

### A.    Statute of Limitations

---

[66]    *See Hirt*, 441 F. Supp. 2d 516; *Laurent v. PriceWaterhouseCoopers, LLP*, 448 F. Supp. 2d 537 (S.D.N.Y. 2006).  *Hirt* is now pending before the Second Circuit Court of Appeals (notice of appeal filed Oct. 13, 2006).

[67]    *See In re J.P. Morgan Chase Cash Balance Litig.*, No. 06 Civ. 732, 2006 WL 3063424 (S.D.N.Y. Oct. 30, 2006) ("*J.P. Morgan*"); *Richards v. Fleet Boston*, 427 F. Supp. 2d 150 (D. Conn. 2006).

[68]    ERISA § 502(a)(1)(B); 29 U.S.C. § 1132(a)(1)(B).

[69]    ERISA § 502(a)(3); 29 U.S.C. § 1132(a)(3).

As a preliminary matter, I find that plaintiffs' claims are timely.[70]   For even assuming, arguendo, that the clock began at the earliest plausible moment – upon plaintiffs' receipt of the December 1999 § 204(h) notice[71] – this action would still be timely because it was commenced on February 3, 2005, less than six years from that date.

## B.    The Plan's Accrual Formula (Counts I, II, III)

### 1.    Application of the Fractional Rule and Impermissible Backloading

The Plan's cash balance formula misapplies the fractional rule in a way that not only fails to guard against backloading – it *enables* backloading.  The Plan's use of the fractional rule violates section 204(b)(1) because as a career average plan, the only applicable accrual test is the 133 ⅓ rule.[72]  By its very terms,

---

[70]    Defendants argue that the Court should apply a three-year statute of limitations.  *See* Defendants' Memorandum of Law in Support of Summary Judgment ("Def. SJ Mem.") at 17-18.  In arguing for a three-year time limit, defendants ignore – without attempting to distinguish – many Second Circuit decisions.

[71]    *See Carey*, 201 F.3d at 47-48 (the limitations period begins upon a clear and known repudiation of the benefits to which participants were previously entitled); *see also Miles*, 698 F.2d at 598.

[72]    *See Eaton v. Onan Corp.,* 117 F. Supp. 2d 812, 843 (S.D. Ind. 2000) (observing that the three percent rule and the fractional rule "pertain only to plans that take into account no more than ten years of service in calculating benefits"); *Register v. PNC Fin. Servs. Group, Inc.,* No. 04 Civ. 6097, 2005 WL 3120268, at *3 (E.D. Pa. Nov. 21, 2005) ("Since a cash balance plan is calculated using a career pay history, only [the 133 ⅓ percent test] is applicable"); *see also* McGill at

23

the fractional rule may only be applied to participants with ten or fewer years of service.[73]  Defendants argue that the Citigroup cash balance formula does not violate this limitation because "for purpose of applying the fractional test, average compensation is calculated based only on the last ten" years of an employee's service.[74]  Under Plan Article 4.1(e), if this calculation reveals that an individual's hypothetical account balance is less than the minimum amount required by section 204(b)(1)(C) of ERISA, Citigroup credits the participant the difference.[75] Defendants assert that this supplementary contribution brings accrued pensions into compliance with the minimum benefit required by the fractional rule.[76] However, this lump-sum contribution, made on the eve of the benefit payout, is

---

263 (noting that the "133 ⅓ percent rule governs all plans using a career average formula").

[73]    *See* ERISA § 204(b)(1)(C); 29 U.S.C. § 1054(b)(1)(C); *see also* Treas. Reg. § 1.411(b)-1(b) (observing that consistent with the ten year limitation, the fractional rule could be applied "to a benefit based on average compensation").

[74]    Defendants' Memorandum of Law in Opposition to Plaintiffs' Motion for Summary Judgment ("Def. Opp. Mem.") at 2-4.

[75]    *See* Plan Article 4.1(e).

[76]    *See* Def. Opp. Mem. at 3.

inadequate precisely because it permits the backloading that the fractional rule was designed to prevent.[77]

The Plan's unorthodox application of the fractional test only upon a participant's separation from service, rather than on a year-by-year basis, ignores the statutory scheme requiring pension plans to *be able* to test compliance with accrual rules "in any given year," or even any given moment.[78] The Citigroup formula also contravenes the well-acknowledged purpose of the mandatory accrual tests, which is to prevent the backloading of benefits.[79] In applying the fractional

---

[77]    Defendants' contention that the Secretary of the Treasury has "unequivocally" offered his "express endorsement of the fractional test for career average plans" misinterprets the Treasury Regulations.  Def. Opp. Mem. at 2-3. *See* 26 C.F.R. § 1.411(b)-1(b)(3)(iii) Ex. (2).  Not a single authority cited by defendants in support of the Plan's legality approved of an accrual schedule similar to that prescribed by Plan Article 4.1(e).

[78]    *Alessi v. Raybestos-Manhattan*, 451 U.S. 504, 514 (1981) (describing the fractional rule as "essentially a pro rata rule under which *in any given year*, the employee's accrued benefit is proportionate to the number of years of service as compared with the number of total years of service appropriate to the normal retirement age") (emphasis added); *see also* Treas. Reg. § 1.411(b)-1(b) ("The fractional rule operates to prevent back-loading and ensures a *proportional rate of benefit accrual.*  It compares the part of the final benefit payable to a participant *at any time* (for example, accrued benefit) to the normal retirement benefit . . . .").

[79]    *See Langman*, 328 F.3d at 71 (quoting the House Report on ERISA:  "The primary purpose of [minimum accrual rates] is to prevent attempts to defeat the objectives of the minimum vesting provisions by providing undue 'backloading,' i.e., by providing inordinately low rates of accrual in the employee's early years of service when he is most likely to leave the firm and by concentrating the accrual of benefits in the employee's later years of service when he is most likely to remain

rule only once, at the end of an employee's Plan participation, Article 4.1(e) strips

the rule of its functionality because it can no longer "regulate the rate at which

benefits may accrue."[80]  Without its consistent application, the fractional test is

powerless to "prevent [the Plan] from designing accrual schedules that circumvent

the vesting rules by providing that the great preponderance of benefits accrues only

in the last years of employment."[81]  If such applications of the fractional rule were

permissible, plans would be free to adopt formulas providing a mere pittance of

benefit accrual over, say, the first twenty years of employment, and thereafter have

benefits accrue rapidly by tacking on an additional amount, much like the

Citigroup Plan does.

     To the Court's dismay, plaintiffs' characterization of Article 4.1(e) as

a novel end-run around ERISA's minimum accrual standards is accurate.[82]

Defendants downplay their gutting of the fractional rule as a harmless modification

that is permissible because it is not expressly prohibited by statutory text.[83]  More

---

with the firm until retirement."  H.R. Rep. No. 93-807 (1974), *reprinted in* 1974
U.S.C.C.A.N. 4639, 4688).

[80]    *Esden*, 229 F.3d at 154.

[81]    *Id.*

[82]    *See* Pl. SJ Mem. at 8.

[83]    *See* Def. SJ Mem. at 7.

accurately, it is a bold and exploitative contortion of the rule. While defendants

"do[] not (and cannot) dispute" that they are bound to comply with ERISA's

accrual rules, they have nonetheless "resist[ed] – and ha[ve] tried to draft around –

[their] consequences."[84] The Court takes Congress' efforts to prevent the

backloading of pension benefits quite seriously. The Plan's accrual formula is

unlawfully structured to allow for impermissible backloading. Accordingly,

summary judgment is granted in plaintiffs' favor on Counts I and III.[85]

### 2. Reformation of the Plan to Comply with the 133 ⅓ Percent Rule and Avert Whipsaw

Having found Article 4.1(e)'s use of the fractional rule impermissible,

I turn to the Plan's mandatory compliance with the 133 ⅓ percent rule. Defendants

have stipulated that since January 1, 2002, the accrual formula has not satisfied the

133 ⅓ percent rule.[86] In arguing for a reformation of the Plan, plaintiffs request the

---

[84]    *Esden*, 229 F.3d at 159.

[85]    Having granted summary judgment for plaintiffs on Counts I and III, I need
not engage in a theoretical and mathematically complicated discussion of whether
the Plan – once cured of its unlawful backloading – produces an impermissible
whipsaw. Accordingly, plaintiffs' motion for summary judgment on this issue is
denied without prejudice and with leave to renew should it become necessary to do
so.

[86]    By virtue of the 30-Year Treasury Bill rates in effect from January 1, 2000
through December 31, 2001, which ranged from 5.12% to 6.63%, the Plan's
overall rate of accrual during these years satisfied the 133 ⅓ percent rule. *See*
Joint Stips. ¶ 49.

imposition of an interest credit floor that will compensate for the backloaded pay credits while averting whipsaw.[87]    The Court declines to direct defendants to adopt plaintiffs' reformation proposals, but hereby orders defendants to reform the Plan consistent with the requirements of ERISA, retroactive to January 1, 2000.

## C.    Adequate § 204(h) Notice (Count VII)

Both the December 1999 § 204(h) and December 2000 § 204(h) notices omitted any mention of the benefit formula's unorthodox approach to calculating benefits and monitoring accrual rates.  Because it was ultimately revealed that the formula included an unlawful application of the fractional rule, which had the effect of keeping accrual rates below the minimum rate prescribed by statute, defendants' failure to either include or summarize Article 4.1(e) in the notices violated § 204(h).[88]

Adequate notice is critical to ensure the "meeting of expectations in the context of ERISA."[89]  Plaintiffs had every reason to expect that under the new

---

[87]    *See* Pl. SJ Mem. at 11.  Plaintiffs would fix this minimum interest rate at twenty-five percent.  *See id.*  However, defendants' actuary maintains that this percentage would result in enormous windfalls for participants. *See* 9/28/06 Affidavit of Lawrence Sher ("Sher Aff.") ¶¶ 4-5.

[88]    Because I find the December 1999 and the December 2000 § 204(h) notices substantively inadequate, I need not, and do not, reach the issue of whether distribution of the December 2000 § 204(h) notice was procedurally adequate.

[89]    *Hirt*, 441 F. Supp. 2d at 538.  *Accord Amato v. Western Union International, Inc.*, 773 F.2d 1402, 1409 (2d Cir. 1985) ("[T]here can be no doubt that ERISA

cash balance plan, their pensions would continue to accrue at a rate approved by Congress. It therefore is immaterial that the December 1999 § 204(h) notice stated in bolded font that the 2000 CBA could result in a reduction of their benefits. Given the material omissions, it remained "insufficiently 'accurate and comprehensive to reasonably apprise [Plan] participants and beneficiaries of their rights.'"[90] Nor can it be said that the notices "allow[ed] applicable individuals to understand the effect of the plan amendment" because plaintiffs were without fair warning that the formula endangered their right to a minimum rate of benefit accrual.[91]

Defendants submit that the notice claims should be dismissed for plaintiffs' failure to show that they suffered any prejudice as a result of the allegedly deficient § 204(h) notices, as required by *Frommert*.[92] Defendants argue that the "only consequence" here was plaintiffs' failure to commence this litigation

---

was enacted for the purpose of assuring employees that they would not be deprived of their reasonably-anticipated pension benefits . . . .").

[90]    *Frommert*, 433 F.3d at 267 (quoting 29 U.S.C. § 1022(a)).

[91]    68 Fed. Reg. at 17,283 (1998). It is also difficult to imagine that the authors of Plan Article 4.1(e) were unaware that it pushed the boundaries of section 204(b)(1) compliance. Given the sub-standard accrual rates that resulted and the long delay in publishing the provision in a written Plan document, it is not difficult to infer a nefarious intent behind this particular cash balance plan's design and execution.

[92]    *See Frommert*, 433 F.3d at 267 (citations omitted).

sooner, which "hardly constitutes prejudice."[93]  This argument is unavailing for

two reasons.  *First*, in *Frommert*, the prejudice issue arose in the context of tardy

notice, not substantively inadequate notice.[94]  Here, because both the December

1999 and December 2000 § 204(h) notices failed to mention the formula's

fractional rule application, which kept accrual rates below the statutory minimum,

the amendments never took legal effect.  *Second,* in *Frommert,* the Second Circuit

explicitly *rejected* the notion that beneficiaries must demonstrate the type of

prejudice urged by defendants:

> Contrary to defendants' arguments and the district court's
> conclusion, the fact that the plaintiffs remained at Xerox's
> employ does not demonstrate that they suffered no prejudice
> through the purported adoption [of the challenged amendment] .
> . . . Imposing such a requirement that plan participants must
> show actual prejudice . . . by terminating their employment
> imposes an unduly harsh burden on dissatisfied plan
> participants.[95]

---

[93]    Def. SJ Mem. at 24-25.  Defendants further assert that there was no
prejudice because "[n]one of the Plaintiffs are claiming that they would have left
their jobs, and none did, upon learning of either of the amendments."  *Id.*

[94]    *See Frommert*, 433 F.3d at 267 ("Allowing 'tardy notice' several years after
the effective date of an amendment to stand in for the advance notice that is
actually required under § 204(h) upends the purpose of the provision by turning
'future benefit accrual' into past accrual.").

[95]    *Id.*

Like the plaintiffs in *Frommert*, the plaintiffs here "were deprived of the opportunity to take timely action in response to the purported 'amendment.'"[96] "Such action might have included seeking injunctive relief, altering their retirement investment strategies, or perhaps considering other employment."[97] Accordingly, summary judgment for plaintiffs is granted with respect to Count VII.

### D.    Age Discrimination (Count IV and V)[98]

Plaintiffs allege that even after the Plan is reformed to cure the ERISA violations alleged in Counts I through III, the overall accrual formula violates ERISA's prohibition on age discrimination because rates of benefit accrual diminish each year based on increasing age.[99] I agree, for very much the same reasons explained by this Court in *J.P. Morgan*.[100]

---

[96]    *Id.* at 266.

[97]    *Id.*

[98]    In addition to finding the Plan to be age discriminatory under ERISA, the Citigroup formula is invalid on the alternative grounds set forth in Parts IV.B and C, supra.

[99]    I make no determination here as to whether the Plan's misapplication of the fractional rule, by itself, resulted in age discriminatory accrual rates (Count IV).

[100]    *See J.P. Morgan*, 2006 WL 3063424, at *4 (concluding that the J.P. Morgan Plan was age discriminatory because "the unambiguous statutory language, as well as ERISA's different regulatory requirements for defined-contribution and defined-benefit plans, compels this result").

## 1.    ERISA Age-Based Accrual Provisions Are Applicable Before Normal Retirement Age

Although neither party raised it here, courts are divided on the threshold issue of whether ERISA's age-based accrual provisions apply to all workers, including those younger than sixty-five.[101]  ERISA section 204(b)(1)(H)(i) prohibits the reduction of an employee's benefit accrual "because of the attainment of *any age.*"[102]  Despite this broad terminology, some courts have held that the provision does not apply to individuals before they reach normal retirement age.[103]  However, because the statutory language "any age" is unambiguous, I respectfully disagree with those courts.[104]  As the Supreme Court

---

[101]    *Compare Eaton,* 117 F. Supp. 2d at 826 (finding that despite the wording of the statute, "[t]here are strong indications in the statutes and the legislative history . . . that Congress did not intend to apply those provisions to the rate of benefit accrual for employees who have not yet reached normal retirement age"), *with Hirt,* 441 F. Supp. 2d at 550 (ultimately finding a cash balance plan non-discriminatory but noting that "[t]he application of the age discrimination prohibition contained in § 204(b)(1)(H) of ERISA to workers of all ages is . . . the necessary consequence of the broad language employed by the statute").

[102]    29 U.S.C. § 1054(b)(1)(H)(i) (emphasis added).

[103]    *See, e.g., Tootle v. ARINC, Inc.,* 222 F.R.D. 88, 92-93 (D. Md. 2004); *Engers v. AT&T Corp.*, 428 F. Supp. 2d 213, 221-22 (D. N.J. 2001); *Eaton*, 117 F. Supp. 2d at 825-29; *see also Campbell v. BankBoston, N.A.*, 327 F.3d 1, 9 (1st Cir. 2003) (ruling in dicta that "the ERISA age discrimination provision may not even apply to workers younger than the age of normal retirement").

[104]    *See Richards*, 427 F. Supp. 2d at 158-59 ("The inclusion of the word 'any,' when given its ordinary, common meaning . . . renders this language unambiguous with respect to the question of whether it protects only employees who have

has directed, "[t]he preeminent canon of statutory interpretation requires us to presume that [the] legislature says in a statute what it means and means in a statute what it says there."[105] By its own terms, the ERISA age provision protects individuals of all ages.

### 2.    Definition of "Rate of Benefit Accrual"

The crux of the age discrimination issue is the definition of the "rate of an employee's benefit accrual" as it is used in section 204(b)(1)(H)(i) of ERISA. If the phrase refers to an employee's retirement benefit (output), as plaintiffs contend, then cash balance plans are discriminatory because they afford younger employees higher rates of benefit accrual than their similarly situated older counterparts.[106] However, if the phrase refers to the employer's annualcontributions to the hypothetical accounts (inputs), then there is no discrimination.[107] Plaintiffs argue that the relevant "benefit" is the overall benefit

---

reached age 65.") (quotation marks and citation omitted); *Register*, 2005 WL 3120268, at *7 ("The [IRS 2002] proposed regulations emphatically reject the first holding in *Eaton*, that the age discrimination provisions only apply after normal retirement age.").

[105]    *BedRoc Ltd., LLC v. United States*, 541 U.S. 176, 183 (2004) (internal citation omitted). *Accord Nicolaou v. Horizon Media, Inc.*, 402 F.3d 325, 329 (2d Cir. 2005) (citing *BedRoc*).

[106]    *See* Pl. SJ Mem. at 22-25.

[107]    *See* Def. SJ Mem. at 10-13.

an employee receives upon retirement (*i.e.*, the annuity at normal retirement age). Under this interpretation, in order to avoid age discrimination, the rate at which a participant accumulates her retirement benefit cannot decrease as she ages. Defendants, however, contend that "the presence or absence of age discrimination should be measured based on the change in participant's cash balance account from year to year, rather than the total value of the annual contributions to the account at retirement age."[108] Under this view, using annual allocations of interest and pay credits as the relevant paradigm, as long as the employer makes ever-increasing contributions to accounts, there is no ERISA violation.[109] Under defendants' reading, the methodology used to detect age discrimination in a cash balance plan – which is a defined benefit plan – becomes, for all intents and purposes, the same as that which is prescribed for defined contribution plans.

I decline defendants' invitation to "seiz[e] on the obvious similarities" between the parallel anti-discrimination provisions governing defined contribution and defined benefit plans.[110] Although other courts, including the Seventh

---

[108]   *Id.* at 12.

[109]   *See Hirt*, 441 F. Supp. 2d at 550 ("The compounding of interest, that is, the payment or contribution of interest on prior months' accumulations, make it possible for all participants to be treated equally . . . .").

[110]   Def. SJ Mem. at 11.

Circuit,[111] have treated cash balance plans as defined contribution plans for this purpose, doing so would ignore the plain language of the statute as well as the critical distinctions between the types of plans outlined by the Second Circuit in *Esden*.[112]

Defendants ally themselves with the Seventh Circuit's position, which is that

> [i]nterest is not treated as age discrimination for a defined-contribution plan, and the fact that [the respective] subsections are so close in both function and expression implies that it should not be treated as discriminatory for a defined-benefit plan either. The phrase "benefit accrual" reads most naturally as a reference to what the employer puts in (either in absolute terms or as a rate of change), while the defined phrase "accrued benefit" refers to outputs after compounding.[113]

Underlying this interpretation is a presumption that Congress wrote "rate of benefit accrual" in one provision and "allocations to employee's account" in the other, but intended those phrases to say the same thing. Rules of construction preclude me from adopting this view. The simple

> fact is that 'accrual,' using its dictionary meaning and in line with the structure of defined benefit plans, refers to what the employee accumulates [], whereas 'allocation,' using its

---

[111]    *See Cooper v. IBM Pension Plan and IBM Corp.*, 457 F.3d 636 (7th Cir. 2006).

[112]    *See Esden*, 229 F.3d at 158-63.

[113]    *Cooper*, 457 F.3d at 638-39.

> dictionary definition and in line with the structure of defined contribution plans, refers to what an employer puts into the account.[114]

As the Second Circuit has instructed, "[w]hen Congress uses particular language in one section of a statute and different language in another, we presume its word choice was intentional."[115] If Congress had intended for "the rate of an employee's benefit accrual" to mean "the rate at which amounts are allocated to the employee's account," it would have copied those terms from the analogous provision.

The other persuasive argument favoring plaintiffs' interpretation of the statute is ERISA's binary regulatory framework for defined contribution plans and defined benefit plans. This duality exists because defined contribution plans and defined benefit plans make categorically different promises to employees.[116] As a result, the respective anti-discrimination provisions prescribe distinct metrics for detecting discrimination. Specifically, because employees with defined contribution plans are guaranteed employer contributions to retirement accounts but are not guaranteed a retirement benefit, discrimination is better discerned by

---

[114]   *J.P. Morgan,* 2006 WL 3063424, at *5.

[115]   *United States v. Peterson*, 394 F.3d 98, 107 (2d Cir. 2005).

[116]   *See generally Esden*, 229 F.3d at 159-63.

looking at "the rate at which amounts are allocated to the employee's account." [117] By contrast, because employees with defined benefit plans are guaranteed a retirement benefit ("output"), the sheer "*import* of the statutory language" connotes that "'rate of benefit accrual' refers to the outputs from the Plan."[118]

A binary regulatory approach was also required because by their very nature, "'[p]rojections' and 'guesswork' are at the heart of defined benefit plans."[119] Effective regulation of such plans necessarily involves monitoring the future value of the overall pension benefit that will be payable at normal retirement age. This focus on the value of accrued benefits is apparent throughout the statutory scheme. For example, for purposes of testing compliance with ERISA's three accrual rules, the rate at which participants earn their accrued benefit is examined. Similarly, "the rules governing distributions from defined benefit plans are framed in terms of the normal retirement benefit," which explains why distributions in optional forms, such as lump-sum payments, are required to be equal or greater than the actuarial equivalent of such benefit.[120]

---

[117]    ERISA § 204 (b)(2)(A); 29 U.S.C. § 1054(b)(2)(A).

[118]    *J.P. Morgan*, 2006 WL 3063424, at *6 (emphasis added).

[119]    *Esden*, 229 F.3d at 166.

[120]    *Id.* at 159.

Nevertheless, defendants insist that the proper test for age discrimination concerns the *present value* of the hypothetical accounts, rather than their value at the normal retirement age. If Congress wanted to divorce ERISA's age-based accrual standards from its otherwise consistent approach toward regulating defined benefit plans it could have done so by either using explicit language to that effect or using a single provision to apply to both types of plans. Congress did just this elsewhere in the statutory regime, "unsurprisingly" using one provision where they intended one standard to apply to both defined benefit and defined contribution plans.[121]

Defendants also urge this Court to find that a "mere correlation" exists between reduced rates of accrual and older age, because any reduction in rates of benefit accrual is really a function of the time value of money. While this is a fair statement, it is inaccurate to the extent it assumes that the time value of money and age are mutually exclusive.[122] Under a cash balance plan, employees never receive

---

[121]    *J.P. Morgan*, 2006 WL 3063424, at *9 (contrasting 29 U.S.C. § 1052(a)(1)(A), which enumerates in a single provision the participation standards applicable to both types of plans, to the dual anti-discrimination provisions of 29 U.S.C. §§ 1054(b)(1) and 1054(b)(2)).

[122]    *But see Cooper*, 457 F.3d at 642 (stating that "age *discrimination*" should be separated "from other characteristics that may be correlated with age"). Whereas the cash balance plan at issue in *Cooper* was facially age neutral, the Citigroup Plan is not, which perhaps makes its age discrimination more readily apparent. And while I credit the Plan's method of including both years of service and age in the pay credit index as an attempt to mitigate the disparity in age-65 annuity

the amount in their hypothetical accounts as their retirement benefit. Instead, the cash balance in the account must be converted to the age 65 annuity.[123] Because this actuarial conversion requires knowing an individual's age, cash balance plans are not age neutral.

The short of it is that because of this conversion to an age 65 annuity, younger workers are credited with more years to accumulate interest on their hypothetical accounts. [124] Therefore, as a matter of plain arithmetic, a greater value is added to a younger employee's account than to an older employee's account. In other words, "for similarly situated workers (same salary and work history), the older worker, by definition, will receive a smaller retirement benefit

---

values, the record does not reflect that pay credits increase with age quickly enough to make up the difference. *See* Sher Aff. ¶¶ 4, 5.

[123]  *See Esden*, 229 F.3d at 164. Although the Second Circuit did not address an age-discrimination claim, it held in *Esden* that ERISA requires *all* distributions from cash balance plans to be the actuarial equivalent of the accrued benefit expressed as an annual benefit payable at retirement age. Applying this rule where an employee chose to collect a lump sum annuity payment before reaching age 65, the court found that she was entitled to receive the present value of her accrued benefit, $1,595.52, as opposed to the smaller amount in her hypothetical account, $1,533.98. *See id.*

[124]  *See Esden*, 229 F.3d at 170 (holding that "interest adjustments to a hypothetical allocation [i.e. cash balance account] must be provided through normal retirement age, even though the employee terminates employment or commences benefits before that age").

simply because he is older, and thus closer to age 65."[125]  This problem is

exacerbated further by the phenomenon of compound interest:  as the same interest

rate is applied to participants' ever-increasing principal balances, the rate at which

older workers accrue benefits is slower than that of younger workers.  In this light,

the rate of contributions to an individual's account is dependent on age.

Defendants proffer several policy arguments that weigh against

measuring the rate of benefit accrual as an annuity beginning at normal retirement

age.[126]  For instance, they argue that such a finding will "discourage employers

from guaranteeing a level growth in the value of a pension over time," resulting in

the widespread adoption of defined contribution plans, and also preclude plans like

this one from using a variable interest credit rate.[127]  While these practical

considerations may have merit, the language of section 204(b)(1)(H), this Circuit's

---

[125]    *J.P. Morgan*, 2006 WL 3063424, at *8.

[126]    *See* Def. SJ Mem. at 14-15. *See also Tootle*, 222 F.R.D. at 94 ("The
potential claim of age discrimination arises only by applying a definition for
accrued benefits which does not fit with the way cash balance plans are structured.
The more sensible approach is to measure benefit accrual under cash balance plans
by examining the rate at which amounts are allocated and the changes over time in
an individual's account balance, as the ERISA provisions designed for traditional
defined contribution plans would direct."); *Hirt*, 441 F. Supp. 2d at 551.

[127]    Def. SJ Mem. at 14-15.

holding in *Esden*, and the construction of ERISA itself compel the conclusion that such plans are age-discriminatory.[128]

This "dispute is not over what a 'better' regulatory regime, more accommodating to the design objectives of cash balance plans might look like."[129] *Esden* fully acknowledged that "the governing statutes [including ERISA] and regulations were developed with traditional final-pay defined benefit plans in mind" and that "they do not always fit in a clear fashion with cash balance plans and they sometimes require outcomes that are in tension with the objectives of those plans."[130] Nevertheless, I must adhere to *Esden*'s classification of cash balance plans as defined benefit plans. I am not "free to pursue [what may indeed be salutary objectives] at the expense of a textual interpretation . . . ."[131] Under these circumstances, I must "'apply the text, not [] improve upon it.'"[132] Thus

---

[128]    *See Robinson v. Shell Oil Co.*, 519 U.S. 337, 341 (1997) ("The plainness or ambiguity of statutory language is determined by reference to the language itself, the specific context in which that language is used, and the broader context of the statute as a whole.").

[129]    *Esden*, 229 F.3d at 171.

[130]    *Id.* at 159.

[131]    *Pavelic & LeFlore v. Marvel Entm't Group,* 493 U.S. 120, 126 (1989).

[132]    *In re Pennie & Edmonds LLP*, 323 F.3d 86, 101 (2d Cir. 2003) (quoting *Pavelic & LeFlore*, 493 U.S. at 126).

while this ruling will likely increase the difficulty of designing cash balance plans that comport with ERISA, the proper forum for redress is Congress.[133]

## V.    CONCLUSION

For the reasons discussed above, summary judgment in plaintiffs' favor is granted on Count I for impermissible backloading, Count III for violations of ERISA's minimum accrual tests, Count V for age discrimination, and Count VII for failing to meet statutory notice requirements.  Summary judgment for plaintiffs on Count II, alleging whipsaw, is denied without prejudice.  Summary judgment for defendants is denied.

Defendants are ordered to reform the Plan to comply with ERISA. Other appropriate remedies have yet to be determined, in relation to the several claims for relief alleged in the Amended Complaint filed September 21, 2005.  The parties, by their respective counsel, shall make written submissions by January 16, 2007, addressing the issue of a remedy not inconsistent with the rulings contained in this Opinion, and shall appear for a conference on January 2, 2007, at 4:30 p.m. The Clerk of Court is directed to close these motions [Nos. 31, 36 and 43 on the Docket Sheet].

---

[133]    *See, e.g.,* The Pension Protection Act of 2006, Pub. L. No. 109-280 § 701(A)(i) (carving out a distinct regulatory scheme for cash balance plans).

SO ORDERED:

Shira A. Scheindlin,
U.S.D.J.

Dated:   New York, New York
         December 11, 2006

– **Appearances** –

**For Plaintiffs:**

Edgar Pauk, Esq.
144 E. 44th Street, Suite 600
New York, New York 10017
(212) 983-4000

Brad N. Friedman, Esq.
Milberg Weiss Bershad & Schulman, LLP
One Pennsylvania Plaza
New York, New York 10119
(212) 594-5300

William D. Frumkin, Esq.
Sapir & Frumkin LLP
399 Knollwood Road, Suite 310
White Plains, New York 10603
(914) 328-0366

Richard S. Schiffrin, Esq.
Joseph H. Meltzer, Esq.
Edward W. Ciolko, Esq.
Schiffrin & Barroway, LLP
280 King of Prussia Road
Radnor, Pennsylvania 19087
(610) 667-7706

**For Defendants:**

Myron Rumeld, Esq.
Proskauer Rose LLP
1585 Broadway
New York, New York 10036-8299
(212) 969-3021

## <u>CERTIFICATE OF SERVICE</u>

I, Curtis V. Trinko, hereby certify that  true and correct copies of Plaintiff's Notice of

Supplemental Authority was served on the following attorneys by means of postage prepaid, first

class mail delivery through the U.S. Mails and electronic mail on this date:


Jeremy P. Blumenfeld, Esq.
Morgan, Lewis & Bockius, LLP
1701 Market Street
Philadelphia, Pennsylvania 19103
Tel: (215) 963-5258
Fax: (215) 963-5001

Christopher A. Parlo, Esq.
Morgan, Lewis & Bockius, LLP
101 Park Avenue
New York, New York 10178
Tel: (212) 309-6000
Fax: (212) 309-6273

**ATTORNEYS FOR DEFENDANTS**

Joseph H. Meltzer, Esq.
Edward W. Ciolko, Esq.
Mark K. Gyandoh, Esq.
Schiffrin & Barroway, LLP
280 King of Prussia Road\
Radnor, Pennsylvainia 19087
Tel: (610) 667-7706
Fax: (610) 667-7056

Curtis V. Trinko, Esq.
Law Offices of Curtis V. Trinko, LLP
16 West 46th Street, 7th Floor
New York, New York 10036
Tel: (212) 490-9550
Fax: (212) 986-0158

**ATTORNEYS FOR PLAINTIFFS**


Dated: December 14, 2006
        New York, New York



                    /s/ Curtis V. Trinko
    _____
                    Curtis V. Trinko