LAW OFFICES OF
**MORGAN, LEWIS & BOCKIUS LLP**
101 PARK AVENUE
NEW YORK, NEW YORK 10178
(212) 309-6000
FAX: (212) 309-6273

ATTORNEYS FOR DEFENDANTS

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

_____

|  |  |  |
|---|---|---|
| **PAULA KRITZMAN,** | : | |
|  | : | |
| **Plaintiff,** | : | |
|  | : | **06 CV 0233 (LAK)** |
| **v.** | : | |
|  | : | |
| **AMERICAN EXPRESS RETIREMENT** | : | |
| **PLAN, AMERICAN EXPRESS** | : | |
| **COMPANY, AMERICAN EXPRESS** | : | |
| **COMPANY EMPLOYEE BENEFITS** | : | |
| **ADMINISTRATION COMMITTEE,** | : | *__ELECTRONICALLY FILED__* |
| **JOHN DOES 1-100** | : | |
|  | : | |
| **Defendants.** | : | |

**NOTICE OF SUPPLEMENTAL AUTHORITY**

Defendants, by and through their counsel, hereby give notice to the Court of the recent

Opinion issued by the United States Court of Appeals for the Third Circuit in Register v. PNC

Financial Services Group, Inc., No. 05-5445, --- F.3d ---, 2007 WL 222019 (3d Cir. Jan. 30,

2007) (attached as Exhibit "A") and the Opinion issued by United States District Court for the

District of New Jersey in Finley v. Dun & Bradstreet Corp. et al., No. 06-1838, --- F.Supp.2d ---,

2007 WL 196753 (D.N.J. Jan. 26, 2007) (attached as Exhibit "B"). In both Register and Finley,

the courts held that cash balance plans are not age discriminatory. See Register, 2007 WL

222019, *3-11; Finley, 2007 WL 196753, *2-5. Both courts also rejected

"wearaway/backloading" claims identical to those asserted in Counts III and IV of Plaintiffs'

Complaint in this case. See Register, 2007 WL 222019, *11-12; Finley, 2007 WL 196753, *6-8.

Lastly, the Register court rejected SPD and Section 204(h) disclosure claims similar to those asserted in Counts VI and VII of Plaintiffs' Complaint in this case.  See Register, 2007 WL 222019, *13-15.

Defendants respectfully submit that the Register and Finley courts' analyses and conclusions are correct and confirm that Defendants' Motion to Dismiss should be granted as to Counts I, III, IV, VI and VII of Plaintiff's Complaint.


Dated: New York, New York
      January 31, 2007           Respectfully submitted,

**MORGAN, LEWIS & BOCKIUS LLP**

By:   /s/Christopher A. Parlo         
          Christopher A. Parlo (CP 4310)

101 Park Avenue
New York, NY  10178
(212) 309-6000
Fax:  (212) 309-6001
E-Mail: cparlo@morganlew.com

Michael L. Banks
(*Pro Hac Vice* Admission)
Jeremy P. Blumenfeld
(*Pro Hac Vice* Admission)
Morgan, Lewis & Bockius LLP
1701 Market Street
Philadelphia, Pennsylvania  19103-2921
Tel.  215.963.5000
Fax:  215.963.5001
Attorneys for Defendants

2

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a true and correct copy of the foregoing was filed electronically on

January 31, 2007 and accordingly served upon the following:

Law Offices of Curtis V. Trinko, LLP
16 West 46th Street
Seventh Floor
New York, NY 10036

Schiffrin & Barroway, LLP
Joseph H. Meltzer, Esq.
Edward W. Ciolko, Esq.
Mark K. Gyandoh, Esq.
Joseph A. Weeden, Esq.
280 King of Prussia Road
Radnor, Pennsylvania 19087

/s/Jeremy P. Blumenfeld
Jeremy P. Blumenfeld

# EXHIBIT "A"

Westlaw.

--- F.3d ----                                                                                                                    Page 1
--- F.3d ----, 2007 WL 222019 (C.A.3 (Pa.))
**(Cite as: --- F.3d ----)**

Register v. PNC Financial Services Group, Inc.C.A.3 (Pa.),2007.Only the Westlaw citation is currently available.
United States Court of Appeals,Third Circuit.
Sandra **REGISTER**, Grace B. Merchant, Susan L. Wilson, Kristina Beckman, John J. Daggett and Richard Rhoades, on behalf of themselves and others similarly situated, Appellants
v.
**PNC** FINANCIAL SERVICES GROUP, INC.; **PNC** Bank, N.A.; Pension Committee of **PNC** Financial Services Group, Inc. Pension Plan; **PNC** Financial Services Group, Inc. Pension Plans.
**No. 05-5445.**

Argued Dec. 14, 2006.
Filed Jan. 30, 2007.

On Appeal from the United States District Court for the Eastern District of Pennsylvania, (No. 2:04-CV-6097), District Judge: Honorable Legrome D. Davis.

Bryan L. Clobes, Michael S. Tarringer, Miller, Faucher & Cafferty, David H. Weinstein (argued), Andrea L. Wilson, Weinstein, Kitchenoff & Asher, Philadelphia, PA, Attorneys for Appellants.
Alan J. Davis (argued), William A. Slaughter, Arthur Makadon, Barry L. Klein, Allison V. Kinsey, Jamie B. Lehrer, Ballard, Spahr, Andrews & Ingersoll, Philadelphia, PA, Attorneys for Appellees.
Jay E. Sushelsky, AARP Foundation Litigation, Melvin Radowitz, American Association of Retired Persons, Washington, D.C., Attorneys for Amicus Curiae American Association of Retired Persons.
Stephen A. Bokat, Robin S. Conrad, Ellen Dunham Bryant, National Chamber Litigation Center, Inc., Ann Elizabeth Reesman, McGuiness, Norris & Williams, LLP, Washington, D.C., Attorneys for Amicus Curiae Equal Employment Advisory Council and the Chamber of Commerce of the United States of America.
Jeffrey G. Huvelle, David H. Remes, John M. Vine, Covington & Burling, Washington, D.C., Attorneys for Amicus Curiae The ERISA Industry Committee.

Before FISHER, CHAGARES and GREENBERG, Circuit Judges.

OPINION OF THE COURT

GREENBERG, Circuit Judge.

I. INTRODUCTION

**\*1** This matter comes on before the court on an appeal by Sandra Register, Grace B. Merchant, Susan L. Wilson, Kristina Beckman, John J. Daggett, and Richard Rhoades, ("appellants"), from the district court's order entered on November 21, 2005, granting PNC Financial Services Group, Inc., PNC Bank, NA, Pension Committee of PNC Financial Services Group, Inc. Pension Plan, and PNC Financial Services Group, Inc. Pension Plans' (collectively "PNC") motion to dismiss appellants' amended complaint. See Register v. PNC Fin. Serv. Group, Inc., Civ. No. 04-6097, 2005 WL 3120268 (E.D.Pa. Nov. 21, 2005). The dismissed amended complaint alleged that PNC's conversion of its pension plan from a traditional defined benefit plan to a cash balance plan violated certain provisions of the Employee Retirement Income Security Act of 1974 ("ERISA"). The most significant issue on this appeal is whether the district court erred in holding that the PNC cash balance plan does not discriminate against older employees on the basis of their age. For the reasons that follow, we will affirm the district court's November 21, 2005 order in all respects.

II. FACTS AND PROCEDURAL HISTORY

The relevant facts, except in one respect that we discuss later when dealing with the adequacy of a summary plan description that PNC supplied to plan participants, are not in dispute. Before 1999, PNC maintained a traditional defined benefit pension plan for its employees providing that a participant's normal retirement (age 65) benefit was calculated by multiplying a fixed percentage (1.3% for service up to and including 25 years and 1.0% for service in excess of 25 years) with the participant's years of service and final average pay. The plan also provided that if the employee retired after age 50 but before age 65, he could obtain early retirement benefits consisting of a portion of his normal retirement benefits.

As of January 1, 1999, PNC switched to a cash balance plan, which is a particular form of defined benefit plan. Under the cash balance plan, PNC established a bookkeeping account known as a cash

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

balance account for every participant. The new plan took the benefits that accrued under the traditional plan and restated them as opening hypothetical cash balance accounts for each participant. The accounts were "hypothetical" because they did not reflect actual contributions to accounts or actual gains and losses allocable to the accounts, but, instead, reflected a value PNC imputed to the hypothetical accounts in the form of annual "credits ."

When PNC converted its traditional plan to a cash balance plan, the early retirement benefits of the old plan were frozen and the participants were given the option of either receiving the accrued (but frozen) early retirement benefits or the benefit they would have accrued under the cash balance plan, whichever was greater. The benefits for those participants that chose to receive the accrued early retirement benefits were frozen from the date of conversion until their account balances under the cash balance plan exceeded the accrued early retirement benefits.

**\*2** The PNC cash balance plan provides for two types of credits to participants: "earnings or pay credits" and "interest credits." The plan states the earnings credit as a percentage of compensation determined by allocating points for combined age and years of service. The earnings credit ranges from 3% of compensation for participants with less than 40 years of combined age and years of service to 8% of compensation for participants with 70 years or more of combined age and years of service. The second component of the hypothetical account, the interest credit, is determined using an annual interest rate based on the 30-year Treasury rate. The interest credit accrues at the same time that the underlying earnings credit accrues and is projected through age 65 (to offset things such as increased cost of living, inflation, etc.).[FN1] When a participant's employment with PNC ends, the participant may withdraw his hypothetical account balance as a lump sum, convert the account balance into an immediate life annuity, or defer the receipt of a lump sum payment or life annuity until a later date.

> FN1. The plan assumed a benefit commencement date ranging from age 62 to 65.

In 2004, a group of plan participants who were current and former PNC employees and pension plan beneficiaries brought suit against PNC claiming that the PNC cash balance plan violated various ERISA provisions. First, they alleged that the plan violated

the ERISA anti-backloading provision, 29 U.S.C. § 1054(b)(1)(B), because the participants that chose to retain the accrued (but frozen) early retirement benefits did not receive additional benefit accruals until the cash balance plan benefit caught up to their frozen prior plan benefit (Count I). Second, they contended that an employee's benefit accrual decreases because of age in violation of the ERISA's defined benefit plan anti-discrimination provision, id. at § 1054(b)(1)(H)(i) (Count II). Third, they alleged that PNC violated ERISA's notice, id. at § § 1054(h), 1022, and fiduciary duty requirements, id. at § 1104 (Counts III-V).[FN2]

> FN2. Appellants sought to bring the action on behalf of a class and subclass of current and former employees but in view of the court's disposition of the case the court never considered whether to certify the classes.

On May 23, 2005, PNC filed a motion to dismiss the amended complaint. The district court granted PNC's motion to dismiss all counts for failure to state a claim under Fed.R.Civ.P. 12(b)(6). Appellants have appealed from that order to this court.

### III. JURISDICTION AND STANDARD OF REVIEW

The district court had subject matter jurisdiction under 28 U.S.C. § 1331 and 29 U.S.C. § 1132(e)(1). We have jurisdiction pursuant to 28 U.S.C. § § 1291 and 1294(1). "In reviewing a district court's dismissal of a complaint pursuant to Rule 12(b)(6) for failure to state a claim upon which relief may be granted, our review is plenary and we apply the same test as the district court." *Maio v. Aetna, Inc.,* 221 F.3d 472, 481 (3d Cir.2000). "A motion to dismiss pursuant to Rule 12(b)(6) may be granted only if, accepting all well-pleaded allegations in the complaint as true, and viewing them in the light most favorable to plaintiff, plaintiff is not entitled to relief." *Id.* at 481-82 (quoting *In re Burlington Coat Factory § . Litig.,* 114 F.3d 1410, 1420 (3d Cir.1997)). "The issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." *Id.* at 482 (quoting *Burlington Coat Factory,* 114 F.3d at 1420) (internal quotations omitted).

### IV. DISCUSSION

A. *The PNC Cash Balance Plan Does Not Violate
ERISA's Anti-Discrimination Provision.*

1. What is a cash-balance plan?

**\*3** There are two general types of pension plans:
defined contribution plans and defined benefit plans.
A defined contribution plan is a pension plan in
which an individual account is established for an
employee to which his employer (and sometimes the
employee too) contributes a specific amount. *See* 29
U.S.C. § 1002(34); *Hughes Aircraft Co. v. Jacobson,*
525 U.S. 432, 439, 119 S.Ct. 755, 761 (1999). The
employee is entitled "to whatever assets are dedicated
to his individual account." *Id. at 439, 119 S.Ct. at*
761. The employee bears the investment risks and the
employer does not guarantee a retirement benefit to
the employee. *See id., 119 S.Ct. at 761.*[FN3]

> [FN3.] Of course, in some cases the loss may
> be shifted to another party. *See* 29 U.S.C. §
> 1132(a).

A defined benefit plan, on the other hand, is any plan
that is not a defined contribution plan. 29 U.S.C. §
1002(35). It is generally a pension plan where the
employee is promised a retirement benefit based on a
formula the plan sets forth. The plan consists of a
"general pool of assets rather than individual
dedicated accounts." *Hughes Aircraft,* 525 U.S. at
439, 119 S.Ct. at 761. Participants in a defined
benefit plan have no claim to any particular asset that
composes a part of the plan's general asset pool, but,
instead, receive "an annuity based on the retiree's
earnings history, usually the most recent or highest
paid years, and the number of completed years of
service to the company." *Depenbrock v. Cigna Corp.,*
389 F.3d 78, 79 n. 1 (3d Cir.2004) (quoting *Campbell
v. BankBoston, N.A.,* 327 F.3d 1, 4 (1st Cir.2003)).
Under a defined benefit plan the entity funding the
plan, *i.e.,* the employer, bears the investment risks.

The pension plan at issue in this case is a cash
balance plan. A cash balance plan, by law, is a form
of defined benefit plan and must comply with the
statutory regulations applicable to defined benefit
plans. *See, e.g., Esden v. Bank of Boston,* 229 F.3d
154, 158 (2d Cir.2000). However, in actuality, a cash
balance plan is a hybrid between a defined
contribution plan and a defined benefit plan as it
contains attributes of both. *See, e.g., id.* at 158-59.

A cash balance plan is classified as a defined benefit
plan because cash balance plans, like traditional
defined benefit plans such as the plan PNC
maintained before January 1, 1999, "are required to
offer payment of an employee's benefit in the form of
a series of payments for life...." *Burstein v. Ret.
Account Plan for Employees of Allegheny Health
Educ. & Research Found.,* 334 F.3d 365, 370 n. 6 (3d
Cir.2003) (quoting U.S. Dep't of Labor, Employee
Benefits Sec. Admin., "Frequently Asked Questions
about Cash Balance Pension Plans," at 2, *available at*
http://www.dol.gov/ebsa/faqs/faq-consumer-
cashbalanceplans.html). Nevertheless, a cash balance
plan differs from a traditional defined benefit plan in
that "traditional defined benefit plans define an
employee's benefit as a series of monthly payments
for life to begin at retirement, but cash balance plans
define the benefit in terms of a stated account
balance," albeit a "hypothetical" account. *Id .* Thus,
cash balance plans are like defined contribution plans
in that both define the employee's benefit in terms of
a stated balance.

**\*4** Cash balance plan accounts "are often referred to
as hypothetical accounts because they do not reflect
actual contributions to an account or actual gains and
losses allocable to the account." *Id.* Instead, the
employer imputes value to the hypothetical account
in the form of annual "credits." *Cooper v. IBM Pers.
Pension Plan,* 457 F.3d 636, 637 (7th Cir.2006), *cert.
denied,* --- U.S. ----, --- S.Ct. ----, 2007 WL 91579
(U.S. Jan. 16, 2007). As is the case here, there are
typically two types of credits: (1) "pay credits" or
"earnings credits," which are hypothetical
contributions an employer makes usually expressed
as a percentage of wages or salary and may vary with
employee tenure, and (2) "interest credits," which are
hypothetical earnings (either a fixed or variable rate
linked to an index such as the 1-year Treasury bill
rate) on the account balance. *See Berger v. Xerox
Corp. Ret. Income Guarantee Plan,* 338 F.3d 755,
758 (7th Cir.2003); *Esden,* 229 F.3d at 158.

Employers design cash balance plans so that when a
participant receives a pay or earnings credit for a year
of service, he also receives the right to future interest
credits projected out until normal retirement age.
When a participant becomes entitled to receive
benefits under a cash balance plan, his benefits are
defined in terms of an account balance, which then
may be converted actuarially into an annuity at the
option of the participant. As is true in the case of
traditional defined benefit plans, the employer
funding the plan bears the investment risks associated

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

with the plan. This risk could be considerable because, unlike in the case of defined contribution plans, cash balance plans accounts grow on the basis of a predetermined formula rather than on the basis of actual earnings.


### 2. The competing positions.

In order to understand this case it is essential to recognize that, as we already have indicated, cash balance plans are a type of defined benefit plan. This point is crucial because the classification of cash balance plans as defined benefit plans triggers a host of regulatory provisions applicable to defined benefit plans but not to defined contribution plans. Application of the provisions, however, may be difficult because Congress enacted ERISA and the administrative agencies adopted the defined benefit plan regulations before the creation of cash balance plans and thus before employers such as PNC began converting their extant plans to cash balance plans. Thus, the original rules for defined benefit plans simply did not address the unique features and hybrid nature of cash balance plans. This circumstance has required courts, and no doubt persons designing and administering cash balance plans, to face the unenviable task of trying to fit cash balance plans, pension plans with fundamental differences from traditional defined benefit plans and with many attributes of defined contribution plans, within the defined benefit plan framework, a process somewhat similar to placing a round peg into a square hole. As might be expected this task has proven not to be easy, and, as will be seen below, has led courts throughout the country to reach diametrically opposed conclusions with respect to applying ERISA provisions to cash balance plans.[FN4]

> [FN4.] Of course, as will become apparent, our opinion in this case applies settled principles of law and, once we blow away the smoke, is not particularly complex. Nevertheless we point to Internal Revenue Service Notice 2007-06, posted at http://www.irs.gov/ pub/irs-drop/n-07-06.pdf dealing with the adoption of the Pension Protection Act of 2006 ("PPA 06") to demonstrate how complex questions with respect to cash balance plans can be. We discuss PPA 06 below. *See infra* n. 8.

**\*5** One such troublesome provision is ERISA's defined benefit plan age anti-discrimination provision which states:

[A] defined benefit plan shall be treated as not satisfying the requirements of this paragraph if, under the plan, an employee's benefit accrual is ceased, or the rate of an employee's *benefit accrual* is reduced, because of the attainment of any age.

29 U.S.C. § 1054(b)(1)(H)(i) (emphasis added).

This provision is the partial source of the disagreements in this case and, indeed, the outcome of this appeal largely is dependent on the meaning of "benefit accrual" within section 1054(b)(1)(H)(i). Appellants argue that the term "benefit accrual" refers to the employee's retirement benefit (the age-65 annuity), *i.e.,* the output from the plan. Appellants contend that the PNC plan is discriminatory because interest credits used to determine the annuity are based on future interest credits projected through the participant's normal retirement date. As such, they allege in their amended complaint that the interest credits decrease in value as participants move closer to the normal retirement date. Appellants argue that this consequence results in the reduction in the annuity based solely on age in violation of section 1054(b)(1)(H)(i).

A reader of this opinion might wonder how interest credits could be said to decrease in value with the passage of time as everybody knows that the longer a sum of money draws interest the greater the accumulated interest will be. Accordingly, we will explain appellants' position by way of example. It really is quite simple. Someone who leaves PNC at age 50 after 20 years of service will have a larger annual benefit at age 65 than someone whose 20 years of service conclude with retirement at age 65 because the former receives 15 years more interest than the latter. See *Cooper,* 457 F.3d at 638.

For support of their definition of "benefit accrual," appellants point to 29 U.S.C. § 1002(23)(A), which defines "accrued benefit" as "an annual benefit commencing at normal retirement age ." Appellants ask us to equate the terms "benefit accrual" and "accrued benefit." Thus, the argument goes, when the definition of "accrued benefit" is inserted into section 1054(b)(1)(H)(i), the anti-discrimination provision invalidates cash balance plans (the PNC plan as well as any other conceivable cash balance plan) because interest credits, which are projected to age 65, will have reduced value in terms of the age-65 annuity for older employees because they have less time to accrue interest. It should be obvious that the potential impact of this appeal therefore is enormous with

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.3d ----                                                                                    Page 5
--- F.3d ----, 2007 WL 222019 (C.A.3 (Pa.))
**(Cite as: --- F.3d ----)**

respect to cash balance plans.[FN5] Indeed, the district court stated its view, with which we agree, that appellants' argument, if accepted, would mean "that all cash balance plans violate the ERISA age discrimination provision by virtue of their design." *Register,* 2005 WL 3120268, at *6.[FN6]

> FN5. Appellees cite materials in their brief suggesting that almost one half of the assets in defined benefit pension plans are in cash balance plans. Appellees contend that the impact of our opinion in this case if the court adopts appellants' arguments "would have wide ranging ramifications, sweeping away twenty years of guidance, practice and thought, and invalidating hundreds of pension plans affecting millions of employees and billions" of dollars of benefits." Appellees' br. at 7. Even though we have learned from many years of judicial and legal experience in both the public and private sectors to be skeptical when a litigant suggests the "horribles" that can follow from the result of a case, still it is obvious that much is at stake here.

> FN6. Actually the district court here was making reference to an observation in *Tootle v. ARINC, Inc.,* 222 F.R.D. 88, 93 (D.Md.2004). The *Tootle* court in turn was referring to the effect of the district court's opinion in *Cooper v. IBM Pers. Pension Plan,* 274 F.Supp.2d 1010 (S.D.Ill.2003), that the Court of Appeals for the Seventh Circuit reversed in *Cooper,* 457 F.3d 636, a case that we discuss below at length.

**\*6** Appellants also point to the parallel anti-discrimination provision applicable to defined contribution plans, 29 U.S.C. § 1054(b)(2)(A), which prohibits reductions based on "amounts ... allocated to the employee's account." [FN7] Appellants argue that "allocat[ions]" as used in the defined contribution plan provision refers to contributions or inputs and Congress used a different phrase ("benefit accrual") in the defined benefit plan provision to refer to something else, *i.e.,* the age-65 annuity or outputs. In addition, appellants emphasized at oral argument that defining "benefit accrual" in terms of the age-65 annuity is consistent with "employee expectations."

> FN7. Section 1054(b)(2)(A) provides:

A defined contribution plan satisfies the requirements of this paragraph if, under the plan, allocations to the employee's account are not ceased, and the rate at which amounts are allocated to the employee's account is not reduced, because of the attainment of any age.

PNC, on the other hand, argues that "benefit accrual" refers to the employer's contributions in the form of credits to the hypothetical accounts, *i.e.,* the inputs to the plan. Thus, according to PNC, because all participants receive the same interest credit, there is no discrimination against older participants and any increase in the value of the annuity results from the time value of money, not discrimination, and thus is entirely appropriate.

For support, PNC relies on the fact that a cash balance plan, while classified as a defined benefit plan, differs from a traditional defined benefit plan in that an employee's benefit in a cash balance plan is set forth in terms of a stated account balance while a traditional defined benefit plan is defined in terms of an age-65 annuity. *See Burstein,* 334 F.3d at 370 n. 6. Thus, they urge us to look at the inputs into the account, not the outputs represented by the payment of the annuity. Additionally, PNC points to the parallel anti-discrimination provision applicable to defined contribution plans, section 1054(b)(2)(A), which legitimizes equal contributions made to defined contribution plans that grow to greater amounts for younger workers because of the time value of money. It argues that Congress could not have intended to make the same economic consequence legal for one type of pension plan but illegal for the other.[FN8]

> FN8. We recognize that section 701(a)(1) of the Pension Protection Act of 2006, H.R. 4, 109th Cong. § 701 (2006), ("PPA 06") provides that the accrued benefit for the purposes of cash balance plans may be expressed as the balance of a hypothetical account and significantly modified the application of the ERISA anti-discrimination provisions to cash balance plans, thus apparently settling the age discrimination dispute at issue here prospectively from June 29, 2005. However, PPA 06 specifically indicates that nothing in the amendments "shall be construed to create an inference" with respect to the ERISA's defined benefit plan anti-discrimination provision, section

--- F.3d ----                                                                    Page 6
--- F.3d ----, 2007 WL 222019 (C.A.3 (Pa.))
**(Cite as: --- F.3d ----)**

1054(b)(1)(H), "as in effect before such amendments." Section 701(d). Thus, we cannot draw any inference from Congress's decision to recognize the legality of cash balance plans with respect to certain ERISA anti-discrimination provisions prospectively and seemingly insulate such plans from the anti-discrimination provision at issue in this case.

### 3. Caselaw

Last year the Court of Appeals for the Seventh Circuit became the first court of appeals to confront squarely the discrimination issue raised in this appeal. *See Cooper, 457 F.3d 636*. Making an argument similar to that that the appellants advance here, the plaintiffs in *Cooper* argued that the IBM cash balance plan at issue in *Cooper* was discriminatory because, regardless of equal employer credits put into the account, "benefit accrual" refers to what the employee takes out upon retirement, and thus, younger employees receive interest credits for more years. *Id. at 638.* The court rejected this argument because it concluded that the phrase "benefit accrual" as used in the defined benefit plan provision "reads most naturally as a reference to what the employer puts in" the account, not what an employee takes out upon retirement. *Id. at 639.*

**\*7** The court of appeals compared the parallel anti-discrimination provisions applicable to defined contribution plans and defined benefit plans, and concluded that they proscribe the same conduct even though the rule for defined benefit plans indicates what is prohibited and the rule for defined contribution plans indicates what is permitted, *i.e.*, "the employer can't stop making allocations (or accruals) to the plan or change their rate on account of age." *Id. at 638.* The court reasoned that given the similarity of the subsections in both function and expression, it would be incongruous to say that the differences in the accumulation of interest on equal employer cash contributions made to defined contributions plans are not discriminatory while the differences in interest that accumulates on equal credits made to hypothetical cash balance accounts are discriminatory. *Id. at 638-39.* Rather, the court concluded that the computation of interest in both situations is not indicative of age discrimination as nothing "suggests that Congress set out to legislate against the fact that younger workers have (statistically) more time left before retirement, and thus a greater opportunity to earn interest on each year's retirement savings. Treating the time value of

money as a form of discrimination is not sensible." *Id. at 639* (citing *Hazen Paper Co. v. Biggins, 507 U.S. 604, 611, 113 S.Ct. 1701, 1706-07 (1993)*).[FN9]

> **FN9.** Unfortunately for appellants, their brief on this appeal relied in part on the district court opinion in *Cooper, 274 F.Supp.2d 1010 (S.D.Ill.2003)*, which the court of appeals reversed. Of course, inasmuch as appellants in their brief in this court noted that *Cooper* was on appeal to the Court of Appeals for the Seventh Circuit they assumed the risk that the court of appeals would reverse the district court in that case. The district court in *Cooper* believed that "benefit accrual" means the same thing as "accrued benefit," but that Congress used different language in order to be "grammatically correct." *Cooper, 274 F.Supp.2d at 1016.* The district court in our case decided the case between the time of the district court's opinion in *Cooper* and the court of appeals' opinion reversing the district court, but, with considerable prescience, declined to follow the district court's opinion in *Cooper* and, instead, reached a diametrically opposite result supported by other precedent.

The majority of district courts that have confronted this issue, including the district court in this case, have reached the same result that the court of appeals reached in *Cooper. See Drutis v. Quebecor World (USA), Inc., 459 F.Supp.2d 580 (E.D.Ky.2006); Laurent v. PriceWaterhouseCoopers LLP, 448 F.Supp.2d 537 (S.D.N.Y.2006); Hirt v. Equitable Ret. Plan for Employees, Managers & Agents, 441 F.Supp.2d 516 (S.D.N.Y.2006); Register v. PNC Fin. Serv. Group, Inc., 2005 WL 3120268; Tootle v. ARINC, Inc., 222 F.R.D. 88 (D.Md.2004); Eaton v. Onan Corp., 117 F.Supp.2d 812 (S.D.Ind.2000).*

Yet the court of appeals' view in *Cooper* is not unanimous as certain district courts within the Second Circuit disagree with the result that the court of appeals reached in *Cooper*, and these courts have held that cash balance plans are discriminatory. *See Parsons v. AT & T Pension Benefit Plan, 2006 WL 3826694 (D.Conn. Dec. 26, 2006) (slip op.); In re Citigroup Pension Plan ERISA Litig., --- F.Supp.2d ----, 2006 WL 3613691 (S.D.N.Y. Dec. 12, 2006); In re J.P. Morgan Chase Cash Balance Litig., 460 F.Supp.2d 479 (S.D.2006); Richards v. FleetBoston Fin. Corp., 427 F.Supp.2d 150 (D.Conn.2006).*[FN10]

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.3d ----                                                                                          Page 7
--- F.3d ----, 2007 WL 222019 (C.A.3 (Pa.))
**(Cite as: --- F.3d ----)**

FN10. It seems to us to be inevitable that the Court of Appeals for the Second Circuit ultimately will decide the discrimination issue for that circuit. But pending that day we think that we should consider the conflicting views of the district courts within that circuit and have done so.

The Second Circuit district courts that found discrimination in the circumstances that we face relied on three basic rationales in reaching their conclusion. First, they relied on either the statutorily defined term of "accrued benefit" or the dictionary definition of "benefit accrual" in concluding that "benefit accrual" refers to the outputs of the cash balance plan, *i.e.,* the age-65 annuity. Second, they found it significant that as a form of defined benefit plan, participants in a cash balance plan are promised a benefit upon retirement, not contributions in an account, and thus, the court in considering the discrimination issue should focus on the plan's outputs. Lastly, they believed that Congress, in choosing to prohibit discriminatory "allocat[ions]" in the defined contribution plan provision but discriminatory "benefit accrual[s]" in the defined benefit plan provision, must have intended to proscribe different conduct. Appellants' arguments here echo these considerations.

4. Analysis.

**\*8** It is well-settled that "[t]he role of the courts in interpreting a statute is to give effect to Congress's intent." *Rosenberg v. XM Ventures,* 274 F.3d 137, 141 (3d Cir.2001). "When interpreting statutes or regulations, the first step is to determine whether the language at issue has a plain and unambiguous meaning." *Dobrek v. Phelan,* 419 F.3d 259, 263 (3d Cir.2005). "Because it is presumed the Congress expresses its intent through the ordinary meaning of its language, every exercise of statutory interpretation begins with an examination of the plain language of the statute." *Rosenberg,* 274 F.3d at 141. "[T]he plain meaning of statutory language is often illuminated by considering not only the particular statutory language at issue, but also the structure of the section in which the key language is found, the design of the statute as a whole and its object...." *Alaka v. Attorney General,* 456 F.3d 88, 104 (3d Cir.2006) (internal quotation marks omitted); *see also King v. St. Vincent's Hosp.,* 502 U.S. 215, 221, 112 S.Ct. 570, 574 (1991) ("a statute is to be read as a whole ... since the meaning

of statutory language, plain or not, depends on context"); *M.A. ex rel. E.S. v. State-Operated Sch. Dist. of Newark,* 344 F.3d 335, 348 (3d Cir.2003) (holding that it would be a mistake to "squint[ ] myopically" at the phrase in question and interpret it in isolation rather than in the context of the "text and structure" of the statute as a whole). Where the statutory language, on examination of "the language itself, the specific context in which that language is used, and the broader context of the statute as a whole" is plain and unambiguous, further inquiry is not required. *Rosenberg,* 274 F.3d at 141.

The requirement that "[s]tatutes must be interpreted to receive a sensible construction, limiting application so as not to lead to injustice and oppression ..." also guides us. *Evcco Leasing Corp. v. Ace Trucking Co.,* 828 F.2d 188, 195 (3d Cir.1987). In this light, "[s]tatutes should be interpreted to avoid untenable distinctions and unreasonable results whenever possible." *American Tobacco Co. v. Patterson,* 456 U.S. 63, 71, 102 S.Ct. 1534, 1538 (1982).

With these principles in mind, we again set forth the defined benefit plan anti-discrimination provision at issue:

[A] defined benefit plan shall be treated as not satisfying the requirements of this paragraph if, under the plan, an employee's benefit accrual is ceased, or the rate of an employee's *benefit accrual* is reduced, because of the attainment of any age.

29 U.S.C. § 1054(b)(1)(H)(i) (emphasis added). As we discussed at length above, the age discrimination component of this case comes down to the meaning of "benefit accrual" as applied to cash balance plans. ERISA does not define the phrase, and its plain meaning is not evident from the particular language at issue. However, while the meaning of that phrase may not be evident from a reading of the words "benefit accrual" in isolation, a consideration of the context in which Congress used the words and the object of the ERISA anti-discrimination provisions makes its meaning clear.

**\*9** By engaging in this exercise in considering context, we reach the same conclusion as that of the court of appeals in *Cooper* for the reasons that follow. First, as we have explained, "cash balance plans define the benefit in terms of a stated account balance," not "as a series of monthly payments for life to begin at retirement" like a traditional defined benefit plan. *Burstein,* 334 F.3d at 370 n. 6. Thus, the "benefit" as used in the phrase "benefit accrual"

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.3d ----                                                                                                                    Page 8
--- F.3d ----, 2007 WL 222019 (C.A.3 (Pa.))
**(Cite as: --- F.3d ----)**

refers to the stated account balance as that is how the benefit is defined by cash balance plans. Once this proposition is grasped, it becomes clear that the "accrual" of "benefit" in section 1054(b)(1)(H)(i) refers to the credits deposited into the participant's cash balance accounts, *i.e.,* the inputs. If we concluded otherwise we simply would ignore the characteristic of a cash balance plan distinguishing it from a traditional defined benefits plan, *i.e.,* that a cash balance plan account is defined in terms of a stated account balance. Contrary to appellants' assertions, we do not believe that a cash balance plan's technical classification as a defined benefit plan compels us to disregard this critical distinction and thereby unreasonably interfere with employers in the crafting of pension plans. [FN11]

> [FN11.] The district court in this case pointed out the advantages to both employees and employers of cash balance plans as compared to traditional defined benefit plans. *Register,* 2005 WL 3120268, at *1. Courts should not rush in to preclude persons interested in plans, whether employees or employers, from securing these benefits.

Second, a comparison of the parallel defined benefit plan and defined contribution plan anti-discrimination provisions reinforces our interpretation. This comparison is particularly relevant in that both cash balance plans and defined contribution plans are defined in terms of their stated account balances, albeit one is hypothetical and the other is cash. In comparing the two anti-discrimination provisions, we agree with the analysis and conclusion reached by the court of appeals in *Cooper.* The provisions are nearly identical and prohibit the same behavior, *i.e.,* "the employer can't stop making allocations (or accruals) to the plan or change their rate on account of age." *Cooper,* 457 F.3d at 638. In this regard we point out that under ERISA section 204(b)(2)(A) a defined contribution plan is not age discriminatory if "the rate at which amounts are allocated to the employee's account is not reduced, because of the attainment of any age." 29 U.S.C. § 1054(b)(2)(A). The PNC plan does not make such a reduction. Rather, the PNC plan calculates earnings credits based on points allocated for combined age and years of service [FN12] and interest credits with identical rates credited into the participants' accounts regardless of their age.

> [FN12.] The PNC plan is different from some plans in that earnings credits take into account both age and years of service, and thus older employees actually are rewarded because of their age in this respect.

Contrary to appellants' assertions, there is simply no evidence that, by prohibiting discriminatory "allocat[ions]" in one provision and "accrual[s]" in the other, Congress intended to provide different metrics for detecting discrimination. Such a construction would lead to a result that is not sensible. The effect of the cash balance design that appellants challenge (the accumulation of interest) is identical to the accumulation of interest on employer contributions under defined contribution plans. Accordingly, employer contributions in both instances ultimately are more valuable when those contributions are made to younger employees as the contributions have a longer time to grow. That unremarkable consequence of a contribution growing in value because of earnings on it is no different than that when a bank deposit is drawing interest. The longer the deposit remains in the bank in an interest bearing account, the more it is worth. We do not find any support for appellants' argument that Congress wanted to prohibit such a consequence with respect to cash balance plans, but legitimize it for defined contribution plans. Rather, the similarities of the anti-discrimination provisions governing defined benefit and defined contribution plans suggest that Congress was not seeking to prohibit the consequences of the time value of money in either circumstance, and appellants have not offered a reasonable explanation of why Congress would have wanted to do so.

**\*10** While we agree with appellants that we are not permitted to rewrite a statute and we must adhere to the statutory text applicable to defined benefit plans, we have not rewritten anything here. The fact is that even though a cash balance plan's classification as a defined benefit plan is important, it is also important that it be understood that cash balance plans include attributes of both defined benefit and defined contribution plans. It seems to us that when dealing with a hybrid plan subject to defined benefit plan rules, a court should look to the parallel defined contribution plan anti-discrimination provision to clarify the meaning of "benefit accrual" within the cash balance plan context. Contrary to appellants' assertions, in doing so, we are not reclassifying cash balance plans as defined contribution plans nor are we ignoring the language of the statute, but, instead, we are looking to the parallel anti-discrimination provisions because "the plain meaning of statutory

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

language is often illuminated by considering not only the particular statutory language at issue, but also the structure of the section in which the language is found, the design of the statute as a whole and its object...." *Alaka,* 456 F.3d at 104 (internal quotation marks omitted). This is a fundament of statutory interpretation.

Finally, in our analysis of the discrimination issue we address appellants' remaining arguments (and those accepted by the minority courts). First, contrary to appellants' contention, "accrued benefit," which section 1002(23)(A), defines as "an annual benefit commencing at normal retirement age," is simply not the same thing as "benefit accrual." We find no indication that Congress intended that courts and administrators use these phrases interchangeably. Additionally, we agree with the court of appeals in *Cooper* that "[t]he phrase 'benefit accrual' reads most naturally as a reference to what the employer puts in ..., while the defined phrase 'accrued benefit' refers to outputs after compounding." *Cooper,* 457 F.3d at 639.

Moreover, we are not persuaded by the appellants' position that the result we reach runs contrary to "employee expectations," which, according to appellants, focuses on their retirement annuity and not their account balance. We have examined the summary plan description PNC distributed relating to the cash balance plan as this document provides the best insight into what the employees should "expect" from the plan. The plan description reveals the following. "Each quarter, [the employees will] receive a statement showing the value of [their] account[s], including Earnings Credits and Interest Credits," app. at 224, "which allows [the employees] to watch [their] retirement benefits grow from year to year, just as [they] do with [their] [Incentive Savings Plan] account," *id.* at 221. At the time an employee leaves PNC, so long as he is vested he has immediate access to his account balance and may take the cash balance account value either in the form of a lump sum payment (subject to income taxes and possibly penalties) or, at his election receive monthly annuity payments. *Id.* at 222, 229. It is clear from the summary plan description that the credit accruals in the cash balance account provided to each employee on a quarterly basis, and not the prospective (and optional) conversion to an age-65 annuity, best defines what the employees should "expect" from the PNC plan. In sum, we find that PNC's cash balance plan does not discriminate against participants because of age in violation of section 1054(b)(1)(H)(i). As the district court put it in *Eaton,*

"[t]he concept of the 'benefit of accrual rate' does not have a single, self-evident meaning, especially in the complex world of pension plan regulation." *Eaton,* 117 F.Supp.2d at 830.

**\*11** In applying the anti-discrimination provision in the context of cash balance plans, which defines the benefit in terms of the cash balance account, we are concerned with what PNC puts into an employee's account, not what the employee eventually may obtain from the plan on retirement. In evaluating the plan's inputs, PNC does not reduce contributions (in the form of either earnings or interest credits) to older employees. The circumstance that the same contribution in the form of interest credits may result in a more valuable annuity for a younger employee is not discrimination in whole or in part based on age; rather it is the completely appropriate consequence of the application of an age-neutral principle to an accumulating account of the time value of money. The fact is that rather than we rewriting the statute, it is the appellants that are doing so in order to accommodate their position. As is our obligation we are honoring the intent of Congress in reaching our result.

B. *The PNC Cash-Balance Plan Does Not Violate ERISA's Anti-Backloading Rules.*

ERISA contains three alternative anti-backloading tests, each of which specifies how much of the pension benefit must accrue each year: the 3% rule, the 133 1/3% rule, and the fractional accrual rule. 29 U.S.C. § 1054(b)(1)(A). In this case, it is undisputed that the only test that applies is the 133 1/3% rule because the PNC cash balance plan is calculated using a career pay history.[FN13] The applicable provision states:

> FN13. In their brief appellants state that the "District Court correctly held that the PNC Plan must comply with the 133 1/3 % rule of § 204(b)(1)(B)." Appellants' br. at 36.

A defined benefit plan satisfies the requirements of this paragraph of a particular plan year if under the plan the accrued benefit payable at the normal retirement age is equal to the normal retirement benefit and the annual rate at which any individual who is or could be a participant can accrue the retirement benefits payable at normal retirement age under the plan for any later plan year is not more than 133 1/3 percent of the annual rate at which he can

--- F.3d ----                                                                                    Page 10
--- F.3d ----, 2007 WL 222019 (C.A.3 (Pa.))
**(Cite as: --- F.3d ----)**

accrue benefits for any plan year beginning on or after such particular plan year and before such later plan year. For purposes of this subparagraph-
(i) any amendment to the plan which is in effect for the current year shall be treated as in effect for all other plan years....

29 U.S.C. § 1054(b)(1)(B). It is clear from this section that ERISA "requires that the value of the benefit accrued in any year may not exceed the value of a benefit accrued in any previous year by more than 33%." *Esden, 229 F.3d at 167 n. 18*.

The purpose of the anti-backloading provision is to "prevent an employer from avoiding the vesting requirements through minimal accrual of benefits in early years of employment, followed by larger benefit accruals as an employee nears retirement." *Hoover v. Cumberland, Md. Area Teamsters Pension Fund,* 756 F.2d 977, 982 n. 10 (3d Cir.1985). Congress intended by the anti-backloading provision to prohibit an employer from "providing inordinately low rates of accrual in the employee's early years of service when he is most likely to leave the firm and ... concentrating the accrual of benefits in the employee's later years of service when he is most likely to remain with the firm until retirement." *Langman v. Laub,* 328 F.3d 68, 71 (2d Cir.2003) (quoting H.R. REP. NO. 93-807, at 4688 (1974), *reprinted in* 1974 U.S.C.C.A.N. 4639, 4688).

***12** Appellants argue that the PNC cash balance plan violates section 1054(b)(1)(B) for the following reasons. Under the prior defined benefit plan, participants age 50 and older were entitled to an early retirement benefit which included an early retirement subsidy. When PNC converted its prior plan to a cash balance plan, the participants were given the option of either receiving the accrued early retirement benefits or the benefit they would have accrued under the cash balance plan, whichever benefit is greater. For those participants that chose to receive the accrued early retirement benefits, their hypothetical benefits were frozen from the date of conversion until their hypothetical account balances exceeded that amount. Then, once the cash balance exceeded the accrued early retirement benefit under the prior plan, the credits into the cash balance account would commence.

Appellants contend that the period in which the early retirement benefits remains level (often called the "wear-away") followed by a resumption of accruals once the cash balance exceeds the frozen amount violates section 1054(b)(1)(B) "[s]ince the previous

growth rate of benefits had been zero [and] this new increase will automatically be at a rate greater than 133 1/3% of the previous growth rate." Appellants' br. at 43. Appellants reach this conclusion because they believe that the court should use two separate formulas to make a determination under section 1054 for those participants that chose to retain their early retirement benefits: the prior plan formula to determine their previous accrued benefits including the early-retirement subsidy and the cash balance formula once the account exceeds the benefits under the prior plan.

Appellants cite to Treasury Regulation § 1.411(b)-1(a) for support. That regulation states:
A defined benefit plan may provide that accrued benefits for participants are determined under more than one plan formula. In such a case, the accrued benefits under all such formulas must be aggregated in order to determine whether or not the accrued benefits under the plan for participants satisfy one of the alternative methods.

26 C.F.R. § 1.411(b)-1(a).

Appellants' argument fails, however, because it cannot surmount the barrier that the regulation they cite does not apply in cases of plan amendments. Rather, it applies in cases where there are two co-existing formulas under a single plan. The governing provision is section 1.411(b)-1(b)(2)(ii)(A), 26 C.F.R. 1.411(b)-1(b)(2)(ii)(A), 29 U.S.C., § 1054(b)(1)(B)(i), the plan amendment provision under the 133 1/3% rule, which states, "any amendment to the plan which is in effect for the current year shall be treated as in effect for all other plan years." Thus, once there is an amendment to the prior plan, only the new plan formula is relevant when ascertaining if the plan satisfies the 133 1/3% test. A participant's election to retain his early retirement benefits from the old plan is not relevant to this calculation. If we treat the amended plan as in effect for all other plan years, as Congress directs us to do, appellants never would have accrued a benefit under the old plan and would have started to accrue benefits under the cash balance formula from the beginning of their employment. Accordingly, there is no violation of the anti-backloading provisions under appellants' aggregate-formula theory. Moreover, the objective of the anti-backloading provisions, to prevent a plan "from being unfairly weighted against shorter-term employees," *Langman,* 328 F.3d at 71, simply is not implicated by the PNC conversion.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.3d ----                                                                                    Page 11
--- F.3d ----, 2007 WL 222019 (C.A.3 (Pa.))
**(Cite as: --- F.3d ----)**

## C. *PNC Did Not Violate ERISA's Notice Requirements.*

**\*13** At the time of the PNC amendment, 29 U.S.C. § 1054(h)(1)(A) provided that a plan,
may not be amended so as to provide for a significant reduction in the rate of the future benefit accrual, unless, after adoption of the plan amendment and not less than 15 days before the effective date of the plan amendment, the plan administrator provides a written notice, setting forth the plan amendment and its effective date, to ... each participant in the plan.... FN14

    FN14. Congress amended ERISA in 2002 to provide that an amendment must "be written in a manner calculated to be understood by the average plan participant and shall provide sufficient information ... to allow applicable individuals to understand the effect of the plan amendment." 29 U.S.C. § 1054(h)(2).

The Treasury Regulations that existed at the time of the amendment indicated that the notice need not contain an exact quotation of the text of the amendment, but may contain "a summary of the amendment ... if the summary is written in a manner calculated to be understood by the average plan participant and contains the effective date. The summary need not explain how the individual benefit of each participant ... will be affected by the amendment." *Scott v. Admin. Comm. of the Allstate Agents Pension Plan,* 113 F.3d 1193, 1200 (11th Cir.1997) (quoting 26 C.F.R. § 1411(d)-6T (1996)).

In this case, PNC issued a 20-page brochure which summarized the changes to the plan, described the cash balance pension plan design, offered additional resources for more information, defined important words and terms, and instructed participants on how to read their personalized statements. The last page of the plan stated:
This brochure represents notification as required under section 204(h) of [ERISA, 29 U.S.C. § 1054(h) ] with respect to the amendments to the Pension Plan. The amendments to the Pension Plan effective January 1, 1999 described in this brochure may affect the future rate of benefit accruals under the Pension Plan and in some instances may reduce the rate of future Pension Plan benefit accruals.

App. at 237.

Appellants challenge one aspect of the notice. They believe that the notice was flawed because it failed to explain to the participants that the conversion would "significantly reduce[ ] the rate of future pension plan benefit accruals for each plan participant." Appellants' br. at 49. Appellants believe that PNC should have done more than tell the participants that the new plan "may affect the future rate of benefit accruals" and "in some instances may reduce the rate of future Pension Plan benefit accruals."

The district court concluded that PNC satisfied the section 1054(h) notice requirements applicable at the time of the conversion and we agree. The brochure set forth the plan amendment and the effective date. That explanation was all that was required. Contrary to appellants' argument, the Treasury Regulations at the time of the amendment were clear that PNC was not required to discuss "how the individual benefit of each participant or alternate payee will be affected by the amendment." FN15

    FN15. We express no opinion on whether the notice would satisfy current law.

## D. *Appellants Fail to State a Claim With Respect to the Insufficiency of the Summary Plan Description.*

Appellants allege in Count IV of their amended complaint that the summary plan description is insufficient under 29 U.S.C. § 1022(a), because it fails to disclose (1) that the cash balance plan reduces accrual rates based on a participant's age, and (2) that the cash balance plan does not retain the early retirement subsidy available under the old plan. 29 U.S.C. § 1022(a) provides,
**\*14** [t]he summary plan description ... shall be written in a manner calculated to be understood by the average plan participant, and shall be sufficiently accurate and comprehensive to reasonably apprise such participants and beneficiaries of their rights and obligations under the plan. A summary of any material modification in the terms of the plan and any change in the information required under subsection (b) of this section shall be written in a manner calculated to be understood by the average plan participant and shall be furnished in accordance with section 1024(b)(1) of this title. FN16

    FN16. Subsection (b) requires that the summary plan description contain certain categories of information, all of which the

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

PNC summary plan description included. 29 U.S.C. § 1022(b).

With respect to appellants' first contention set forth above, PNC's allocations to participants under the cash balance plan are not reduced on account of age, and thus it hardly would have been appropriate to say that they were. The district court dismissed appellant's second contention as it concluded that the average plan participant would recognize that the early retirement subsidy, by its omission from the summary plan description, was being terminated. This conclusion gives rise to the single factual matter in dispute in this litigation to which we made reference at the outset of this opinion. But even assuming that appellants are correct that this conclusion required factual findings the making of which was inappropriate at the motion to dismiss stage of the litigation, appellants nevertheless fail to state a claim upon which relief may be granted with respect to nondisclosure of the termination of the early retirement subsidy because there would not be a remedy available under ERISA to them even if the district court's conclusion with respect to the plan participants' perception was incorrect. Indeed, at oral argument before us appellants could not identify with specificity the appropriate relief for this violation if there was one.

In the "Prayer for Relief" section of their amended complaint, appellants seek relief under 29 U.S.C. §§ 1132(a)(2) and (a)(3). However, section 1132(a)(2) is not applicable to the summary plan description allegations in Count IV because (a)(2) applies only to liability for breach of fiduciary duty, a matter not at issue on this appeal.FN17 Under section (a)(3), participants may seek "(A) to enjoin any act or practice which violates any provision of this subchapter or the terms of the plan, or (B) to obtain other appropriate equitable relief (i) to redress such violations, or (ii) to enforce any provisions of this subchapter or the terms of the plan." While (A) does not apply as there is no act or practice to enjoin with respect to the allegedly misleading summary plan description, appellants arguably can ask for "appropriate equitable relief ... to redress [the disclosure] violations," under section 1132(a)(3)(B)(i). However, we have indicated that "substantive remedies are generally not available for violations of ERISA's reporting and disclosure requirements" except "where the plaintiff can demonstrate the presence of extraordinary circumstances." *Jordan v. Fed. Express Corp.*, 116 F.3d 1005, 1011 (3d Cir.1997) (quoting *Ackerman v. Warnaco, Inc.*, 55 F.3d 117, 124 (3d Cir.1995)).

While we "have not provided a rigid definition of 'extraordinary circumstances,' " such circumstances "generally involve acts of bad faith on the part of the employer, attempts to actively conceal a significant change in the plan, or commission of fraud." Id.

> FN17. The district court dismissed appellants' breach of fiduciary duty claims and they have not raised the dismissal of the claims as an issue on this appeal.

*15 In this case, viewing the allegations in the light most favorable to appellants, Count IV of the amended complaint is devoid of any allegation that even approaches "extraordinary circumstances" as we defined it in *Jordan*. Rather, paragraph 67 of the amended complaint states, "On information and belief, Defendants distributed to participants a Summary Plan Description ("SPD") of the Plan, as amended by the new Cash Balance Formula. The SPD, however, fails to disclose the Cash Balance Formula's failure to include the protected early retirement subsidy...." The allegation does not assert that PNC acted in bad faith, nor does it allege that PNC attempted to "actively conceal" the termination of the early retirement subsidy or that PNC committed fraud. Instead, according to the amended complaint, PNC merely "fail[ed] to disclose" the termination of the subsidy and the alleged reduction of future benefit accruals. Thus, appellants have not set forth an "extraordinary circumstance" that triggers equitable remedies under section 1132(a)(3)(B)(i). Accordingly, we will affirm the order dismissing Count IV.

## V. CONCLUSION

For the foregoing reasons, we will affirm the order of November 21, 2005 granting PNC's motion to dismiss appellants' amended complaint.

C.A.3 (Pa.),2007.
Register v. PNC Financial Services Group, Inc.
--- F.3d ----, 2007 WL 222019 (C.A.3 (Pa.))

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT "B"

Westlaw.

--- F.Supp.2d ----    Page 1
--- F.Supp.2d ----, 2007 WL 196753 (D.N.J.)
**(Cite as: --- F.Supp.2d ----)**

Briefs and Other Related Documents
Finley v. Dun & Bradstreet Corp.D.N.J.,2007.Only
the Westlaw citation is currently available.
United States District Court,D. New Jersey.
Jack **FINLEY**, Plaintiff,
v.
DUN & BRADSTREET CORP. and the Dun &
Bradstreet Corp. Retirement Account, Defendants.
**Civil Action No. 06-1838 (SRC).**

Jan. 26, 2007.

Jonathan I. Nirenberg, Esq., Resnick Nirenberg &
Siegler, Roseland, NJ, for Plaintiff Jack Finley.
Christopher H. Mills, Esq., Fisher & Phillips, LLP,
Somerset, NJ, Patrick W. Shea, Esq., Christine
Button, Esq., Paul, Hastings, Janofsky & Walker
LLP, Stamford, CT, for Defendants Dun &
Bradstreet Corp. and the Dun & Bradstreet Corp.
Retirement Account.

**OPINION**

CHESLER, U.S.D.J.
**\*1** This matter comes before the Court on the motion
to dismiss for failure to state a claim upon which
relief may be granted, pursuant to FED. R. CIV. P.
12(b)(6), by Defendants Dun & Bradstreet Corp. and
the Dun & Bradstreet Corp. Retirement Account
(collectively, "Defendants" or "D & B"). For the
reasons set forth below, the motion will be
**GRANTED IN PART** and **DENIED IN PART.**

**BACKGROUND**

This case arises out of disputes over a retirement plan
for Dun & Bradstreet employees. According to the
Amended Complaint, Plaintiff Jack Finley ("Finley")
has been employed by D & B since 1978. Prior to
January 1, 1997, D & B provided Finley with a
defined benefit retirement plan (referred to as the
"Traditional Plan Terms"). As of January 1, 1997, D
& B amended the Traditional Plan Terms to convert
the plan to a **cash balance** plan (referred to as the
"**Cash Balance** Terms" or the "Plan"). On September
7, 2005, Finley filed a Complaint in the United States
District Court for the Northern District of Illinois,
alleging various ways that, in amending the
Traditional Plan Terms, D & B violated ERISA. On

March 30, 2006, on motion, that court transferred the
case to this district. An Amended Complaint was
filed on June 5, 2006. Defendants have filed the
instant motion to dismiss the Amended Complaint for
failure to state a claim.

**ANALYSIS**

**I. Legal Standards**

A. Rule 12(b)(6) motion to dismiss

On a motion to dismiss for failure to state a claim,
pursuant to FED. R. CIV. P. 12(b)(6), the court must
accept as true all allegations in the complaint and all
reasonable inferences that can be drawn therefrom,
and view them in the light most favorable to the non-
moving party. See Oshiver v. Levin, Fishbein, Sedran
& Berman, 38 F.3d 1380, 1384-85 (3d Cir.1994). A
complaint should be dismissed only if the alleged
facts, taken as true, fail to state a claim. See In re
Warfarin Sodium, 214 F.3d 395, 397-98 (3d
Cir.2000). The question is whether the claimant can
prove any set of facts consistent with his or her
allegations that will entitle him or her to relief, not
whether that person will ultimately prevail. See
Hishon v. King & Spalding, 467 U.S. 69, 73 (1984).
"[A] complaint should not be dismissed for failure to
state a claim unless it appears beyond doubt that the
plaintiff can prove no set of facts in support of his
claim which would entitle him to relief." Conley v.
Gibson, 355 U.S. 41, 45-46 (1957).

While a court will accept well-pled allegations as true
for the purposes of the motion, it will not accept
unsupported conclusions, unwarranted inferences, or
sweeping legal conclusions cast in the form of factual
allegations. See Morse v. Lower Merion School
District, 132 F.3d 902, 906 n. 8 (3d Cir.1997). All
reasonable inferences, however, must be drawn in the
plaintiff's favor. See Sturm v. Clark, 835 F.2d 1009,
1011 (3d Cir.1987). Moreover, the claimant must set
forth sufficient information to outline the elements of
his or her claims or to permit inferences to be drawn
that the elements exist. See FED. R. CIV. P. 8(a)(2);
Conley, 355 U.S. at 45-46. "The defendant bears the
burden of showing that no claim has been presented."
Hedges v. United States, 404 F.3d 744, 750 (3d

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.Supp.2d ----                                                              Page 2
--- F.Supp.2d ----, 2007 WL 196753 (D.N.J.)
**(Cite as: --- F.Supp.2d ----)**

Cir.2005).

**\*2** The Supreme Court has characterized dismissal with prejudice as a "harsh remedy." New York v. Hill, 528 U.S. 110, 118 (2000). Dismissal of a count in a complaint with prejudice is appropriate if amendment would be inequitable or futile. "When a plaintiff does not seek leave to amend a deficient complaint after a defendant moves to dismiss it, the court must inform the plaintiff that he has leave to amend within a set period of time, unless amendment would be inequitable or futile." Grayson v. Mayview State Hosp., 293 F.3d 103, 108 (3d Cir.2002).

**II. Defendants' Rule 12(b)(6) motion**

A. *Count One: violation of § 1054(b)(1)(H)*

In Count One of the Complaint, Plaintiffs allege that the Plan violates ERISA § 204(b)(1)(H) (29 U.S.C. § 1054(b)(1)(H)) by reducing benefit accrual by reason of age. ERISA pension plan benefit accrual requirements are set forth in 29 U.S.C. § 1054. Plaintiffs invoke provision (i) of subsection (b)(1)(H):
(i) Notwithstanding the preceding subparagraphs, a defined benefit plan shall be treated as not satisfying the requirements of this paragraph if, under the plan, an employee's benefit accrual is ceased, or the rate of an employee's benefit accrual is reduced, because of the attainment of any age.

29 U.S.C. § 1054(b)(1)(H).

Plaintiff alleges that, under the **Cash Balance** Terms of the Plan, younger workers accrue greater benefits than similarly situated older workers:
Under the [ ] Plan, an older worker with the same rate of pay and years of service, receiving the same dollar amount of contribution to her **cash balance** account, buys an increasingly smaller annuity with that money because the closer the older worker gets to retirement age, the less time the money contributed has to earn annual interest credits under the Plan.

(Pl.'s Opp. Br. 23.) Thus, when a younger worker and a similarly-situated older worker receive equal contributions to the Plan, the younger worker ends up with a larger benefit at retirement age because time and the principle of compound interest have caused the contribution to grow more. The question for this Court is whether this phenomenon constitutes a reduction in the "rate of an employee's benefit accrual," within the meaning of the statute.

While the Third Circuit has not addressed this matter of statutory interpretation, the Seventh Circuit recently ruled on it in Cooper v. IBM Personal Pension Plan, 457 F.3d 636 (7th Cir.2006), *cert. denied,* 75 U.S.L.W. 3368 (2007), holding that this phenomenon does not constitute a reduction in the "rate of an employee's benefit accrual," nor is it age discrimination. *Cooper,* like this case, involved an age discrimination challenge to a **cash balance,** defined benefit pension plan under § 1054(b)(1)(H). In an opinion that provides a strikingly clear, concise, and persuasive treatment of the issue, the Seventh Circuit made several important points.

First, the Court observed that the plaintiffs' challenge confused payments into the retirement account with payments out, an approach unsupported by the language of the statute. *Id.* at 639. The Court explained that the term "benefit accrual," used in 1054(b)(1)(H) but not defined in the statute, must be distinguished from "accrued benefit," which ERISA does define. *Id.* The term "benefit accrual" refers to what the employer puts into the account, while the term "accrued benefit" refers to what the employee takes out of it. *Id.*

**\*3** This distinction alone undermines Plaintiff's claim in Count One of this case: § 1054(b)(1)(H) prohibits reduction in benefit accrual which, following *Cooper,* is the amount that the employer puts in. It does not apply to accrued benefits that an employee takes out. Because Plaintiff complains in Count One that age has a differential effect on what an employee takes out-but not what the employer puts in-he has failed to state a valid claim for violation of § 1054(b)(1)(H).

Second, the Court observed that the phenomenon of which the plaintiffs complained was due to the time value of money, rather than age discrimination, and that "[t]reating the time value of money as a form of discrimination is not sensible." *Id.* at 639. The problems in this view are highlighted when one considers Plaintiff's recommended remedy: "increasing pay credits with advancing age enough to wipe out the difference in the annuity yields." (Pl.'s Opp. Br. 24.) The idea that older workers should be compensated for the injury of having fewer years until retirement by giving them greater benefits than younger workers-thus discriminating against younger people-is not sensible, and does no more than turn an age-neutral plan into one that affirmatively discriminates.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.Supp.2d ----                                                                                     Page 3
--- F.Supp.2d ----, 2007 WL 196753 (D.N.J.)
**(Cite as: --- F.Supp.2d ----)**

Third, the Seventh Circuit cautioned that the plaintiff's argument ran afoul of the principles established by the Supreme Court in *Hazen Paper Co. v. Biggins,* 507 U.S. 604, 611 (1993). *Cooper,* 457 F.3d at 639. "Here, as so often, it is essential to separate age *discrimination* from other characteristics that may be correlated with age." *Id.* at 642. Again, this is right on point in the instant case: Plaintiff has failed to distinguish age discrimination from a characteristic correlated with age, the time value of money. The principle of compound interest and the passage of time produce the age differences that Plaintiff complains of, but these are things that are correlated with age; they are not effects of age discrimination.

Plaintiff asks this Court to reject *Cooper* and, instead, follow district court decisions such as the one reversed by the Seventh Circuit in *Cooper* or *Richards v. FleetBoston Fin. Corp .,* 427 F.Supp.2d 150 (D.Conn.2006). [FN1] Taking the position opposite to the Seventh Circuit in *Cooper,* the *Richards* court held that "rate of benefit accrual," as used in § 1054(b)(1)(H), means exactly the same thing as "rate of accrued benefit," as defined elsewhere in ERISA. [FN2] *Id.* at 164. This position is problematic on several grounds. First and most obviously, ERISA does not define the phrase "*rate of* accrued benefit;" only "accrued benefit" is defined by 29 U.S.C. § 1002(23).

> FN1. A number of district courts in the Second Circuit have addressed the question of the meaning of "rate of benefit accrual," and the decisions are split. *See In re Citigroup Pension Plan ERISA Litig.,* 2006 U.S. Dist. LEXIS 89565, *28 (S.D.N .Y.2006).

> FN2. The basis for the court's equation is not articulated: it states without explanation that the phrases are "grammatically" equivalent. *Id.* As will be discussed, a noun and a past participle of a verb are not grammatically equivalent.

Second, and more importantly, close inspection of the *Richards* court's equation reveals that it made a mistake identical to the one caught by the Seventh Circuit in *Cooper.* "Accrual" and "accrued" are not equivalents: "accrual" is "the action or process of accruing," while "accrued" is the past participle of the verb "accrue," which means "to come by way of increase or addition: arise as a growth or result."

Webster's Third New International Dictionary 13 (1993). Thus, a benefit which is accrued is the result of a process of increase that has already occurred, while the accrual of a benefit occurs in the present during the process of accruing. Finding "benefit accrual" to be the same as "accrued benefit" is tantamount to equating a past process with the present result of it. It violates both language and logic. As the Seventh Circuit pointed out, it is a mistake to confuse the two; they are different. *Cooper,* 457 F.3d at 639.

**\*4** This Court agrees with the *Richards* court on the "presumption that Congress 'says in a statute what it means and means in a statute what it says there.' " *Richards,* 427 F.Supp.2d at 165-66 (quoting *BedRoc Ltd., LLC v. United States,* 541 U.S. 176, 183 (2004)). Yet following that presumption leads this Court to a very different conclusion: Congress used different phrases in 29 U.S.C. § 1002(23) and § 1054(b)(1)(H), rather than the same phrase, and thus "benefit accrual" and "accrued benefit" should be understood to mean different things.

Plaintiff points to the decisions of district courts which state that the "plain meaning" of "rate of benefit accrual" is the payment out at the end, not the rate of payment in. *See, e.g., In re J.P. Morgan Chase Cash Balance Litig.,* 2006 U.S. Dist. LEXIS 79145, *19 (S.D.N.Y.2006) ("plain meaning"); *In re Citigroup Pension Plan ERISA Litig.,* 2006 U.S. Dist. LEXIS 89565, *48 (S.D.N .Y.2006) ("simple fact"). The fact that district courts are split demonstrates that the meaning is not plain. *See Eaton v. Onan Corp.,* 117 F.Supp.2d 812, 830 (D.Ind.2000) ("The concept of the 'benefit accrual rate' does not have a single, self-evident meaning, especially in the complex world of pension plan regulation").

Moreover, the *Morgan* court based its position on yet another mistaken analysis of language. The court quoted this definition of "accrual" from the 1999 edition of Merriam-Webster's Collegiate Dictionary: "To accumulate or be added periodically." *Morgan,* 2006 U.S. Dist. LEXIS 79145 at * 19. Yet it is obvious that a mistake has been made, as this is a definition of the verb "to accrue," not the noun "accrual." According to Merriam-Webster's Online Dictionary, [FN3] the definition of "accrual" is: "the action or process of accruing." Thus, while claiming to base its construction on the true dictionary definition of "accrual," the *Morgan* court took the wrong word from the dictionary.

--- F.Supp.2d ----                                                                          Page 4
--- F.Supp.2d ----, 2007 WL 196753 (D.N.J.)
**(Cite as: --- F.Supp.2d ----)**

FN3.              http://www.m-w.com/cgi-
bin/dictionary/accrual (last visited January
26, 2007).

As suggested above, using the correct dictionary
definition leads to an interpretation different from
that of the *Morgan* court. A process is not its result.
Accrual is the process of accumulating, not the end
result of accumulation. This is consistent with the
Seventh Circuit's position that "rate of benefit
accrual" refers to the process of putting in, not the
result taken out.

Furthermore, this Court concurs with the reasoning of
its sister court in *Register v. PNC Fin. Servs. Group,
Inc.,* 2005 U.S. Dist. LEXIS 29678, *22-23
(E.D.Pa.2005):
**Cash balance** plans accrue benefits differently than
traditional defined benefit plans. Under a traditional
defined benefit plan, the benefits are defined in terms
of the age 65 annuity. Therefore, it follows logically
that the rate of benefit accrual is the change in the
accrued benefit. **Cash balance** plans are not defined
in terms of an age 65 annuity, rather they are defined
in terms of an account balance that grows with pay
credits and interest. Therefore, it follows logically
that the rate of benefit accrual is determined by the
change in the account balance.

**\*5** Again, this is consistent with the Seventh Circuit's
understanding of the statutory language.

In Count One, Plaintiff complains of age
discrimination in benefits taken out of the Plan. In
view of this Court's decision that the language of 29
U.S.C. § 1054(b)(1)(H) applies only to amounts paid
in, Plaintiffs have failed to state a valid claim for a
violation of that provision. This Court perceives no
way for Plaintiff to amend Count One so that it could
withstand a future motion to dismiss. As to Count
One, Defendants' motion to dismiss for failure to
state a claim will be granted, and Count One will be
dismissed with prejudice.

In view of this dismissal, this Court need not address
Defendants' argument that Count One is barred by
New Jersey's two-year statute of limitations.

*B. Arguments based on time: statutes of limitation
and laches*

Defendants contend that Counts Two, Three, and
Four are barred by New Jersey's six-year statute of

limitations for tortious injury. Plaintiff agrees that a
six-year statute of limitations applies to these claims,
but disagrees that the claims accrued in 1997. The
parties agree as well that the question of the trigger
for the running of the limitations period is governed
by *Romero v. Allstate Corp.,* 404 F.3d 212 (3d
Cir.2005).

In *Romero,* the Third Circuit held:
The date of accrual of [ ] ERISA non-fiduciary duty
claims asserted is determined as a matter of federal
common law ... [W]hen an ERISA plan is amended
but the fact that the amendment actually affects a
particular employee or group of employees cannot be
known until some later event, the cause of action of
the employee will not accrue until such time as the
employee knew or should have known that the
amendment has brought about a clear repudiation of
certain rights that the employee believed he or she
had under the plan.

*Id.* at 221, 223. Thus, a claim accrues on the date of a
clear repudiation of the right to certain benefits. As to
what constitutes a clear repudiation, *Romero* provides
guidance through its statement of the general rule:
"The rule that has developed in the [ ] ERISA context
is that an ERISA non-fiduciary duty claim will
accrue after a claim for benefits due under an ERISA
plan has been made and formally denied." *Id.* at 222.
See also *Henglein v. Colt Indus.,* 260 F.3d 201, 214
(3d Cir.2001) (accrual at time of "outright
repudiation" of benefits). Moreover, to serve as a
basis for dismissal as time-barred, the clear
repudiation must appear on the face of the Complaint.
*Romero,* 404 F.3d at 224.

No clear repudiation of benefits appears on the face
of the Amended Complaint. Nor do Defendants
contend that one does; rather, they base their
argument on the contents of documents outside the
Amended Complaint. (Defs.' Br. 8-9.) This Court
cannot conclude from the Amended Complaint that
"it appears beyond doubt that the plaintiff can prove
no set of facts in support of his claim which would
entitle him to relief." *Conley,* 355 U.S. at 45-46. As
to their argument that Counts Two, Three, and Four
are barred by the statute of limitations, Defendants'
motion to dismiss for failure to state a claim will be
denied.

**\*6** Defendants contend as well that Count Five,
alleging breach of fiduciary duty, is barred by
ERISA's six-year limitation of action:
No action may be commenced under this title with
respect to a fiduciary's breach of any responsibility,

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.Supp.2d ----                                                              Page 5
--- F.Supp.2d ----, 2007 WL 196753 (D.N.J.)
**(Cite as: --- F.Supp.2d ----)**

duty, or obligation under this part ... after the earlier of (1) six years after (A) the date of the last action which constituted a part of the breach or violation, or (B) in the case of an omission, the latest date on which the fiduciary could have cured the breach or violation ...

29 U.S.C. § 1113. Plaintiff concurs that this provision sets forth the applicable limitations period, but contends that the "date of last action" provision has operated to prevent the running of the six-year period. This has merit. The Amended Complaint alleges that "Dun & Bradstreet officials made the misrepresentations and omissions to Plaintiffs and the Class beginning in October 1997 and have continued to make them to the present day." (Am.Compl.¶ 45.) Because, on a Rule 12(b)(6) motion, the Court accepts as true all allegations in the Complaint, the date of the last action which constituted a part of the violation is contemporaneous with the filing of the Amended Complaint, and the six-year limitations period cannot have expired. As to the argument that Count Five is barred by the statute of limitations, Defendants' motion to dismiss for failure to state a claim will be denied.

Defendants also argue that all of the claims are barred by the doctrine of laches. Given that this Court has found that it cannot dismiss the claims as barred by the applicable statutes of limitation, it would be extraordinary to find inexcusable delay that justifies the invocation of laches. *See* Mantilla v. United States, 302 F.3d 182, 186 (3d Cir.2002) ("Because [the] claim survives the statute of limitations, the equitable defense of laches is presumptively inapplicable"); United States v. One Toshiba Color TV, 213 F.3d 147, 158 (3d Cir.2000) ("if a suit is brought within the statutory period, laches would not be available.") Furthermore, inexcusable delay would have to be apparent from the face of the Amended Complaint, which this Court does not find. As to the argument that Counts Two through Five are barred by the doctrine of laches, Defendants' motion to dismiss for failure to state a claim will be denied.

### C. Count Two: violation of § 1054(b)(1)(B)

In Count Two, Plaintiff alleges the existence of a "wear-away effect," occurring when a participant has years in which he accrues no benefits, followed by years in which he begins again to accrue benefits. Plaintiff contends that this violates 29 U.S.C. § 1054(b)(1)(B) ("the 133 1/3 % rule"), which states:
A defined benefit plan satisfies the requirements of

this paragraph of a particular plan year if under the plan the accrued benefit payable at the normal retirement age is equal to the normal retirement benefit and the annual rate at which any individual who is or could be a participant can accrue the retirement benefits payable at normal retirement age under the plan for any later plan year is not more than 133 1/3 percent of the annual rate at which he can accrue benefits for any plan year beginning on or after such particular plan year and before such later plan year.

*7 The Amended Complaint explains the wear-away effect in ¶¶ 29-33. In brief, since the change from the Traditional Plan Terms to the **Cash Balance** Terms, "Finley has not earned any new retirement benefits in the nine years he has worked under the **Cash Balance** Terms. This phenomenon is known as the 'wear-away effect.' " (Am.Compl.¶ 33.)

On its face, the Amended Complaint fails to state a claim for violation of the 133 1/3 % rule. Although Count Two, in ¶ 39, makes the general statement that "the wear away effect causes plan participants, including Finley, to face years where they accrue zero benefits followed by years where they accrue actual benefits," the Amended Complaint makes no supporting factual allegations. The assertion in ¶ 39 is only a conclusory allegation and is insufficient to state a valid claim for relief. For factual support, all that is alleged in ¶ 33 is that Finley has had years of accruing zero benefits. There is no assertion that Finley had a subsequent year of receiving a non-zero benefit. The Amended Complaint thus makes no particularized allegation of a violation of the 133 1/3 % rule. Nor does the Amended Complaint make clear that a violation of the 133 1/3 % rule-through a year of non-zero benefit accruals-is imminent. "To state a claim, the complaint must allege *facts* supporting a finding of [injury]." County Concrete Corp. v. Twp. of Roxbury, 442 F.3d 159, 171 (3d Cir.2006). The Amended Complaint fails to allege sufficient facts to support a finding of a violation of the 133 1/3 % rule. Even without more, this reason alone justifies granting Defendants' motion to dismiss Count Two, and dismissing Count Two without prejudice.

Further analysis of Count Two, however, reveals a defect that cannot be remedied by repleading: even if Plaintiff alleged that his years of zero benefit accrual were followed by nonzero benefit accrual, the wear-away effect would not and could not violate the 133 1/3 % rule. Plaintiff's concept of the wear-away effect is undermined specifically by § 1054(b)(1)(B)(i),

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.Supp.2d ----                                                          Page 6
--- F.Supp.2d ----, 2007 WL 196753 (D.N.J.)
**(Cite as: --- F.Supp.2d ----)**

which provides that "any amendment to the plan which is in effect for the current year shall be treated as in effect for all other plan years." In defining the wear-away effect, Plaintiff applies the 133 1/3 % rule to a hybrid model that does not comport with this provision. Section 1054(b)(1)(B)(i) requires that, in applying the 133 1/3 % rule, one must look only at the provisions in force during the current year and apply them as if they had been in effect for all other plan years. This precludes the use of hybrid models in which the benefit accruals are calculated by reference to calculations made under a previous plan. To show that the accruals under the **Cash Balance** Terms violate § 1054(b)(1)(B), Plaintiff must calculate the entire accrual history as if the **Cash Balance** Terms had been in effect for every year, and thus that the Traditional Plan Terms had never been in effect, as required by § 1054(b)(1)(B)(i).

**\*8** In alleging the wear-away effect, Plaintiffs have overlooked this. In ¶ 33, Plaintiff defines the wear-away effect as involving the benefits accrued under the **Cash Balance** Terms. In ¶ 32, Plaintiff alleges that the accrued benefit under the **Cash Balance** Terms is calculated using a "greater of" formula, which "uses the benefits previously accrued under the Traditional Plan Terms to calculate the new benefit accruals under the **Cash Balance** Terms." This definition expressly makes use of a hybrid model: it calculates benefits using a mix of the old plan and the new plan. Such a calculation cannot violate the 133 1/3 % rule, since § 1054(b)(1)(B)(i) requires that the rule is applied to an annual accrual under the **Cash Balance** Plan *as if* the **Cash Balance** Plan had been in effect for all years and there had never been any Traditional Plan Terms. Thus, any effect on benefits due to the interaction between the Traditional Plan Terms and the **Cash Balance** Terms cannot show a violation of 29 U.S.C. § 1054(b)(1)(B) by the **Cash Balance** Plan.[FN4] Count Two thus fails to state a valid claim for relief.

> FN4. *See also Allen v. Honeywell Ret. Earnings Plan,* 382 F.Supp.2d 1139, 1160 (D.Ariz.2005) ("in determining whether a new benefit formula violates the 133 1/3 percent rule, one does not compare the new formula with the old formula; rather, the backloading question must be answered by considering the new formula on a stand-alone basis"); *Richards,* 427 F.Supp.2d at 171 ("If the Amended Plan is treated as having been in effect for all plan years, employees such as [plaintiff] would never

have accrued a benefit under the Traditional Plan, and would have started accruing benefits under the **cash balance** formula from the start of their employment"); *Richards v. Fleetboston Fin. Corp.,* 2006 U.S. Dist. LEXIS 55809 (D.Conn.2006) ("if the court assumes that the Amended Plan has always been in effect, no employees would be subject to the wear-away effect, because all employees would have started their employment when the **cash balance** plan was already in place").

Given the analysis stated above, amendment is futile. As to Count Two, Defendants' motion to dismiss for failure to state a claim will be granted, and Count Two will be dismissed with prejudice.

### D. *Counts Three and Four: failure to allege extraordinary circumstances*

Counts Three and Four of the Amended Complaint allege violations of ERISA's notice requirements. In Count III, Plaintiff claims that D & B failed to provide participants with advance notice of the Plan amendment as required by ERISA § 204(h). In Count IV, Plaintiff contends that D & B failed to provide participants with a summary plan description satisfying ERISA § 102. Defendants argue that Counts Three and Four fail to state a valid claim for relief because they allege only ordinary notice defects rather than the extraordinary circumstances required to give rise to a substantive remedy.

The Third Circuit holds that "the general rule [is] that plan amendments are valid in spite of inadequate notice." *Lettrich v. J.C. Penney Co.,* 213 F.3d 765, 771 (3d Cir.2000). Moreover, under ordinary circumstances, the remedy for violations of notice requirements is very limited: "We have repeatedly held that under ordinary circumstances defects in fulfilling the reporting and disclosure requirements of ERISA do not give rise to a substantive remedy other than that provided for in section 502(a)(1)(A) of that Act." *Ackerman v. Warnaco, Inc.,* 55 F.3d 117, 124 (3d Cir.1995). It is only under extraordinary circumstances that other substantive remedies may be available:
We have, however, recognized the possibility of a remedy where the plaintiff can demonstrate the presence of 'extraordinary circumstances.' Such circumstances include situations where the employer has acted in bad faith, or has actively concealed a change in the benefit plan, and the covered

--- F.Supp.2d ----                                                                      Page 7
--- F.Supp.2d ----, 2007 WL 196753 (D.N.J.)
**(Cite as: --- F.Supp.2d ----)**

employees have been substantively harmed by virtue of the employer's actions.

**\*9** *Id.* (citation omitted). *See also Hooven v. Exxon Mobil Corp ., 465 F.3d 566, 571 (3d Cir.2006)* (following *Ackerman).*

Count Three contains no allegations of extraordinary circumstances, nor does it state a claim under ERISA § 502. Under *Ackerman,* it fails to state a valid claim for relief. As to Count Three, Defendants' motion to dismiss will be granted, and Count Three will be dismissed without prejudice.

Count Four, however, does allege that "Dun & Bradstreet intentionally, recklessly, or negligently took steps that actively concealed material elements of the **Cash Balance** Terms." (Am.Compl.¶ 43.) This vague assertion is a conclusory allegation, and Plaintiff has pled no facts to support it. The Complaint makes no factual allegations as a foundation for the claim of active concealment. Because Plaintiff has not pled facts which could support a finding of active concealment, Plaintiff has failed to *state a valid claim. County Concrete, 442 F.3d at 171.* As to Count Four, Defendants' motion to dismiss will be granted, and Count Four will be dismissed without prejudice.

In view of this dismissal, this Court need not reach Defendants' arguments that Counts Three and Four should be dismissed because D & B provided legally adequate notice and disclosure.

E. *Count Five: the claim for breach of fiduciary duty*

In Count Five, Plaintiff alleges that D & B breached its fiduciary duties under ERISA § 404 by misleading participants and making material misrepresentations and omissions in its communications with them. In support of their motion to dismiss, Defendants contend that Plaintiff has failed to state a valid claim because he has not alleged affirmative misrepresentation. Even if this were correct-which it is not, since this Court is not persuaded that sending out misleading documents could not be affirmative misrepresentation-it is of no significance, because omissions may be actionable as well:
In our own efforts to develop a federal common law of ERISA rights, we have held that administrators generally have a fiduciary duty not to misinform employees through material misrepresentations and incomplete, inconsistent or contradictory disclosures.

A misleading statement or omission by a fiduciary is actionable if there is a substantial likelihood that it would mislead a reasonable employee in making an adequately informed retirement decision.

*Harte v. Bethlehem Steel Corp., 214 F.3d 446, 452 (3d Cir.2000)* (citation omitted). Thus, the key issue is whether there is a substantial likelihood that a communication would mislead a reasonable employee in making an adequately informed retirement decision-not whether it is categorized as an affirmative statement or an omission.[FN5]

> [FN5.] Moreover, the Supreme Court has made clear that fiduciary duties may not be evaded by this type of approach: "any distinction between omissions and misrepresentations is illusory in the context of [one] who has a fiduciary duty ..." *SEC v. Zandford, 535 U.S. 813, 823 (2002).*

Count Five alleges that D & B breached its fiduciary duties under ERISA by materially misleading plan participants about their retirement plan. Third Circuit law does not require more to state a valid claim. As to Count Five, Defendants' motion to dismiss will be denied.

### *CONCLUSION*

**\*10** For the reasons stated above, Defendants' motion to dismiss for failure to state a claim upon which relief may be granted, pursuant to *FED. R. CIV. P. 12(b)(6),* is granted in part and denied in part. As to Counts One and Two, Defendants' motion to dismiss for failure to state a claim is **GRANTED,** and Counts One and Two will be dismissed with prejudice. As to Counts Three and Four, Defendants' motion to dismiss for failure to state a claim is **GRANTED,** and Counts Three and Four will be dismissed without prejudice. As to Count Five, Defendants' motion to dismiss for failure to state a claim is **DENIED.** As to Counts Three and Four, Plaintiff is granted leave to amend the Amended Complaint within 45 days of the filing of this Opinion.

D.N.J.,2007.
Finley v. Dun & Bradstreet Corp.
--- F.Supp.2d ----, 2007 WL 196753 (D.N.J.)

Briefs and Other Related Documents (Back to top)

• 2:06cv01838 (Docket) (Apr. 20, 2006)

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.Supp.2d ----
--- F.Supp.2d ----, 2007 WL 196753 (D.N.J.)
**(Cite as: --- F.Supp.2d ----)**


END OF DOCUMENT

©  2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.